IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **NICHOLAS STRICKLAND, *et al.*,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Case Number:  1:06-CV-00682-TFM** |
| | * | |
| **CHAMPION ENTERPRISES, INC., *et al.*,** | * | |
| | * | |
| **Defendants.** | * | |

### SECOND SUPPLEMENT TO MOTION TO DISMISS
### OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, Champion Enterprises, Inc. (hereinafter referred to as "CEI"), by and through counsel of record, and provides the following as its second supplement to the Motion to Dismiss, or in the alternative, Motion for Summary Judgment (Doc. No. 5) (hereinafter referred to as the "Original Motion"):

1.      In accordance with the Order on Motion entered the 9th day of January, 2007 (Doc. No. 33), the defendant was given until the 9th day of February, 2007 to conduct limited discovery.  On the 8th day of February, 2007, the deposition of plaintiff's accounting expert, Edward Sauls (hereinafter referred to as "Sauls") was taken.

2.      On the 9th day of February, 2007, CEI filed a Motion for Briefing Schedule. (Doc. No. 37).  That same date, an Order was entered granting the motion and setting forth deadlines.  (Doc. No. 38).

3.      As additional support for the motion, CEI is submitting herewith excerpts from the deposition of Sauls which are attached hereto as Exhibit "A" and made a part hereof by reference (hereinafter referred to as the "Sauls Depo.").

1

## SUPPLEMENTAL NARRATIVE SUMMARY OF UNDISPUTED FACTS[1]

CEI propounded the following interrogatory to Plaintiffs:

"2.    Please "identify" everything you claim supports your contention that CEI "is the parent corporation and/or alter ego of Defendant Champion Home Builders, Co." as alleged in the Complaint."

(Ex. C to CEI's Supplement to Motion to Dismiss or, in the Alternative, Motion for Summary Judgment and Motion to Seal (Doc. No. 18) (hereinafter referred to as the "First Supplement").

In response, Plaintiffs identified the following items of evidence in support of their alter ego theory:

"A)    All documents produced by defendant in this matter.  Bate stamped Brown R00001-R00944; Allen A00001-A00947; Ford 00001-00947; Allen J 00001-J00944; Deese 00001-00944; and Strickland 00001-00944.
B)    All documents that are exhibits to the deposition of David Goltz taken in this matter.
C)    All 10-K's and Annual Statements for Champion Enterprises for the last ten years."

(Ex. C to First Supplement).

The evidence referenced in "A" above consists of documents produced by Defendants in this case and other cases.  The evidence referenced in "B" above was attached to the deposition of David N. Goltz, CEI's corporate representative.  At his deposition, Goltz testified that CEI does not control the day-to-day operations of its subsidiaries.  (Ex. A. to First Supplement, p. 63, 14-25; p. 64, 1-24; p. 67, 12-18; p. 73, 20-25; p. 74, 1-16).

In support of Plaintiffs' Response to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment[2] (hereinafter referred to as "Plaintiffs' Response") (Doc. No. 21), Plaintiffs submitted the affidavit a certified public accountant, Edward W.

---

1 The facts set forth herein supplement the facts previously discussed in CEI's Original Motion and the First Supplement.
2 The Original Motion was entitled Motion to Dismiss or, in the alternative, Motion for Summary Judgment (Doc. No. 5) and was only filed by CEI.

Sauls (hereinafter referred to as the "Sauls Aff."), as additional evidentiary support for their alter ego theory. (Ex. I to Plaintiffs' Response).  In his affidavit, Sauls testified to various issues concerning control, which is the first prong of the alter ego test.  Sauls completely and totally disregarded in his opinions and calculations financial information related to Champion Home Builders Co. (hereinafter referred to as "CHB") as he disregarded the "CHB" column in the 10-Ks. (Sauls Depo. pp. 39, 13-23, 40, 1-23, 45, 19-23, 46, 1-4, 17-23, 47, 1-23, 48, 1-23, 49, 1-15).

CEI's 2005 Annual Report & Form 10-K, reveals that Defendants and their subsidiaries had revenues of $1,272,590,000.00 billion dollars and net income of $37,805,000.00 million dollars. (Ex. O to Plaintiffs' Response, p. 17).  In 2005, Defendants and their subsidiaries sold 23,960 homes. (Ex. O to Plaintiffs' Response, p.2).  CHB – the defendant that built the Plaintiffs' home – is by far the most successful subsidiary of CEI.  The most recent consolidated balance sheets of CHB reveal that is had more than one hundred twenty-nine million dollars ($129,000,000) in 2003 in cash and cash equivalents and one hundred twenty million ($120,000,000.00) in 2004 in cash and cash equivalents. (Ex. M to Plaintiffs' Response, p.F-32; Ex. N to Plaintiffs' Response, p. F-33).  These numbers were overlooked by Plaintiffs' expert witness, Sauls, who did not address the financial success of CHB in his affidavit and testimony as he disregarded the "CHB" column in the 10-Ks.  (Sauls Depo. pp. 71-74, 123-125, 129).

## SUPPLEMENTAL ARGUMENT

This court should apply the summary judgment standard enunciated in *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428 (11th Cir. 1991).[3] There, the court stated:

> The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponents claim,' *Celotex*, 477 U.S. 323, in order to discharge this 'initial responsibility.' Instead, the moving party simply may show[] '—that is, point[] out to the district court – that there is an absence of evidence to support the nonmoving party's case.' *Id.* at 324. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 331. (Brennan, J., dissenting). If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial. Fed.R.Civ.P. 56(e); *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the nonmoving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.

*Four Parcels of Real Property*, 941 F.2d at 1438.

To defeat CEI's motion for summary judgment, Plaintiffs have the burden of proving each of the three prongs of the alter ego theory:

(1) The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;

(2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is

---

3 Because the parties submitted evidence in connection with CEI's motion to dismiss, this court should convert the motion to a motion for summary judgment under Rule 56, and all pleading standards under Rule 56 should apply.

necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed.

(3) The misuse of this control must proximately cause the harm or unjust loss complained of.

*Messick v. Mooring*, 514 So. 2d 892, 894-95 (Ala. 1978).

Because the Plaintiffs have the burden of proof at trial, CEI may move for summary judgment with or without supporting evidence. Fed.R.Civ.P. 56(c); *Four Parcels of Real Property*, 941 F.2d at 1438. To defeat summary judgment, the Plaintiffs may not rest on the pleadings; instead, they must introduce admissible evidence showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Here, even if the Plaintiffs could support the first prong of the alter ego theory (a point CEI does not concede), Plaintiffs cannot carry their burden because they lack sufficient evidence supporting the second and third prongs of the alter ego theory.

### A. Plaintiffs Cannot Prove Misuse of Control

Under the second prong of the alter ego theory, Plaintiffs must prove misuse of control. In Plaintiffs' Response, Plaintiffs devote 20 pages of argument to the first prong of the alter ego theory – control. However, Plaintiffs devote less than 2 pages to the second prong of the test – misuse of control. (Plaintiff's Response, pp. 22-3). Plaintiffs do not cite to any portion of the record in support of their misuse of control argument. There is no evidence in the record that the home in question is defective. There is no evidence in the record that CEI caused CHB to build the home in question, as Plaintiffs allege in their complaint. In fact, the testimony of Goltz establishes that CEI does not control the day-to-day operations of CHB. (Ex. A. to First Supplement, p. 63, 14-25; p. 64, 1-24; p. 67, 12-18; p. 73, 20-25; p. 74, 1-16). There also is no evidence in the record that Plaintiffs are damaged or that proximate harm resulted from misuse of control.

Importantly, CEI asked Plaintiffs through an interrogatory to "'identify' everything you claim supports your contention that CEI 'is the parent corporation and/or alter ego of Defendant Champion Home Builders, Co.' as alleged in the Complaint." In response, Plaintiffs failed to cite to a single shred of evidence that showed misuse of control, or even any damage. (Ex. C to First Supplement, Response to No. 2). Plaintiffs simply rely on conclusory statements, without any factual support. It is also important to note that Sauls did not find any misuse of control by the parent over the subsidiary. (Sauls Depo. pp. 135, 15-23; 136, 1-9).

Plaintiffs will no doubt claim that misuse of control should be "presumed when it is necessary to prevent injustice or inequitable results." *Perry v. Household Retail Services, Inc.*, 953 F. Supp. 1378 (M.D. Ala. 1996). (Plaintiffs' Response, p. 22). However, their argument fails to establish how such presumption prevents injustice or inequitable results in this case. Although Alabama law does not flesh-out the analysis associated with this prong of the test, persuasive authority demonstrates that "injustice" or "inequity" could result only if CEI perpetrated a fraud on Plaintiffs through an insolvent subsidiary that could not pay a judgment, if one were obtained.

This principle is discussed in *Dorris Marketing Group v. Dorris*, No. 03-15025-SSM, 2006 Bankr. LEXIS 1096 (Bankr. E.D. Va. March 17, 2006). There the Bankruptcy Court pierced the corporate veil of a company where the evidence showed that the company could not pay its debts and the company was used to pay the personal debts of an individual. *Id.* at *37-41 ("It would simply work an injustice to creditors to allow such egregious behavior to go unchecked").

Likewise, in *Dana v. 313 Freemason, a Condominium Assoc., Inc.*, 587 S.E.2d 548 (Va. 2003) the Supreme Court of Virginia held:

It then only remains to be resolved whether the trial court properly concluded that as a matter of law piercing the veil of the corporation was necessary to avoid an injustice. One of the principal factors we look to in resolving the issue of piercing the veil of a corporation, and pertinent here, is whether the inability of the corporation to satisfy the judgment against it is the result of the deliberate undercapitalization by the incorporating stockholders.

*Dana*, 587 S.E.2d at 554.

Based on the corporation's inability to pay a judgment, among other things, the court in *Dana* pierced the corporate veil. *Id.* at 554-5.

In the case at bar, there is no evidence that CEI thinly capitalized CHB to escape paying a judgment in this or any other case. The latest financial records show that CHB had between 120 and 129 million dollars in cash or cash equivalent. (Ex. M to Plaintiffs' Response, p.F-32; Ex. N to Plaintiffs' Response, p. F-33). CHB, and the other CEI related companies, built and sold almost 24,000 homes in 2005. (Ex. O to Plaintiffs' Response, p.2). CEI and its subsidiaries had revenues of 1.29 billion dollars, according to the latest public disclosures of the companies. (Ex. O to Plaintiffs' Response, p. 17). Even if Plaintiffs obtain a judgment against CHB, there is no evidence that even a substantial verdict in connection with this singular mobile home would impact the company at all. In short, no injustice or inequity will result, even if CEI has "dominated" CHB.

**B. Plaintiffs Cannot Prove Proximate Harm**

Plaintiffs devote less that 1 page of argument to establishing proximate harm. (Plaintiffs' Response, p. 24). Again, there is no cite to the record and no evidence offered to support their argument. Even though CEI specifically asked Plaintiffs to "'identify' everything you claim supports your contention that CEI 'is the parent corporation and/or alter ego of Defendant Champion Home Builders, Co.' as alleged in the Complaint," Plaintiffs produced no evidence of harm or proximate cause of harm. (Ex. C to First Supplement, Response to No. 2). Instead of

7

evidence, Plaintiffs cite to an <u>un</u>verified complaint, make conclusory references to unsupported facts, and promise to come up with sufficient proof at trial.  (Plaintiffs' Response, p. 24). Reliance on pleadings, without more, is not sufficient to defeat a motion for summary judgment. *Sorenson v. IRS*, No. 96-A-1410-N, 1997 U.S. Dist. LEXIS 2656 (M.D. Ala. Feb. 27, 1997)("A party opposing a motion for summary judgment cannot rely only on his unsworn pleadings but must oppose the motion by filing sworn affidavits that set forth specific facts which demonstrate that there is a genuine issue of material fact for trial in this case").

### C. The Plaintiffs Cannot Prove The Dominant Party Had Complete Control And Domination Of The Subservient Corporation

Even if it is determined that the second and third prongs of the alter ego theory have been met, the plaintiffs have not met the burden of proving the first prong.  In his Affidavit, Sauls stated he had been in public accounting for 35 years, worked for Jackson Thornton and his accounting experience was in the area of tax, accounting and consulting services including business evaluations.  (Sauls Aff., p. 1).  At his deposition, Sauls admitted he does not have any current accounting clients, has not had accounting clients during the last eight years, he has never had a client that was a publicly traded company, during the last ten (10) years, his firm, Jackson Thornton has not had a client that was a publicly traded company, he has not done any audited financial statements in the last ten (10) years, he has not had a client that was required to comply with the Sarbanes-Oxley Act, he has no understanding what a 302 Certification or 404 Certification is under the Sarbanes-Oxley Act, and he could not give any examples on any internal controls a company must have in place to comply with the Sarbanes-Oxley Act.  (Sauls Depo. pp. 39, 13-23, 40, 1-23, 45, 19-23, 46, 1-4, 17-23, 47, 1-23, 48, 1-23, 49, 1-15).

Although Sauls in his Affidavit gave opinions such as "The *parent* corporation finances the *subsidiary*"; "The *subsidiary* has grossly inadequate capital"; "The *parent* corporation pays

the salaries and other expenses or losses of the *subsidiary*"; and "The *parent* corporation uses the property of the *subsidiary* as its own" (emphasis added), Sauls experienced difficulty in definitely stating who was the parent and who was the subsidiary.[4] (Sauls Depo., pp. 54-70, generally).

Sauls was able to affirmatively state that he completely and totally disregarded in his opinions and calculations financial information related to Champion Home Builders Co. (hereinafter referred to as "CHB") as he disregarded the "CHB" column in the 10-Ks. (Sauls Depo. pp. 70, 11-23; 71, 1-23; 72, 1-23; 73, 1-23; 74, 1-23: 75, 1; 124, 7-18; 129, 6-9). The reference to "CHB" in the 10-Ks was defined as "Champion Home Builders Co." (Ex. M to Plaintiffs' Response, p. F-20; Ex. N to Plaintiffs' Response, p. F-20). For the Court's convenience, page F-32 of CEI's Form 10-K for 2003,[5] which was marked as Ex. M to Plaintiffs' Response and Ex. 9 to the Sauls Deposition, is set forth below:

---

4  There are only two defendants in this action, CEI and Champion Home Builders Co., improperly named in the Complaint as Champion Home Builders Co., Inc.

5  Since the subject manufactured home was built in 2003, it is respectfully submitted that the appropriate year in question is 2003. *See Messick v. Moring,* 514 So.2d 892, 894-895 (Ala. 1987); *see also Kwick Set Components Inc. v. Davidson Indus., Inc.,* 411 So.2d 134 (Ala. 1982) ("The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that **at the time of the attacked transaction** the subservient corporation had no separate mind, will, or existence of its own").

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

CHAMPION ENTERPRISES, INC.

CONDENSED CONSOLIDATING BALANCE SHEET
AS OF JANUARY 3, 2004

| | Parent | CHB | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Consolidating Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | | | (In thousands) | | | |
| **Assets** | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents.... | $ — | $129,072 | $ 3,824 | $12,972 | $ — | $145,868 |
| Restricted cash ............. | — | 310 | 8,031 | | | 8,341 |
| Accounts receivable, trade.... | — | 5,952 | 13,229 | 892 | (6,300) | 13,773 |
| Inventories................. | — | 11,862 | 85,182 | 1,930 | (150) | 98,824 |
| Other current assets ......... | — | 17,900 | 92,872 | 415 | (92,862) | 18,325 |
| Total current assets ....... | — | 165,096 | 203,138 | 16,209 | (99,312) | 285,131 |
| Property, plant and equipment, net ..................... | — | 27,913 | 65,831 | 2,077 | — | 95,821 |
| Goodwill ................. | — | — | 125,783 | 754 | — | 126,537 |
| Investment in consolidated subsidiaries ............... | 18,441 | 315,730 | 110,039 | 6,866 | (451,076) | — |
| Non-current assets of discontinued operations .... | — | — | 68 | — | — | 68 |
| Other non-current assets ..... | 1,095 | 9,067 | 1,809 | 8,772 | — | 20,743 |
| | $ 19,536 | $517,806 | $506,668 | $34,678 | $(550,388) | $528,300 |
| **Liabilities, Redeemable Convertible Preferred Stock and Shareholders' Equity** | | | | | | |
| Current liabilities | | | | | | |
| Floor plan payable .......... | $ — | $ — | $ 14,094 | $ 29 | $ — | $ 14,123 |
| Accounts payable ........... | — | 6,774 | 19,273 | 777 | (100) | 26,724 |
| Accrued warranty obligations | — | 10,926 | 28,858 | 774 | — | 40,558 |
| Accrued volume rebates ..... | — | 9,580 | 19,841 | 1,872 | — | 31,293 |
| Current liabilities of discontinued operations .... | — | — | 3,177 | (4) | — | 3,173 |
| Other current liabilities ...... | 1,078 | 138,008 | 48,764 | 685 | (92,762) | 95,773 |
| Total current liabilities....... | 1,078 | 165,288 | 134,007 | 4,133 | (92,862) | 211,644 |
| Long-term liabilities | | | | | | |
| Long-term debt............. | 113,715 | 118,444 | 13,309 | — | — | 245,468 |
| Other long-term liabilities .... | 3,300 | 34,417 | 9,659 | 134 | — | 47,510 |
| | 117,015 | 152,861 | 22,968 | 134 | — | 292,978 |
| Intercompany balances ....... | (113,635) | (41,151) | 487,574 | 2,959 | (335,747) | — |
| Redeemable convertible preferred stock ........... | 8,689 | — | — | — | — | 8,689 |
| Shareholders' equity | | | | | | |
| Common stock ............. | 65,470 | 1 | 59 | 4 | (64) | 65,470 |
| Capital in excess of par value | 125,386 | 613,336 | 273,160 | 34,740 | (921,236) | 125,386 |
| Accumulated deficit ......... | (184,467) | (372,529) | (411,100) | (6,875) | 799,521 | (175,450) |
| Accumulated other comprehensive income (loss) ................. | — | — | — | (417) | — | (417) |
| Total shareholders' equity .. | 6,389 | 240,808 | (137,881) | 27,452 | (121,779) | 14,989 |
| | $ 19,536 | $517,806 | $506,668 | $34,678 | $(550,388) | $528,300 |

F-32

It appears CEI was made a defendant to this action based on nothing more than the

allegation that "Champion is the parent corporation and/or alter ego of Defendant Champion

Home Builders, Co."[6]   (Complaint, ¶ 17).  All of Saul's opinions related to the "parent" and "subsidiary", which in this case can only refer to CEI and CHB, are flawed since he completely disregarded the financial information related to CHB. (Sauls Depo. pp. 70, 11-23; 71, 1-23; 72, 1-23; 73, 1-23; 74, 1-23: 75, 1; 124, 7-18; 129, 6-9).

It is respectfully submitted that because Sauls failed to take into consideration the financial information related to CHB in forming his opinions, all opinions are due to be disregarded in their entirety.  Even if Sauls did take into consideration the financial information related to CHB, his testimony clearly indicated he did not have sufficient information to support his opinions.  The opinions given by Sauls were specifically referenced as "Points of Emphasis" and the additional opinions in bold set forth on pages 8 and 9 of the Sauls Affidavit. (Sauls Depo. p. 28, 2-17).  His Affidavit was complete and he did not need to do any more research for his opinions. (Sauls Depo. p. 29, 2-6).

The first opinion stating the "The parent company has no significant assets other than investments in and advances to subsidiaries" is inappropriate for this case as he based his opinion solely on the year 2005. (Sauls Depo. p. 90, 9-14).  The only relevant year in this case is 2003.  See Footnote 3 above.

With regard to the claim that "Significant amounts of its cash go to or from its subsidiaries", Sauls stated that a significant amount of cash was "$34,865,000". (Sauls Depo. p.

---

6  It is alleged in the Complaint that CEI was engaged in the business of manufacturing, designing, building and/or assembling, etc. the subject manufactured home and did so negligently or wantonly so as to cause damages.  (Complaint, ¶¶ 13, 17, 24, 46, 51, 64). However, no evidence has been submitted to refute the evidence in the Affidavit of David N. Goltz attached to the Motion to Dismiss or, in the alternative, Motion for Summary Judgment that CEI did not and was not in the business of supplying, selling or manufacturing the subject manufactured home or any manufactured home. (Goltz Affidavit, ¶ 3).  Uncontested statements of fact may sometimes be treated as stipulations. *Munoz v. International Alliance of Theatrical State Employees and Moving Picture Machine Operators of the U.S. and Canada,*563 F.2d 205, 215 (5th Cir. 1977).

91, 8-12). However, Sauls could not state whether CHB received a dime from CEI during the five (5) year period he reviewed or whether CHB paid anything to CEI during that same period. (Sauls Depo. p. 83, 2-12).

With regard to the statement that "The parent raises significant amounts of capital", Sauls believed a significant amount of capital was $68,514,000 mentioned on the Chart on page 3 of the Sauls Affidavit. (Sauls Depo. p. 91, 13-23; 92, 1-2). With regard to the statement "Without the parent, the subsidiaries are isolated from significant amounts of capital", Sauls considered a "significant amount of capital" to be "$210,000,000". (Sauls Depo. p. 98, 4-9). Sauls admitted that CHB was able to raise $150,000,000 in Senior Notes (Ex. M to Plaintiffs' Response, p. F-20). (Sauls Depo. p. 95, 20-23). Further according to the 2003 10-K, CHB was able to secure $75,000,000 in a revolving credit facility (Ex. M to Plaintiffs' Response, p. F-21) and floor plan facilities that totaled $21,000,000 (Ex. M to Plaintiffs' Response, p.-21), the total being approximately $246,0000,000. When asked whether the amount of $245,000,000 would be considered by Sauls to be a "significant amount of capital" since it was larger than the "$210,000,000" he stated earlier was a "significant amount of capital", he would only agree that one amount was "larger than the other." (Sauls Depo. pp. 93-103, generally, p. 101, 22-23: 102, 1-10). In any event, Sauls did not dispute that CHB could raise money or borrow money on its own. (Sauls Depo., p. 94, 4-8).

With regard to the statement that "The parent and its subsidiaries are considered one by its lender", Sauls was only assuming that based on the parent and some subsidiaries being jointly and severally liable on some debt obligations. (Sauls Depo. p. 92, 3-15). Sauls never spoke with a lender or anyone that made the above statement. (Sauls Depo. p. 92, 16-23; 93; 1-7).

With regard to the statement "The parent corporation finances the subsidiary", Sauls used the term "advances" to subsidiaries. (Sauls Aff. Chart on p. 7 and p. 8). However, the 10-Ks did not use the term "advances", but rather the term "intercompany balances" was used. (Sauls Depo. pp. 104, 15-23; 105, 1-23; 106, 1-23). Sauls did not have anything he could point to that specifically showed CEI paid expenses for CHB; only that it is reflected as a liability on the "guarantor's subsidiaries". (Sauls Depo. p. 107, 14-23; 108, 1-8). In any event, Sauls did not find any problem with a parent loaning money to a subsidiary as it is a normal business practice. (Sauls Depo. p. 108, 21-23; 109, 1-5). Further, Sauls determined that for the five (5) year period, the subsidiaries had a positive cash flow. (Sauls Depo. 113, 2-5).

With regard to the statement "The subsidiary has grossly inadequate capital", Sauls again did not take into consideration the "CHB" column of the Form 10-Ks. (Sauls Depo., p. 127, 17-23; 128, 1-23; 129, 1-9). In any event, Sauls did not have any evidence that at the time CEI was formed, it was inadequately capitalized; that at the time CHB was formed, it was inadequately capitalized; Sauls had no clue what kind of capital CEI or CHB had in the 1990s; he did not review the articles of incorporation of either CEI or CHB; nor was he familiar with any credit rating of CEI or CHB. (Sauls Depo., pp. 130, 14-23; 131; 1-8; 137, 22-23; 138, 1-20). In fact, Sauls did not do any market research regarding manufactured housing since 1999 and completely disregarded the 60% decline in the manufactured housing market between 1999 and 2004 that was **set forth in the first ten pages of the Form 10-Ks.** (Sauls Depo. pp. 131-134, generally; Exs. J, K, L, M, N, O to Plaintiffs' Response, pp. 1-10).

With regard to the statement that "The parent corporation pays the salaries and other expenses or losses of the subsidiary", Sauls gave the following responses with regard to direct questions concerning the above opinion:

13

Q.    As we sit here today, you have no evidence that Champion Enterprises
      paid any salary of any subsidiary's employees?

A.    I don't have an opinion on that.

Q.    And as we sit here today, you don't have an opinion as to whether
      Champion Enterprises paid any specific expenses of any subsidiary?

A.    Not specific expenses, no.

(Sauls Depo., p. 115, 14-22).

In addition to the above, when pressed to provide specifics with regard to the claim that the parent pay losses of the subsidiary, Sauls admitted that the payments from the parent to subsidiaries could be loans as it that is how it is reflected in the footnotes of the financials and that there was nothing wrong with that. (Sauls Depo. pp. 116-119, generally). The financials showed investments in and advances to consolidated subsidiaries in some years and it is not unusual for a parent to invest in a subsidiary. (Sauls Depo. pp. 119, 15-23; 120, 1-9). As for the numbers listed in the middle of page 9 of the Sauls Affidavit, Sauls could not support the conclusion that all of the money he claimed was owed to the parent was actually owed to the parent during any of the years listed. (Sauls Depo. p. 123, 3-19).

With regard to the claim that "The parent corporation uses the property of the subsidiary as its own", this claim was solely based on the subsidiary guaranteeing the debt of the parent and "certainly reflective as of that point in time based on that, but no other point". (Sauls Depo. p. 125-127, generally). The point in time Sauls used was 2004 or 2005 (Sauls Depo. p. 126, 3-23; 127, 1-10), not 2003, which is the applicable time period for the alter ego claims.

**Conclusion**

Even if Plaintiffs provided sufficient evidence of control (a point CEI does not concede), Plaintiffs cannot prove that CEI is the alter ego of CHB because Plaintiffs have no evidence of the second or third prong of the alter ego test. Under Alabama law, "[m]ere domination or control of a corporation by its stockholders cannot be enough to allow a piercing of the corporate veil. There must be the added elements of misuse of control and harm or loss resulting from it." *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1335 (Ala. 1991).

**WHEREFORE PREMISES CONSIDERED**, CEI prays that this Honorable Court will grant its motion for summary judgment and for such other or different relief as is just.

Respectfully submitted,

**RITCHEY & RITCHEY, P.A.**

_____
Gregory S. Ritchey, Esquire  {ASB-8193-H68G}
Richard S. Walker, Esquire  {ASB-8719-L70R}
Counsel for Champion Home Builders Co.
and Champion Enterprises, Inc.

OF COUNSEL:
**RITCHEY & RITCHEY, P.A.**
P.O. Drawer 590069
Birmingham, Alabama  35259-0069
Telephone:  205.271.3100
Facsimile:  205.271.3111

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the 12ᵈ day of _____, 200__, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
BEASLEY, ALLEN, CROW,

15

METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103



OF COUNSEL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-00682-TFM


NICHOLAS STRICKLAND, et al.,

      Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al,

      Defendant(s).


DEPOSITION TESTIMONY OF:

EDWARD SAULS


February 8, 2007

9:10 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR

ORIGINAL

Page 2

1           S T I P U L A T I O N

2                IT IS STIPULATED AND AGREED, by

3      and between the parties through their respective

4      counsel, that the deposition of EDWARD SAULS may

5      be taken before Deborah B. Townsend, Certified

6      Shorthand Reporter and Notary Public, State at

7      Large, at the offices of BEASLEY, ALLEN, CROW,

8      METHVIN, PORTIS & MILES, Montgomery, Alabama, on

9      February 8, 2007, commencing at approximately

10     9:10 a.m.

11                IT IS FURTHER STIPULATED AND

12     AGREED that the signature to and the reading of

13     the deposition by the witness is waived, the

14     deposition to have the same force and effect as

15     if full compliance had been had with all laws

16     and rules of Court relating to the taking of

17     depositions.

18                IT IS FURTHER STIPULATED AND

19     AGREED that it shall not be necessary for any

20     objections to be made by counsel to any

21     questions, except as to form or leading

22     questions, and that counsel for the parties may

23     make objections and assign grounds at the time

Page 3

1   of trial or at the time said deposition is

2   offered in evidence, or prior thereto.

3            In accordance with Rule 5(d) of

4   the Alabama Rules of Civil Procedure, as

5   amended, effective May 15, 1988, I, Deborah B.

6   Townsend, am hereby delivering to Greg Ritchey

7   the original transcript of the oral testimony

8   taken February 8, 2007, along with exhibits.

9            Please be advised that this is the

10  same and not retained by the Court Reporter, nor

11  filed with the Court.

12

13

14

15              EXAMINATION INDEX

16

    EDWARD SAULS

17

18      BY MR. RITCHEY                    8

19

20

21

22

23

American Court Reporting
toll-free (877) 320-1050

Page 4

EXHIBIT INDEX

PAGE

Defendant's

| 1  | Notice of Deposition and Request for Production | 9  |
| 2  | Engagement Letter                               | 10 |
| 3  | 11/30/06 Invoice                                | 11 |
| 4  | Curriculum Vitae                                | 11 |
| 5  | Financial Information Compiled from 10-K's       | 12 |
| 6  | Excerpt from 2000 10-K                           | 12 |
| 7  | Excerpt from 2001 10-K                           | 15 |
| 8  | Excerpt from 2002 10-K                           | 15 |
| 9  | Excerpt from 2003 10-K                           | 16 |
| 10 | Excerpt from 2004 10-K                           | 16 |
| 11 | Excerpt from 2005 10-K                           | 16 |
| 12 | Deposition of David Goltz                        | 17 |
| 13 | Affidavit of Edward Sauls                        | 19 |
| 14 | Affidavit of Sauls from Brown v. Champion        | 20 |
| 15 | Affidavit of Sauls from Allen v. Champion        | 20 |
| 16 | File Notes                                       | 20 |
| 17 | Champion Governance Guidelines                   | 51 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1

2                              EXHIBIT INDEX

3
      18      Champion Job Descriptions            52

4
         19      Champion Delegation of Authority     53

5
         20      Management and Administrative        137

6               Services Agreement

7        21      Management and Administrative        137
                Services Agreement

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**www.AmericanCourtReporting.com**
**February 8, 2007**

Page 6

1          A P P E A R A N C E S

2

3

4      FOR THE PLAINTIFF(S):

5              C. Gibson Vance, Esquire

6              BEASLEY, ALLEN, CROW, METHVIN,

7              PORTIS & MILES

8              218 Commerce Street

9              Montgomery, Alabama   36104

10

11

12     FOR THE DEFENDANT(S):

13             Gregory S. Ritchey, Esquire

14             RITCHEY & RITCHEY

15             1910 28th Avenue South

16             Birmingham, Alabama   35209

17

18

19     ALSO PRESENT:

20             STEPHEN ALEXANDER

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 7

1            I, Deborah B. Townsend, a

2      Certified Shorthand Reporter of Birmingham,

3      Alabama, and a Notary Public for the State of

4      Alabama at Large, acting as Commissioner,

5      certify that on this date, pursuant to the

6      Federal Rules of Civil Procedure and the

7      foregoing stipulation of counsel, there came

8      before me at the offices of BEASLEY, ALLEN,

9      CROW, METHVIN, PORTIS & MILES, Montgomery,

10     Alabama, commencing at approximately 9:10 a.m.

11     on February 8, 2007, EDWARD SAULS, witness in

12     the above cause, for oral examination, whereupon

13     the following proceedings were had:

14

15

16

17            THE REPORTER:   Usual

18     stipulations?

19            MR. RITCHEY:   That's fine.

20            MR. VANCE:   Please.

21

22

23

Page 8

1                         EDWARD SAULS,

2      After having first been duly sworn, was examined

3      and testified as follows:

4                         EXAMINATION

5      BY MR. RITCHEY:

6           Q.      Could I ask you to please state

7      your full name for the record?

8           A.      Edward Walton Sauls.

9           Q.      I'm Greg Ritchey, and I represent

10     Champion Enterprises, Inc. and Champion Home

11     Builders Company.  I assume you've done a

12     deposition before?

13          A.      Yes.

14          Q.      How many depositions have you done

15     before?

16          A.      I would have to estimate a hundred.

17          Q.      A hundred.  Okay.  I'll be real

18     quick, then.  I expect you probably know the

19     ground rules.  I'll be asking questions.  If you

20     don't understand a question, if I ask two

21     questions at once, you know, your attorney may

22     object to it, or you may just say please

23     separate them into one.

Page 28

1    Q.      Okay.

2    A.      On page eight, there are some

3  points of emphasis that we'll be going over.

4    Q.      These points of emphasis, do each

5  one of those represent an opinion of yours or

6  just points of emphasis that --

7    A.      In a spirit of caution, I'll say

8  yes, they do.

9    Q.      Okay.

10   A.      Page eight contains additional

11  information that the parent corporation finances

12  its subsidiary.  There's a note that the

13  subsidiary has grossly inadequate capital.  On

14  page nine, that the corporation pays salaries

15  and other expenses and losses of the

16  subsidiary.  Also on page nine, that the parent

17  corporation uses property of the subsidiary.

18   Q.      Now, we've gone over the opinions,

19  I guess, and we'll go over them in more detail.

20  But essentially, is that the listing of opinions

21  that you plan to give?  Is there anything else

22  other than that at this time that you would like

23  to add?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1    A.    Not at this time.

2    Q.    Is your affidavit and your -- what

3    you've put into this affidavit complete?  In

4    other words, do you need to do any more

5    research?

6    A.    It is complete.

7    Q.    Now, I've asked for a copy of any

8    articles or publications written by you.  Do you

9    have any of those?

10    A.    I have none.

11    Q.    And I've asked you for documents

12    or items that you provided that were provided to

13    you by the person that hired you, and I'll try

14    to go over a couple of them real quick that I

15    know of.  The Duff case; is that correct?

16    A.    (Witness nods head.)

17    Q.    You've got to answer out loud.

18    A.    Yes.

19    Q.    Sorry about that.  The deposition

20    of David Goltz?

21    A.    Yes.

22    Q.    And the 10-K's for years 2000 to

23    2005?

**www.AmericanCourtReporting.com**
**February 8, 2007**

Page 39

1      A.    Yes.

2      Q.    All right.  Can you, I guess, tell

3  me what type of work you do for Jackson

4  Thornton?

5      A.    I head our firm's business

6  valuation and litigation consulting group.

7      Q.    Do you yourself do any type of

8  accounting for businesses, like if somebody

9  needs your help, say, preparing a Form 10-K?

10     A.    I have been with the firm since

11  1971, and over that 30-whatever years, I have

12  worked in the area of accounting, yes.

13     Q.    Do you have your own accounting

14  clients?

15     A.    No, not currently.

16     Q.    You have no accounting clients

17  currently?

18     A.    That's correct.

19     Q.    When's the last time you had an

20  accounting client?

21     A.    Strictly from recall would be

22  eight years ago, maybe.

23     Q.    Would it be fair to say, then, you

Page 40

1    do not have any present clients that are a

2    publicly-traded company?

3         A.      That's correct.

4         Q.      Have you ever had a client that

5    was a publicly-traded company?

6         A.      No.

7         Q.      Does Jackson Thornton presently

8    represent any clients who are publicly-traded

9    companies?

10        A.      No.

11        Q.      Have they ever represented a

12   client that was a publicly-traded company?

13        A.      Jackson Thornton dates back to

14   1919, so I don't -- I'm afraid to answer that

15   question.  I can't tell you of one.  Probably

16   so.

17        Q.      Probably so, but you can't think

18   of one?

19        A.      That's correct.

20        Q.      Would it be fair to say that in

21   the last ten years, they've not had a client

22   that was a publicly-traded company?

23        A.      Yes.

Page 45

1    mean, just to make sure I understand, that can

2    be retained earnings, right, or the ability to

3    raise funds when you refer to capital?

4         A.    Well, capital -- You're using

5    capital as a verb or a noun?

6         Q.    Well, I guess let me ask you

7    this:  How would you define capital?

8         A.    Capital could be described as the

9    assets employed by a business net of its

10   liabilities.

11        Q.    Okay.

12        A.    And when I say liabilities, its

13   operating liabilities.  Bank debt is referred to

14   as capital as well.

15        Q.    And also the ability to raise

16   funds?

17        A.    When you raise funds, that is

18   considered raising capital, yes.

19        Q.    Okay.  Now, do you know whether or

20   not your firm issues audited statements, audited

21   financial statements?

22        A.    They do.

23        Q.    Have you ever done any?

Page 46

1      A.      Yes.

2      Q.      Have you done any in the last ten

3  years?

4      A.      I'll say no.

5      Q.      Has your firm done some in the

6  last ten years?

7      A.      Yes.

8      Q.      Be fair to say that none of those

9  were on any publicly-traded companies, though?

10      A.      That's correct.

11      Q.      And I'm assuming that Jackson

12  Thornton is not registered with the Public

13  Company Accounting Oversight Board?

14      A.      I'm not sure I -- I'm going to

15  answer that as I believe it to be.  I believe

16  the answer to that is no.

17      Q.      Are you familiar with Sarbanes-

18  Oxley laws?

19      A.      Generally.

20      Q.      Fair to say that you've not had a

21  client subject to Sarbanes-Oxley in the last ten

22  years?

23      A.      As it -- And that's because I have

Page 47

1    not -- as we testified earlier, no longer do

2    typical accounting.  We may have done work for a

3    client that Sarbanes-Oxley applied to, but it

4    would be irrelevant to the service we were

5    providing.

6            Q.    Well, are you aware of any client

7    that Jackson Thornton has had in the last, I

8    guess, five years -- because Sarbanes-Oxley

9    hasn't been around except for, I guess, three or

10   four -- but any client that they've had that's

11   been subject to Sarbanes-Oxley laws for what

12   Jackson Thornton has given any type of advice?

13           A.    Yes.

14           Q.    Do you have some clients that

15   Sarbanes --

16           A.    You being Jackson Thornton?

17           Q.    Jackson Thornton, yes.

18           A.    Yes.

19           Q.    Would it be fair to say that your

20   firm has dealt with 302 certifications?

21           A.    Yes.

22           Q.    Can you give me, I guess, your

23   understanding of 302 certifications?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 48

1          A.      I have no understanding of it.

2          Q.      How about 404 certifications?

3          A.      I have no understanding of that.

4          Q.      Do you have any understanding of

5     why there's a reason for these certifications

6     under Sarbanes-Oxley?

7          A.      No.

8          Q.      Well, do you have an opinion that

9     any company that Jackson Thornton may have given

10    advice to is in compliance with the Sarbanes-

11    Oxley laws?

12         A.      I don't deal in that area, so I --

13         Q.      Okay.  So would it be fair to say

14    that you're not familiar at all with the

15    Sarbanes-Oxley laws?

16         A.      Well, I'm reluctant to answer a

17    question in that way.  We, as a firm, are

18    certainly aware and on top of all of the

19    requirements relative to Sarbanes-Oxley.

20         Q.      Well, can you give me some

21    examples of internal controls under 404?

22         A.      No.

23         Q.      Have you ever had to draft any

Page 49

1    type of controls or information such as that for

2    a client?

3         A.     Relative to internal controls in

4    the audit workplace in the years in which I was

5    involved in audits, we worked in the internal

6    control area.

7         Q.     But specifically as under

8    Sarbanes-Oxley?

9         A.     I'm not in the accounting side, so

10   I would not perform services relative to

11   internal controls.

12        Q.     Can you give me an example of any

13   internal control that a company must have in

14   place in order to comply with Sarbanes-Oxley?

15        A.     Not relative to Sarbanes-Oxley.

16        Q.     Let's take a break while he's --

17        A.     That's fine.

18                    10:00 a.m.

19                    (Brief recess.)

20                    10:02 a.m.

21        Q.     I guess as a former auditor,

22   you're familiar with the COSO studies and things

23   like that regarding -- COSO studies in terms of

Page 54

1      A.      All right.

2      Q.      And I think on page one, it just

3  basically gives your background information; is

4  that correct?

5      A.      Yes.

6      Q.      And what you've reviewed.  On page

7  two -- Let me ask you this:  As far as this case

8  is concerned, who do you understand to be the

9  parent and who do you understand to be the

10  subsidiary?  And I'm talking about the

11  Strickland case, obviously.

12      A.      The parent, at least in the latter

13  years, I understand to be Champion Enterprises,

14  Inc.

15      Q.      What do you mean by at least in

16  the latter years?

17      A.      I recall that in the earlier

18  years, possibly 2000, 2001, there may have been

19  a reference to one of the others parties as a

20  parent.

21      Q.      Is that in the 10-K's?

22      A.      Excuse me?

23      Q.      Was that in the 10-K?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 55

1      A.      Yes.

2      Q.      What party was referenced as a

3  parent?

4      A.      I don't recall from memory or with

5  what's contained in 6.

6      Q.      Do you want to look -- I've got

7  the 10-K for the period ending December 30,

8  2000, which has previously been marked as

9  Exhibit J.  Would you be able to look in that

10  and be able to tell --

11      A.      Yeah.  If everybody wanted to go

12  take a break and come back while I find it.

13      Q.      It's not something you can get to

14  pretty quickly?

15      A.      Possibly not, unless you happen to

16  know where it might be.

17      Q.      I don't.

18      A.      Okay.

19      Q.      I don't.  Well, I guess my

20  understanding is that Champion Enterprises has

21  been the parent.  This is news to me.  If you

22  think that some other subsidiary is a parent, I

23  just would like to know what subsidiary that is.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 56

1      A.      It seems that I recall that in an

2  earlier year that there may have been one of the

3  subsidiaries of Champion Enterprises, Inc. that

4  in itself had subsidiaries and may have been

5  referred to as a parent.  And I recall it may

6  have been some reporting of more than one entity

7  as a parent back in earlier years.

8      Q.      Can you tell that from any of your

9  calculations?  I believe Defendant's Exhibit

10  Number 5 were some calculations that you

11  prepared.

12      A.      The information that is in Exhibit

13  5 is reflective of what was representative of

14  parent's financial information within the body

15  of each of those 10-K's.

16      Q.      Okay.

17      A.      So I guess the answer to your

18  question is you cannot look at Number 5 and

19  suggest which year and who it may be.

20      Q.      Okay.  Well, wouldn't it be

21  beneficial to know, in forming your opinions,

22  which company is, in fact, a parent and what

23  company is, in fact, a subsidiary?

Page 57

1      A.      I cannot report any more than is

2    reported to me in the public domain of the 10-K,

3    and that's what I've done.

4      Q.      Wouldn't it be important to know,

5    in forming your opinion, to know which company

6    is the parent and which company is a subsidiary?

7      A.      The parent is Champion

8    Enterprises, Inc.  The 10-K disclosure does not

9    provide financial information on separate

10   subsidiaries, and therefore, I have reported

11   those as in the 10-K as subsidiary financial

12   information.

13     Q.      Let me ask it again.  Wouldn't it

14   be important to know, in forming your opinions,

15   which company is the parent and which company is

16   the subsidiary?

17     A.      My opinions are as -- are included

18   in the affidavit.  I have taken information that

19   is compiled by the company and reported it as

20   reflected.

21     Q.      One of your opinions is that --

22   and correct me if I'm wrong -- the parent

23   finances the subsidiary; is that right?

Page 58

1    A.    Yes.

2    Q.    Wouldn't it be an important thing

3  to know what company is the parent and what

4  company is the subsidiary?  Yes or no?

5    A.    I'll answer that no.

6    Q.    So it's not important for your

7  opinions to determine what company is the parent

8  and what company is the subsidiary; is that

9  correct?

10    A.    I cannot report anything other

11  than what is reported here.  And my opinion is

12  the parent does as is stated in my report.  Now,

13  if the parent is defined in here, then my

14  opinions would reflect that that are of the

15  activities of the parent as in the company's

16  10-K.

17    Q.    So is it important to know which

18  company is the parent, that you're saying is the

19  parent in your report, as opposed to which

20  company is the subsidiary, that you're saying is

21  a subsidiary in your report?  Are you saying it

22  doesn't matter or isn't important?

23    A.    It would not and could not alter

American Court Reporting
toll-free (877) 320-1050

Page 59

1    anything I've done.

2          Q.    So it would not alter your

3    opinions if you mixed up the parent and

4    subsidiaries?

5          A.    I haven't --

6                MR. VANCE:  Object to the

7    form.

8          A.    Excuse me.  There's no way that

9    you could mix up the parent or the subsidiary

10   because it's reflected as the parent in the

11   10-K's.

12         Q.    And maybe I'm not following you.

13               MR. VANCE:  Can I wade in?

14   What I think Ed's hearing you ask is has he done

15   anything outside of what the 10-K shows to

16   investigate who the parent is and who the

17   subsidiary is.  I think Ed's just saying, I'm

18   just basing it on what the 10-K says.

19               He's asking you do you need, by

20   looking at the 10-K, to understand who the

21   parent is and who the subsidiary is.

22         A.    I mean, I think it's evident that

23   the parent, as defined in the 10-K, is the

Page 60

1    activities and opinions of -- of that.

2        Q.    Do you need to know who the parent

3    is and who the subsidiary is in order to form

4    your opinions?

5        A.    If there was any information given

6    to me that I felt should be considered any

7    differently, I would certainly consider it, but

8    I'm not aware of any.

9        Q.    I don't know that that answers the

10   question.  Repeat the question back.  I think

11   I've asked -- I don't --

12            (WHEREUPON, the requested portion

13   of the record was read.)

14       Q.    And I guess your answer to that is

15   no?

16            MR. VANCE:  Well, now, let's

17   let him answer.

18       A.    The answer is I have given an

19   opinion based upon the definition of parent

20   within the 10-K's.

21       Q.    Okay.  But the question is:  In

22   order to formulate your opinions, would a person

23   need to know who the parent is and who the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1    subsidiary is?

2         A.    The parent is Champion

3    Enterprises, Incorporated.  That's what's

4    reflected in the 10-K's.  If there is another

5    entity outside Champion Enterprises, Inc. that's

6    financial information would be provided in such

7    a way as to change what I did, I would certainly

8    be the first to change it, but there's --

9    there's nothing to suggest otherwise.

10        Q.    That wasn't my question.

11        A.    Your question cannot be properly

12   answered with a yes or no.

13        Q.    Okay.  There's no way to answer

14   whether or not one would need to know the name

15   of the parent, as opposed to the name of the

16   subsidiary, in order to reach the opinions that

17   you reached in this particular case?

18        A.    I'm going on what the company

19   itself tells me is the parent.

20        Q.    What does the company itself tell

21   you the parent is?

22        A.    Champion Enterprises, Inc., with

23   the possible exception, if you will -- and I'm

**American Court Reporting**
**toll-free (877) 320-1050**

Page 62

1    using that loosely -- of some reference in an

2    earlier year that I've already stated that if

3    you'd like me to find that reference, we can all

4    take a break, and I'll be more than happy to try

5    to find it.

6         Q.     Let's look at Exhibits 6 through

7    11.  Here's what I want you to do for each one

8    is if you will mark for me or just put -- Where

9    it has parent and subsidiary, if you will,

10   please, just mark parent and subsidiary.

11                (Off-the-record discussion.)

12        Q.     If you'll mark who the parent is

13   for each year, I guess, and who you believe is a

14   subsidiary that are involved in this case.  And

15   the two entities involved in this case are

16   Champion Enterprises, Inc. and Champion Home

17   Builders.  If you'll just go through Defendant's

18   Exhibits 6, 7, 8, 9, 10, and 11.  Do you need a

19   pen?

20        A.     Yes.

21        Q.     And you can just put it up by

22   where it says the parent and the subsidiary.

23        A.     The Defendant's Exhibit 6 and each

Page 63

1    page in which there is financial information,

2    there is a column that says parent.  That is the

3    financial information used in my report.  On

4    each of those pages in each of the years, there

5    are columns referred to as guarantor

6    subsidiaries and non-guarantor subsidiaries.

7    Those are the financial numbers that are

8    reflected in the 10-K of the subsidiaries.

9    Would you like me to place a mark on each of

10   those columns I just described?

11        Q.      I want you to tell me, when it

12   says parent, who that is.  We have two

13   defendants in this case; one is Champion Home

14   Builders and one is Champion Enterprises.  If

15   you don't know, just say you don't know.

16        A.      Champion Home Builders.

17        Q.      You want to look at some of these

18   10-K's?

19        A.      The gentleman that is here with

20   you, Mr. Alexander, pointed out that in the

21   10-K, the financial statements include accounts

22   of Champion Enterprises, Inc. and its wholly-

23   owned subsidiaries.  I don't know if that

Page 64

1    answers your question.

2        Q.      No, it doesn't.

3        A.      May I see --

4        Q.      You want to see J?  Which one do

5    you want, which year?  I think J is right

6    there.  That's one --

7        A.      May I see the 10-K for the year

8    2001 or the earliest one we have?  I don't

9    believe that's a complete 10-K.  Do you want me

10   to continue to look for an item that I recall to

11   be in an earlier year?  I mean, if you guys know

12   where it is, tell me, and we might expedite

13   something.

14       Q.      I don't.

15       A.      Okay.

16       Q.      But what I'd like to know, again,

17   is if you would please put down on each one of

18   those, Exhibits 6 through 11, who you understand

19   to be the parent.

20       A.      You want me to mark the column,

21   don't you?

22       Q.      The column.

23       A.      I'll be glad to mark the parent

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1    column.

2         Q.     And whether it's Champion

3    Enterprises or Champion Home Builders.

4         A.     Well, I will answer that as it's

5    my understanding that it to be Champion

6    Enterprises, Incorporated, with, again, one of

7    the earlier years, it may be both.  Now, I don't

8    know how else I can answer it.

9         Q.     Well, wouldn't this be something

10   you would want to know prior to giving opinions,

11   especially some that state that a parent uses

12   property of the subsidiary?  Yes or no?

13        A.     What's your question?

14        Q.     Wouldn't that be something you'd

15   want to know in order to determine whether a

16   parent corporation used the property of the

17   subsidiary as its own?  We only have two

18   companies here that are involved, Champion

19   Enterprises and Champion Home Builders.

20   Wouldn't you need to know which one is the

21   parent and which one is the subsidiary to give

22   the opinion that the parent corporation uses the

23   property of the subsidiary as its own?  Yes or

Page 66

1    no?

2         A.    That question is not answered

3    properly with a yes or no.  The opinions I'm

4    giving are based upon the parent as described in

5    the 10-K.  That's my answer.

6         Q.    And as we sit here today, you

7    can't tell me what the parent is that's

8    described in the 10-K?

9         A.    I cannot tell you if in one year

10   there is some party other than Enterprises, Inc.

11   in there, and if it were, I'm not aware that

12   there's financial information within here to do

13   any different than we've done.

14        Q.    So in order to determine if the

15   parent corporation used property of a subsidiary

16   or paid the salaries of a subsidiary or an

17   expense of a subsidiary, you would need more

18   information.  Is that what you're telling me?

19        A.    No.  I'm not telling you that at

20   all.

21        Q.    Okay.

22        A.    The information is all in the

23   company's financial information as its

**American Court Reporting**
**toll-free (877) 320-1050**

Page 67

1   relationship between parent as defined by them

2   and subsidiary as defined by them.

3          Q.      But as we sit here today, you

4   can't tell me and mark on any of the columns on

5   Defendant's Exhibits 6 through 11 what company,

6   whether it be Champion Enterprises or Champion

7   Home Builders, is the parent; is that correct?

8          A.      The parent is whatever they

9   described as a parent within their financial

10  information.

11         Q.      But you can't tell me who it is

12  today?

13         A.      I cannot tell you if any one of

14  those years contains Home Builders, if that's

15  your point; that's correct.

16         Q.      Can you tell me if any of those

17  years contains Champion Enterprises?

18         A.      Yes.  I believe they do.

19         Q.      Which years?

20         A.      All with the exception of the one

21  that I recall there being some comments in the

22  financial statements about.

23                 (Off-the-record discussion.)

Page 68

1      Q.      Can I see those documents again?

2      A.      All of them?

3      Q.      Yeah.

4      Okay.  I'm referring to Defendant's

5  Exhibit 6.  On the second page, it's got parent

6  and then guarantor subsidiaries.  Is it fair to

7  say, that at this time, you can't tell me who

8  the parent is, whether it's Champion Home

9  Builders or Champion Enterprises; is that

10 correct?

11     A.      The financial statements as a

12 whole reveal that they are the financial

13 information of Champion Enterprises, Inc. and

14 its wholly-owned subsidiaries.

15     Q.      Let me ask the question again.

16     A.      So the parent would be Champion

17 Enterprises, Incorporated.

18     Q.      So in Defendant's Exhibit 6, the

19 parent is Champion Enterprises, Inc.; is that

20 what you're saying?

21     A.      That is what they have reflected

22 in that particular footnote to be the parent,

23 yes.

Page 69

1      Q.      Okay.  On Defendant's Exhibit 7,

2   page two, it's got the parent and guarantor

3   subsidiaries.  Again, the same question:  Who is

4   referred to as the parent, Champion Enterprises,

5   Inc., or Champion Home Builders?

6      A.      Well, it just says parent.  It

7   doesn't reference a particular number in that

8   footnote.

9      Q.      Who do you understand to be the

10  parent in this particular case, in this

11  particular --

12     A.      Champion Enterprises, Inc., is

13  what I understand to be the parent.

14     Q.      Okay.  Defendant's Exhibit 8, on

15  page two, it's got parent CHB, and then it has

16  subsidiaries past that.  Who do you understand

17  to be the parent in this particular year?

18     A.      It's not reflective on there.  I

19  understand it to be Champion Enterprises, Inc.

20     Q.      And then Champion Home Builders

21  would be the subsidiary?

22     A.      It doesn't say that.  It's listed

23  separately.

American Court Reporting
toll-free (877) 320-1050

Page 70

1          Q.       Do you consider Champion Home

2     Builders to be a parent in that situation?

3          A.       As reflected in my work, no.

4          Q.       So in your work, you didn't

5     consider Champion Home Builders to be a parent

6     when you reviewed Defendant's Exhibit 8 or 6 or

7     7, but rather Champion Enterprises?

8          A.       I reflected it as they reflected

9     it in their financial information; that's

10    correct.

11         Q.       Defendant's Exhibit 9, and it's

12    actually going to be on page three.  It's your

13    opinion that the parent is referencing Champion

14    Enterprises, Inc.?

15         A.       Yes.

16         Q.       And what does your work reflect

17    the second column, CHB, to be?

18         A.       It does not reflect it as a

19    parent.

20         Q.       It reflects CHB as a subsidiary?

21         A.       My opinions were relevant to the

22    uses of cash and sources of cash of the parent

23    as described in the first column there, and

**American Court Reporting**
**toll-free (877) 320-1050**

Page 71

1    there would be exclusive of CHB.

2        Q.    So you didn't -- you did not even

3    consider anything in the CHB column in your

4    calculations?

5        A.    Not as it relates to sources and

6    uses of cash of the parent, no.

7        Q.    Did you use anything in that

8    column in any of your opinions?

9        A.    May I see -- there is a

10   document --

11       Q.    Right over there, 5?

12       A.    I think I have succeeded in maybe

13   getting something out of place here.  I

14   apologize.

15       Q.    That's okay.  I think they're

16   numbered at the bottom, so we ought to be able

17   to figure it out.

18       A.    Okay.  May I --

19       Q.    Sure.

20       A.    To answer your question -- Bear

21   with me.  I don't believe that CHB -- We talked

22   about the -- in the report the capital structure

23   of the subsidiaries, and that is reflective on

Page 72

1    page nine.  And for the one you have in front of

2    me as it relates to the subsidiaries, capital

3    structure, it is not made by reference to CHB on

4    the subsidiary column.

5         Q.    And I guess just so I'm

6    understanding you correctly, in your

7    calculations and your opinions, you have

8    disregarded the column CHB; is that correct?

9         A.    Yes.  I believe so.

10        Q.    Okay.  And would that be also true

11   for Defendant's Exhibit Number 8 where they also

12   have another CHB column that you've just

13   disregarded that column?

14        A.    Yes.  That column as it relates to

15   the balance sheets within those -- Well, it was

16   not inclusive of information about the debt and

17   equity of the subsidiaries.  We did not use

18   that.

19        Q.    So you just disregarded that

20   column?

21        A.    Yes.

22        Q.    And Defendant's Exhibit Number 10,

23   again, the parent on page two is listed as -- is

Page 73

1    it -- Who do you understand to be the parent?

2           A.      Enterprises, Inc., Champion

3    Enterprises, Inc.

4           Q.      And next to it is a column CHB.

5    Is it true that you also have disregarded this

6    column in your calculations and opinions?

7           A.      Yes.

8           Q.      And Defendant's Exhibit 11 on page

9    two, the parent again is listed, is that your

10   understanding, to be Champion Enterprises, Inc.?

11          A.      Yes.

12          Q.      So would it be fair to say that

13   for Defendant's Exhibits 8, 9, and 10, you have

14   disregarded the CHB columns in your opinions and

15   calculations?

16          A.      Yes.

17          Q.      Can I ask you why you disregarded

18   CHB in those three years?

19          A.      I am providing information as to

20   what the sources and uses of cash and other --

21   of the parent and of the subsidiaries.  And so

22   it is done based upon the definition or as

23   compiled by the company itself within its

Page 74

1    financial records.

2        Q.      Okay.  And just so the record is

3    clear, Defendant's Exhibit 8 relates to year

4    ended 2002, Defendant's Exhibit 9, year end

5    2003, and Defendant's Exhibit 10 is the year end

6    2004; is that correct?

7        A.      I would have to -- I'm sure you

8    can read.

9        Q.      Yeah.  I hope I'm not splitting it

10   up, but just see if that's correct.

11       A.      Eight is for the December '02; 9

12   is for '03; 10 is for '04; 11 is for '05.

13       Q.      Okay.  And those three columns

14   that -- and those years we just mentioned, which

15   is '03, '04, and '05; is that right, for CHB,

16   did you use those columns to perform

17   calculations or in any way reach your opinions

18   in the debt-to-equity ratios?

19       A.      I don't think that I did.  At

20   least we looked in 2003 and --

21       Q.      Okay.  So you don't believe that

22   you considered those columns in your debt-to-

23   equity ratios column?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 75

1       A.       I think not.

2       Q.       On page two, you have that for

3   years 2000 through 2005, the parent company

4   generated 19,168,000 in cash from operating

5   activities; is that right?

6       A.       Yes.

7       Q.       And that's just based on the

8   information you obtained from Defendant's

9   Exhibits 6 through 11?

10       A.       Yes.

11       Q.       Okay.  Page three -- and I'm going

12   to try to go down and make sure I understand

13   we've got everything -- for that same time

14   period, it raised $68 million in capital from

15   the sales of common and preferred stock; is that

16   right?

17       A.       Yes.

18       Q.       So basically, the parent sold

19   stock to raise 68,514,000?

20       A.       Over that time of period, yes.

21       Q.       Do you know about how much of the

22   money that was raised was used to pay debt?

23       A.       For that same period of time, page

Page 90

1   investments in and advances to its subsidiaries,

2   you're specifically referencing December 31,

3   2005?

4        A.     Yes.   The most current

5   information.

6        Q.     But you've not referenced any

7   other previous year?

8        A.     That's right.

9        Q.     Next you say -- And I guess just

10  to go back one more, you basically just isolated

11  that first point of emphasis to December of

12  2005; is that correct?

13       A.     That is -- Yes.   That emphasis is

14  as it relates to that particular date.

15       Q.     Okay.   Now, significant amounts of

16  cash go to or come from its subsidiaries is your

17  second point of emphasis.   Again, what do you

18  consider to be a significant amount of cash?

19       A.     It's relative to the uses of cash

20  and the relative amounts that go to the

21  subsidiaries.   And it is reflective of the chart

22  on page seven, which is reflective of all the

23  periods.

Page 91

1      Q.      Chart on page seven, which is --

2      A.      The top.

3      Q.      Okay.  Well, you're saying the

4  99,670,000; is that correct?

5      A.      Of the 99 million cash expended,

6  34,865,000 net, there are advances and

7  investments in that number net.

8      Q.      So you're saying, I guess, that

9  the significant amount of cash to go to and from

10  subsidiaries, that amount is 34 million and

11  some-odd change?

12      A.      Yes.

13      Q.      Okay.  And you've also got the

14  parent raises significant amount of cash.  I

15  don't want to put words in your mouth, but I

16  think I can probably figure this one out.  That

17  is your 88,886,000 reflected on page four.  If

18  not, just tell me.  I'm just --

19      A.      Well, I think you misread that.

20  It says the parent raises significant amount of

21  capital.

22      Q.      I'm sorry.  Yeah, I did.  I'm

23  sorry.

Page 92

1      A.      And that would be reflective of

2   the $68 million on the chart on page three.

3      Q.      And the next point of emphasis is

4   that the parent and its subsidiaries are

5   considered one by its lender.  Who said that?

6      A.      I'm referring to the jointly and

7   several liability on debt.

8      Q.      Did you ever talk to the lender?

9      A.      No.

10      Q.      Did any lender ever tell you that

11   they consider the parent and subsidiary as one?

12      A.      No.

13      Q.      You're just making that assumption

14   because there's a guarantee on the debt?

15      A.      Jointly and severally, yes.

16      Q.      So this whole parent and

17   subsidiary considered one by its lender is

18   strictly based on your assumption, because there

19   is a joint and several guarantee of the debt?

20      A.      The lender is looking to all,

21   correct.

22      Q.      Would it be fair to say that

23   you've never discussed anything with that

Page 93

1    particular lender that we're discussing?

2         A.    That's correct.

3         Q.    Do you know who the lender is?

4         A.    It's in the financial statement.

5         Q.    But you've not talked with anybody

6    at that bank, or whoever it is?

7         A.    That's correct.

8         Q.    Okay.  And then the subsidiary

9    assets are used to secure debt.  Is that what

10   you're talking about, the joint and several

11   liability?

12        A.    Yes.

13        Q.    Is that an unusual business

14   practice?

15        A.    I would think not.

16        Q.    Would it be fair to say that

17   probably Jackson Thornton has some clients that

18   have guaranteed debts of some of their

19   subsidiaries?

20        A.    Yes.

21        Q.    Do you know whether or not any of

22   the subsidiaries can go borrow money or raise

23   money on their own?

Page 94

1      A.      I have not -- I don't have an

2    opinion on that.  I haven't been through these

3    documents with that thought in mind.

4      Q.      Do you have anything to dispute

5    that Champion Home Builders can go out and

6    borrow money on its own or raise money on its

7    own?

8      A.      No.

9      Q.      Did you notice in any of the

10   10-K's that some of the subsidiaries did borrow

11   money?

12     A.      Yes.

13     Q.      So you're aware that subsidiaries

14   are out there borrowing money on their own?

15     A.      That would be -- The balance

16   sheets would indicate some long-term debt on the

17   subsidiary side, yes.  Now, whether that was

18   able -- whether that balance sheet would be --

19   you say on its own.  Certainly as to the debt

20   that may be on those subsidiary balance sheets

21   that relate to the joint and several liability,

22   they may not have been able to take it.  But I

23   have no -- nothing to suggest that they -- on

**American Court Reporting**
**toll-free (877) 320-1050**

Page 95

1    some other debt that they're borrowing aside

2    from that.

3         Q.    My understanding of what I've seen

4    in the 10-K's indicates that the subsidiaries

5    can borrow up to $75 million in a line of

6    credit; is that correct?

7         A.    Yes.  If that's in there, I -- I'm

8    not -- If that's what's in there, then that's

9    correct.

10        Q.    Did you also notice that there's

11   approximately $20 million of floor planning

12   sources available for subsidiaries to utilize?

13        A.    Are you asking did I -- have I

14   read that?

15        Q.    In the 10-K's?

16        A.    No.

17        Q.    But if it's in there, you have

18   nothing to dispute that?

19        A.    That's correct.

20        Q.    Did you notice that in April of

21   2002, Champion Home Builders issued 150 million

22   of notes?

23        A.    I do recall that.

Page 96

1      Q.      An indication that it's able to

2  borrow money on its own?

3                    MR. VANCE:  Object to the

4  form.

5      A.      When you say on its own, I had not

6  seen those borrowing documents.  That may or may

7  not be the case.  It may be the fact that they

8  are part of the group as a whole is the reason

9  they were able to.  I don't know.  I don't have

10  an opinion on that.

11      Q.      But there is $150 million of notes

12  that Champion Home Builders went out and got?

13                    MR. VANCE:  I object to the

14  form.  I'm going to ask you if he asks you

15  questions that you don't remember or don't know

16  for sure about what may be in a document, ask

17  him to show it to you.

18                    MR. RITCHEY:  Well, he said he

19  remembered seeing that.

20      Q.      Is that correct?

21      A.      Yes.

22      Q.      So roughly $145 million, including

23  the line of credit, the floor-planning source,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1   and the 150 million raised on notes, the

2   subsidiaries were able to borrow.  Do you

3   disagree?

4          A.      But under what terms and

5   conditions, I don't know.

6          Q.      But it's there?

7                  MR. VANCE:  I object to the

8   form.

9          Q.      Do you have anything indicating

10  that they haven't gone out and borrowed it on

11  their own?

12                 MR. VANCE:  Object to the

13  form.

14         A.      I don't have an opinion on that.

15         Q.      Is it fair to say that you didn't

16  take that into consideration in figuring out

17  your opinions?

18         A.      It's irrelevant to the opinions.

19         Q.      Okay.  Your last one is:  Without

20  the parent, the subsidiaries are isolated from

21  significant amounts of capital.

22         Again, who is the parent that you're

23  referring to?

Page 98

1      A.      Enterprises, Inc.

2      Q.      Champion Enterprises?

3      A.      Yes.

4      Q.      And you're saying the subsidiaries

5  are isolated from significant amounts of

6  capital.  What do you consider to be significant

7  amounts of capital?

8      A.      One example would be $210 million

9  that is due from subsidiaries.

10     Q.      Okay.  Would you also agree that

11  $245 million is a significant amount of capital

12  also?

13     A.      I don't have an opinion on that.

14  It depends on what it's relative to, all the

15  facts and circumstances.

16     Q.      Well, assuming that it's a line of

17  credit of 75 million, $20 million in floor

18  planning, and 150 million in notes, would you

19  consider that a significant amount of capital?

20     A.      May not be enough.

21     Q.      Well, you're considering, I

22  understand earlier, that they're -- your

23  definition of a significant amount of capital

**American Court Reporting**
**toll-free (877) 320-1050**

Page 99

1    was that 212 million; is that correct?

2         A.    You'll have to show me where the

3    212 was.

4         Q.    That's what you just said.

5         A.    I said --

6         Q.    Two hundred and what million?

7         A.    I said 210 million has been

8    advanced.  That's a significant amount of --

9         Q.    Would you also agree that 245

10   million is a significant amount of capital?

11              MR. VANCE:  I object to the

12   form.  As it relates to what?

13        Q.    As it relates to the 75 million in

14   inventory and accounts receivable, line of

15   credit.

16              MR. VANCE:  Ed, I want him to

17   show you that before you testify about it.

18        A.    The counsel has asked that you

19   show me.

20        Q.    Well, you've seen 150 million,

21   right, in notes?

22        A.    I recall that, uh-huh.

23              (Off-the-record discussion.)

**www.AmericanCourtReporting.com**
**February 8, 2007**

Page 100

1          Q.      For the record, we're looking in

2    Exhibit Number L, which is for year ended

3    December 2002; is that correct?

4                  MR. ALEXANDER:  That's

5    correct.

6          A.      Now, what is your question?

7          Q.      You mentioned earlier that a

8    significant amount of capital was 210 million,

9    and I mentioned that the subsidiaries had access

10   to the 75 million in inventory and accounts

11   receivable and line of credit.  See that?

12         A.      No.

13         Q.      You're going to have to find this

14   page.  It's F-21.  Do you see where, at the

15   bottom paragraph, it says:  In January 2003,

16   subsequent to year end, Champion Home Builders,

17   CHB, entered into a three-year, $75 million

18   revolving credit facility to use in support of

19   letters of credit for general corporate

20   purposes.  That's what I was referring to.  Do

21   you see that?

22         A.      Yes.

23         Q.      So you'd agree that Champion Home

**American Court Reporting**
**toll-free (877) 320-1050**

Page 101

1    Builders, as a subsidiary, was able to get a

2    significant amount of credit for capital in --

3         A.    I'm only stating as I will agree

4    that that's what it says in the financial

5    statements.  I don't know under what terms and

6    conditions and if the fact that they were a part

7    of the group as a whole made a difference or

8    not.  I can't give you an opinion on that.

9         Q.    But regardless, it was able to

10   secure a $75 million line of credit, the

11   subsidiary was, right?

12        A.    Yes.

13        Q.    But let's -- We'll make it

14   simple.  And you're familiar with the 150

15   million in notes that Champion Home Builders was

16   also able to secure, right?

17        A.    If you're referring to F-20,

18   there's a 150 million warehouse facility, yes.

19        Q.    It's up top, the very top of that

20   page.  Issued 150 million of senior notes to --

21        A.    Uh-huh.

22        Q.    So that 75 million plus 150

23   million would be 225 million, correct?

**www.AmericanCourtReporting.com**
**February 8, 2007**

Page 102

1    A.    Those two numbers add to that, I

2    would think, yes.

3    Q.    Would you agree that's more than

4    the 210 million you just gave me as the

5    significant amounts of capital that the parent

6    isolates from the subsidiary?

7    A.    I'll only suggest that the two

8    numbers that you just articulated, one is larger

9    than the other.

10    Q.    Okay.

11                MR. VANCE:  Do you have to

12    have a degree to know that, Ed, a lot of

13    training?

14                THE WITNESS:  It helps.

15    Q.    So if I understand you correctly,

16    that even though the subsidiary without the

17    parent was able to generate $225 million

18    capital, you would say that the parent -- your

19    opinion is still that without the parent, the

20    subsidiaries are isolated from a significant

21    amount of capital which you consider to be $210

22    million --

23                MR. VANCE:  Object to the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 103

1    form.

2        Q.       -- is that correct?

3        A.       It does not change my opinion;

4    that's correct.

5        Q.       Okay.  Your next, well, opinion is

6    that the parent corporation finances the

7    subsidiary.  You say that because only assets of

8    the parent include those related to activity

9    with the subsidiary, logically, the use of

10   borrowed monies by the parent was related to

11   activity with the subsidiaries.

12       Can you explain that?

13       A.       It speaks for itself.

14       Q.       That's the only explanation you

15   have?

16       A.       Sure.

17       Q.       Now, the parent, Champion

18   Enterprises, raised $68 million, correct?

19       A.       From preferred and common stocks.

20       Q.       Correct.

21       A.       Yes.

22       Q.       Okay.

23       A.       For that period of time.

**www.AmericanCourtReporting.com**
**February 8, 2007**

Page 104

1      Q.      That same period of time,

2   approximately 56 million of that money was paid

3   to reduce debt, correct?

4      A.      No.

5      Q.      How much was?

6      A.      You're suggesting that the 68

7   million was used to pay debt, and we've already

8   testified that that was just one source of cash

9   to pay debt.  There were others.

10      Q.      But I'm asking that same period,

11   $56 million was used to pay debt, right?

12      A.      The 56 million was used in a

13   period in which 88 million -- there were 88

14   million in sources of cash.

15      Q.      And your next statement, that at

16   December 31, 2005, the parent had over 2 million

17   advanced to subsidiaries?

18      A.      Yes.

19      Q.      Where is that?  Where do you show

20   that?

21      A.      In the chart on page seven.

22      Q.      Well, if I'm reading your chart

23   correctly, those are investments in and advances

Page 105

1    to subsidiaries, right?

2         A.      The blue is.

3         Q.      The blue is.  And that's the 200

4    million?

5         A.      No.  No.

6         Q.      Okay.  Where is -- See, I don't

7    have color.  Chart on page seven?  Okay.  Where

8    is the 200 million on page seven?

9         A.      The largest part of the pie there.

10        Q.      And those, you're saying, are

11   advances to subsidiaries?

12        A.      Uh-huh.

13        Q.      Can you show me where in the 10-K

14   that shows up, or the 10-K wherever you've got

15   it?

16        A.      If you would provide -- Let's

17   see.  Which one of those is 2005?

18        Q.      I believe that's going to be

19   Defendant's Exhibit Number 11.

20        A.      Under the Defendant's Exhibit 11,

21   which is the consolidating balance sheet under

22   the parent column.  Under intercompany balances,

23   it reflects $210,222,000.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 106

1    Q.    And of that amount, how much --

2   And you're saying because it says intercompany

3   balances, that means advances?

4        A.    Yes.

5        Q.    And by advances, what are you

6   saying?

7        A.    That it has advanced dollars to

8   its subsidiaries.

9        Q.    Could that be investment?

10       A.    No.  That's another line.

11       Q.    So do you know what kind of

12   advanced dollars we're talking about as far as

13   what -- how they advanced those dollars?

14       A.    I don't understand your question.

15       Q.    Well, it says intercompany

16   balances.  I don't see anything that says

17   advances.  Do you see anything on there that

18   says advances?

19       A.    It is termed intercompany

20   balances.

21       Q.    So there's no advances?

22       A.    The word advances is not present

23   there.

**www.AmericanCourtReporting.com**
**February 8, 2007**

Page 107

1        Q.      Right.   So all that you've shown

2    me is an intercompany balance of 210,000 but not

3    an advance?

4        A.      It is a -- reflected as an asset

5    due from the subsidiaries on the parent's

6    balance sheet.   So it's advances either in the

7    form of cash or the form of doing something for

8    the benefit of.

9        Q.      Okay.   And cash or doing something

10    for the benefit of, what could doing something

11    for the benefit of be?

12        A.      Paying expenses of the subsidiary

13    would be an example.

14        Q.      Okay.   And do you have anything

15    before you today that shows that Champion

16    Enterprises, Inc. paid any expenses for Champion

17    Home Builders?

18        A.      Specific to a particular item,

19    no.   But the subsidiaries have sustained losses,

20    and they have to be funded, as the report

21    reflects.   It depended on resources of the

22    parent to fund those losses.

23        Q.      Is it borrowed money?   Is it

Page 108

1    gifted money?  Do you know?

2         A.    It's reflective on the balance

3    sheet of the parent, certainly, as not a gift.

4         Q.    Is there anything reflected

5    showing that it's borrowed on anything before

6    you?

7         A.    It's reflected as a liability on

8    the guarantor's subsidiaries.

9         Q.    Do you know whether the subs had

10   positive cash flow in 2005 from operations?

11        A.    2005, which ones?

12        Q.    The subs had positive cash flow

13   from operations in 2005?

14        A.    Did.

15        Q.    Did they?

16        A.    Uh-huh.

17        Q.    So they weren't losing money in

18   2005, right?

19        A.    Not in that year, but they were in

20   others.

21        Q.    Is there any problem with loaning

22   money from a parent to a sub?

23        A.    It's done, so no.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1    separately on that one.

2         Q.      Would it be fair to say that the

3    subsidiaries had a positive cash flow during

4    those five-year periods?

5         A.      Combined, yes, I think so.

6         Q.      I mean, it looks like if I'm

7    throwing everything in, at a 107 million some-

8    odd change one year, 63 million some-odd change

9    one year.  It looks like if you include the CHB,

10   there would be about an 8 million loss in 2002;

11   about a $60 million -- 60,600,000 some-odd in

12   2003; approximately 2 to 3 million in 2004; and

13   it looks like a loss of approximately $7 million

14   in 2005, but for the most part, a positive cash

15   flow?

16        A.      Assuming you can add, I think

17   you're probably right.

18        Q.      Now, cash from operations would go

19   to pay salaries and other expenses, right?

20        A.      Cash from operations would be

21   after paying those types of things, but also

22   from increases and decreases in other assets and

23   liabilities, other current assets and current

Page 115

1   of subsidiary, is written in that as that is --

2   as it is written in the case we referred to as

3   items of consideration.

4        So that was not written there to suggest

5   necessarily that it was a -- wrote a check for a

6   person's salary or some other expense, although

7   it may have.  The point is that the

8   subsidiaries, over that period, were showing

9   losses, and losses have to be funded with

10  capital in the form of addition to capital or

11  debt.  And we know that at December of '05,

12  there was over $200 million advanced to the

13  subsidiaries.

14       Q.    As we sit here today, you have no

15  evidence that Champion Enterprises paid any

16  salary of any subsidiary's employees?

17       A.    I don't have an opinion on that.

18       Q.    And as we sit here today, you

19  don't have an opinion as to whether Champion

20  Enterprises paid any specific expenses of any

21  subsidiary?

22       A.    Not specific expenses, no.

23       Q.    Do you have any evidence in the

Page 116

1   10-K that you reviewed showing that Champion

2   Enterprises actually paid an expense of a

3   subsidiary?

4       A.      Are you speaking of -- If you're

5   speaking of directly, no.

6       Q.      Now, the last one is losses of the

7   subsidiary.  Which subsidiary lost money?

8       A.      Bear with me.  Bear with me, and

9   I'll answer your question.

10                  11:49 a.m.

11                  (Brief recess.)

12                  11:55 a.m.

13      A.      I am ready, if you would like to

14  re-ask the question.

15              MR. RITCHEY:  Okay.  Go ahead,

16  Debbie.

17              (WHEREUPON, the requested portion

18  of the Record was read.)

19      A.      As to -- On page nine, would

20  you -- To answer that, I will go and give you

21  the source of the income loss numbers as

22  reflected there, and that should be responsive

23  to your question.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1      Q.      Do you know which subsidiary we're

2    talking about?

3      A.      The guarantor subsidiaries or

4    non-guarantor subsidiaries as reflected are

5    those other than the parent.

6      Q.      Okay.  Now, let me ask you this:

7    Are you assuming that the parent paid losses as

8    opposed to, say, the senior notes or something

9    like that paying the losses?

10     A.      What this shows is that over this

11   period of time, there were losses, and that the

12   obligation to its parent increased during that

13   time.  So the use of dollars from the parent

14   company were used, in part, to fund these

15   losses.

16     Q.      Okay.  Are you assuming that, or

17   is it anywhere in there that says that the

18   parent company paid losses of the subsidiary?

19     A.      They used funds of the parent

20   to -- in their operations.

21     Q.      Could that be borrowed funds?

22     A.      From the parent, yes.

23     Q.      Could they --

Page 118

1          A.      Yes.

2          Q.      Could it be invested funds from

3    the parent?

4          A.      Could be -- It looked to the

5    parent, although the obligations I reflect here

6    are reflected on the subsidiary balance sheet in

7    the intercompany, not in the investment

8    accounting.

9          Q.      Does it show anywhere that

10   Champion paid any creditor of any subsidiary,

11   Champion Enterprises paid any creditor of any

12   subsidiary?

13         A.      It's not the purpose of the

14   financials to show that one way or the other, so

15   it's not in there.

16         Q.      It's not in there.  Okay.  So by

17   making the statement that the parent company

18   paid a loss of the subsidiary, you have nothing

19   to back that up other than saying that there are

20   intercompany balances between the parent and

21   subsidiary; is that correct?

22         A.      You use the term a loss.  The

23   report says losses of the subsidiary.  Funds of

Page 119

1    the parent were used to fund losses of the

2    subsidiaries.

3    　　　　Q.　　　Were they loans?

4    　　　　A.　　　They are reflected as such in the

5    footnotes of the financials, yes.

6    　　　　Q.　　　Is it unusual to get a loan to pay

7    losses?

8    　　　　A.　　　Well, it's fortunate that it was

9    there so they could.　There's nothing wrong.

10    　　　　Q.　　　There's some capital between the

11    parent and the subsidiary through sources of a

12    loan, perhaps, to pay a loss; is that correct?

13    　　　　A.　　　That's -- Yes.　That's capital

14    available to fund those losses.

15    　　　　Q.　　　And you say that there's going

16    back and forth between the parent and

17    subsidiaries.　Some years the subsidiaries are

18    paying to the parent?　Is that what I'm

19    understanding from you?

20    　　　　A.　　　In the cash flow statements of the

21    parent, it reflects some years where they are --

22    and to use the terms that are within the

23    financials -- investments in and advances to

Page 120

1    consolidated subsidiaries.  They're going --

2    Yes, in some years, it's -- They're going in

3    different directions in some years.

4         Q.    And it's not unusual to invest in

5    one of your subsidiaries?

6         A.    We've answered that.

7         Q.    That's correct.  That's not

8    unusual, right?

9         A.    That's not unusual.

10        Q.    Let me ask this:  Where did you

11   get the 546,462 in 2005?  On page nine, it says,

12   owed to parent company.

13        A.    I believe if you combine the two

14   intercompany balances of the guarantor

15   subsidiaries and non-guarantor subsidiaries,

16   combine those two numbers, would be 546.

17        Q.    And we're looking on Defendant's

18   Exhibit 11, F-31?  Well, correct me if I'm

19   wrong, but my understanding of a discussion we

20   had a few minutes ago is that on the same page,

21   F-31, this 210,222 is what you said the parent

22   had advanced, loaned, done whatever, to a

23   subsidiary.  How do you then come up with the

Page 123

1      A.      I don't understand your question.

2  What other figure?

3      Q.      Well, you can't support, as we sit

4  here today, that in 2005, 546,462 -- 546 million

5  some-odd change was owed to the parent by the

6  subsidiary?

7      A.      It was owed in intercompany

8  balances to --

9      Q.      You can't say that all that money

10  was owed to the parent, correct?

11      A.      Not definitively one way or the

12  other.

13      Q.      And that will be true for each of

14  these years that are mentioned on page nine,

15  correct?

16      A.      To -- If you'll allow me to see

17  and make sure that there are eliminations in

18  each of those.  I would answer the same for

19  those years, yes.

20      Q.      Let's go back to -- It's going to

21  be for the year ended December of 2004, and that

22  would be Exhibit Number 10.  I know there were a

23  bunch of these.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 124

1      A.      Okay.

2      Q.      How did you come up with the

3  447,427?

4      A.      It would be combining -- I believe

5  combining these two, the guarantor and

6  non-guarantor subsidiary columns.

7      Q.      Would it be fair to say that you

8  totally disregarded the column under CHB?

9      A.      Yes.

10     Q.      Would that be true also in years

11 2003 and 2002, that you totally disregarded the

12 column under CHB?

13     A.      Yes.  What was the last year you

14 mentioned?

15     Q.      Be 2002, I believe.

16     A.      And that is Exhibit --

17     Q.      Number 8.

18     A.      Yes.

19     Q.      All right.  Moving down to the

20 next statement:  The parent corporation uses the

21 property of the subsidiary as its own.

22        What are you basing that opinion upon?

23     A.      The footnote disclosure that's

Page 125

1   quoted in that paragraph.

2         Q.      Okay.  So your opinion is that

3   because a subsidiary guaranteed a debt or

4   subsidiaries guaranteed debt, that the parent

5   company uses the property of the subsidiary as

6   its own?

7         A.      They're considered one, yes.

8         Q.      In your mind, they're considered

9   one?

10        A.      Yes.

11        Q.      No lender told you that?

12        A.      Same answer that I testified to

13  earlier; that's correct.

14        Q.      So would it be fair to say that

15  for any client that Jackson Thornton has ever

16  dealt with that has a subsidiary guarantee the

17  debt of a parent, they're considered one and the

18  same in front of a lender?

19        A.      Jointly and severally, yes.

20        Q.      So for any client that Jackson

21  Thornton might have where a subsidiary

22  guaranteed the debt of a parent, it would be

23  your opinion that that parent corporation uses

Page 126

1   the property of the subsidiary as its own?

2       A.     Yes.

3       Q.     When was that debt -- or when was

4   that guarantee issued?

5       A.     That is the quote that I've

6   already suggested would take some time to find.

7   What -- You want to suggest to me what you

8   think?  I mean, at some point in time during

9   this period of time that -- I'm not trying to be

10   unresponsive to your question.

11       Q.     No.  I understand.  Do you know

12   where that is?

13       A.     The 2005 K is which one?

14       Q.     It is the Exhibit O.  Is that

15   where --

16       A.     I don't see O.

17       Q.     I've got it.  Do you think you

18   know -- You said you may have a better -- may

19   have more luck trying to find it than I will.

20       Is it your recollection it was in 2005

21   from those guarantee --

22       A.     I cannot locate the quote, the

23   credit agreement is secured.  There's a quote:

Page 127

1    Guarantees are full and unconditional, as well

2    as joint and several for the senior note due

3    2009 and for the term due 2012.  And that was --

4    Yes.  It could have been 2005.  It could have

5    been 2004; could have been 2005.

6            Q.      You just can't recall as we sit

7    here today?

8            A.      It's here.  I mean, we can all

9    find it.  I mean, it's quoted, so we can find

10   it.

11           Q.      And then other than that, do you

12   have any other indication the parent corporation

13   used the property of subsidiaries as its own?

14           A.      Well, that is certainly reflective

15   as of that point in time based on that, but no

16   other point.

17           Q.      All right.  If I can get you to go

18   back.  It looks like I've skipped one.  Page

19   eight.  You state that the subsidiary has

20   grossly inadequate capital.  And by capital,

21   what do you mean?

22           A.      The capital employed in a business

23   can be made up of equity and lending.  So the --

Page 128

1   This page eight reflects that percentage of

2   total capital that is relative to debt.

3       Q.      Equity and lending; is that right?

4       A.      The term capital means both.  The

5   term debt means lending.

6       Q.      How did you get the percentages?

7       A.      From the information within

8   Exhibits 6 through 11.

9       Q.      Like for 2001, that would be

10  Exhibit 6?

11      A.      Yes.  I have another worksheet

12  that I don't know that we've designated that

13  particular document unless it got out of another

14  one.

15      Q.      This was behind your Defendant's

16  Exhibit 5.

17      A.      That would be the last page of 5.

18      Q.      So you got all the figures on page

19  eight and I guess the top of page nine.  Is that

20  contained on the last page of Defendant's

21  Exhibit 5?

22      A.      Yes.

23      Q.      And then these figures were taken

Page 129

1    off of Defendant's Exhibits 6 through 11; is

2    that right?  Do you want to look at them?  I'm

3    not trying to --

4        A.    Yes.  Yes, they did, 6 through 11,

5    yes.

6        Q.    Okay.  And would it be fair to say

7    that you didn't take into consideration the CHB

8    column in any of these calculations also?

9        A.    I believe that's the case.

10       Q.    The years that we have, 2002 to

11   2005, during those years, subs could raise

12   capital, right?  I think we went over that 150

13   million, 75 million.

14       A.    We've had some discussion of that,

15   yes.

16       Q.    And do you recall those numbers as

17   the subs raising 150 and 75 million?

18                 MR. VANCE:  Object to the

19   form.

20       Q.    Do I need to go back and pull that

21   out or --

22       A.    I remember we discussed that.

23       Q.    Is that your recollection that the

Page 130

1    subs were able to raise that amount of money?

2              MR. VANCE:   Object to the

3    form.

4         A.      That would imply that that might

5    be new capital.  It may have replaced some old

6    capital.  But there was a borrowing instrument

7    with those numbers as you articulate.

8         Q.      So what do you consider to be

9    grossly inadequate capital?

10        A.      Comparison to the industry would

11   suggest that the debt-to-equity ratio would be

12   more along the terms of 27 percent, and in this

13   case, it exceeds that.

14        Q.      Do you have any evidence to

15   suggest that at the time Champion Enterprises,

16   Inc. was formed, that it was inadequately

17   capitalized?

18        A.      I haven't looked at that.

19        Q.      Do you have any evidence to say or

20   to show that Champion Home Builders Company, at

21   the time it was formed, was inadequately

22   capitalized?

23        A.      I haven't made an analysis of

Page 131

1  that.

2       Q.      Okay.  Do you have what kind of

3  capital Champion Enterprises had in the '90s?

4       A.      No.

5       Q.      Do you have any idea of what kind

6  of capital Champion Home Builders had in the

7  '90s?

8       A.      No.

9       Q.      Does it appear to you in what you

10 reviewed in all of these 10-K's that there's

11 been a tremendous downturn in the industry?

12              MR. VANCE:   Object to the

13 form.

14       A.      I don't have an opinion on that.

15       Q.      States it in the 10-K's, doesn't

16 it?

17       A.      I don't have an opinion on that.

18       Q.      Okay.  You mentioned in your --

19 There was a single page here somewhere that you

20 just had your notes.  Do you know where that

21 is?  Here it is.  Defendant's Exhibit 16,

22 2004/2005 sold/closed 66 retail locations.  Why

23 did you put that in there?

Page 132

1    A.    As I answered before, those were

2    items, that as I was reviewing initially the

3    10-K, that I wrote down as just items of

4    interest.

5    Q.    Do you know what percent of retail

6    locations were closed --

7    A.    No.

8    Q.    -- during those years?

9    Have you done any market research to

10   determine what happened with the manufactured

11   housing industry between 2000 and 2005?

12   A.    No.

13   Q.    Did you read the first ten pages

14   of any of these 10-K's?

15   A.    I reviewed those.

16   Q.    You've got J right there, don't

17   you?

18   A.    Yes.

19   Q.    All right.  I'm going to show you

20   in Exhibit J on the ninth page of this one --

21   and it's not marked by page -- but just tell me

22   if you recall reading this:  That according to

23   the data reported -- I'm sorry -- Data reported

Page 133

1     by Statistical Surveys, Inc. indicates that

2     industry retail home sales in 2000 were down 19

3     percent from 1999 levels to an estimated 278,000

4     new homes.

5          A.     I don't recall reading that.

6          Q.     You don't recall reading that?

7     Okay.

8          Assuming my math is right, that's roughly

9     330,000 homes in '99.

10         A.     Okay.

11         Q.     I'm looking at page four of

12    Exhibit N that's previously been marked.  This

13    is the last 10-K that we were looking at for

14    year ended December of 2000.  This is for year

15    end December of 2004, although it says for

16    fiscal year ended January 1, 2005.  On page

17    four, did you note that under market, said all

18    new single-family homes -- industry wholesale

19    shipments of HUD Code homes totaled

20    approximately 131,000 homes in both 2004 and

21    2003, which was down 48 percent from 2000

22    levels.

23         Did you read that?

Page 134

1        A.        I don't recall reading that.

2        Q.        That's 48 percent down in 2004

3   from 2000 levels, and in '99, if they had

4   330,000, that's roughly a 60 percent decline by

5   2004, is it not?

6        A.        You're just doing math.

7        Q.        Well, assuming my math is right,

8   is that about --

9        A.        I have no reason to --

10        Q.        Is that a tremendous downturn,

11   would you not say, in a five-year period?

12        A.        In what?

13        Q.        In manufactured housing sales.

14        A.        If that's what the national is

15   reporting.

16        Q.        How many plants -- Do you know how

17   many plants were operating across the country in

18   '99 to 2000?

19        A.        No.

20        Q.        Do you know how many are operating

21   now in -- or in 2005?

22        A.        No.

23        Q.        Are you familiar with manufactured

Page 135

1    housing companies that have gone out of business

2    since 2000?

3         A.      No.

4         Q.      Well, you mentioned Homes of

5    Legend, didn't you?

6         A.      You did.

7         Q.      You said you're not familiar that

8    they've gone out of business?

9         A.      Is that what I answered?  I said I

10   didn't -- I wouldn't know whether they have or

11   not.

12        Q.      Okay.  Do you know whether these

13   subsidiaries have separate bank accounts?

14        A.      No.

15        Q.      Can you point me to any evidence

16   in these 10-K's where you found any type of

17   misuse of a control?

18        A.      Misuse of what?

19        Q.      Of any controls that a parent

20   might have over a subsidiary?

21                MR. VANCE:  Object to the

22   form.

23        A.      I don't know if there's something

American Court Reporting
toll-free (877) 320-1050

Page 136

1  in there or not.  I didn't --

2       Q.     Okay.  Do you have any evidence

3  that Champion Enterprises, Inc. was formed for a

4  fraudulent purpose?

5       A.     I don't have an opinion on that.

6       Q.     Do you have any evidence that

7  Champion Home Builders was formed for a

8  fraudulent purpose?

9       A.     I don't have an opinion on that.

10      Q.     Can we take about a five-minute

11 break?

12      A.     Sure.

13             (Off-the-record discussion.)

14                  12:32 p.m.

15             (Brief recess.)

16                  12:41 p.m.

17      Q.     I'm going to show you what's been

18 marked as Defendant's Exhibit 20, which is a

19 management and administrative services agreement

20 between Champion Enterprises Management and

21 Champion Home Builders Company.  Have you

22 reviewed that document?  It's also marked as

23 Strickland Exhibit 00668; is that right?

Page 137

1          (WHEREUPON, Defendant's Exhibit

2    Number 20 was marked for identification and is

3    attached to the original transcript.)

4          A.     Yes.  I have -- Yes, it is 668,

5    and no, I have not reviewed it.

6          Q.     I'm also going to show you what's

7    been marked as Defendant's Exhibit 21.  It's

8    also been Bates stamped at Strickland 00665.

9    That's also a management and administrative

10   services agreement.  I believe that was between

11   Champion Enterprises, Inc., and Champion

12   Enterprises Management, Inc.  Have you reviewed

13   that document?

14          (WHEREUPON, Defendant's Exhibit

15   Number 21 was marked for identification and is

16   attached to the original transcript.)

17          A.     No.

18          Q.     Would it be safe to say you didn't

19   utilize either one of those documents when you

20   formed your opinions?

21          A.     Yes.

22          Q.     Have you reviewed the articles of

23   incorporation of Champion Enterprises?

American Court Reporting
toll-free (877) 320-1050

Page 138

1          A.      No.

2          Q.      Have you reviewed the articles of

3    incorporation of Champion Home Builders?

4          A.      No.

5          Q.      Have you reviewed any actual

6    Champion Enterprises, Inc. documents other than

7    what we've discussed today?

8          A.      No.

9          Q.      Any purchase orders, invoices,

10   anything of that nature?

11         A.      No.

12         Q.      Have you reviewed any actual

13   documents of Champion Home Builders Company

14   other than what we've reviewed today; purchase

15   orders, invoices, anything of that nature?

16         A.      No.

17         Q.      Are you familiar with any credit

18   rating of Champion Enterprises, Inc. or Champion

19   Home Builders?

20         A.      No.

21         Q.      Based on what we went over with

22   regard to the marketing decline, do you believe

23   that that might have had -- or it may have led

Page 140

1           C E R T I F I C A T E

2

3    STATE OF ALABAMA)

4    JEFFERSON COUNTY)

5

6             I hereby certify that the above

7    and foregoing deposition was taken down by me in

8    stenotype, and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the deposition

12   given by said witness upon said hearing.

13             I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in anywise interested in

16   the result of said cause.

17                    *Deborah B. Townsend*

18

19                    DEBORAH B. TOWNSEND, CSR

20                    Certificate No. AL-CSR-207

21

22   My Commission expires

23   March 3, 2008