IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NICHOLAS STRICKLAND, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case Number:  1:06-CV-00682-TFM |
| | * | |
| CHAMPION HOME BUILDERS CO., | * | |
| INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Defendant, Champion Home Builders Co. ("CHB"), the remaining defendant in the above-styled action, by and through counsel of record, and pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, submits the following Memorandum of Law in Support of its Motion for Summary Judgment, and states as follows:

1.    In support of its motion CHB is submitting herewith excerpts from both volume one and two of the deposition of Robert Parks, (hereinafter referred to as "Parks") which is attached hereto as "Exhibit A" and made a part hereof by reference.

2.    CHB is also submitting excerpts from the deposition of the Stricklands, which is attached hereto as "Exhibit B" and made a part hereof by reference. [Because the Stricklands are both hearing impaired their depositions were taken simultaneously with the aid of an interpreter, Ms. Becky Hunt, and are recorded together in this one transcript.]

3.    CHB is also submitting a copy of the Manufacturers Limited Warranty (herein after refered to as "Limited Warranty") for the Stricklands' home which is found on pages 4

through 6 of their Homeowner's Manual, which is attached hereto as "Exhibit C" and made a part hereof by reference.

## I.     INTRODUCTION

This is a manufactured housing case where the plaintiffs, Nicholas and Jennifer Strickland (collectively referred to herein as "the Stricklands"), claim that their home is defective because CHB constructed the home with an internal vapor barrier consisting of vinyl coated wallpaper. The Stricklands contend that CHB should not have utilized an internal vapor barrier in his home even though the federal building code has expressly permitted this design since 1975. 24 C.F.R. § 3280.504(b)(1). For the reasons discussed below, this Court should grant CHB final summary judgment.

## II.     NARRATIVE STATEMENT OF UNDISPUTED FACTS

In March of 2003 the Stricklands purchased the relevant home from an independent dealer, not CHB. (Exhibit B, pp. 40:20 – 41:23; 97:14 – 21). The Stricklands understood that CHB built the home. *Id.* They also understood that the representatives of the dealer were not employees of CHB. Id. The Stricklands had no dealings with CHB before their purchase of the home. *Id.* Though their claims in this case are based entirely on alleged condensation in the walls, the Stricklands have never seen any mold or soft walls in their home. (Exhibit B, pp. 161:9 – 15; 162:13 – 19).

The Stricklands filed this action on June 26, 2006. (Complaint).[1] The Stricklands allege the following ten claims : (1) violation of the Magnuson Moss Act, 15 U.S.C. 2301 et seq.; (2) breach of express warranty; (3) breach of the implied warranty of merchantability; (4) breach of

---

[1] The Stricklands filed his Complaint in the Circuit Court for Mobile County, Alabama. CHB removed this action to the United States District Court for the Southern District of Alabama on July 21, 2006. The Stricklands' Complaint was attached to CHB's Notice of Removal at Exhibit A.

the implied warranty of fitness for a particular purpose; (5) breach of the implied warranty of habitability; (6) negligence; (7) wantonness; (8) unjust enrichment; (9) fraudulent concealment; and (10) violation of Alabama's Extended Manufacturer's Liability Doctrine.  (Complaint, pp. 7-14, ¶¶ 23 – 68)

The Stricklands contend that their home is defective because CHB constructed the walls of their home with an internal vapor barrier (vinyl-coated wallpaper).[2]  However, one of the Stricklands' expert witnesses, Bobby Parks, testified that it is permissible for a manufacturer to build walls pursuant to 24 C.F.R. § 3280.504(b)(1).  (Exhibit A, vol. 1, p. 71:8 – 72:12).  It is undisputed that the walls complained of in the Stricklands' home are built to this standard.  Parks is also actively lobbying the Consensus Committee for HUD[3] to abrogate the use of internal vapor barriers through a change in the regulations.  *Id.*[4]

The Stricklands received an express Limited Warranty from CHB in connection with their home.  (Complaint, p.7, ¶ 18; Exhibit B, pp. 16:21 – 18:2).  The Warranty is limited, and it does not warrant "deterioration or damage from high relative humidity, condensation…" (Exhibit C, p. 4).  The Stricklands contend that the walls of their home are damaged from condensation, due to the location of the vapor barrier.  (Exhibit B, p. 162:3 – 12; Complaint, p. 3, ¶¶ 8, 13, 15).  The Limited Warranty also waived all implied warranties to the extent permitted by law.  (Exhibit C, p.5).

The Stricklands do not claim any personal injury in this case.  When questioned on the subject, the Stricklands' attorney interjected a stipulation that his clients would not be making

---

[2] Walls with internal vapor barriers are governed by 24 C.F.R. § 3280.504(b)(1).
[3] Federal statutory law creates a standing Consensus Committee, which must approve of proposed changes to the HUD Code before the Secretary of HUD publishes a proposed rule in the Federal Register.  42 U.S.C. § 5403(a)(4)-(6).
[4] The weakness of the Stricklands' position is obvious:  if CHB is liable for following the law, then why is Parks trying to change the law?  The question answers itself.

any personal injury claims related to mold, nor would there be any medical expert testimony on this issue. (Exhibit B, pp. 165:13 – 166:15).

The Stricklands urge a claim for breach of the implied warranty of habitability. However, when questioned, they testified that their family continues to live in the home without injury. (Exhibit B, pp. 26:12 – 19; 165:13 – 166:15).

The Stricklands claim that CHB breached the implied warranty of fitness for a particular purpose. The evidence establishes that the Stricklands never spoke to anyone at CHB before they purchased the home. (Exhibit B, pp. 40:20 – 41:23; 97:14 – 21). The home was not specially ordered, it was purchased from an existing floor plan with only minor alterations. (Exhibit B, pp. 38:5 – 41:23). The Stricklands saw the home at an independent manufactured home lot and decided to buy it after they were given the opportunity to inspect a lot model. (Exhibit B, pp. 36:8 – 37:16). Thus, there is no evidence that the Stricklands' purchasing decision was influenced by anyone working for CHB. The Stricklands filed one count of fraudulent concealment. (Complaint, p. 13, ¶¶ 57-62). As the Stricklands have had no pre-sale contact with CHB it will be impossible for them to present evidence that CHB defrauded them or suppressed material facts. (Exhibit B, pp. 40:20 – 41:23; 97:14 – 21).

**ARGUMENT**

**A. SUMMARY JUDGMENT STANDARD**

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Federal Rule of Civil Procedure 1). Summary judgment is proper under Federal Rule of Civil Procedure 56(c) where the movant shows that

there is no genuine issue of material fact and that, based upon the undisputed facts, it is entitled to judgment as a matter of law.  *Early v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).  For a question of fact to be *genuine*, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Instead, the evidence must be of such quality that "a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Id.* at 249-50; *see also Early*, 907 F.2d at 1080.

In considering a motion for summary judgment, the trial court must consider the evidence in the light most favorable to the non-movant.  *Early*, 907 F.2d 1080.  However, the court is required to resolve only *reasonable* doubts in the non-movant's favor; it is not required to resolve *all* doubts in his favor.  *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).  "A court is not obligated to find that there is no conflict in the evidence; the court must merely find that there is not <u>substantial</u> evidence opposed to the moving party's position."  *Jones v. Miles Laboratories, Inc.*, 887 F.2d 1576, 1578 (11th Cir. 1989) (emphasis in original).

A movant is entitled to summary judgment where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex*, 477 U.S. at 232.  Where a movant has properly supported a motion for summary judgment, the burden shifts to the non-movant to demonstrate a genuine issue of material fact necessitating a trial.  *Id.*  The substantive law governing the plaintiff's claim determines which facts are material and which are irrelevant.  *Anderson*, 477 U.S. at 248.

**CHB IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE
STRICKLANDS' CLAIMS ARE BARRED BY THE PREEMPTION DOCTRINE**

The Stricklands' claims are preempted by the federal building code (referred to hereafter as the "HUD Code").[5]  The manufactured housing industry is a highly regulated industry. Those regulations found within the HUD Code create tight confines within which manufacturers must function. The regulations dictate with specificity how, among other things, wall structures must be built. The HUD Code is continually under review.  The wall design options under the HUD Code have been thoroughly tested and proven to be effective. Because of this stringent approval process HUD in effect guarantees the design options under the HUD Code and creates a presumption that any design not approved under the code is inferior.

Importantly, since the filing of this case, this court decided an <u>identical</u> on-point case holding that the plaintiff's claims are impliedly preempted.[6]  In *Murphy v. Southern Energy Homes, Inc*., Case No. 2:06-cv-618-MEF the court issued a Memorandum Opinion and Order dismissing the plaintiff's claims with prejudice. (The court's order is attached hereto as "Exhibit D" and made a part hereof by reference).  CHB urges this court to apply the holding of *Murphy* to the instant case and grant a summary judgment in CHB's favor.

In *Murphy* the court noted, "Plaintiff's claims are based on Defendant's construction of the exterior walls of Plaintiff's home with interior vapor barriers, which is expressly permitted

---

[5] Manufacturers are required to comply with the Federal Manufactured Home Construction and Safety Standards promulgated by the U.S. Department of Housing and Urban Development ("HUD").  The National Manufactured Housing Construction and Safety Standards Act, 42 U.S.C. § 5401, *et seq*. (MHCSS), which was passed and signed into law in August 1974, required the Secretary of HUD to establish Federal manufactured home construction and safety standards and to issue regulations to carry out the purpose of the MHCSS Act.  The standards for the construction of and safety issues concerning manufactured homes are contained in the Code of Federal Regulations, Title 24, Federal Manufactured Home Construction and Safety Standards.  24 CFR § 3280, *et seq*.  In addition, there are many regulations concerning the construction and safety of manufactured homes, which appear in the Code of Federal Regulations Title 24, Manufactured Home Procedural and Enforcement Regulations.  24 CFR § 3282, *et seq*.  These two sections of Title 24 are commonly referred to in the manufactured housing industry as the "HUD Code."  The standards promulgated pursuant to the MHCSS Act apply to all manufactured homes manufactured for sale to purchasers in the United States on or after the effective date of the standards, which was June 15, 1976.
[6] The same attorneys that represented *Murphy* also represent the Stricklands. The original complaint in *Murphy* is nearly identical to the complaint pled in this case.

6

under the HUD Code." (Exhibit D, p. 4). The court unequivocally stated: "Plaintiff's claims are due to be dismissed because of conflict preemption." (Exhibit D, p. 3). Further, the court went on to adopt the findings in both *Perry v. Fleetwood Enterprises, Inc.*, 2007 WL 2893410 (M.D. Ala. Sept. 28, 2008) and *Guidroz v. Champion Enters. Inc.*, No. 05-1148 (W.D. La. January 26, 2007), stating: "The Court agrees and concludes that Plaintiff may not penalize Defendant for choosing an option permitted by § 3280.504(b)." (Exhibit D, p. 4).

The Court stated in *Perry*:

> "Plaintiff argues, looking both to case law and the structure of the regulations themselves, that the regulations at issue set forth are performance-based. In other words, the manufacturer is given several options to meet a performance-based requirement. Therefore, Plaintiff argues, the regulations set forth minimum standards. The Court disagrees." "Plaintiff's state law claims are DISMISSED with prejudice to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b)."

*Perry v. Fleetwood Enterprises, Inc.*, No. 2:06-cv-502-MEF (WO), 2007 U.S. Dist. LEXIS 73355 (M.D. Ala. Sept. 28, 2007) attached hereto as "Exhibit E" and made a part hereof by reference.

It bears mentioning again that HUD itself has already rejected the Stricklands' position that manufactured home walls constructed with internal vapor barriers are somehow improper or defective. The Stricklands have argued through their expert that Section 3280.303(b) of the HUD Code, which is a general provision of the Code, somehow overcomes and invalidates Section 3280.504(b)(1), which is a specific code section applicable to wall design. (Exhibit A, vol. 1, pp. 71:8- 72:12).[7] HUD, through William W. Matchneer III, HUD's Associate Deputy

---

[7] Even if this argument is a viable one, it is not within the province of the jury to determine whether the requirements of a code have been met based on a witnesses' opinion, as such determinations must be made by the trial court. *See Williams v. State of Florida Dept. of Trans.*, 579 So.2d 226, 230 (Fla. 1991) *overruled on other grounds* (trial court was required to determine the legal requirements of the code and give appropriate instructions to the jury); *Seibert v. Bayport Beach and Tennis Club Association, Inc.*, 573 So.2d 889, 891-2 (Fla. 2d DCA 1990) (An expert should not be allowed to testify concerning questions of law, and the interpretation of the building code presented a question of law); *Perry v. Medeioros*, 369 Mass. 836, 343 N.E.2d 859 (Mass. 1976) (finding trial court properly ruled that the building inspector was properly precluded from giving the jury his opinion interpreting the

Assistant Secretary for Regulatory Affairs and Manufactured Housing (the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards) expressly rejected such a theory in his letter of January 19, 2007, which states as follows:

> As the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards, I can say that these pleadings consistently misrepresent HUD enforcement policy by arguing that HUD's general standard at 3280.303(b) should be applied to manufacturers' practices regarding the placement of vapor barriers even though these manufacturers have complied with HUD's more specific vapor barrier standard at 3280.504(b).
>
> Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).
>
> Thank you again for bringing this situation to our attention. HUD has a distinct interest in maintaining an accurate understanding by arbitrators and the courts of HUD's enforcement policies and practices regarding the Manufactured Home Construction and Safety Standards. We would be especially concerned by a reported judicial decision that misstated HUD policy and practice, so please keep us advised of developments in these cases.

(opinion letter from William W. Matchneer III, HUD's Associate Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing (the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards) dated January 19, 2007 attached hereto as "Exhibit F" and made a part hereof by reference).[8]

---

code and the effect thereof on facts to be found by the jury); citing *S. D. Shaw & Sons, Inc. v. Joseph Rugo, Inc.*, 343 Mass. 635, 639, 180 N.E.2d 446 (1962); *Killam v. Standard Oil Co. of N.Y.*, 248 Mass. 575, 582, 143 N.E. 698 (1924); *Campbell v. Leach*, 352 Mass. 367, 373, 225 N.E. 594 (1967); *Edward J. Siebert, AIA, v. Bayport Beach and Tennis Club*, 573 So.2d 889 (Fla. 1990) (permitting experts to testify regarding their opinions on how building code fire exit requirements should be interpreted was erroneous, as interpretation of building code presented question of law; it was duty of trial court to interpret meaning of building code fire exit requirements).

[8] CHB wishes to bring to the attention of the Court that in a separate Memorandum Opinion and Order (Doc. No. 75) in *Murphy*, the letter was stricken as it was determined that it did not satisfy one of the hearsay exceptions in Rule 803(8).

Thus, because HUD has already answered the question currently before the Court, the Court should accord broad deference to HUD's interpretation of its own regulation and refuse to revisit this question. *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002) (holding that deference should be afforded to agency's interpretation of its own rules even when the interpretation did not emerge from formal rulemaking); *United States v. Mead Corp.*, 533 U.S. 218, 229-234 (2001) (same); *Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257, 1261-62 (11th Cir. 2002) (noting that deference should be afforded to HUD interpretations although such interpretations did not emerge out of an official rule-making process); *Price v. Countrywide Home Loans, Inc.*, CV205-15, 2005 WL 2354348 at *7-*8 (S.D. Ga. 2005) (explaining that informal HUD interpretation of rule was to be accorded deference pursuant to binding Eleventh Circuit and Supreme Court precedent, as well as HUD's expertise in regulating the subject of the case at issue). *Feliciano v. Romney*, 363 F. Supp. 656, 674 (S.D.N.Y. 1974) (noting that "[c]ourts are limited to reviewing the efforts of HUD in carrying out its statutory responsibilities.")[9]

Essentially, by arguing that liability can be imposed upon CHB under 24 C.F.R. §3280.303(b) notwithstanding CHB's strict compliance with the specific provisions of 24 C.F.R. § 3280.504(b)(1), the Stricklands are really arguing that 24 C.F.R. § 3280.504(b)(1) is irrational to the extent it allows for internal vapor barriers contained in the exterior walls of manufactured homes in "humid and fringe zone climates." In so doing, the Stricklands would have this Court modify the HUD Code retroactively based simply upon the Stricklands' opinion of what the

---

[9] The fact that the Stricklands' expert, Parks, admitted that the design used by CHB is compliant with Section 3280.504(b)(1), really ends the inquiry in the case. Parks testified that it is permissible for a manufacturer to build walls pursuant to 24 C.F.R. § 3280.504(b)(1). (Exhibit A vol. 1, pp. 71:8 – 72:12). Recognizing that his design theory is fatally flawed, Parks is actively lobbying the Consensus Committee for HUD to abrogate the use of internal vapor barriers through a change in the regulations. (Deposition of Bobby Parks in Ford v. CHB, vol. 1, pp. 8:20-9:2) Respectfully, CHB should not be held liable for a design choice that might be changed at some unknown time in the future.

HUD Code should say, and hold that millions of previously-conforming manufactured homes are now subject to wide recall or further liability, which respectfully speaking, is a ridiculous position.

Indeed, HUD has actively regulated the issues at hand since 1975.  58 F.R. 54975 (Oct. 25, 1993); 67 F.R. 20400 (Apr. 24, 2002); 69 F.R. 70016 (Dec. 1, 2004); 70 F.R. 72024 (Nov. 30, 2005).   Since the inception of the HUD Code, HUD has expressly permitted the use of interior vapor barriers in homes throughout the country.  It is within the sole discretion of HUD to decide whether to limit a regulation in terms of geographical application.  Most recently, in 2006 HUD amended 24 C.F.R. § 3280.504(b) to permit the use of external vapor barriers in some homes.[10]  This amendment limited the use of such external vapor barriers to certain areas within the Gulf region, but did not eliminate or geographically limit any other wallboard design set forth in 24 C.F.R. § 3280.504(b).  If HUD thought it best to limit the use of internal vapor barriers pursuant to 24 C.F.R. § 3280.504(b)(1) to certain geographical regions, HUD would have done so.  However, HUD made a conscious choice to refrain from limiting 24 C.F.R. § 3280.504(b)(1) in the manner that the Stricklands seek.  Thus, the Stricklands' argument here amounts to nothing more than a complaint as to HUD's wisdom in making determinations regarding the substance of the applicable HUD Code provisions.  Because HUD is the entity charged with the duty to promulgate and review its regulations, this Court should refuse to entertain such a complaint and defer to HUD's discretion in fulfilling its Congressional mandate. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (noting that "[w]hen a challenge to an agency construction of a statutory provision . . . really centers on the wisdom of the agency's policy . . . the challenge must fail.  In such a case, federal

---

[10] It should be noted that this amendment does not apply here because the Plaintiff's home was manufactured in January 2006, before the amendment went into effect.

judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices . . . are not judicial ones.").[11]

Based on the forgoing CHB is entitled to a final summary judgment in its favor on all claims. The court need not read any further as the plaintiff's claims are preempted. However, CHB has provided further appropriate arguments warranting final summary judgment in its behalf on each of the plaintiffs' claims.

### B.    CHB IS ENTITLED TO SUMMARY JUDGMENT ON THE STRICKLANDS' FRAUD CLAIMS

In Count Nine of the complaint, the Stricklands allege a claim for fraudulent concealment. (Complaint, pp.13-14, ¶¶ 57 – 62).

It is respectfully submitted that the two (2) year statute of limitations for fraud claims expired prior to the filing of the lawsuit. *See* § 6-2-38(l), *Code of Alabama, (1975); Foremost*

---

[11] In the event this Court has any doubts about the strength of CHB's position with respect to the issue of whether Section 3280.504(b)(1) should not be overcome by the tortured application of Section 3280.303(b) (as the Stricklands contend), it should nevertheless dismiss the Stricklands' claims based on the doctrine of primary jurisdiction. The common-law doctrine of primary jurisdiction "comes into play when a claim . . . calls for resolution of issues which, 'under a regulatory scheme, have been placed within the special competence of an administrative body.'" *Sprint Corp. v. Evans,* 846 F. Supp. 1497, 1505 (M.D. Ala. 1994) (Thompson, J.) (quoting *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 64 (1956)). The doctrine applies, especially as here, when "protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321 (1963). *Ricci v. Chicago Mercantile Exch.,* 409 U.S. 289, 299-300 (1973) (noting that primary jurisdiction applies when conduct that is subject to court litigation "is . . . at least arguably protected or prohibited by . . . [a] regulatory statute . . ."); *Alabama Assoc. of Home Health Agencies v. ABC Home Health & Hospice of Ala., Inc.,* 601 So. 2d 1027, 1030-31 (Ala. 1992) ("while the trial court may have technically had jurisdiction . . . it should have deferred, at the outset to . . . the agency which, by law, administers the . . . program [at issue]"); *Fraternal Order of Police, Strawberry Lodge #40 v. Entrekin,* 314 So. 2d 663, 670 (Ala. 1975) ("the doctrine of primary jurisdiction implies that matters entrusted by the legislature to an administrative agency, ought to first be considered by that agency"). The doctrine counsels a court to dismiss or stay a matter "pending referral of such issues to the administrative body for its views." *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 63-64 (1956).

*Insurance Co. v. Parham,* 693 So.2d 409, 417 (Ala.1997).  Even if the statute of limitations had

not expired, Alabama fraud law is codified at Alabama Code Sections 6-5-100 through 104.  A

claim for concealment or suppression is governed by Section 6-5-102.  It provides that

"[s]uppression of a material fact which the party is under an obligation to communicate

constitutes fraud.  The obligation to communicate may arise from the confidential relations of the

parties or from the particular circumstances of the case."  Ala. Code § 6-5-102 (Repl. Vol. 2005).

To prove a *prima facie* case of fraudulent suppression under Alabama law, a plaintiff must show

that (1) the defendant had a duty to disclose an existing, material fact; (2) that the defendant had

actual knowledge of the fact and its materiality; (3) that the defendant suppressed that fact; (4)

that plaintiff's lack of knowledge concerning that fact induced him to act; and (5) that the

plaintiff suffered actual damage as a proximate result of acting.  *Perry v. Household Retail*

*Services, Inc.*, 953 F. Supp 1365, 1368 (M.D. Ala. 1996).

   The duty to disclose rarely arises in arm's length transactions because "when both parties

to a transaction are intelligent and fully capable of taking care of themselves and are dealing at

arm's length and when there are no confidential relations between them, one of them owes no

duty to disclose a material fact to the other without a request, and mere silence concerning such a

fact is not fraud; there must be active concealment or misrepresentation.  *DeWitt v. Long*, 519 So.

2d 1363, 1366 (Ala. Civ. App. 1987).  Mere silence does not constitute fraud; there is no duty to

disclose facts when information is not requested.  *Hardy v. Blue Cross & Blue Shield*, 585 So. 2d

29, 32 (Ala. 1991).  In a purchase and sale transaction, a duty to disclose typically exists only

where there is a fiduciary relationship among the parties, or if a purchaser specifically inquires

about a material condition concerning the property purchased.  *Cato v. Lowder Realty Co.*, 630

So. 2d 378, 382 (Ala. 1993).  The existence of a duty to disclose is a question of law to be

determined by the trial judge, not a question of fact for the jury. *State Farm Fire and Cas. Co. v. Owen*, 729 So. 2d 834, 837-841 (Ala. 1998).

The Stricklands' suppression claims fail because CHB does not owe the Stricklands any legal duty to disclose any facts. There is no evidence of any direct transaction between the Stricklands and CHB, as the Stricklands purchased his home from an independent manufactured home lot after inspecting a lot model. (Exhibit B, pp. 36:8 – 37:16). Furthermore, there is no evidence of any confidential relationship between the Stricklands and CHB. Therefore, CHB could not have participated in any fraud. There was no contact by and between the Stricklands and CHB by which a duty to disclose could have arose. Since there was no direct contact between the Stricklands and CHB before the sale of the Manufactured Home, no duty can be established to support any fraud claim.

The only representations regarding the Manufactured Home, for which the Stricklands could claim fraud, would be contained in the Limited Warranty delivered in connection with the sale of the Manufactured Home. (Exhibit C, pp. 4 – 6). However, the language contained in the Limited Warranty does not amount to an actionable representation that the Manufactured Home was "free from defects". *See Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d 3 (Ala. 1997); *Rhodes v. General Motors Corp.*, 621 So.2d 945 (Ala.1993); *Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So.2d 883 (Ala.1989). In the *Crawford* case, it was alleged that the manufacturer expressly warranted that the home was "free from defects in material and workmanship" and that the manufactured home was "constructed in compliance with the federal guidelines". *Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d at 9-10. The Supreme Court of Alabama, relying on previous holdings, found that the language of an express warranty to repair

cannot be construed as a representation that a product is entirely free of defects. *Palm Harbor Homes, Inc. v. Crawford*, 689 So.2d at 10-11.

In *Rhodes v. General Motors Corp.*, 621 So.2d 945, 948 (Ala.1993), the Supreme Court held that language in a warranty stating that the "warranty covers repairs to correct any defect in material or workmanship of the vehicle" cannot be construed as a representation that the car was and would remain free of defects. In *Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So.2d 883 (Ala.1989), the Supreme Court reviewed language in a warranty that stated: "This warranty covers any repairs and needed adjustments to correct defects in material or workmanship." *Tittle*, 544 So.2d at 891. The Supreme Court determined that rather than guaranteeing the car to be free of defects, the warranty actually anticipated that defects would arise and provided for remedying such defects. *Id.*

It is anticipated the Stricklands will claim that the alleged problems set forth in their Background Facts support their fraudulent concealment theory. However, the Background Facts failed to provide any admissible evidence in support of the generalized statements. Even if it can be proven that there was some sort of recurring defect, such a fraud claim is not actionable. The Supreme Court of Alabama has reviewed similar claims in several cases and held there is no duty to disclose recurring defects in a line of products to a buyer. When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested. *Mason v. Chrysler Corporation,* 653 So.2d 951, 954-955 (Ala. 1995), *citing Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch Inc.,* 611 So.2d 238 (Ala.1992); *Norman v. Amoco Oil Co.,* 558 So.2d 903 (Ala.1990); *see* Ala.Code 1975, § 6-5-102.

In *Mason,* the Masons' contacts with Chrysler Corporation consisted primarily of their viewing national advertisements before they purchased the vehicle and their presenting the vehicle for repair. Neither the Masons' depositions nor their affidavits in opposition to the summary judgment motion contained any evidence indicating that they inquired of Chrysler Corporation or Royal Motor Company regarding whether problems similar to theirs had occurred in other automobiles. *Mason v. Chrysler Corporation,* 653 So.2d at 955.

The Supreme Court of Alabama in *Mason* held as follows:

Although the Masons took their car in for repairs on several occasions, that fact standing alone--bringing a car in for repairs--does not establish any special relationship between the dealer and the purchaser that would require the dealer to disclose to the purchaser that the car may require additional repairs. The Masons complain that they were assured by the salesman and by Chrysler Corporation' promotional material that the car they bought would give a smooth ride, like that of a Cadillac, and that the warranty Chrysler Corporation offered was one of the best. They contend that these statements were false and that the dealer knew they were false. The statements may have been false, but they were not statements of material fact that a buyer could be expected to rely on.

Under the express provisions of its warranty, Chrysler Corporation would be responsible for repairing the car, but the plaintiffs produced no evidence that will support a fraud action based either on statements made at the time of the sale or on the defendants' failure, when the car was brought in for repairs under the warranty, to disclose that the problems with the car might recur. Because the plaintiffs failed to establish the necessary facts to support their fraud claim, the trial court correctly entered the summary judgment as to this claim. The extent and the nature of the harm the Masons claim in this case are substantially similar to those of the harm claimed in *McGowan, supra.* As we noted in *McGowan:*

"Even if there was substantial evidence that [the dealer] knew of the problems with the Fifth Avenue line, the record does not contain substantial evidence to support the inference that [it] actively or knowingly concealed these problems with an intent to deceive McGowan. Likewise, even if there was substantial evidence that Chrysler knew of the problems with its Fifth Avenue cars, McGowan produced no evidence of a confidential relationship or of any special circumstances between him and Chrysler, nor did he present substantial evidence that Chrysler knowingly

> or actively concealed from him its knowledge of the
> problems with the Fifth Avenue line."

631 So.2d at 847-48.    The summary judgment is also affirmed as to the
fraudulent suppression claim.
*Mason v. Chrysler Corporation,* 653 So.2d at 955.

This position has steadfastly been followed by the Supreme Court of Alabama. *See e.g,*

*Freighliner, LLC v. Whatley Contract Carriers, LLC*, 932 So. 2d 883, 892 (Ala. 2005) (with

arm's length transaction and no specific inquiry, no duty to disclose any information regarding

the internal audit results for the Mexico plant, which found discrepancies above-sometimes four

to five times above-the goal set by Freightliner; law generally allows a business to keep

confidential its internal operating procedures and data unless that information is specifically

requested); *DaimlerChrysler Corp. v. Morrow,* 895 So.2d 861, 867 (Ala.2004) (no generalized

duty to disclose similar problems occurring in other vehicles).

The above is true even where work was performed at the factory.  In *Century 21-Reeves*

*Realty, Inc. v. McConnell Cadillac, Inc*., GM, the manufacturer of the subject vehicle, serviced

the automobile at its factory prior to its sale to a finance company to correct a problem with the

engine and had no contacts with buyer; the Supreme Court of Alabama concluded that a

summary judgment for GM was proper as to Century 21's fraud claim based on the following

analysis:

> The undisputed evidence shows that Century 21 purchased the automobile from
> GMAC, not from GM.   GM was not involved with the negotiations leading up to
> Century 21's purchase of the automobile from GMAC. GM, which had no
> confidential relationship with Century 21 (in fact, GM had no contacts with
> Century 21 at all), had serviced Century 21's automobile at the factory to correct
> the problem with the engine.    Although GM may have misjudged the
> effectiveness of its efforts to rectify the problem with the engine's gasket, we can
> find no basis under the circumstances of this case upon which to impose a duty on
> GM's part to disclose information concerning the automobile directly to Century
> 21.  See *Cobb v. Southeast Toyota Distributors, Inc.,* 569 So.2d 395 (Ala.1990).
> [FN1]

> FN1. The record shows that GM adopted a plan to notify owners of record of automobiles equipped with the HT-4100 engine of the problem that it had had with the gaskets.    The record is unclear; however, as to whether GMAC or Century 21 actually received specific notice of the engine's problematic history.

*Century 21-Reeves Realty, Inc. v. McConnell Cadillac, Inc.,* 626 So.2d 1273, 1275-1276 (Ala. 1993).

CHB is a remote home manufacturer; the Stricklands are consumers, who purchased the home from an independent dealer.  Absent direct communications between the parties, there can be no duty to disclose.  *Cato*, 630 So. 2d at 382. Even if a duty did exist, there is no evidence that CHB suppressed any material facts.

Thus, the Stricklands cannot prove the existence of a legal duty or that CHB has suppressed any material facts.  For the reasons discussed herein, CHB respectfully urges this Court to grant a summary judgment in CHB's favor on the Stricklands' claims for fraudulent concealment including any negligent/wanton fraudulent concealment.

## C.    CHB IS ENTITLED TO SUMMARY JUDGMENT ON THE STRICKLANDS' TORT CLAIMS

The Stricklands advance three tort claims (in addition to fraud) wherein they allege that their home was constructed and designed in an improper manner.    In Count Six of the Complaint, the Stricklands allege negligent manufacture and design of their home. (Complaint, pp. 11, ¶ 46)  In Count Seven of the Complaint, the Stricklands allege wanton construction of their home.  (Complaint, p. 12, ¶ 51)  Finally, in Count Ten of the Complaint, the Stricklands allege a product liability action under Alabama's Extended Manufacturer Liability Doctrine ("AEMLD"), claiming that the home was sold to them in a defective condition and that it was unreasonably dangerous.  (Complaint, pp. 14, ¶ 67).  The Stricklands' tort claims fail for several reasons.

Claims alleging negligence, wantonness or liability under the AEMLD are barred under Alabama law by its two year statute of limitations. *See* § 6-2-38(l), *Code of Alabama, (1975). See, generally, Smith v. Medtronic, Inc.,* 607 So. 2d 156, 159 (Ala. 1992) (an action alleging negligence, wantonness, or liability under the AEMLD must be brought within two years after the cause of action accrued).  The cause of action arose as soon as Strickland was entitled to maintain it. The Stricklands purchased their home in March of 2003. "A cause of action 'accrues' as soon as the party in whose favor it arises is entitled to maintain an action thereon." *Id.,* (*citing Garrett v. Raythorn Co.,* 368 So.2d 516 (Ala. 1979)).  Any cause of action for the alleged defective manufactured home accrued on or shortly after the Stricklands accepted delivery of the house in March or April, 2003.  The cause of action was not brought until the 26th of June, 2006, which is after the two year statute of limitations period.

Assuming, *arguendo,* that the statute of limitations did not expire prior to the filing of the civil action, any negligent or wanton manufacture or repair claims are due to be summarily dismissed as said claims are merely breach of warranty claims and not cognizable under Alabama law.  One cannot recover in tort for injury to the product itself, compensation for such injury may be obtained through available contractual remedies, i.e. claims for breach of express warranty.  *See Dairyland Ins. Co. v. General Motors Corp.,* 549 So.2d 44, 46 (Ala. 1989); *see also Lloyd Wood Coal Co. v. Clark Equip. Co.,* 543 So.2d 671, 673-674 (Ala. 1989) (relying on *East River S.S. Corp. v. Transamerica Delavel, Inc.,* 476 U.S. 858 (1986), which held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself" and that "[d]amage to a product itself is most naturally understood *as a warranty claim.*") (emphasis in original); see also *Grand Manor, Inc. v. Dykes,* 778 So.2d 167, 171, n.3 (Ala.Civ.App. 1998) ("warranty actions

under the Uniform Commercial Code are the only appropriate means for seeking recovery for damage to the product itself caused by negligent manufacture") (overruled on other grounds by *Ex parte Grand Manor, Inc.,* 778 So.2d 173 (Ala. 2000)).

The Stricklands cannot support any negligent or wanton manufacture or repair claims as there is no substantial evidence that CHB harbored an intent not to repair the home or otherwise injure or deceive the Stricklands.  *See, e.g., Jewell v. Seaboard Industrial, Inc.,* 667 So.2d 653, 659 (Ala. 1995) (Jewell presented no substantial evidence that manufacturer harbored an intent not to repair the manufactured home or otherwise to injure or deceive Jewell; the evidence indicated that on one occasion, a representative from Southern Energy spent two or three days making repairs to Jewell's manufactured home, apparently repairing all but 5 of 128 defects in Jewell's original list-on other occasions, Southern Energy tried to make appointments with Jewell, but the parties could not agree on a time or else Jewell could not be reached).

It is further respectfully submitted there is no public or common law duty owed by manufactured home builders in Alabama or anywhere else in the country to build a perfect home or to perform repairs.  *See Burnell v. Morning Star Homes, Inc.*, 494 NYS 2d 488 (NY App. Div. 1985).  In *Burnell*, the Supreme Court of New York correctly recognized that a manufactured home manufacturer that provides a limited warranty to a purchaser owes duties under the limited warranty to the purchaser.  If a home is manufactured incorrectly, or improperly repaired thereafter, a manufacturer is guilty of breach of express warranty.  The manufacturer cannot simultaneously be guilty of negligence since there is no common law or public law duty for a manufactured housing company to do anything.

The economic loss doctrine bars any recovery in this instance.  At their deposition, the Stricklands and their attorney stipulated that they had not suffered any personal injuries in

connection with his home. (Exhibit B, pp. 165:13 – 166:15). This case is thus reduced to a claim for damage to the product itself. In *Lloyd v. Wood Coal Co. v. Clark Equipment Co.*, 543 So. 2d 671 (1989), the Alabama Supreme Court discussed the economic loss rule as it applies in tort claims involving manufactured products. There, the Court held that a manufacturer in a commercial relationship owes no duty under tort theories (including negligence and AEMLD) to prevent a product from injuring itself. *Id.* Where, as here, there is no personal injury and there is no damage to property other than to the product itself, the economic loss doctrine bars any recovery in tort. *Id.* The Stricklands' claims for negligence, wantonness and AEMLD are thus barred by the economic loss doctrine because property damage claims are not actionable.

Even though the Stricklands testified that the home has not injured him in any way, they will likely tumble to a position that they suffered mental anguish and distress arising out of alleged defects in his home. However, allegations of mental anguish under tort theories do not state a claim under Alabama law *unless* the plaintiff sustains an actual physical injury or the plaintiff is placed in immediate risk of physical harm (*i.e.* suffers a "near miss" under Alabama's zone of danger test). *Ex parte Grande Manor, Inc.*, 778 So. 2d 173, 179 (Ala. 2000). The Stricklands stipulated that they have not been injured by the home; furthermore, they did not complain to a doctor nor receive any diagnosis in connection with any alleged defects in their home. (Exhibit B, pp. 165:13 – 168:4). The Stricklands' mental anguish claims, therefore, are due to be dismissed.

The Stricklands' product liability claim under AEMLD also fails because they cannot establish the *prima facie* elements of that claim. To make a case for product liability under Alabama's AEMLD statute, the Stricklands must show:

> [A]n injury was caused by one who sold a product in a defective condition that made the product unreasonably dangerous to the ultimate user or consumer; that

> the seller was engaged in the business of selling such a product; and that the
> product was expected to, and did, reach the user without substantial change in the
> condition in which it was sold. *Sapp v. Beech Aircraft Corp.*, 564 So. 2d 418
> (Ala. 1990). Furthermore, the burden of proof rests with the plaintiff to prove that
> the product left the defendant's control in an unreasonably dangerous condition
> and not fit for its expected use, and that that which caused the product to be in
> such an unfit condition in fact caused the injury. *Sears, Roebuck & Co. v. Haven
> Hills Farm, Inc.*, 395 So. 2d 991, 995 (Ala. 1981).

*Bell v. T.R. Miller Mill Co.*, 768 So. 2d 953, 957 (Ala. 2000).

The Stricklands' AEMLD claim fails because they have no evidence that their home left

CHB's factory in an "unreasonably dangerous" condition, or that the home "caused" them any

injury. (Exhibit B, pp. 165:13 – 168:4). Because the Stricklands suffered no physical injury,

CHB is due judgment as a matter of law on the Stricklands' claim under AEMLD.

Further, the Supreme Court of Alabama has held that exterior walls of homes are not

products under the AEMLD. *Keck v. Dryvit Systems. Inc.,* 830 So.2d 1 (Ala. 2002) (holding that

a house's exterior insulation finishing system is not a product); *see also*, *Wells v. Clowers

Construction Co.,* 476 So. 2d 105, 106 (Ala. 1985) (holding that a fireplace is not a product as

attachments or improvements to a home that become as much a part of a house as the four walls

cannot be considered a product under the AEMLD). Given that the walls themselves are not a

product, there is no cause of action under AEMLD.[12]

Finally, the Stricklands' tort claims fail because the Stricklands did not "special-order"

the home. (Exhibit B, pp. 36:19 – 37:21). They purchased the home based on their inspection of

a display model on the dealer's lot. The Stricklands requested only a few minor differences

between the home they viewed and the home they ordered. *Id.* Both Mr. and Mrs. Strickland

testified that they received "exactly" what they ordered. (Exhibit B, pp. 42:23 – 44:5). None of

---

[12] The issue of whether the home, as a whole, is a product under AEMLD appears to be an open
question under Alabama law. *Ex parte Grand Manor*, 778 So. 2d 173, 179, n.4 (Ala. 2000).

the allegations which form the basis of the Stricklands' Complaint relate in any way to the minor variations requested. Also, the Stricklands had no pre-sale contact with CHB, and further, they realized that the sales person with whom they did have contact, did not work for CHB. (Exhibit B, pp. 39:20 – 42:1). Alabama law provides that a manufactured home purchaser who *special-orders* a home directly from a manufacturer is owed a duty of reasonable care under tort theories, such as negligence. Where, as here, a customer purchases a home from a retailer and does not special order it, a manufacturer owes no duties of care because the harm is deemed to be unforeseeable. *Keck,* 830 So.2d at 21-24. Accordingly, the Stricklands' negligence and wantonness claims fail because CHB does not owe the Stricklands any duties under tort law.

Based on the foregoing, it is clear that the Stricklands cannot advance claims for negligent or wanton construction or strict liability under AEMLD. CHB, therefore, is due judgment as a matter of law.

### D.     CHB IS ENTITLED TO SUMMARY JUDGMENT ON THE STRICKLANDS' UNJUST ENRICHMENT CLAIM

The Stricklands allege a claim for unjust enrichment. (Complaint, pp.12 – 13, ¶ 54 – 56). The Stricklands' claim for unjust enrichment fails because the parties are subject to a written agreement – an express warranty – and an unjust enrichment action cannot be maintained in the presence of an express agreement between the parties.

Under Alabama law, a party cannot recover on a claim of unjust enrichment where there is an enforceable agreement among the parties which addresses the same subject matter. *Kennedy v. Polar-Bek & Baker Wildwood Partnership*, 682 So. 2d 443, 447 (Ala. 1996); *Sullivan v. Mazak Corp.*, 805 So. 2d 674 (Ala. 2000) (Justice See, concurring in part and dissenting in part). This is the case because a suit for unjust enrichment is a claim for quasi contract, and a party cannot simultaneously advance claims based on the existence of an express

agreement on one hand, and the absence of any agreement on the other.  *Architecture, Inc. v. Miller*, 769 So. 2d 330, 335 (Ala. Civ. App. 2000).  Thus, an unjust enrichment / quasi contract action lies only where there is no express agreement.  *Id.*

Judge Thompson recently discussed this principle in *ASD Specialty Healthcare, Inc. v. Robert G. Hickes, M.D., P.C.*, No. 1:05cv592-MHT, 2006 U.S. Dist. LEXIS 55129 (M.D. Ala. August 7, 2006), where he held that:

> it is black letter law that the predicate for a claim of unjust enrichment is the absence of a contract: "the existence of a contract precludes the existence of a contract implied by law, or quasi contract," 66 Am. Jur. 2d *Restitution and Implied Contracts* § 24, and "when an adequate remedy at law exists, a claim of unjust enrichment will not be entertained." *Id.*, § 30.

*ASD Specialty Healthcare*, 2006 U.S. Dist. LEXIS at *5.

The undisputed evidence in this case is that CHB gave the Stricklands an express, written Limited Warranty, and that the Stricklands are suing under said Limited Warranty.  (Complaint, p.7, ¶ 18; Exhibit B, pp. 92:2 – 22).  Because there is an express agreement between the parties, the Stricklands' unjust enrichment claim is due to be denied.  Accordingly, CHB requests that the Court enter summary judgment in CHB's favor on the claim of unjust enrichment.

E.  **CHB IS ENTITLED TO SUMMARY JUDGMENT ON THE STRICKLANDS' CLAIM FOR BREACH OF IMPLIED WARRANTY OF HABITABILITY**

The Stricklands allege a claim for breach of the implied warranty of habitability in Count Five of the Complaint.  (Complaint, p. 11, ¶ 41 – 44).  This claim fails for factual and legal reasons.

This claim fails factually speaking because the Stricklands testified that they continue to live in the home without any problems.  (Exhibit B, pp. 26:14 – 27:4).

The Stricklands claim fails legally speaking for at least two reasons. First, in the Limited Warranty provided by CHB, CHB waived all implied warranties. In *Turner v. West Hampton Court, L.L.C.*, 903 So. 2d 82 (Ala. 2004), the Alabama Supreme Court held that the implied warranty of habitability claim may be waived through a contract or warranty. In that case, the court affirmed the trial court's grant of summary judgment in favor of a homebuilder based on a contractual provision that waived all implied warranties.

Secondly, with regard to the specific claim of an implied warranty of habitability, such warranties only apply to real property or "buildings", and do not apply to goods. *See Waites v. Toran,* 411 So.2d 127, 129 (Ala. 1982). Therefore, if a manufactured home is considered to be a consumer product, a belief which is disputed by CHB,[13] the warranty of habitability does not apply to the Manufactured Home made the basis of this civil action.[14] Even if the implied

---

[13] The Manufactured Housing Improvement Act of 2000 struck subsection (a) of 42 U.S.C. 5403 which required the Secretary to consult with the Consumer Product Safety Commission prior to establishing appropriate Federal manufactured home construction and safety standards. Pub. L.106-569, 114 Stat. 2997. The new law governing manufactured housing establishes a consensus committee to, among other things, provide periodic recommendations to the Secretary to adopt, revise and interpret the Federal manufactured housing and construction safety standards and the procedural and enforcement regulations. 42 U.S.C. 5403(a)(3). Based on the forgoing and the Manufactured Housing Improvement Act of 2000's purpose to, among other things, "facilitate the availability of affordable manufactured homes and to increase homeownership for all Americans" 42 U.S.C. 5401 (a)(2), it appears Congress no longer considers manufactured housing as a "consumer product". *See also Clark v. Jim Walters Homes, Inc.*, 719 F.Supp. 1037, 1043 (M.D.Ala. 1989) (finding that the "plain reading of the statute suggests that sales of dwellings are not covered by the Magnuson-Moss Warranty Act"); *Zimprich v. Stratford Homes, Inc.*, 453 N.W.2d 557, 561 (Minn. App. Ct. 1990) (finding that the sale of a manufactured home involved the sale of separate building materials and component parts, thus the Magnuson-Moss Act did not apply); *but see Yoemans v. Homes of Legend, Inc.,* 2001 WL 237313 (M.D.Ala. 2001), not reported in F. Supp.2d (Relying in part on 40 Fed.Reg. 25721, 27722 (1975), 16 C.F.R. §§ 700.1(a)--(f) and *In re VanBlarcum,* 19 S.W.3d 484, 491-92 (Tex.Ct.App.2000), which was subsequently overruled by *In re American Homestar of Lancaster, Inc.* 50 S.W.3d 480 (Tex. 2001).

[14] In the alternative, if the manufactured home is considered real property, as opposed to a "good" or "consumer product", it is not subject to claims for breach of implied warranties for

warranty of habitability does apply, privity is also a requirement for the implied warranty of habitability. *See Howe v. Bishop,* 446 So.2d 11, 14 (Ala. 1984) (noting that one of the elements of the implied warranty of habitability is that the plaintiff purchased a residence "from" the defendant); *Cochran v. Keeton,* 47 Ala. App. 194, 198-199; 252 So.2d 307 (Ala.Civ.App. 1970) (adopting the implied warranty of habitability as an exception to the rule of *caveat emptor* solely "for the sale of a brand-new house by a vendor-builder to a first buyer").

Based on the foregoing, CHB is entitled to a judgment in its favor as to the implied warranty claims.

### F.    CHB IS ENTITLED TO SUMMARY JUDGMENT ON THE STRICKLANDS' IMPLIED WARRANTY CLAIMS FOR MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE

The Stricklands allege two implied warranty claims that arise under Alabama's Uniform Commercial Code. In Count Three of the complaint, the Stricklands allege a claim for breach of the implied warranty of merchantability; in Count Four, the Stricklands allege a claim for breach of the implied warranty of fitness for a particular purpose. (Complaint, pp. 9-10, ¶ 33 – 40). The Stricklands' implied warranty claims fail because they lack privity of contract with CHB. Furthermore, the Stricklands' fitness for a particular purpose claim fails because the undisputed evidence shows that CHB had no involvement in the Stricklands' decision to buy the home in question.

Both of the Stricklands' implied warranty claims fail because CHB did not sell the home to the Stricklands; instead, the Stricklands purchased the home from an independent retail dealership. (Exhibit B, pp. 40:20 – 41:23). Because the Stricklands purchased their home from

---

merchantability, fitness for a particular purpose, or Magnuson-Moss Warranty Act claims. *See Code of Alabama,* §§ 7-2-105; 7-2-314; 7-2-315; 15 U.S.C. § 2301(1); *Cf. Clark v. Jim Walter Homes, Inc.,* 719 F. Supp. 1037, 1043 (M.D. Ala. 1989).

an independent dealer, and the only agreement they had with CHB was a Limited Warranty, there is no privity of contract between CHB and the Stricklands and, therefore, their claims for breach of implied warranty are barred by the doctrine of privity.

In *Jenkins Brick Co. v. Waldrip*, 384 So. 2d 117 (Ala. Civ. App. 1980), the Alabama Court of Civil Appeals held that there is no right of action on implied warranty claims against a manufacturer for property damage without privity of contract. *Id*. at 318; *Bryant v. Southern Energy Homes, Inc.*, 682 So. 2d 3 (1986) (under Alabama law, the implied warranty of fitness for a particular purpose does not apply to Southern who is the manufacturer, not the seller); *Hobbs v. General Motors Corp.,* 134 F. Supp.2d 1277, 1281 (M.D.Ala. 2001) (a "remote manufacturer" has been identified as being a manufacturer who is not involved in any transaction with and, therefore, is not in privity with the buyer); *Ex parte Miller*, 693 So. 2d 1372, 1375 (Ala. 1997) (finding no error in directed verdict for remote manufacturer on implied warranty theories and revocation of acceptance issue); *Johnson v. Anderson Ford, Inc.,* 686 So. 2d 224, 228 (Ala. 1996) (absence of privity of contract that arises out of seller/buyer relationship is fatal to implied warranty claim under Alabama version of UCC in cases of strictly economic loss); *Rhodes v. General Motors Corp.*, 621 So. 2d 945, 947-48 (Ala. 1993) (without privity of contract, there is no right of action against a manufacturer for direct economic loss); *Kidd v. Kilpatrick Chevrolet, Inc.*, 613 So. 2d 336, 338 (Ala. 1993) (because Kilpatrick was not the "seller," the implied warranty sections are not applicable).

Moreover, the Alabama Supreme Court has expressly confronted and rejected the argument that an express warranty from a remote manufacturer creates "privity" sufficient to deem the remote manufacturer a "seller" with respect to the buyer. *Rhodes v. General Motors Corp.*, 621 So. 2d 945, 947-48 (Ala. 1993) (regardless of any express warranties that a

26

manufacturer may wish to give with a product, by their very language the commercial code's implied warranty sections apply to the seller of the product).

The fitness claim also fails because the Stricklands cannot prove the prima facie elements of his claim. To succeed on an implied warranty of fitness claim, a plaintiff must prove three elements: (1) that the seller had reason to know the buyer's particular purpose; (2) that the seller had reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) that the buyer, in fact, relied upon the seller's skill or judgment. *Donald v. City Nation Bank of Dothan*, 295 Ala. 320, 324-25, 329 So. 2d 92, 95-96 (1976). All three elements are lacking here.

The record reflects that the Stricklands had no presale contact with CHB at all. (Exhibit B, pp. 40:20 – 41:23). Therefore, there was no opportunity, conversation or exchange where the Stricklands ever informed CHB of particular needs, or had an opportunity to rely on advice provided by CHB. In short, because the Stricklands had no contact with CHB before purchasing his homes, they cannot claim the benefit of the implied warranty of fitness for a particular purpose.

Accordingly, CHB is due summary judgment as to the Stricklands' claims for breach of the implied warranties of merchantability and fitness for a particular purpose.

### G. CHB IS ENTITLED TO SUMMARY JUDGMENT ON THE STRICKLANDS' CLAIMS FOR BREACH OF EXPRESS WARRANTY AND VIOLATION OF THE MAGNUSON MOSS ACT

The Stricklands urge claims for breach of express warranty (Count Two) and violation of the Magnuson Moss Act (Count One). (Complaint, pp. 7 – 9, ¶ 23 – 32). Both claims fail because CHB has not breached any warranty nor did the Stricklands provide notice of the alleged defect.

27

The Stricklands contend that the walls of their home are damaged from *condensation and mold*, due to the location of the vapor barrier.  (Exhibit B, p. 162:3 – 12).  However, the Limited Warranty that CHB provided to the Stricklands excludes warranty coverage for "deterioration or damage from high relative humidity, condensation…"  (Exhibit C, p. 4).  The law provides that consumers cannot recover under manufacturer's limited warranties for matters that are excluded from such warranties.  *Froning v. Toyota Motor Sales*, U.S.A., Inc., No. 1:05cv273, 2006 U.S. Dist. LEXIS 75514, *11-*12 (W.D.N.C., Sept. 12, 2006) (granting summary judgment to manufacturer on defective tire claim where tires are excluded from coverage under limited express warranty);  *Owens Transp. Serv., Inc. v. Int'l Truck and Engine Corp*., No. 1:05cv2897, 2006 U.S. Dist. LEXIS 89083, *10 (N.D. Ohio, Dec. 7, 2006) (granting summary judgment to International where warranty expressly disclaims components warranted by their respective manufacturers, such as the engine); *Eugene Truck Builders, Inc. v. Ford Motor Co*., 622 S.E. 2d 698, 700-02 (N.C. Ct. App. 2005) (upholding summary judgment in favor of manufacturer where plaintiff had non-Ford parts installed and express written warranty stated that it did not cover "Damages Caused By: … non-Ford parts installed after the vehicle leaves Ford's control"); *Kociubuk v. Huntington Nat'l Bank*, No. 64551, 1994 Ohio App. LEXIS 11, *12-*13 (Ohio Ct. App., Jan. 6, 1994) (holding that trial court properly granted summary judgment on express warranty claims where Hyundai's warranty stated that "damage or failure resulting from misuse, abuse, accident, theft or fire, is not covered").  Here, because condensation claims are excluded under the Limited Warranty, CHB is due judgment as a matter of law.

The Stricklands' Magnuson Moss Act claim fails for the same reason.  The Magnuson Moss Act provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title [15 USCS §§ 2301 et seq.], or

under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief . . ." 15 U.S.C. § 2310(d).  In the case at bar, the Stricklands are claiming that CHB violated the Magnuson Moss Act because CHB breached state law express and implied warranties.  (Complaint, p. 7, ¶ 18 - 21)  Under the law, Magnuson Moss claims are derivative from state law warranty claims.  Thus, Magnuson Moss Act liability is predicated on a finding of breach of warranty.[15]   *Rhode v. E & T Investments, Inc.*, 29 F. Supp.2d 1298, 1304 (M.D. Ala. 1998) (summary judgment denied on Magnuson Moss Act claim because question of fact existed as to express warranty claim); *Diaz v. Paragon Motors of Woodside, Inc*., 424 F. Supp. 2d 519 (E.D.N.Y. 2006) (granting summary judgment on plaintiff's Magnuson-Moss Act claim where defendant did not violate its express warranty); *Farley v. Country Coach, Inc*., No. 05-CV-71623, 2006 U.S. Dist. LEXIS 95728, *19 (E.D. Mich. Nov. 14, 2006) (court held that Magnuson Moss Act liability was predicated on state law breach of warranty claim); *Schultz v. General R.V. Center*, No. 04-72562, 2006 U.S. Dist. LEXIS 63414, *33-*34 (E.D. Mich. Sept. 6, 2006) (summary judgment granted on Magnuson Moss Act claim because court granted summary judgment on plaintiff's express and implied warranty claims).

To the extent the Stricklands' Magnuson Moss Act claim is predicated on their *express* warranty theory, their claim fails because CHB's Limited Warranty excludes coverage for condensation claims (as discussed above), and CHB is due judgment as a matter of law on the express warranty claim.

---

[15] Section 2310(d) of the Magnuson Moss Act also contemplates a cause of action for the violation of the statute itself, independent of any breach of warranty.  Such a claim might arise if a warrantor included in a limited warranty language prohibited by the Act itself.  The Stricklands makes no such claim in this action; their Magnuson Moss Act claim derives from their state law warranty claims.

Similarly, to the extent the Stricklands' Magnuson Moss Act claim is predicated on their *implied* warranty theories, their claim fails because the absence of privity bars any recovery. As discussed above in section G, the Stricklands' claims for breach of implied warranty under the U.C.C. should be denied because CHB is a remote manufacturer and the absence of privity bars implied warranty claims under Alabama law. In *Gill v. Blue Bird Body Co*., No. 05-10466, 2005 U.S. App. LEXIS 11626, *10 (11th Cir. 2005),[16] the court held that a manufacturer was entitled to judgment as a matter of law on a Magnuson Moss Act claim because of the absence of privity.

> [W]hile the appellees' Magnuson-Moss claims constitute a separate federal cause of action for breach of an implied warranty, 15 U.S.C. § 2310(d)(1), courts must look to the relevant state law to determine the meaning and creation of any implied warranty. See 15 U.S.C. § 2301(7)("The term 'implied warranty' means an implied warranty arising under State law . . . in connection with the sale by a supplier of a consumer product."). Importantly, courts have uniformly held that Magnuson-Moss does nothing to alter or modify state law privity requirements. The question of whether privity is required thus hinges entirely on applicable state law. *See Voelker v. Porsche Cars N. Am., Inc*., 353 F.3d 516, 525 (7th Cir. 2003); *Walsh v. Ford Motor Co*., 257 U.S. App. D.C. 85, 807 F.2d 1000, 1011 (D.C. Cir. 1986)("Under the terms of Magnuson-Moss, state law governs the existence and basic meaning of implied warranties."); *Abraham v. Volkswagen of Am., Inc*., 795 F.2d 238, 249 (2d. Cir. 1986)("Both the statutory language and the legislative history, therefore, indicate that Congress [in enacting Magnuson-Moss] did not intend to supplant state law with regard to privity in the case of implied warranties."); *Carlson v. Gen. Motors Corp*., 883 F.2d .287, 291-92 (4th Cir. 1989). In relevant part, state law thus controls appellees' implied warranty Magnuson-Moss claims.

> * * *

> Finally, because appellees' Magnuson-Moss claims turn on Georgia implied warranty law, appellees' lack of privity similarly defeats their federal claims. *See* 15 U.S.C. § 2301(7). This is notwithstanding the jury's determination that the appellees were "consumers" within the meaning of 15 U.S.C. § 2301(3). Nothing in Magnuson-Moss displaces substantive state law privity requirements governing implied warranty claims. *Voelker*, 353 F.3d at 525; *Walsh*, 807 F.2d at 1011; *Abraham*, 795 F.2d at 249.

---

[16] This case is an unpublished decision. However, points of law quoted herein are on-point and consistent with other authorities.

*Gill*, 2005 U.S. App. LEXIS at *9-*13.

Here, because the Stricklands and CHB do not stand in privity with one another, the Stricklands' Magnuson Moss Act claim is due to fail to the extent it arises out of their implied warranty claims.

In any event, the Stricklands failed to offer evidence that CHB violated the Magnuson Moss Act or breached the express Limited Warranty.  More importantly, the Stricklands' Magnuson Moss Act claims should be denied because they failed to give CHB the opportunity to repair the home. The Magnuson Moss Act requires a consumer to provide a warrantor with a reasonable opportunity to cure before filing suit. 15 U.S.C. 2310(e); *Cunningham v. Fleetwood Homes of Georgia*, 263 F.3d 611, 618 (11th Cir. 2001); *Forest River Inc. v. Posten*, 847 So. 2d 957 (Ala. Civ. App. 2002).    The Stricklands' deposition testimony established that they never gave CHB notice of their alleged condensation claims. (Exhibit B, pp. 164:3 – 165:1). Perhaps the reason that the Stricklands have failed to complain about condensation, mold or mildew is that they have failed to find something to complain about.

> Mr. Ritchey: All right. Are there any soft walls?
>
> Ms. Hunt: Are there any soft walls, like, you know, soft, that you feel anywhere that you know about?
>
> Mrs. Strickland: Not Really.
>
> Ms. Hunt: Not Really.
>
> - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
> Mr. Ritchey: She's never seen the mold, any mold, or nobody has ever seen mold?
>
> Ms. Hunt: You never saw the mold?

> Mr. Strickland: Never.
>
> Mrs. Strickland: Never

Exhibit B, pp. 161:9 – 15; 162:13 - 19.

Accordingly, the Stricklands' Magnuson Moss Act claims should be denied.

CHB's Limited Warranty applies to "defects" that become evident within the one-year warranty period, where <u>written notice</u> is provided to CHB. (Exhibit C, p. 4). In order to prove breach of warranty, the Stricklands must show that CHB either refused to repair or replace a defect, or failed to repair or replace a defect within a reasonable time. Ala. Code § 7-2-729(1)(a); *Ag-Chem Equip. Company, Inc. v. Limestone Farmers Co-op., Inc.*, 567 So. 2d 250 (Ala. 1990). In the case at bar the warranty specifically states that "written notice" must be given. (Exhibit C, p. 4). When a warranty states the only way to obtain warranty service, a homeowner must follow the specific requirements in the warranty. *See Southern Energy Homes, Inc. v. Washington*, 774 So.2d 505 (Ala. 2000).[17] In addressing whether sufficient notice had been provided, the Supreme Court of Alabama noted:

> " 'Express warranties [are] treated like any other type of contract and interpreted according to general contract principles.' *See Ex parte Miller*, 693 So.2d 1372, 1376 (Ala.1997)(citing 2 Alphonse M. Squillante & John R. Fonseca, Williston

---

[17] A warranty is also similar to an insurance policy wherein the insured is required to submit a claim for benefits. Thus, cases in the insurance context may also provide guidance with regard to situations where a condition precedent, such as notice, is not met. *See, e.g., Nationwide Ins. Co. v. Nilson*, 745 So.2d 264 (Ala. 1998) (in order to recover on his claim alleging breach of contract, plaintiff was required to first comply with the condition precedent that he submit to an examination under oath as required by the insurer); *United Ins. Co. v. Cope*, 630 So.2d 407 (Ala. 1993) (an insurer's obligation to pay an insured's claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims); *Mordecai v. Blue Cross Blue Shield*, 474 So. 2d 95 (Ala. 1985) (until the insured furnishes proof of loss in the form required in the policy, the insurer is under no obligation to pay or to investigate the claim). In addition to the above, the Alabama Supreme Court has noted that "no case from this Court places on an insurance company an obligation to either investigate or pay a claim until the insured has complied with all of the terms of the contract with respect to submitting claims for payment." *Cope*, 630 So.2d at 407.

on Sales, § 15-9 (4th ed.1974)). If a company wishes to require a specific mode of notice as a prerequisite to warranty coverage, it may do so. *See generally Miller,* 693 So.2d at 1376 (stating that a company can limit its warranty coverage); see also *Rhode v. E & T Invs., Inc.,* 29 F.Supp.2d 1298, 1303 (M.D.Ala.1998)(construing a warranty under which a manufacturer agreed to replace defective parts 'PROVIDED THAT the Owner gives written notice of any such defect to the Manufacturer or its Dealer at their business address within one (1) year and ten (10) days')."

*Southern Energy Homes, Inc. v. Washington*, 774 So.2d at 511.

Alabama case law clearly holds that when the first notice of an alleged defect or claim for breach of warranty is given after the warranty expired, it is too late and a claim for breach of warranty can not be maintained *See, e.g. Turner v. Westhampton Court, LLC,* 903 So.2d 82, 91 (Ala.2004) (where Limited New-Home Warranty required written notice of a latent defect be given within the one (1) year warranty period, such a provision "operates as a waiver of the [claimants] rights to sue under the warranty if they fail to give notice of the defect within the one-year warranty period"); *Puckett, Taul & Underwood, Inc. v. Schreiber Corp., Inc. v. Schreiber Corporation, Inc.*, 551 So.2d 979, 983; (Ala. 1989) (one year warranty given at latest in March, 1985 and first notice of claimed breach of warranty given in July, 1986; notice was too late and defendant entitled to a judgment on all warranty claims); *Ag-Chem Equipment Company, Inc. vs. Limestone Farmers Co-op., Inc.,* 567 So.2d 250 (Ala. 1990) (warranty did not fail of its essential purpose where dealer stood ready to rebuild engine in accordance with warranty but buyer never tendered engine to enable dealer to complete repairs); *Feil vs. The Wittern Group, Inc.*, 784 So.2d 302 (Ala. 2000) (buyer failed to establish breach of express warranty where during the warranty period of a repair or replacement warranty, manufacturer supplied replacement parts and according to warranty, buyer was responsible for shipping and reinstallation); *Central Mining, Inc. vs. Simmons Machinery Co., Inc.* 547 So.2d 529, 531 (Ala. 1989) (summary judgment on warranty issue was proper where evidence showed only that

"various and sundry" repairs were made on the loader and that manufacturer was not called on to make repairs to the hydraulic system that allegedly caused the fire); *Jewell v. Seaboard Industrial, Inc.,* 667 So.2d 653, 660-661 (Ala. 1985) (list of 128 items given, but never complained about set-up of home until after suit filed; Supreme Court concluded Jewell did not give sufficient notice); *Century 21-Reeves Realty, Inc. v. McConnell Cadillac, Inc.*, 626 So.2d 1273, 1275 (Ala. 1993) *overruled on other grounds by Hines v. Riverside Chevrolet Olds, Inc.*, 655 So.2d 909 (Ala. 1994) (summary judgment proper were engine failed after warranty expired); *Haynes vs. Ford Motor Company, Inc*., 435 So.2d 1227, 1230 (Ala. 1983) (affirming summary judgment on breach of warranty claim where express warranty had expired prior to request for service and where vehicle was out of warranty, due to excessive mileage, at time claim arose); *Redman Industries v. Binkey*, 49 Ala. App. 595, 599-600, 274 So. 2d 621, 625 (Ala.Civ.App. 1973) (failure to give manufacturer's requested jury charge that manufacturer was entitled to notice within reasonable time after discovery of any breaches of warranty was reversible error); *Copenhagen Reinsurance Company v. Champion Home Builders Company, Inc.*, 872 So.2d 848, 855 (Ala.Civ.App. 2003) (manufacturer's warranty required "written notice" of any claim for warranty related defects; proper notice was not given to the manufacturer as the only notice given was over the telephone).

It should also be noted that under Alabama law, the mere filing of a lawsuit does not constitute notice of breach. *Hobbs v. General Motors Corp.,* 134 F.Supp.2d 1277, 1281 (M.D.Ala. 2001). Since it is undisputed that no written notice was sent regarding any of the allegations contained in the Stricklands' Complaint, CHB is entitled to a judgment in its favor on Counts One and Two.

### H.    THERE IS NO LEGALLY COGNIZABLE CLAIM FOR RISK OF FUTURE DAMAGES

This case is essentially a "fear of vinyl wallboard" case. There has been no showing that the walls of the Strickland home have failed. Rather, it is undisputed by the Stricklands that neither they nor their expert have ever seen any soft walls in the home. (Exhibit B, p. 161:11-15; Exhibit A, vol. 2, pp. 204:20 – 205:7). Because there are no damages currently, the Stricklands premise their claims on the notion that there may be a problem some day. Such potential damage is expressly excluded in CHB's Limited Warranty which in pertinent part, states as follows:

THE WARRANTY DOES <u>NOT</u> COVER:

. . .

deterioration from high relative humidity, condensation, ground moisture, or extended moisture exposure caused by plants, building attachments or accessories;

(Exhibit C, p. 4).

In any event, this case is analogous to *Phizer, Inc. v. Farsian,* 628 So.2d 405 (Ala. 1996). In *Phizer,* the recipient of an artificial heart valve, which had not failed, filed an action in an Alabama state court alleging he was fraudulently induced to purchase the valve and misled about the rate of failure of the same model valve in other recipients and claimed, among other things, that the valve was manufactured "despite knowing of serious manufacturing problems that directly related" to valve failures in other recipients. *Phizer, Inc. v. Farsian*, 682 So. 2d at 406. Although the valve functioned properly, the plaintiff claimed the following injury: "with its higher rate of fracture and risk of death, [it was] worth less than the valve would have been worth if it had been what [the manufacturer] represented it to be" and also sought recovery for emotional distress and expenses related to the removal and replacement of the valve. *Id.* at 407.

The case was removed to federal court and the United States Court of Appeals for the Eleventh

Circuit certified the following question to the Supreme Court of Alabama:

> Does a heart valve implantee have a valid cause of action for fraud under Alabama law if he asserts that the valve's manufacturer fraudulently induced him to have the valve implanted when the damages that he asserts do not include an injury-producing malfunction of the product because the valve has been and is working properly?

> *Phizer, Inc. v. Farsian*, 682 So. 2d at 406.

In response to the above, the Supreme Court of Alabama provided the following analysis:

> The question certified to this Court concerns whether Farsian may maintain a fraud claim under Alabama law. We conclude that he may not.

> Regardless of how Farsian pleads his claim, his claim is in substance a product liability/personal-injury claim--Farsian seeks damages because of the risk that his heart valve may one day fail. Alabama courts have never allowed a recovery based on a product that, like Farsian's valve, is and has been working properly. Each of our prior cases in which fraud or other intentional conduct was alleged has involved a failure, a malfunction, or an accident that involved the defendant's products and which injured the plaintiff. See *Quality Homes Co. v. Sears, Roebuck & Co.,* 496 So. 2d 1 (Ala. 1986); *Treadwell Ford, Inc. v. Campbell,* 485 So. 2d 312, 313 (Ala. 1986), *appeal dismissed*, 486 U.S. 1028, 100 L. Ed. 2d 596, 108 S. Ct. 2007 (1988).

> Under Alabama law, Farsian's fear that his valve could fail in the future is not, without more, a legal injury sufficient to support his claim. Although the facts as presented by the Court of Appeals indicate that the Bjork-Shiley heart valve has experienced problems with strut failures, Farsian's concern that his heart valve, which is presently functioning normally, could later malfunction is not an injury recognized by Alabama law.

> . . .

> For the foregoing reasons, we answer the United States Court of Appeals' question in the negative.

> *Phizer, Inc. v. Farsian*, 682 So. 2d at 407-08.

The Supreme Court of Alabama has steadfastly stood behind its reasoning above. *See,*

*e.g. Houston County Health Care Authority v. Williams,* 961 So.2d 795, 811 (Ala. 2006) (finding

that under Alabama case law, mere exposure to a hazardous substance resulting in no present

manifestation of physical injury is not actionable where a person has suffered only mental anguish, even where the exposure has increased the exposed person's chance of developing a serious physical disease); *Southern Bakeries, Inc. v. Knipp,* 852 So.2d 712, 718 (Ala. 2002) (opening the courts generally to compensation for fear of future disease would be a dramatic change in the law and could engender significant unforeseen and unforeseeable consequences; awarding such compensation is better left to the Legislature).  *Hinton v. Monsanto Co.,* 813 So.2d 827, 830-832 (Ala. 2001) (Alabama law provides no redress for a plaintiff who has suffered no present injury or illness; no cause of action exists for medical monitoring for a potential problem that may occur in the future); *Ford Motor Co. v. Rice,* 726 So.2d 626, 627 (Ala. 1998) (allegations that Ford suppressed that Bronco II contained design defect causing an undue propensity to roll over in sudden avoidance maneuvers, stating vehicles were worth less, cost to "repair", punitive damages, attorney fees, and equitable relief in the form of a warning, even though no plaintiffs' Bronco II actually rolled over or caused personal injuries or property damage; Supreme Court of Alabama found its previous decision in *Phizer* controlling and claims of injury were insufficient to sustain action alleging fraudulent suppression).

In *Ford Motor Co. v. Rice,* the Supreme Court of Alabama noted that its holding is in accord with the view of most courts, as "it is well established that 'purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own.'" *Weaver v. Chrysler Corp.,* 172 F.R.D. 96, 99 (S.D.N.Y. 1997), *quoting Hubbard v. General Motors Corp., 1996 U.S. Dist. LEXIS 6974*, No. 95 Civ. 4362, May 22, 1996 (S.D.N.Y. 1996) (not reported in F. Supp.); *see also Chin v. Chrysler Corp., 182 F.R.D. 448, (D.N.J. 1998)*, citing cases.  *Ford Motor Co. v. Rice,* 726 So.2d at 628-629.  "Where . . . a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies."

*Ford Motor Co. v. Rice,* 726 So.2d at 629; *citing Weaver, supra, at 100* (citation omitted). Further, other commentators have agreed with this approach. *See* Victor E. Schwartz et al., *Medical Monitoring: Should Tort Law Say Yes?,* 34 Wake Forest L. Rev. 1057, 1059 (Winter 1999) ("For over two hundred years, one of the fundamental principles of tort law has been that a plaintiff cannot recover without proof of a physical injury") (*citing* William L. Prosser, *Handbook on the Law of Torts* § 54, at 330-33 (4th ed. 1971)); W. Page Keeton et al., *The Law of Torts* § 30, at 165 (5th ed. 1984) ("The threat of future harm, not yet realized, is not enough") (footnote omitted).

Based on the foregoing, the Stricklands do not have a legally cognizable claim or injury.

**WHEREFORE, PREMISES CONSIDERED,** CHB respectfully requests that the Court enter a full and final summary judgment in its favor, pursuant to Rule 56.

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

/s/ Gregory S. Ritchey
Gregory S. Ritchey, Esquire {ASB-8193-H68G}
Richard S. Walker, Esquire {ASB-8719-L70R}
Counsel for Champion Home Builders Co.

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:          205.876.1600
Facsimile      205.876.1616

## <u>CERTIFICATE OF SERVICE</u>

       I, the undersigned, do hereby certify that on the 28th day of March, 2008, I electronically filed the foregoing with the Clerk of Court using the electronic filing system which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
C. Lance Gould, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103


                                 /s/ Gregory S. Ritchey
                                 OF COUNSEL

# EXHIBIT "A"

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5      CIVIL ACTION NO.:  1:06-CV-00682-TFM

6      NICHOLAS STRICKLAND, et al.,

7                  Plaintiff(s),

8      vs.

9      CHAMPION ENTERPRISES, INC., et al.,

10                 Defendant(s).

11     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12     CIVIL ACTION NO:  1:06-CV-423-BH-C

13     ROBERT FORD, et al.,

14                 Plaintiff(s),

15     vs.

16     CHAMPION ENTERPRISES, INC., et al.,

17                 Defendant(s).

18                    DEPOSITION OF

19                     BOBBY PARKS

20                   JOB NO. 55250

21     BEFORE:   Sabrina L. Nimmer, CSR

22               Court Reporter and

23               Notary Public

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

1          In accordance with Rule 5(d) of The

2     Alabama Rules of Civil Procedure, as

3     Amended, effective May 15, 1988, I, Sabrina

4     L. Nimmer, am hereby delivering to MR.

5     GREGORY S. RITCHEY the original transcript

6     of the oral testimony taken on the 20th day

7     of September, 2007, along with exhibits.

8          Please be advised that this is the

9     same and not retained by the Court Reporter,

10    nor filed with the Court.

11

12          S T I P U L A T I O N

13

14          IT IS STIPULATED AND AGREED, by and

15    between the parties through their respective

16    counsel, that the deposition of BOBBY PARKS

17    may be taken before Sabrina L. Nimmer,

18    Commissioner, at 272 Commerce Street,

19    Mongomery, Alabama 36104 on the 20th day of

20    September, 2007.

21          IT IS FURTHER STIPULATED AND AGREED

22    that the signature to and the reading of the

23    deposition by the witness is waived, the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

1    deposition is to have the same force and

2    effect as if full compliance had been had

3    with all laws and rules of Court relating to

4    the taking of depositions.

5              IT IS FURTHER STIPULATED AND AGREED

6    that it shall not be necessary for any

7    objections to be made by counsel to any

8    questions, except as to form or leading

9    questions, and that counsel for the parties

10   may make objections and assign grounds at

11   the time of trial, or at the time said

12   deposition is offered in evidence, or prior

13   thereto.

14             IT IS FURTHER STIPULATED AND AGREED

15   that notice of filing of the deposition by

16   the Commissioner is waived.

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 4

1                           I N D E X

2    EXAMINATION BY:          PAGE NUMBER:

3    MR. RITCHEY:

4

5

6    EXHIBITS:                PAGE NUMBER:

7    Defendant's Ford # 1            8

8    Defendant's Strickland # 1      8

9    Defendant's Ford # 2            36

10   Defendant's Strickland # 2      37

11   Defendant's Ford # 3            36

12   Defendant's Strickland # 3      38

13   Defendant's Ford # 4            134

14   Defendant's Strickland # 5      149

15   Defendant's Strickland # 6      149

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

1                    A P P E A R A N C E S

2         FOR THE PLAINTIFF(S):

3                    Mr. C. Lance Gould

4                    BEASLEY, ALLEN, CROW, METHVIN,

5                    PORTIS & MILES

6                    272 Commerce Street

7                    Montgomery, Alabama 36104

8

9         FOR THE DEFENDANT(S):

10                   Mr. Gregory S. Ritchey

11                   RITCHEY & SIMPSON

12                   3288 Morgan Drive

13                   Suite 100

14                   Birmingham, Alabama 35216

15

16        ALSO PRESENT:  Francis

17

18                   * * * * * * * * * * * * * * *

19

20                   I, Sabrina L. Nimmer, a Court

21        Reporter of Mobile, Alabama, acting as

22        Commissioner, certify that on this date, as

23        provided by the Alabama Rules of Civil

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1    Procedure and the foregoing stipulation of

2    counsel, there came before me at the law

3    office of C. Lance Gould, 272 Commerce

4    Street, Montgomery, Alabama 36104,

5    commencing at 9:07 a.m., BOBBY PARKS in the

6    above cause, for oral examination, whereupon

7    the following proceedings were had:

8

9

10        THE VIDEOGRAPHER:    Here begins

11   videotape number one in the deposition of

12   Bobby Parks in the matter of Nicholas

13   Strickland, et al., versus Champion

14   Enterprises, et al., Case Number

15   1:06-CV-00682-TFM and Robert Ford, et al.,

16   versus Champion Enterprises, et al., Case

17   Number 1:06-CV-423-BHC.

18        We are on the record at 9:10 a.m.

19   on Thursday, September 20, 2007.    This

20   deposition is taking place at Beasley, Allen

21   in Montgomery, Alabama and the videographer

22   is Jeff Tetherow.

23        Would counsel please identify

Page 7

1    yourselves and state whom you represent.

2           MR. GOULD:  Lance Gould for the

3    plaintiffs.

4           MR. RITCHEY:  Greg Ritchey for

5    Champion Builders in each case.

6           THE VIDEOGRAPHER:  Would the court

7    reporter please swear in the witness.

8

9

10                  ROBERT PARKS,

11         having been first duly sworn,

12      was examined and testified as follows:

13

14                  EXAMINATION

15    BY MR. RITCHEY:

16      Q.    Mr. Parks, I'm Greg Ritchey.  Can I

17    get you to give us your full name for the

18    record.

19      A.    Robert Lynn Parks.

20      Q.    Okay.  You've been deposed before,

21    have you not?

22      A.    Yes, sir.

23      Q.    In fact, we deposed you recently in

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 71

1    feeding the mold growth.

2        Q.    And it's a ventilated wall cavity

3    in the Strickland home?

4        A.    It is.

5        Q.    Okay.  Why don't we -- let's stick

6    with the Ford home right now.

7        A.    Okay.  Sure.

8        Q.    Your first opinion is improper

9    application of the wall construction

10   standards.  Now, will you agree with me that

11   a manufacturer can build a 504 B-1 wall and

12   place it anywhere in the country under the

13   HUD code?

14       A.    Under the HUD code, that option to

15   build a B-1 wall is not geographically

16   specific.  So they can build that wall and

17   send it anywhere they would like, but the

18   standards also require that that wall

19   perform.

20       Q.    Okay.  So if they build that wall

21   in that particular home --

22       A.    Uh-huh.  Yes, sir.

23       Q.    -- that can be sold anywhere in

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 72

1       the United States?

2            A.    Just because they build that

3       wall -- let me -- I don't -- I know where we

4       are going here but -- or at least I think.

5       They are allowed to build that wall but they

6       have to make that wall perform.  If it's

7       accumulating moisture and significant enough

8       moisture to sustain mold growth, then it's

9       not performing to the HUD standard; but as

10      far as building that wall, they can build it

11      but it still has to perform.  They have to

12      make it work.

13           Q.    Okay.  And there are other design

14      applications that are out there with regard

15      to building a 504 B-1 wall other than just

16      the vinyl or the one perm requirement;

17      right?  Am I not making sense?

18           A.    Right.  If you are going to put

19      that one perm requirement on the inside,

20      then you've got to build that wall to where

21      the storage capacity of that wall does not

22      exceeded.  In other words, you don't get as

23      much -- whatever gets in has to be able to

```
1              C E R T I F I C A T E

2    STATE OF ALABAMA      )

3    COUNTY OF JEFFERSON   )

4

5              I hereby certify that the

6    above and foregoing proceeding was taken

7    down by me by stenographic means, and that

8    the content herein was produced in

9    transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a

12   true and correct transcript of the

13   proceedings occurring on said date at said

14   time.

15             I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action; nor am I in anywise

18   interested in the result of said case.

19

20

21   _____

22        Court Reporter and Commissioner

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3            SOUTHERN DIVISION

4
       NICHOLAS STRICKLAND, et al.,    ORIGINAL
5
            Plaintiffs,
6                            CASE NO.
            vs.              1:06-CV-00682-TFM
7
       CHAMPION ENTERPRISES, INC.,
8      et al.,

9           Defendants.

10

11      *      *      *      *      *      *      *      *

12

13          DEPOSITION OF BOBBY PARKS,

14      VOLUME II, taken pursuant to stipulation

15      and agreement before Barbara A. Howell,

16      Certified Court Reporter and

17      Commissioner for the State of Alabama at

18      Large, ACCR No. 123, in the Law Offices

19      of Beasley, Allen, Crow, Methvin,

20      Portis & Miles, P.C., 272 Commerce

21      Street, Montgomery, Alabama, on Tuesday,

22      November 27, 2007, commencing at

23      approximately 9:00 a.m.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 170

1                    A P P E A R A N C E S

2

     FOR THE PLAINTIFF:
3
     Mr. C. Lance Gould
4    Beasley, Allen, Crow, Methvin,
     Portis & Miles, P.C.
5    Attorneys at Law
     272 Commerce Street
6    Montgomery, Alabama   36104

7

     FOR THE DEFENDANTS:
8
     Mr. Gregory S. Ritchey
9    Mr. W. Scott Simpson
     RITCHEY & SIMPSON, P.C.
10   Attorneys at Law
     3288 Morgan Drive
11   Suite 100
     Birmingham, Alabama   35216
12

13

14

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 171

1                    I N D E X

2
        EXAMINATION BY:                        PAGE
3
        MR. RITCHEY......................    173
4

5    EXHIBITS                               PAGE

6    DEFENDANTS' EXHIBIT #7...........    173

7    DEFENDANTS' EXHIBIT #8...........    179

8    DEFENDANTS' EXHIBIT #9...........    201

9    DEFENDANTS' EXHIBIT #10..........    229

10   DEFENDANT'S EXHIBIT #11..........    246

11   DEFENDANT'S EXHIBIT #12..........    265

12   DEFENDANTS' EXHIBIT #13..........    268

13   DEFENDANT'S EXHIBIT #14..........    268

14   DEFENDANT'S EXHIBIT #15..........    272

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 172

1                S T I P U L A T I O N S

2           It is hereby stipulated and agreed

3     by and between counsel representing the

4     parties that the deposition of BOBBY

5     PARKS, VOLUME II, is taken pursuant to

6     the Federal Rules of Civil Procedure and

7     that said deposition may be taken before

8     Barbara A. Howell, Court Reporter and

9     Commissioner for the State of Alabama at

10    Large, without the formality of a

11    commission; that objections to questions

12    other than objections as to the form of

13    the questions need not be made at this

14    time but may be reserved for a ruling at

15    such time as the deposition may be

16    offered in evidence or used for any

17    other purpose as provided for by the

18    Federal Rules of Civil Procedure.

19          It is further stipulated and agreed

20    by and between counsel representing the

21    parties in this case that said

22    deposition may be introduced at the

23    trial of this case or used in any manner

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 173

1          by either party hereto provided for by

2          the Federal Rules of Civil Procedure.

3

4          *     *     *     *     *     *     *     *

5

6                    (Defendants' Exhibit #7 was

7                     marked for identification.)

8                    BOBBY PARKS

9          The witness, having first been duly

10         sworn or affirmed to speak the truth,

11         the whole truth, and nothing but the

12         truth, testified as follows:

13                    THE REPORTER:   Usual

14                     stipulations?

15               MR. GOULD:   Yes, ma'am.

16               MR. RITCHEY:   Yes.

17

18               EXAMINATION, continued

19         BY MR. RITCHEY:

20    Q.   Mr. Parks, Greg Ritchey again.   I

21         represent Champion Home Builders.   This

22         is a continuation of a previous

23         deposition we had scheduled.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 204

1          comfort level.

2     Q.   And one raised it, you know, five

3          degrees, I believe.

4     A.   Yeah, it may have been.

5     Q.   But I guess my point is, when that

6          happened, you also went back and tested

7          the walls, I believe, with a moisture

8          meter; right?

9     A.   Right.

10    Q.   And you found that the moisture content

11         also went down.

12    A.   Correct.  You raise the temperatures

13         and you slow down the rate of

14         condensation, then you can also slow

15         down that moisture accumulation.  Now,

16         that's not to say it fixed the problem.

17         But there was a correlation between

18         those temperatures.

19                    (Cell phone interruption)

20    Q.   All right.  Well, for the Strickland

21         house, you testified earlier that you

22         did not find any soft walls, either in

23         this house or in the Ford house, for

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 205

```
 1              that matter.

 2     A.   Soft walls?

 3     Q.   Yeah.

 4     A.   No.  I found elevated moisture, but the

 5          walls were not, as you referred, soft

 6          to the touch.  I don't specifically

 7          recall that.

 8     Q.   All right.  Well, do you recall saying

 9          that or not finding it, I guess?

10     A.   Either one, actually.

11     Q.   Well, I'll represent to you that that's

12          at least my recollection of what you

13          said in your other deposition.  But I

14          can probably pull the page number if

15          you want to look at it.

16     A.   Yeah.

17     Q.   The defect that you found in the

18          Strickland house, is that contained on,

19          I guess, your summary page or any

20          defects that you found with the house?

21     A.   Correct.  That there was -- that I did

22          find moisture elevation in the wall

23          structure and I did find evidence of
```

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

1           REPORTER'S CERTIFICATE

2

3     STATE OF ALABAMA )
                       )
4     ELMORE COUNTY    )

5

6           I do hereby certify that the above

7     and foregoing transcript was taken down

8     by me in stenotype, and the questions

9     and answers thereto were transcribed by

10    means of computer-aided transcription,

11    and that the foregoing represents a

12    true and correct transcript of the

13    testimony given by said witness.

14          I further certify that I am

15    neither of counsel, nor of any relation

16    to the parties to the action, nor am I

17    anywise interested in the result of

18    said cause.

19

20          *Barbara A. Howell*

21    Barbara A. Howell, Certified
      Court Reporter and Commissioner
22    for the State of Alabama at Large
      ACCR NO. 123 - Expires 9/30/08
23    MY COMMISSION EXPIRES:   12/27/08

# EXHIBIT "B"

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT

 2         MIDDLE DISTRICT OF ALABAMA

 3            SOUTHERN DIVISION

 4

 5   NICHOLAS STRICKLAND, et al.,    ORIGINAL

 6       Plaintiffs,

 7

 8   vs.   CIVIL ACTION NO. 1:06-CV-00682-TFM

 9

10   CHAMPION ENTERPRISES, INC., et al.,

11       Defendants.

12          *    *    *    *    *    *

13      DEPOSITION OF BECKY HUNT, NICHOLAS

14   STRICKLAND, and JENNIFER STRICKLAND,

15   taken pursuant to notice and

16   stipulation on behalf of the

17   Defendants, at Beasley, Allen, at 272

18   Commerce Street, Montgomery, Alabama,

19   before Bridgette Mitchell, Shorthand

20   Reporter and Notary Public in and for

21   the State of Alabama at Large, on

22   October 29, 2007, commencing at

23   10:15 a.m.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

```
 1                      A P P E A R A N C E S

 2

 3

 4        FOR  THE  PLAINTIFFS:

 5        C.  Lance  Gould,  Esquire

 6        BEASLEY,  ALLEN,  CROW,  METHVIN,

 7             PORTIS  &  MILES,  P.C.

 8        218  Commerce  Street

 9        Montgomery,  Alabama    36106

10

11

12        FOR  THE  DEFENDANTS:

13        Gregory  S.  Ritchey,  Esquire

14        RITCHEY  &  SIMPSON

15        3288  Morgan  Drive

16        Suite  100

17        Birmingham,  Alabama    35216

18

19

20

21

22

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

1                    STIPULATIONS

2           It is hereby stipulated and

3    agreed by and between counsel

4    representing the parties that the

5    deposition of BECKY HUNT, NICHOLAS

6    STRICKLAND, and JENNIFER STRICKLAND,

7    are taken pursuant to notice and

8    stipulation on behalf of the

9    Defendants; that all formalities with

10   respect to procedural requirements are

11   waived; that said deposition may be

12   taken before Bridgette Mitchell,

13   Shorthand Reporter and Notary Public in

14   and for the State of Alabama at Large,

15   without the formality of a commission;

16   that objections to questions, other

17   than objections as to the form of the

18   questions, need not be made at this

19   time, but may be reserved for a ruling

20   at such time as the deposition may be

21   offered in evidence or used for any

22   other purpose as provided for by the

23   Civil Rules of Procedure for the State

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 4

1    of Alabama.

2        It is further stipulated and

3    agreed by and between counsel

4    representing the parties in this case

5    that the filing of the deposition of

6    BECKY HUNT, NICHOLAS STRICKLAND, and

7    JENNIFER STRICKLAND, is hereby waived

8    and that said deposition may be

9    introduced at the trial of this case or

10   used in any other manner by either

11   party hereto provided for by the

12   Statute, regardless of the waiving of

13   the filing of same.

14       It is further stipulated and

15   agreed by and between the parties

16   hereto and the witness that the

17   signature of the witness to this

18   deposition is hereby waived.

19

20                    INDEX

21

22   EXAMINATION                    Page

23   By Mr. Ritchey................... 7

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| 1 | EXHIBITS: | | Page |
|---|---|---|---|
| 2 | DX-1 | Plaintiffs' Disclosure | 14 |
| 3 | DX-2 | Contract | 15 |
| 4 | DX-3 | Arbitration Provision | 16 |
| 5 | DX-4 | Homeowner's Guide | 16 |
| 6 | DX-5 | PX Supplemental Response | 61 |
| 7 | DX-6 | Bill of Sale | 61 |
| 8 | DX-7 | Evidence of Insurance | 62 |
| 9 | DX-8 | Important Instructions | 66 |
| 10 | CHB-3 | Data Plate | 6 |
| 11 | CHB-11 | Owner's registration card | 6 |
| 12 | CHB-12 | Walk-through complaint | 6 |
| 13 | CHB-13 | Customer survey | 6 |
| 14 | CHB-16 | Service work order | 6 |
| 15 | CHB-17 | Walk-through list | 6 |
| 16 | CHB-20 | Service work order | 6 |
| 17 | CHB-23 | Complaint list | 6 |
| 18 | CHB-26 | Service work order | 6 |
| 19 | CHB-28 | Homeowner's guide | 6 |
| 20 | CHB-29 | Installation manual | 6 |
| 21 | CHB-41 | Customer deposit form | 6 |
| 22 | CHB-42 | Check | 6 |
| 23 | CHB-43 | Dealer installed options | 6 |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1    CHB-44    Site prep requirements    6

2    CHB-45    Contract    6

3    CHB-46    Dealer closing agreement    6

4    CHB-47    Disclosure statement    6

5    CHB-48    American Modern Ins. Group    6

6

7        (All CHB Exhibits were pre-marked

8        for identification.)

9

10        BECKY HUNT, having been first

11    duly sworn to translate the spoken word

12    into Sign language and Sign language

13    into the spoken word, to the best of

14    her ability:

15

16        BECKY HUNT, NICHOLAS

17    STRICKLAND, and JENNIFER STRICKLAND,

18    having first been duly sworn or

19    affirmed to speak the truth, the whole

20    truth, and nothing but the truth,

21    testified as follows:

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 16

```
 1              MS. HUNT:  About how much you
 2    paid for the trailer.
 3              MR. STRICKLAND:  Right.
 4              MS. HUNT:  So that -- so you
 5    recognize that paper?
 6              MRS. STRICKLAND:  Yes.
 7              MR. RITCHEY:  Is that the
 8    purchase contract that both of them
 9    signed?
10              MRS. STRICKLAND:  Right.
11              MR. STRICKLAND:  Yes.
12              (Defendants' Exhibits 3 and 4
13              marked for identification.)
14              MR. RITCHEY:  I think I've
15    got -- let me strike that question.
16    I'm going to show you what I've marked
17    as Defendants' Exhibit 4 and see if
18    they recognize that.
19              MR. STRICKLAND:  I have a book.
20              MS. HUNT:  You have that book?
21              MR. RITCHEY:  And that is --
22    and Defendants' Exhibit 4, for the
23    record, is entitled Gateway Homes,
```

Page 17

1    Advantage Homes, Redman Homes,

2    Homeowners' Guide, Limited Warranty,

3    and Arbitration Agreement.

4         MS. HUNT:  Do you recognize it

5    as being something you saw before?

6         MRS. STRICKLAND:  That is

7    something that I saw before, yes.

8         MR. STRICKLAND:  Yes.

9         MS. HUNT:  Something that they

10   saw before.

11        MR. RITCHEY:  And did they get

12   that as part of the -- did that come

13   with the house?

14        MS. HUNT:  Do you remember, did

15   that come with the house?

16        (Conversation between Ms. Hunt

17         and Mr. Strickland in English

18         and Sign.)

19        MS. HUNT:  There's some things

20   that look unfamiliar, but they remember

21   seeing this, is what they're saying.

22   They remember seeing it, it just looks

23   somewhat different.  He's saying that

Page 18

1    he had maybe some other books and he's

2    not really . . .

3            MR. RITCHEY: I'm going to show

4    you what I premarked at CHB Exhibit 28

5    and CHB Exhibit 29 and see if those two

6    documents might help you out a little

7    bit.  Is that what -- were those the

8    other documents that they got?

9            MS. HUNT: The question is, do

10   you remember seeing these documents?

11           MR. STRICKLAND: Yes, I

12   remember that.

13           MS. HUNT: It does not mean

14   that you read everything or understand,

15   but do you remember seeing maybe the

16   cover, seeing that that was put in the

17   home or something?

18           MRS. STRICKLAND: Right.

19           MR. STRICKLAND: Yes.

20           MS. HUNT: Yes.

21           MR. RITCHEY: And just -- it's

22   my understanding that CHB Exhibit 28 as

23   well as what I've marked as Defendants'

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

```
 1              MS. HUNT:  Have you ever filed

 2    for bankruptcy protection?

 3              MR. STRICKLAND:  No.

 4              MRS. STRICKLAND:  No.

 5              MR. RITCHEY:  Have you ever

 6    been arrested or convicted of any

 7    crime?

 8              MS. HUNT:  Have you ever been

 9    arrested or convicted of any crime?

10              MRS. STRICKLAND:  No.

11              MR. STRICKLAND:  No.

12              MR. RITCHEY: And where do they

13    presently live now?

14              MS. HUNT:  Where do you

15    presently live now?

16              MR. STRICKLAND:  Cowarts.

17              MR. RITCHEY: In the

18    manufactured home?

19              MR. STRICKLAND:  Yes.

20              MRS. STRICKLAND:  Right.

21              MR. RITCHEY: Is that their

22    first home or did they live someplace

23    before?
```

Page 27

```
 1              MS. HUNT:  Is that your first

 2    home?

 3              MRS. STRICKLAND:   Yes.

 4              MR. STRICKLAND:  Yes.

 5              MR. RITCHEY:   It seemed like

 6    there was a house that may have been

 7    traded in.  Was there a house that was

 8    traded in?

 9              MS. HUNT:  Was there a house

10    traded in?

11              MRS. STRICKLAND:  No.

12              MR. STRICKLAND:  No.

13              MR. RITCHEY:  Did they finance

14    the manufactured home?

15              MS. HUNT:  Did you finance the

16    home?

17              MR. STRICKLAND:  Yes.

18              MRS. STRICKLAND:  Yes.

19              MS. HUNT:  Yes.  Payments?

20              MRS. STRICKLAND:  Yes.

21              MR. STRICKLAND:  Yes.

22              MR. RITCHEY: Who was that

23    through?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 36

```
 1            and Mr. Strickland in English

 2            and Sign.)

 3         MS. HUNT:  He said because they

 4    knew it was a decision for a long time.

 5    They wanted to make sure it was the

 6    right one, they would live there

 7    longer, so they had to be satisfied.

 8         MR. RITCHEY:  I guess, when did

 9    they decide to buy it?

10         MS. HUNT:  When did you decide

11    or pick that home?  Do you remember

12    when you decided that that's the right

13    house?

14         MRS. STRICKLAND:  A few days

15    before March 9, 2003.

16         MS. HUNT:  A few days before

17    March 9, 2003.  They decided about the

18    house a few days prior to that.

19         MR. RITCHEY: Was the house on

20    the lot at that time?

21         MS. HUNT:  Was the house on the

22    lot at that time?

23         MRS. STRICKLAND:  Yes.
```

Page 37

```
 1            MR. STRICKLAND:   Yes.

 2            MS. HUNT:   Yeah, but a display,

 3    the one like the design.   It wasn't the

 4    actual house of delivery.

 5            MR. RITCHEY: So they bought off

 6    of the display?

 7            MS. HUNT:   So you bought off of

 8    the display that you saw?

 9            MR. STRICKLAND:   No.   We did

10    not from display.   We looked at the

11    display, then the the other one from

12    manufacturer.

13            MS. HUNT:   Right.   But you

14    decided to buy from what you saw on the

15    display?

16            MR. STRICKLAND:   Yes.

17            MR. RITCHEY:   Okay.   So they

18    decided off of display and then I

19    guess --

20            MS. HUNT:   They showed floor

21    plan changes.

22            (Conversation between Ms. Hunt

23            and Mrs. Strickland in English
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1          and in Sign.)

2               MS. HUNT: They had changes and

3     some things that they had chose and

4     picked out.

5               MR. RITCHEY: Were the changes

6     in the floor plan or were the changes

7     more or less colors, carpet?

8               MS. HUNT: Was the changes

9     floor plans or carpet, vinyl, things

10    like that, the things that you wanted

11    to change?

12              MRS. STRICKLAND: The things I

13    wanted to change was vinyl in both

14    bathrooms, about the doorsteps.

15              MR. STRICKLAND: Two bathrooms.

16    The laundry and two bathrooms.

17              MR. RITCHEY: What did they do

18    to the two bathrooms and laundry?

19              MS. HUNT: The two bathrooms,

20    what was the change? The other house,

21    I believe, just had one bathroom.

22              MR. STRICKLAND: No, it had two

23    bath. Same.

Page 39

1              MS. HUNT:  So the change in the

2       bathroom was what?

3              MR. STRICKLAND:  Vinyl instead

4       of carpet.

5              MS. HUNT:  Vinyl instead of

6       carpet.  And in the laundry room, what

7       was the change?

8              MR. STRICKLAND:  About the

9       same.

10             (Conversation between Ms. Hunt

11             and Mr. Strickland in English

12             and in Sign.)

13             MS. HUNT:  They didn't have a

14      water faucet on the outside.  They

15      asked them to install that.  It was

16      just some minor adjustments.  So I

17      guess it would be to floor plan and --

18      but not a lot of floor plan changes as

19      far as the structure.

20         The steps was to do with how the

21      door opened or something?  What did

22      they do to change the steps?

23             (Conversation between Ms. Hunt

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 40

```
 1              and Mrs. Strickland in English

 2              and in Sign.)

 3              MS. HUNT:  So really what she's

 4    saying is no floor plan changes because

 5    she wanted carpet -- she wanted just

 6    vinyl right at that front part.  And so

 7    it actually is not a what you would

 8    call a floor plan change.  It is all to

 9    do with carpet, vinyl, the styles,

10    those choices.

11              MR. RITCHEY:  Okay.  Colors?

12              MS. HUNT:  Colors.

13              MR. RITCHEY: All right.  And do

14    they go -- again, they only dealt with

15    Van in making those changes?

16              MS. HUNT:  You only talked to

17    Van about the changes?

18              MRS. STRICKLAND:  Yes.

19              MR. STRICKLAND:  Yes.

20              MR. RITCHEY: Did they ever talk

21    with anybody at Champion Home Builders

22    prior to buying the house?

23              MS. HUNT:  Did you talk to
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 41

1    Champion Home or anybody else about

2    buying the house, anybody else?

3            (Conversation between Ms. Hunt

4            and Mrs. Strickland in English

5            and in Sign.)

6        MS. HUNT:  Not that she knows.

7        MR. RITCHEY:  Okay.

8        MS. HUNT:  Did you ever call on

9    the phone and talk to someone with a

10   TTY?  Did you always talk to Van?  No

11   one else?

12       MRS. STRICKLAND:  Nobody.  Just

13   Van.

14       MR. RITCHEY: Just Van.

15       MS. HUNT:  That's what she's

16   saying.

17       MR. RITCHEY:  Did they

18   understand Van was an employee of Palm

19   Harbor Homes?

20       MS. HUNT:  Did you understand

21   that Van was an employee of Palm Harbor

22   Homes?

23       MR. STRICKLAND:  Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 42

1          MRS. STRICKLAND:  Yes.

2          MR. RITCHEY:  As far as the

3   changes that were made, did they

4   actually make it into the house?

5          MS. HUNT:  Did the changes make

6   it?  When the home was delivered, did

7   you get what you asked for?

8          MRS. STRICKLAND:  Well, yeah,

9   but (unintelligible) problems.

10          MS. HUNT:  Like you got some

11   but not all?

12          MRS. STRICKLAND:  Some of the

13   changes, but not all of the changes.

14          MS. HUNT:  Some of the changes,

15   but not all.

16          MR. RITCHEY: Which ones did she

17   not get?

18          MS. HUNT:  Which ones did you

19   not get?

20          MR. STRICKLAND:  You mean did

21   the carpet change or walls plans after

22   it was set up?

23          MS. HUNT:  No.  When it was

Page 43

```
1    delivered, set up, did you get what you

2    ordered?

3            MR. STRICKLAND:  Yeah.

4            MS. HUNT:  Was the carpet

5    right?

6            MR. STRICKLAND:  Right.  No

7    problem.

8            MS. HUNT:  There was vinyl --

9            MRS. STRICKLAND:  Yes.

10           MS. HUNT:  -- in the bathrooms.

11           MR. STRICKLAND:  Yes.

12           (Conversation between Ms. Hunt

13           and Mr. and Mrs. Strickland in

14           English and in Sign.)

15           MS. HUNT:  So everything was

16   changed right?

17           MRS. STRICKLAND:  Right.

18           MS. HUNT:  You got everything

19   that you had asked them for?

20           MRS. STRICKLAND:  Right.  Yes.

21           MR. STRICKLAND:  Yes.

22           MS. HUNT:  All the changes you

23   were happy about, the carpet, the
```

Page 44

1    vinyl?

2            MRS. STRICKLAND:  Yes.

3            MR. STRICKLAND:  Yes.

4            MRS. STRICKLAND:  Exactly what

5    I ordered.

6            MS. HUNT:  What she ordered.

7            MR. RITCHEY:  Did she say

8    exactly what she ordered?

9            MS. HUNT:  She's saying that

10   it -- I personally -- I'd like to

11   interject because I'm thinking that

12   they're not understanding because there

13   was a --

14            (Conversation between Ms. Hunt

15            and Mrs. Strickland in English

16            and in Sign.)

17            MS. HUNT:  But when you got it,

18   was there vinyl in both bathrooms?

19            MRS. STRICKLAND:  Yes.

20            MS. HUNT:  So the stuff was

21   right, like the changes?

22            MRS. STRICKLAND:  Yes, it was

23   right.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 92

1    that you're suing under?

2           MS. HUNT:  This is the warranty

3    that you're suing under?

4           MRS. STRICKLAND:  Yes.

5           MR. RITCHEY: Did they

6    understand that they needed to give

7    notice to the manufacturer of problems

8    with the house?

9           MS. HUNT:  Did you understand

10   you needed to give notice to the

11   manufacturer for problems with the

12   house?

13          MRS. STRICKLAND:  Say that

14   again.

15          MS. HUNT:  Did you understand

16   that you were to give notice for

17   problems with the house to the

18   manufacturer, I guess these people

19   which I had an 800 number that we

20   called?

21          MRS. STRICKLAND:  Yes.

22          MS. HUNT:  Yes, we did.

23          MR. RITCHEY: I'm going to show

Page 97

1    because they would be early or they

2    didn't show up at all that day or they

3    would be late knowing that my child was

4    deaf and they needed communication to

5    be able to adequately tell them this is

6    my problem.  And I got very, very

7    frustrated with the dealings with how

8    this was handled.  And so that's where

9    mom come into play on this piece of

10   paper.

11            MR. RITCHEY:  All right.  Hang

12   on.

13            MS. HUNT:  Okay.

14            MR. RITCHEY:  Hang on to that.

15   I'm going to try to ask you some

16   things.  Is it fair to say that until

17   after the purchase or, I guess, the

18   first communications with anybody at

19   Champion Homebuilders was after the

20   purchase of the house?

21            MS. HUNT:  Correct.

22            MR. RITCHEY:  And then this --

23   is this CHB Exhibit 12, is this the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 161

```
 1              and Mr. and Mrs. Strickland in

 2              English and in Sign.)

 3         MS. HUNT:  Okay.  What she's

 4    saying is that it may just be that when

 5    they -- he's saying when they fill a

 6    hole in, it's mud what he's thinking

 7    that she's -- that's her interpretation

 8    of your question.

 9         MR. RITCHEY:  All right.  Are

10    there any soft walls?

11         MS. HUNT:  Are there any soft

12    walls, like, you know, soft, that you

13    feel anywhere that you know about?

14         MRS. STRICKLAND:  Not really.

15         MS. HUNT:  Not really.

16         MR. RITCHEY:  So if the only

17    problem is the mold, is that the only

18    problem that they're saying that they

19    have?

20         MS. HUNT:  Beyond what they

21    said, the other --

22         MR. RITCHEY: Beyond the five,

23    yes.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 162

1          MS. HUNT:  Right.

2          MR. RITCHEY: Is that --

3          MS. HUNT:  He asked is the main

4    problem you have now besides the five

5    things -- the window, the air, the

6    other things we said before -- now is

7    the main problem the mold?

8          MRS. STRICKLAND:  Right.

9          MR. STRICKLAND:  Right.

10         MRS. STRICKLAND:  Exactly.

11         MS. HUNT:  She said that's

12   right.

13         MR. RITCHEY:  She's never seen

14   the mold, any mold, or nobody has ever

15   seen mold?

16         MS. HUNT:  You never saw the

17   mold?

18         MR. STRICKLAND:  Never.

19         MRS. STRICKLAND:  Never.

20         MR. RITCHEY:  Did they not know

21   about it until after someone said they

22   had mold?

23         MS. HUNT:  Did you know about

Page 164

1    Exactly.

2            MR. STRICKLAND:  Right.

3            MR. RITCHEY:  Would it be fair

4    to say that no problems with the walls

5    or the mold were ever turned in to

6    Champion Homebuilders?

7            MS. HUNT:  Were any problems

8    with mold ever turned in to Champion

9    Homebuilders?

10            MRS. STRICKLAND:  Say that

11    again.

12            MS. HUNT:  Were any problems

13    with mold turned in to Champion

14    Homebuilders?

15            (Conversation between Ms. Hunt

16            and Mr. and Mrs. Strickland in

17            English and in Sign.)

18            MS. HUNT:  Because you did not

19    know --

20            MR. STRICKLAND:  Right.  I

21    didn't know about them.

22            MS. HUNT:  So the answer is no,

23    because they did not have any

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 165

1    knowledge.

2         MR. RITCHEY:   Is there anything

3    else that they're claiming is a problem

4    besides that?

5         MS. HUNT:   Is there anything

6    else that you are claiming a problem?

7         (Conversation between the

8         plaintiffs in English and in

9         Sign.)

10        MS. HUNT:   At this point, he's

11   saying the major problem now is the

12   issue with the mold.

13        MR. RITCHEY:   Okay.   Do either

14   of them plan to make any personal

15   injury claims with regard to exposure

16   to mold?

17        MR. GOULD:   Let me -- let me

18   handle this.   We're not claiming any

19   personal injuries as a result of mold

20   exposure, but we will have in the

21   language claims as it may relate to

22   being concerned and worried about mold.

23   But we are not saying that they have

Page 166

1     exhibited any physical symptoms as a

2     result of the mold.

3          MS. HUNT: He asked about the

4     claim to do with personal injury to do

5     with mold and your attorney is the

6     expert of what he is claiming, so we

7     let him answer.

8          MRS. STRICKLAND: All right.

9          MR. RITCHEY: And I'm presuming

10    there won't be any doctors' testimony

11    or anything like that?

12         MR. GOULD: That's correct.

13         MR. RITCHEY: That's either for

14    personal injury or mold?

15         MR. GOULD: Correct.

16         MR. RITCHEY: Can I ask if any

17    doctor has diagnosed them with any

18    mental-anguish-related injuries? Will

19    you ask that?

20         MS. HUNT: I don't really know.

21    Have they been to doctors and have they

22    had normal issues and things? I mean,

23    yes. But as far as what you're asking,

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 167

1    I don't know that they would even

2    understand that word mental anguish.  I

3    mean, I'm really --

4          MR. RITCHEY:  Is there a way to

5    say has any doctor diagnosed them with

6    any mental or physical problems as a

7    result of the house?  Is that fair

8    enough?

9          MR. GOULD:  I think so.

10          MS. HUNT:  Has any doctor told

11    you that your condition or your mental

12    health has anything to do with the mold

13    in your house?

14          MR. RITCHEY: Or any problem in

15    the house.

16          (Conversation between Ms. Hunt

17          and Mr. and Mrs. Strickland in

18          English and in Sign.)

19          MS. HUNT:  Did the doctor tell

20    you it's to do with mold?

21          MRS. STRICKLAND:  No.

22          MS. HUNT:  And I don't know

23    that they've ever approached that

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 168

1    question.

2         MR. RITCHEY:   The answer would

3    be no?

4         MS. HUNT:   The answer is no.

5         MR. RITCHEY:   Okay.  When we

6    were at the house in September, they

7    had their thermostat set at 78.  Is

8    that typically where they keep it

9    during the summer months?

10        MS. HUNT:   When you were --

11   when they were at your home in

12   September, they looked at your

13   thermostat and it said 78.  Is that

14   usually where you keep it in the summer

15   or do you cut it on when you're hot?

16             (Conversation between Ms. Hunt

17             and Mrs. Strickland in English

18             and in Sign.)

19        MS. HUNT:   At 72, 74 when it

20   gets too hot.

21        MRS. STRICKLAND:   But not all

22   the time because I can't afford it.

23        MS. HUNT:   Not all the time

1              REPORTER'S CERTIFICATE

2

3       STATE OF ALABAMA  )
                          )
4       ELMORE COUNTY     )

5

6            I do hereby certify that the above

7       and foregoing transcript was taken down

8       by me in stenotype, and the questions

9       and answers thereto were transcribed by

10      means of computer-aided transcription,

11      and that the foregoing represents a true

12      and correct transcript of the testimony

13      given by said witness.

14           I further certify that I am neither

15      of counsel, nor of any relation to the

16      parties to the action, nor am I anywise

17      interested in the result of said cause.

18

19           *Bridgette W. Mitchell*

20      Bridgette W. Mitchell, Certified
        Court Reporter and Commissioner
21      for the State of Alabama at Large
        ACCR NO. 231 - Expires 9/30/08
22      MY COMMISSION EXPIRES 1/25/2010

23

# EXHIBIT "C"

# GATEWAY HOMES
# ADVANTAGE HOMES

## 6440 US HWY 43
## GUIN, AL 35563
## (800) 239-3191



CHB
Exhibit 28

# HOMEOWNER'S GUIDE
# LIMITED WARRANTY
# &
# ARBITRATION AGREEMENT

**CHAMPION**

Dear Homeowner:

Welcome to your new manufactured home. We are delighted that you have decided to take advantage of the exceptional values that manufactured housing has to offer, and we're proud that you've chosen us to deliver those values to you. We've been working hard for a long time to make sure that the design, the construction, and the comfort of your home meet your needs and your expectations. We think they will!

You too have reason to be proud because you've achieved that prestigious American goal of home-ownership. With the care that's outlined in this Guide, that pride can accompany many years of satisfied housing experience. The information, the instructions and the recommendations included on the following pages are intended to help you enjoy and protect your investment. There also is essential safety information that you should review with your family. Please read this Guide carefully and store it for future reference.

The dedicated employees who helped build your home thank you for letting us be your housing provider. We think you'll be glad you did.

Sincerely,

Champion

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................... 2
    YOUR HOMEOWNER'S INFORMATION PACKET ............................................ 2
    HOMEOWNER'S INFORMATION CARDS .................................................... 3
    DATA PLATE .................................................................................... 3
    SERIAL NUMBER ............................................................................... 3
    LOOK FOR THE HUD SEAL ................................................................... 4
MANUFACTURER'S WARRANTY ..................................................................... 6
MINOR OR COSMETIC DEFECTS ................................................................... 6
    APPLIANCE & OTHER PRODUCER WARRANTIES ....................................... 7
RESPONSIBILITIES .................................................................................... 7
    OWNER'S RESPONSIBILITIES ............................................................... 7
    RETAILER'S RESPONSIBILITIES ............................................................ 7
    TRANSPORTER'S RESPONSIBILITIES ..................................................... 8
    SETUP CREW'S RESPONSIBILITIES ....................................................... 8
    WARRANTY CLAIM PROCEDURE ........................................................... 9
ARBITRATION & LIMITATION OF REMEDIES .................................................. 10
PROPER INSTALLATION ............................................................................. 11
ABOUT YOUR HOME ................................................................................. 11
    APPLIANCES ................................................................................... 12
    PLUMBING ...................................................................................... 13
    HEATING SYSTEMS .......................................................................... 14
    ENERGY SUPPLY SYSTEMS ............................................................... 16
SAFETY, HEALTH AND COMFORT ............................................................... 16
    FIRES AND FIRE SAFETY ................................................................... 17
    WINDSTORM PROTECTION ................................................................. 18
    CONDENSATION, RELATIVE HUMIDITY AND VENTILATION ......................... 19
    AIR QUALITY ................................................................................... 20
INTERIOR MAINTENANCE .......................................................................... 20
    WALLS AND CEILINGS ...................................................................... 21
    FLOORS ......................................................................................... 21
    COMPONENTS ................................................................................. 22
    FIXTURES ....................................................................................... 23
EXTERIOR MAINTENANCE .......................................................................... 23
    SIDING .......................................................................................... 24
    ROOFS .......................................................................................... 25
    SKIRTING ....................................................................................... 26
    CAULKING ...................................................................................... 26
    LOCKS .......................................................................................... 26
    WINTER PROTECTION DURING NON-OCCUPANCY .................................... 27
RESALE & RELOCATING YOUR HOME .......................................................... 28
INSURING YOUR HOME ............................................................................. 29
TROUBLE-SHOOTING GUIDE ...................................................................... 30
HOMEOWNER CHECKOUT GUIDE ............................................................... 31
OWNER'S MAINTENANCE CALENDAR .......................................................... 32
LOCAL RETAILER AND SERVICE LOCATIONS FOR APPLIANCES ....................... 33
STATE ADMINISTRATIVE AGENCIES ............................................................



# INTRODUCTION

## YOUR HOMEOWNER'S INFORMATION PACKET

Your new home is a major investment and we want to help you get the maximum enjoyment and benefit from it. That's why we've put together a Homeowner's Information Packet of several very important documents. Make sure that you've received all the documents listed below, that you've read and understand them, and that you store them in a safe place for future reference. If for some reason, you didn't get one or more of these documents, make sure that you ask the retailer who sold your home to you to get it for you.

*Homeowner's Guide, Limited Warranty & Arbitration Agreement* - This is what you're reading now. It describes many of the important features of your home and gives guidelines on what you need to do for the continuous care and upkeep necessary to protect your investment. It also includes our written commitment to you concerning the home you just purchased, through our limited warranty. The Guide describes the details, use and limitations of the warranty, and an explanation of how to get service if you need it. You'll find other information about your rights, duties, and remedies as a homeowner as well.

You will also find an explanation of our minor and cosmetic defect policy. Finally, we point out important safety warnings and other health and safety information throughout.

*Installation Manual* - It spells out our minimum requirements for a proper supporting foundation, how to anchor your home, and how to connect to the utilities. It's a very important manual because no matter how well your home was built, it cannot withstand a poor foundation or setup.

*Insulation Information Sheet* - A statement on the amount of insulation provided with your home.

*Appliance Warranty and Use-and-Care Booklets* - These are provided for, and usually with, the major appliances.

*30-Day Satisfaction Inspection Sheets* – To help you identify minor and cosmetic defects.

*3-Part Homeowner Information Card* - As described in the following section.

## HOMEOWNER'S INFORMATION CARDS

The Federal Manufactured Home Construction and Safety Standards Act requires every producer of manufactured homes to provide a booklet containing at least 3 detachable information cards with each home manufactured. It is important that we receive the information requested by these cards. If you bought your home from a retailer, please be sure your retailer has completed and mailed a card for you. If you acquired your home from someone other than a retailer, you should promptly fill out and send a card to us at the address on your data plate. It is important that you keep this booklet and give it to any person who buys the manufactured home from you.



# INTRODUCTION

## DATA PLATE

The Data Plate is usually located near the main electrical panel, in a closet wall or, on the back of a cabinet door. It is an important piece of information that gives many technical specifications including the areas of the country where your home is suitable for installation based on the climate and exposure to wind and snow loads. As the homeowner, you need to make sure that your home has been designed for the location of your choice, as shown by the certified zones on the data plate. Your home's model and serial numbers, an identification of the major factory installed appliances, and the manufacturing division's name and location are also included. That information will be valuable to you if your home ever needs warranty service.

## SERIAL NUMBER

The serial number of your home is included on the data plate and is permanently stamped on the front of the steel frame of your home. When you contact your home retailer for service or for a warranty claim, be sure you have the serial number available.

## LOOK FOR THE HUD LABEL

All manufactured homes built by us are designed to comply with tough Federal Construction and Safety Standards as evidenced by this red label located on the outside of the home. The U.S. Department of Housing and Urban Development (HUD) administer these standards through a network of state and independent inspection agencies.

> AS EVIDENCED BY THIS LABEL NO. [ IND XXXXXXXXXXX ]
> THE MANUFACTURER CERTIFIES TO THE BEST OF THE MANUFACTURER'S KNOWLEDGE AND BELIEF THAT THIS MANUFACTURED HOME HAS BEEN INSPECTED IN ACCORDANCE WITH THE REQUIREMENTS OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT AND IS CONSTRUCTED IN CONFORMANCE WITH THE FEDERAL MANUFACTURED HOME CONSTRUCTION AND SAFETY STANDARDS IN EFFECT ON THE DATE OF MANUFACTURE. SEE DATA PLATE.

If for some reason, we determine that your home does not meet the standards, we will notify you. If you believe you have, a problem for which the Act provides a remedy, you should contact Champion or the Department of Housing and Urban Development. We recommend that you contact your home retailer first because that is the quickest way to have your problem considered.

## DIRECT CONSUMER INQUIRIES TO...

If you have any questions concerning the Federal Construction and Safety Standards or consumer's rights under the standards, you should direct them to HUD. In order to contact HUD, please refer to the Department of Housing and Urban Development under listings for the U.S. Government in your phone book. When calling or writing, direct your inquiry to the "Consumer Complaint Officer" in your local HUD or FHA office. You may contact the central HUD office by writing or calling the Manufactured Home Standards Division, Department of Housing and Urban Development, Washington, D.C. 20410. The telephone number is (202) 755-7430. For a list of state administrative agencies (SAA's) see page 32.



## Champion's One-Year Limited Warranty

Champion ("Manufacturer") warrants to you, the Homeowner, for one year that the new manufactured home purchased by you was manufactured free from substantial defects in materials and workmanship. The term "substantial defects in materials and workmanship" means any factory introduced failure of the structural, mechanical, electrical, plumbing or weather-resistance systems of the home to meet the performance or specification requirements of the applicable building standards as specified on the house certification label.

This warranty begins on the date of the original retail delivery to the site and continues for one year from that date, which is the one year "Warranty Period." The warranty only applies to substantial defects that become evident within the Warranty Period and where written notice is provided to the retailer or the Manufacturer not later than 10 days following the expiration of the Warranty Period. The only remedy for substantial defects offered under this warranty is repair or replacement of affected parts after inspection by the Manufacturer or its authorized representative. If the identical part or component is not available, the Manufacturer will provide a similar part or component of equal or greater value. All parts or components repaired or replaced under the warranty are the exclusive property of the Manufacturer. The Manufacturer will make the final decision whether to repair or replace any part or component or system.

The Manufacturer reserves the right to make changes or improvements at any time in the design or manufacture of its manufactured home or any component thereof without incurring any obligation to others.

## HIS WARRANTY DOES <u>NOT</u> COVER:

- problems resulting from failure to comply with instructions in this Guide, including instructions for obtaining warranty service, or the Installation Manual;

- damage caused by use of the home for anything other than private residential occupancy;

- alterations or modifications provided by retailers or other third parties, including appliances, appurtenances, accessories, or options such as skirting and other similar items;

- problems resulting from improper or inadequate set-up, leveling, re-leveling, or securement;

- problems resulting from an inadequate foundation, settling, or shifting soil;

- problems resulting from abuse, misuse, unauthorized repairs, negligence or accidental damage, or from theft, vandalism, natural disasters or Acts of God;

- deterioration from high relative humidity, condensation, ground moisture, or extended moisture exposure caused by plants, building attachments or accessories;

- deterioration caused by loads for which the home was not designed to support or resist;

- deterioration from exposure to insects or decay;



4

- normal wear and tear;

- water distribution leaks on systems that have water pressure supplies at 80 psi or greater;

- improper or inadequate connection of utility systems to the utility supply services or between sections of multi-sectional units;

- roof leaks caused by ice or debris build-up, ice or debris dams, or water ponding on the roof;

- damage caused by improper electrical service grounding;

- bedding, draperies, furniture, wheels, tires, axles or brakes;

- any undertaking, representation or warranty made by a retailer or other person beyond those expressly set forth in this warranty;

- minor or cosmetic defects, as defined in this Guide;

- INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO YOUR LOSS OF TIME OR INCONVENIENCE, LOSS OF REVENUE, COMMERCIAL LOSS, BEING DISPLACED OR UNABLE TO USE YOUR HOME, MENTAL DISTRESS, TRAVEL, LODGING, OR TELEPHONE CALLS. NEITHER THE MANUFACTURER OR OTHERS ASSUME ANY RESPONSIBILITY UNDER ANY CIRCUMSTANCES FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.

THE REMEDIES SET FORTH IN THIS WARRANTY ARE THE SOLE REMEDIES PROVIDED BY THE MANUFACTURER. ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, TO THE EXTENT IMPLIED BY LAW, ARE LIMITED IN DURATION TO ONE YEAR AND OTHERWISE DISCLAIMED. Some states do not allow limitations on how long an implied warranty lasts, and some states do not allow the exclusion or limitation of incidental or consequential damages, so the above exclusions or limitations may not apply to you.

THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS THAT MAY VARY FROM STATE TO STATE.

---

### -NOTICE-
### TAPE & TEXTURE DRYWALL FINISH IS NOT WARRANTED BY CHAMPION

Champion does not warrant that tape and texture finishes of drywall walls or ceilings will be free from cracks. Champion will not make or pay for repairs to drywall cracks, or drywall finishing including multi-section close-ups. Champion strongly recommends that all homes with tape and texture finishes have additional perimeter blocking, as described in the Installation Manual. The additional blocking is not required by the standards, but such blocking may reduce the opportunity for minor movement and settlement, which can affect tape and textured drywall finish.

---



## MINOR OR COSMETIC DEFECTS

Minor or cosmetic defects are imperfections in the appearance of the house or a component of the house that do not affect the habitability of the house. These are not covered under our one-year limited manufactured home warranty. However, we will repair those minor or cosmetic defects described below, provided they were present when the home is initially delivered from the factory and provided they are listed on the 30 Day Satisfaction Inspection Sheet provided as part of the Homeowner's Information Packet, or a comparable written document. The inspection sheet or other written notice, including consumer's certification of completion of inspection, must be received by the retailer or us within 30 days of first occupancy of the home.

The minor or cosmetic defects do not include personal cosmetic preferences that differ from the particular standards of construction for any particular house.

The following are examples of minor or cosmetic defects:

- Loose molding, trim, or counter edging;
- Cracks, dents, chips, or scratches in wood, formica, linoleum, tile, drywall or other interior or exterior finish materials;
- Loose, torn, stained, or matted carpet;
- Scratches, chips, discoloration or other visual imperfections of fixtures, appliances, and other hardware;
- Torn, damaged, or stained screens, curtains, or shower or bath enclosures;
- Dried, cracked, or missing caulk.
- Alignment or adjustment of drawers, cabinet doors, and fixture covers.

## APPLIANCE AND OTHER PRODUCERS' WARRANTIES

Warranties issued by various other producers of appliances, accessories, heating and air conditioning equipment, and other items installed in the manufactured home remain in effect. These other producers or their local service agents should be contacted first for prompt corrective warranty action and for routine service and maintenance. The appliance warranties are usually shipped with the appliances themselves.



# RESPONSIBILITIES

## OWNER'S RESPONSIBILITIES

As the homeowner, you are responsible for normal maintenance as described or referenced in this Guide or otherwise. You also are responsible for tending to those items that are not covered under warranty. To assist you with those responsibilities, we have included in this Guide certain useful information about the systems of your home, maintenance recommendations and instructions, and a Trouble-Shooting Guide to help you identify the cause of an alleged problem. If a problem occurs that you believe is covered by the warranty, you must follow the procedure for obtaining service on a timely basis as explained below. You also must take reasonable steps to prevent the problem from causing additional damage while the service is being arranged.

## RETAILER'S RESPONSIBILITIES

The company that sold your home to you is an independent business and is not an agent or representative of the Manufacturer. Their responsibilities to you depend in part on the agreements and the services they provided to you, which may include delivery and installation, air-conditioning, skirting, etc.

Additionally, the retailer is responsible for the following:

*Pre-Delivery Inspection* - the retailer thoroughly inspected your home after receiving it.

*Processing Warranty Claims* - any request for service or warranty work must first be made to your retailer who will determine who may be responsible for providing service or repair. When appropriate, the retailer will arrange for the necessary service to be provided.

*Minor Adjustments/Repairs* - as appropriate.

## TRANSPORTER'S RESPONSIBILITIES

Your home was designed and built to be transported over the roads and highways with minimal wear. However, minor to severe damage to your home can occur during transportation because of accident or lack of care. Transporters are responsible for delivering the home in basically the same condition as they received it. You should make sure that any transporters you contract with are able to accept that responsibility. We've included some information in this Guide about moving your home and mobile components for secondary moves.



## SETUP CREW'S RESPONSIBILITIES

Proper setup and installation of your home in accordance with the Installation Manual is very important. *Proper setup and installation should only be done by qualified, experienced and/or licensed people who are capable of doing it safely and competently, as described in the Installation Manual, and who are able to stand behind their work. If the setup is not done right, or if the home is damaged during the setup process, our limited warranty will not apply.*

The setup crew is responsible for setting the home right the first time. Make sure you know who's responsible for keeping the home level and adequately supported. Damage to the home caused by lack of levelness or inadequate support is not covered by our limited warranty. We recommend that the home be professionally inspected after it is setup to assure that it has not been damaged in transit and that it has been setup properly. Check with your state or local building authorities for details about inspection services.

## WARRANTY CLAIM PROCEDURE

1. When you find something with your home that you think should be fixed, evaluate for yourself whether it is covered by the manufacturer's limited warranty. Review the responsibilities described and check through the Trouble-Shooting Guide in the back of this Guide.

2. If you are satisfied that the item is a manufacturing defect, apply for service and warranty work through your retailer.

3. Identify the specific problem for which you are requesting service, and the serial number of your home and the date you purchased it, your address and a telephone number where you can be reached.

4. If your efforts to obtain service through your retailer have not been successful, contact the Manufacturer directly. The address is shown on the data plate.



# ARBITRATION & LIMITATION OF REMEDIES

<u>ARBITRATION AND LIMITATION OF REMEDIES</u>: It is agreed that any controversy, claim or dispute between or among the Manufacturer, homeowner, independent dealer, finance company or any other person or entity arising from or relating to the Manufactured Home, its sale, transportation, setup, repair, installation, use, design, manufacture, financing, insurance, any other condition, the manufacturer's limited warranty, any contract or any alleged promise, representation, agreement or instrument relating to or delivered in connection with the Manufactured Home, or any alleged breach thereof, and any claim based on or arising from an alleged tort or claim of any kind whatsoever, including any claim relating to the validity of this arbitration and limitation of remedies provision [collectively "Claim(s)"], and if the Claim(s) cannot be resolved through direct discussions or negotiations, the Claim(s) first shall be mediated as administered by the American Arbitration Association under its Commercial Mediation Rules before resorting to binding arbitration. Thereafter, any unresolved Claim(s) shall be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and any judgment on the award rendered by the arbitrator(s) may be entered in any Court having jurisdiction thereof. All fees and expenses of the mediation or arbitration shall be borne by the parties equally, unless otherwise agreed in writing. Moreover, each party shall bear the expense of its own counsel, experts, witnesses and other costs, including preparation and presentation of proofs. All mediation or arbitration proceedings shall be conducted in the jurisdiction of the original retail sale or at any other place selected by agreement of all parties.

IT IS AGREED AND UNDERSTOOD THAT THE PARTIES ARE KNOWLINGLY GIVING UP AND WAIVING ANY RIGHT TO TRIAL BY JURY. This arbitration and limitation of remedies provision is part of the manufacturer's limited warranty for the Manufactured Home and shall be binding on and inure to the benefit of the parties' respective heirs and assigns.



## THE IMPORTANCE OF INSTALLATION

No matter how well your home was built, it is dependent on the foundation for its structural integrity. This point is so important that we are emphasizing it again even though it has been discussed elsewhere in this Guide and in the Installation Manual.

When your home is initially setup, it should be level. You may experience some slight settling of the foundation early on, which may require that you re-level the home. Additional shifting of the foundation may show a more severe problem. As your home settles in, it will ultimately take the shape of the foundation it rests on. If that foundation cannot offer a firm, level resistance, the home may not perform as it was intended.

• Doors, windows, and cabinetry were installed level and operational at the factory. If they are binding or do not align at your site, the first thing to check is the levelness of the home. Buckled, sagging, or loose structures or components, including trim pieces, may indicate that there are stresses caused by inadequate foundation.

Water leaks and air drafts, especially at doors and windows and at marriage walls on multiple-section units, may mean movement or lack of solid connection between different parts, which may also be a result of inadequate foundation.

After your home is installed, the best way to check the adequacy of the foundation is by making sure that it is level. Check after initial installation and then again whenever adjustments to the setup are made. The most convenient and accurate way to measure levelness is with the water level shown below.

Your home was engineered to resist most high winds, provided it is anchored in accordance with the Installation Manual. Any sliding or tipping during a windstorm can result in considerable damage to your home, so make sure the tie-downs meet the specifications. They need to remain taut at all times, so you should periodically check to see if there has been loosening as a result of soil or foundation settling, erosion or other reasons. For further precautions, refer to the section *WINDSTORM PROTECTION*.



WATER LEVEL

Refer to the Installation Manual for details about construction and use



*ABOUT YOUR HOME*

## APPLIANCES

Your home is equipped with nationally known band-name appliances. They have their own warranties and owner registration cards, and their own "Use and Care" manuals. Check and see if these important papers are provided with your home for each appliance, and if not, contact your home retailer. If you lose any of these papers, request new copies directly from the respective appliance manufacturer.

Normally, you will need to follow the manufacturer's procedures for obtaining warranty service, but if you need assistance, you should consult with your home retailer. You should thoroughly read and understand all the appliance manufacturer's "Use and Care" manuals and keep them in a single location. For your convenience, there is a place in the back of this Guide to record the names and phone numbers for the appliance manufacturer's representative or factory authorized service center in your area.

In addition to operating and maintaining your appliances in the manner described by their manufacturer, here are a few general considerations that need to be remembered:

*Routinely inspect* (at least annually) all appliances for wear, buildup of dirt, grime, or debris around the appliance, and general, obvious defects to the appliance or its surroundings. This is especially important for appliances like the water heater and furnace that you may not frequently come in contact with.

*Make sure* that the inlet paths for combustion-air and any ventilation air for fuel-burning appliances remains clear and unrestricted.

*Make sure* that chimneys, roof jacks and flues are not blocked or damaged. We recommend inspection at least annually.

---

**WARNING!**
Failure to maintain the combustion-air intakes and the exhaust outlets of fuel-burning appliances could lead to asphyxiation, as well as affect the performance of the appliances.

---

*Verify* that gas appliances have the orifice designed for the type of gas being used, either LP-gas or natural gas. Orifice conversions must be made by qualified personnel. Check with your gas supplier or the appliance representative.

---

**WARNING!**
Use of improper fuel-burner orifices is potentially a fire hazard and can cause poor performance of the appliance.

---

*Make sure* fuel-burning appliances have been adjusted to account for the thinner atmosphere if your home has been installed in high altitudes. See the appliance manufacturer's instructions for details.

*Make sure* that the moisture lint exhaust ducts for clothes dryers and the condensate drain lines for air conditioners do not terminate underneath the house.



# PLUMBING

### Water Supply Line

Freeze Protection - If your home is located in an area where freezing temperatures occur, the water supply line to the home should be installed below the frost line. The entire pipe riser above the frost line should be insulated.    There are a number of suitable insulating materials available.    An electric heating element, generally referred to as a "heat tape", may also be used.

---

### WARNING!
**Improperly designed or installed heat tapes may be fire hazards. Make sure the heat tape is listed by a nationally recognized testing agency and that it is installed in accordance with the manufacturer's instructions.**

---

When the heat tape is wrapped around the pipe and plugged into an electrical outlet, protection against freezing will be provided to the pipe even in coldest weather.    Electric current consumption is about equal to that of a 25-watt light bulb if the water line is not too long.

Pressure Control - In areas where water pressure exceeds 80 psi, install a pressure reducing valve at the water inlet to protect your plumbing.

Main Shut-off Valve - A shut-off valve on the water inlet line should be installed at the site.  A 3/4" threaded inlet is provided with the home.  See your Installation Manual.

Leaks - Leakage anywhere in the water distribution system can cause extensive trouble if not found early.  An occasional check of the water line, especially the fittings, both inside

and outside the home is a worthwhile precaution.

Sometimes, plumbing leaks that first occur after the home was setup are related to stress in the system caused by the installation of the home itself.  That kind of problem is not covered by the factory warranty.  When a leak occurs after you've moved into the home, check to see what stresses are on the plumbing lines. You may find that the home has to be re-leveled.

### Drain Lines

Leaks - Leaks at traps can normally be fixed by tightening the fitting.  Do not use tools on plastic fittings.  Like the supply line, leaks in the drain system that occur after the home has been installed may not be factory related. Check to see the home is level or if there are other stresses placed on the pipes.

Drain Cleaners - Commercial chemical drain cleaners may be used to unclog drains and to keep them draining smoothly.  However, some chemicals may be harmful to your pipes so make sure that the drain cleaner you use is suitable for use with plastic plumbing.

### Plumbing Fixtures

See the section on Interior Maintenance for tips on caring for your plumbing fixtures.



# ABOUT YOUR HOME

## HEATING SYSTEMS

### Central Heating System

Your home has a central heating system. Adequate circulation of warm air is accomplished by the blower in the furnace. This blower forces air through floor ducts to various points within the home. To suit your own comfort needs, you can balance the flow of air throughout your home by opening or closing the various registers. The air is pulled back to the furnace by the blower through return air openings under doors, reheated, and then discharged through air ducts again.

CAUTION: THE EXTRA CLEARANCE



UNDER YOUR ROOM DOORS IS TO FACILITATE AIR CIRCULATION THROUGHOUT THE HOME. IF WARMER OR COOLER AIR IS DESIRED IN A PARTICULAR PART OF YOUR HOME, YOU MUST ADJUST THE REMAINING REGISTERS ACCORDINGLY.

Your furnace is especially designed to provide "sealed combustion." This means that air from the outside is used for combustion and that no inside air is used, which prevents flue products from entering the home.

CAUTION: UNDER NO CONDITIONS SHOULD THE COMBUSTION AIR INTAKE ON THE FURNACE BE BLOCKED OR OBSTRUCTED, AND THE OUTSIDE DRAFT OPENING MUST NOT BE OBSTRUCTED.

Lighting, operating and maintenance instruction information is supplied by the furnace manufacturer and usually placed within the burner compartment or attached to the furnace door when the home leaves the factory. These instructions should be carefully followed at all times.

> **WARNING!**
> Unvented fuel exhausts can cause headaches, drowsiness, and even asphyxiation. Do not install or use unvented combustible fuel heaters (e.g., kerosene, propane, natural gas, wood, etc.) in your home.

### Fireplaces

If your home is factory equipped with a fireplace or other wood-burning appliance, it has been installed with the proper clearances and protection to combustible materials. Any modifications should only be done in accordance with the manufacturer's specifications. Like the furnace, your wood burning appliance is a "sealed combustion" design.

CAUTION: DO NOT BLOCK OR OBSTRUCT THE COMBUSTION AIR INTAKE OR DRAFT OPENINGS FOR WOOD BURNING APPLIANCES.

When properly used and maintained, wood-burning appliances can provide many years of carefree use.

> **WARNING!**
> Improperly maintained or improperly used wood-burning appliances and their chimney systems are leading causes of fires in residential construction. Be familiar with and follow the use and care instructions for these appliances.



## ENERGY SUPPLY SYSTEMS

### LP or Natural Gas Systems

If any of the appliances supplied with your home use gas, the home will be provided with a gas distribution system that is designed to handle either natural gas or liquefied petroleum gas (LP-gas). The appliances are normally supplied with an orifice for each type of gas and it is important to verify that the orifice actually installed on the appliance is the one intended for the type of gas being used.

CAUTION: MAKE CERTAIN THAT THE PERSON CONNECTING GAS TO YOUR HOME HAS INSTALLED THE PROPER ORIFICE FOR THE TYPE OF GAS BEING SUPPLIED. SEE THE APPLIANCE SECTION OF THIS GUIDE FOR ADDITIONAL CARE.

---

**WARNING!**
When connecting gas to your home, check for leaks using a soapy water solution applied to joints and connections and look for telltale bubbles. A match or open flame should never be used in checking for gas leaks.

---

### Oil Supply

Where oil is used as a fuel for heating, an adequate supply must be readily available. In general, this means the use of either an individual oil storage tank located adjacent to your home or a centralized oil distribution system. A readily accessible and approved shut-off valve, manually operated, must be installed at the outlet of any oil supply tank.

During summer months when the heater is not in operation, the oil tank should be kept full to prevent condensation and rusting. Check your oil lines from oil tank to furnace; check for leaks and also for kinks in tubing. In

extremely cold climates, the oil line should be completely insulated to keep oil from congealing.

### Electric Power Supply

Your home is equipped with 120/240 volt, 4-wire power supply system in the range of 40 amp to 200 amp service. A tag on the side of the home at the power supply service entrance will identify the specific capacity of your system.



Before moving, check the intended site for your home to see that the electric power supply available meets your needs. Inadequate wiring to your home can result in low voltage and cause a drop in the efficiency of lights and appliances.

*Grounding Systems* - For the protection of you and your family, your home must be properly grounded when it is connected to a source of electrical power. It is provided with a complete grounding system at the factory. The wiring system is a four- wire system (three wire plus ground.) The exterior metal surfaces, metal piping, gas lines and metal ducts are bonded to the grounding lug through a bonding connection to the chassis.

When your home is setup, the electrical installer will connect the grounding lug to a properly installed grounding rod, to a metal water line or in another method approved by the National Electrical Code.

---

**WARNING!**
Failure to properly ground the electrical system increases the risk of fire or electrical shock. See the Installation Manual for proper grounding procedures.

---



*ABOUT YOUR HOME*

*Electrical Distribution Panel -* Your home has another safety factor in its electrical distribution panel. Within the panel are a series of circuit breakers that are provided to protect the home against overloading of the wiring. One is provided for each circuit and for the wiring coming into the home from the utility source. A main circuit breaker controls the power throughout the entire home. Each individual circuit breaker allows the electrical power to the circuit it controls to be cut if problems occur. It is important that the rating of the breaker does not exceed the carrying capacity of the conductor it is protecting. The circuit breakers in your home are properly sized at the factory. If you must replace one, the same capacity must be used. An oversized circuit breaker can cause overheating of the circuit, which can cause a fire or damage a connected appliance. An undersized circuit breaker can result in unnecessary tripping of the breaker.

If the circuit continually trips breakers in short periods of time, consult an electrician. You probably have problems with a short or an overloading of the circuit.

> **WARNING!**
> In an emergency, electrical power to the entire home may be cut off by tripping the main breaker or pulling the main fuse.

*Ground Fault Circuit Interrupter -* The outdoor receptacle on the outside wall of the home, receptacles in the bathrooms and in the kitchen, and some receptacles near sinks are protected by a ground fault circuit interrupter (GFCI). The GFCI is a safety device installed to protect people from electrical shock in the event of a ground fault in the circuit. There are two types of GFCI's. One is installed in the main electrical panel box and the other type is in the receptacle. Either type works on the same principle. If a fault occurs, the GFCI will trip to the "off" position and interrupt the electrical supply to the receptacle. The reset button on the GFCI will activate it. If it continues to trip, a qualified electrical service man should be called to locate the source of the trouble.

The GFCI is equipped with a test button. Check the operation monthly or at the frequency recommended by the manufacturer by pressing the test button. The breaker will trip if the GFCI is operating properly. The breaker then can be reset to restore service. GFCI-protected circuits should not have continuous motor loads connected in them (i.e. refrigerators, freezers, etc.).

NOTE: THE HEAT TAPE RECEPTACLE UNDER THE HOME IS NOT GROUND FAULT PROTECTED AND SHOULD NOT BE USED AS AN OUTSIDE POWER SOURCE. IT SHOULD ONLY BE USED TO POWER A HEAT TAPE TO PREVENT WATER SUPPLY LINE FREEZING.

### Connections & Modifications

The energy distribution systems provided with your home, including the fuel lines and the electrical system, were properly designed and sized for use with the appliances provided. If you decide to change appliances or modify the systems, make sure you don't overload them.

> **WARNING!**
> Overloaded or improperly connected gas, oil, or electrical distribution systems can result in fire, explosion, or electrical shock. Any changes to these systems, including repairs and installation of major appliances, should only be done by qualified electricians or fuel-service personnel.



## FIRES AND FIRE SAFETY

Your manufactured home, like most residential structures, contains systems and materials that can burn. Home fires, though rare, do occur and range from being minor to deadly. Even minor fires can result in damage that is very costly to repair. As a homeowner, you need to be aware of and vigilant about your fire to protect yourself, your family, and your investment. As a minimum, you should follow this crucial 4-point plan:

**1. Educate yourself and your family about the dangers of fire and the best methods of reacting to it.**

Fires produce heat, smoke and poisonous gases that are all deadly. All three products usually become more concentrated the closer to the ceiling they are. Therefore, in the presence of a fire, always stay low.



Most fatalities occur from smoke or toxic gas, rather than the heat or flame. Even a few breaths of high concentrations of some of the gases can cause complete disorientation and unpredictable behavior. The most breathable air is usually low to the ground. Use a damp cloth held over the mouth and nose to offer some protection.

Fires need oxygen from fresh air to continue burning. Keep windows and doors (both inside and outside) closed when not in use and when sleeping. In the event of a fire, close any window or door near you and do not

open any closed door without first testing it for high heat buildup on the other side. If there is heat on the other side, the very act of opening the door could result in the fire dangerously flashing up as it gets new air. Exit the room you are in through another door or window.

Plan emergency escape routes, using two alternate paths from anywhere in the house, and practice escape at least once a year. Meet outside in a prearranged meeting spot.

If there are small children, elderly, or disabled persons in the home who may not be able to get out on their own, make plans and provisions for a primary and a secondary route for getting to them to help them escape in the event of a fire. Consider that the secondary route may need to be from the outside, through a window, in the event the occupant's room is cutoff by a fire.

**2. Do not allow fire hazards in or near your home.**

Do not store flammable liquids or hazardous materials in or underneath the home.

Maintain electrical appliances, devices and their connecting cords in good repair; do not overload electrical outlets; and only use extension cords temporarily.

Do not smoke in bed. Keep matches, lighters, and other flammable materials away from small children.

Do not store materials or restrict air movement around heat producing or heat generating appliances.

Never pour water on a grease fire.

**3. Maintain the energy distribution and energy consuming systems provided with**



# SAFETY, HEALTH AND COMFORT

your home.

Cooking and heating equipment is a major category of fire causes. At least once a year, check the condition of your major appliances including any wood-burning appliance, the furnace, range and water heater.

If you smell gas or experience electrical problems that do not seem to be related to an appliance, stop using the system immediately and have it checked out by a knowledgeable professional. Do not take chances!

### 4. Maintain the fire protection systems provided with your home.

The smoke detectors provided near each sleeping area of your home could save your life by providing early warning of a fire! Make sure that you read, understand, and follow the smoke detector manufacturer's operational and maintenance instructions provided. Keep those instructions for future reference. Studies show that smoke detectors that are not periodically tested according to manufacturer's instructions are less likely to be operational in time of need. Most manufacturers recommend weekly tests.

If a smoke detector becomes inoperable or otherwise must be removed, replace it immediately to insure maximum protection.

> **WARNING!**
> The smoke alarm will not work without 120 VAC power and a good battery properly installed. The smoke alarm should be tested when installed and then weekly after that.

Each home is provided with at least two remotely located exit doors, located so the path of travel from any bedroom is not more than 35 ft. The doors are operable from the inside without the use of keys. Keep these doors and their operating mechanisms in good repair. Do not obstruct the path to them or reduce their usefulness as a means of egress.

Each bedroom is equipped with a safety-exit escape window that includes operating mechanisms and operating instruction markings. Maintain the mechanisms and the markings in good order and become familiar with their use. Do not block access to the window or otherwise restrict its operation.

---

## WINDSTORM PROTECTION

Your home has been designed to provide shelter from wind including many high windstorms that occur throughout the country, provided it is properly tied down. However, no housing, including your manufactured home, is capable of resisting extreme windstorms such as hurricanes and tornadoes and it is not safe to remain inside the home during the threat of these types of storms.

### Tornadoes

During a Tornado Warning, evacuate your home immediately and seek emergency shelter, or if your home is over a basement foundation,

proceed to the basement.

### Hurricanes

If your home is in the path of a hurricane, do not rely on the home to provide shelter. Evacuate the home and move to emergency shelter inland from the coast. In anticipation of the hurricane's approach, secure all property both inside and outside the house because flying debris is a major cause of damage in hurricanes. If your home is equipped with hurricane shutters or equivalent door and window covering devices (see *Data Plate*), use them. If the home is not so equipped, refer to our Installation Manual for recommendations on how to provide for coverings.

---



Case 1:06-cv-00682-TFM Document 87 Filed 03/28/2008 Page 1 of 18

## CONDENSATION, RELATIVE HUMIDITY AND VENTILATION

In all types of buildings – including manufactured homes - condensation on windows and cold surfaces is usually a sign of a potentially severe problem: excessive levels of relative humidity in the indoor air. Relative humidity is a measure of the amount of moisture that's carried by the air. Too high a relative humidity level means too much moisture, and too much moisture will cause wood and other building products to fail, including the thermal insulation. Unmanaged levels of high relative humidity can severely damage your home. If condensation is visible in your home, especially in the winter, it probably means better management of the relative humidity is needed. Simply put, the lower the outdoor temperature is, the lower the indoor relative humidity should be.

One way to manage the relative humidity is to *reduce or control the amount of moisture that is put into the air*. Normal sources of moisture include the use of the bath and shower, cooking, and even people themselves. Other, more controllable sources of moisture may include humidifiers, large numbers of houseplants, large aquariums, and laundry that is allowed to dry inside. Kerosene heaters add more than a gallon of water for every gallon of kerosene burned and should never be used inside a home.

You can also manage the relative humidity by *removing some of the moisture from the air* after it gets there by using mechanical dehumidifiers, or by replacing the moist indoor air with usually drier outdoor air, through ventilation. Mechanical ventilation in the form of electric vent fans is available in the kitchen and in many of the bathrooms. Passive ventilation can be provided by simply opening your windows and doors. Continuous ventilation can be achieved by "cracking" the bottom of one or two windows slightly (don't

forget to raise the storm windows). In all cases, whenever you use the shower or tub, keep the bathroom door closed and the bathroom vent fan on or the window open so extra moisture can escape to the outside.

If the relative humidity underneath your home is high compared to the outside air, it may become too difficult to effectively manage the indoor humidity; and there may be several resulting structural and foundation problems. Those problems could include anything from warped or buckled floors, buckled or deteriorating exterior siding, structural sagging (from either deteriorated structural components or from sinking foundations), to excessive moisture in the attic cavity. *It is important that the relative humidity underneath your home be managed as well!*

The most effective way to do that is to provide proper ground drainage underneath and within a few feet of the home so water will not accumulate and will flow away from the home. You can supplement that with a vapor barrier on the ground to reduce the amount of ground moisture that gets into the crawl space. Don't let moisture-producing equipment empty into the crawlspace; for instance, clothes dryer vents and air conditioning condensation lines should be routed to the outside.

Finally, ventilate the space underneath the home so that moisture can get out. If there is skirting around the bottom of the home, the ventilation must be capable of keeping the relative humidity of the air in the crawl space at about the same level as the outside air.

NOTE: HIGH HUMIDITY IS NOT THE RESULT OF A DEFECT IN THE HOME. DAMAGE CAUSED BY HIGH HUMIDITY, INCLUDING CONDENSATION, IS NOT COVERED BY THE WARRANTY.



SAFETY 06-H-082-TM AND COMFORTed 03/28/2008    Page 2 of 18

## AIR QUALITY

Because of energy conservation concerns, manufactured homes have been designed and built in accordance with stringent Department of Housing and Urban Development (HUD) standards to greatly reduce air infiltration. Air infiltration occurs in all residential buildings. Because it takes considerable energy to heat or cool the indoor air to a comfortable temperature, HUD decided it is beneficial to lower the rate of exchange with the outdoor air by making the building "tighter."

However, as a result of reducing air infiltration, the quality, or purity, of the indoor air may be reduced. The indoor environment of residential buildings - including manufactured homes - can be a source of many undesirable odors, gases, particulates and allergens that tend to accumulate in the air. The sources include furniture, carpeting, clothing and the building materials themselves. Living conditions such as cooking, smoking, and even breathing are also such sources. Cleaning materials and cosmetic sprays can often be heavy contributors.

If the various particulates or gases, which include formaldehyde, are allowed to accumulate, such concentrations may produce discomfort. At that time it may be necessary to increase the rate of exchange with the higher quality outdoor air. This can be accomplished economically by periodic and routine use of the exhaust vents, by keeping the air moving and circulating within the home itself, and by keeping one or two windows slightly "cracked." In some cases it may be beneficial to give the home a thorough "airing out" on a regular basis. Your home has been provided with automatic and/or manual ventilating systems.

---

*IMPORTANT HEALTH NOTICE*

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure.

Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at a greater risk. Research is continuing on the long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your retailer for information about the ventilation options offered with your home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

---



## WALLS AND CEILINGS

Most, if not all, of the walls and ceilings in your home are made of gypsum drywall.

Cleaning - Sprayed textured surfaces may be lightly dusted or vacuumed to remove dirt but should not be washed. Washing will remove the texture. On other surfaces, dirt can easily be removed with a damp cloth or a mild detergent. Strong soaps or cleansers are not advisable.

Mold, mildew, or water stains on the wall or ceiling surface indicate that moisture is getting into drywall panel. If that happens, it is extremely important that you find the source of that moisture and correct it. Do not overlook the possibility of high relative humidity or condensation, as explained in the section titled Condensation, Relative Humidity and Ventilation. Once you have successfully found and corrected the source of the moisture, you

 can usually remove the stain with bleach or a commercially available cleaner specifically designed for that purpose.

Repairing - If it becomes necessary to repair your wall or ceiling surfaces, it will probably be because of some damage to the surface finish. The repair method you will need to use will depend primarily on the kind of finish that was used. Any of several different finishing methods may have been used but they can generally be categorized as prefinished or textured.

Some or all wall fasteners may not be hidden or puttied, depending on the manufacturer's building standard. Commercially available putties may be used by the homeowner. Typically, this is not a warranty issue.

*Prefinished* - Prefinished drywall wall or ceiling panels are finished with either paper, a coated paper, or a vinyl. The surfaces are relatively flat. Small scrapes, scratches or chips can be rubbed with very, soft, white chalk and then wiped with a clean cloth. A deep scratch may require more than one application. A little touch-up paint matching the color of the surface may be applied over the chalk if the area is small, but in general, painting of prefinished surfaces is not recommended. Spackle and touch-up paint should be used for heavy gouges.

Larger damage may require significant repair or replacement of the panel itself using techniques for drywall repair that are commonly available. If you replace vinyl coated panels, you will need to provide another vinyl finish for moisture control purposes, especially if the panel is in the ceiling, the exterior wall, or in a bathroom.

*Textured Finish* - Cracks and damage in the textured finish of wall or ceiling panels must be repaired by first, preparing the damaged surface for finishing. Scrape away the old texture and make sure the panels are mechanically secure and the joints are properly taped. Fill in any cracks with pre-mixed drywall compound. Use the same pre-mixed drywall compound dabbed or sprinkled on with a brush or cloth to provide a textured finish consistent with the rest of the surface. Your hardware store may carry commercial applicators to help you obtain a professional look. Prime the surface with a vapor resistant primer-sealer and then apply a finish coat of high quality latex paint.

NOTE: WALL AND CEILING CRACKS THAT OCCUR AFTER THE HOME HAS BEEN SETUP ARE USUALLY CAUSED BY SETTLING OR FOUNDATION FAILURES. THEY ARE NOT MANUFACTURING DEFECTS COVERED BY THE WARRANTY.

## FLOORS

Floors are covered with vinyl floor covering or carpeting. Vinyl flooring will look better and last longer if it is cleaned regularly. Avoid excessive application of water, as it may cause lifting and curling. A number of good floor coatings and preservatives are available and may be purchased locally. All carpeting should be vacuumed regularly and kept clean for long wear. Please note that sun fading of carpeting is not considered a carpet defect and is not warranted. Carpet, as well as draperies and upholsteries, should be protected from direct sunlight. All carpeting, regardless of its manufacturer, will fade when exposed to direct sunlight.

## COMPONENTS

### Doors

A good fit around the doors of your home is important for ease of operation and longer life of the door itself as well as the door framing. For exterior doors, good fit is needed to provide the intended weather protection and keep the locking mechanism functioning properly.

Occasionally, minor adjustment to the door hang may be necessary after the home is first setup on site because of slight differences in level. Check with your retailer to have those adjustments made. This usually won't be covered under your factory warranty because the doors were fit at the factory while the home was level.

If doors should begin binding sometime after the home was set or after an initial adjustment has already occurred, it may be an indication that the home's foundation is settling and that leveling adjustments are necessary. Since a level, solid foundation is absolutely critical for the long-term integrity and performance of your home, don't overlook the possibility that binding doors may be giving you an important early warning. You might be able to eliminate the door problem by adjusting the swing, but that might be covering up a larger, more important problem with the foundation.

### Windows

In cold climates, windows or exposed glass areas may accumulate excessive moisture due to condensation. In most cases, it is helpful to pull down or install storm windows when cold weather comes. You should view condensation as a warning signal that you need to take steps to manage the environment. See the section on Condensation, Relative Humidity and Ventilation. If the moisture on the glass is running down and accumulating in the windowsills, you need to attend to it so the moisture is not allowed to damage the sills.

If your windows are hard to open or close or otherwise bind, or do not close tightly against the frame, you should see if the casing guides need cleaning or lubricating. Soap, WD-40 or a variety of other lubricants may be all that's needed. However, it may be that a minor adjustment in the seating or framing of the window is necessary. If so, do not overlook the possibility that imperfect window alignment may be an indication that the foundation is settling and the home needs to be re-leveled. Don't ignore such warnings!

### Counter Tops

Counter tops should be protected from extreme heat that may crack or discolor them. Hot utensils should not be placed on any laminated surface. A wire rack or protective pad should be placed beneath the hot utensil



until it has cooled. Sharp knives or choppers should not be used on the counter top.

### Cabinet Drawers



If any drawers in your built-in cabinetry should stick or not slide right, check the drawer glides for proper alignment. They can normally be adjusted by loosening a screw, adjusting, and then tightening the screw.

## FIXTURES

### Sinks

Under ordinary conditions the secret of keeping your sink or lavatory bright as new is simple: light swabbing with soap or detergent, rinsing with clear water, and a wipe with a cloth or dish towel should remove everyday dirt. Occasional scouring with a household cleaner will make your sink shine like new.

For stains and tougher jobs, there are a variety of commercial cleaners available specifically designed for stainless steel, porcelain enamel, fiberglass or plastic, depending on which kind of sink is in your home. You should generally avoid strong bleaches containing chlorides that tend to corrode many materials, or strong scouring agents that can scratch surfaces.

### Bathtubs and Showers

The bathtubs and showers in your home should be cleaned with a household dishwashing detergent applied with a soft cloth. However, make sure you rinse the detergent off thoroughly to eliminate any film. Do not use abrasive materials that can dull or scratch the surface.

Mold will commonly form in tubs and showers, particularly on surfaces where moisture is allowed to stand for extended periods (for instance, small ledges, corners, etc.) You can reduce the probability of mold forming by keeping the humidity down in the bathroom. Use fans or vent windows during baths or showers; keep objects such as wash cloths that can trap moisture off the fixture surfaces; and wipe the shower or tub with a towel after use. If mold does appear, there are several commercial moldicides available to control it.

### Toilets

Use commercial toilet bowl cleansers. If yellow rings are forming inside the bowl, it may be from mineral deposits in the water. Consider water softening or purifying services.



## SIDING

Your manufactured home's exterior siding, whether it is wood, metal, vinyl or some other composition, will serve a long and useful life provided it is properly maintained and protected. The finish on the siding will deteriorate with age and exposure to the elements, but that process can be retarded by simply keeping the siding clean and, for metal sidings, waxed, as needed.

## Wood or Composition Siding

These sidings are designed to provide excellent long-term resistance to weathering when adequately protected by house paint. They are usually warranted by their manufacturers to perform as intended for many years, so you should make sure you have and save that warranty, with its specific terms and conditions, along with specific maintenance requirements.

Generally, the siding manufacturer's warranty does not apply to siding deterioration caused by moisture that has gotten beyond the surfaces of the siding and into the core material. Like any wood or cellulose based product, unwanted moisture can change the shape or destroy the siding. Therefore you should follow the following minimum maintenance requirements as well as the siding manufacturer's specific recommendations:

### A. Manage the home's moisture environment

High relative humidity levels inside the home or in the crawl space under the home can eventually cause moisture to penetrate the siding from the backside or underside of the board, from which there is little or no resistance. You must have a ground vapor barrier placed underneath the home, ventilated skirting, and other controls as described in the section of this Guide titled Condensation, Relative Humidity, and Ventilation.

### B. Maintain the exterior finish

Periodic repainting of the siding is necessary, with the frequency varying depending primarily on the climate and exposure your home is in, and the quality of paint used. If the surface is discolored or blotchy, or if the coating is too thin, porous, checked, cracked, scaling or chalked, refinishing is probably necessary. Use good quality paint suitable for use with wood-type siding, as recommended by the siding manufacturer or your paint supplier. If the board is exposed, make sure you use a primer before refinishing. The exterior finish will last longer if the siding is kept clean. You can wash it with plain water or as recommended by the manufacturer but you should normally avoid soaps, detergents and solvents as they may cause the finish to wear. Any mold or mildew should be removed using commercially available fungicides.

Bushes, trees, other plant growths, or other materials or structures that are held, pressed, or rub against the siding should be removed or controlled so that the finish is not scratched and moisture is not allowed to stand against the surface. Any break in the surface of the siding should be protected immediately to prevent moisture getting into the board.

### C. Re-caulk and re-nail as necessary

If factory-provided caulking hardens, cracks, or loses its seal, it should be replaced with good quality caulk. If expansion and contraction of the board opens new paths for moisture to penetrate into the board through joints, cracks, nail holes, etc., then they should be caulked and sealed. Any loose siding or trim should be re-nailed as necessary, taking care that the head of the nail itself provides a good seal with the siding surface.

# EXTERIOR MAINTENANCE

## Metal Siding

Pre-finished metal exteriors may be waxed for maximum protection. Wax jobs last longest when applied in spring or fall, and when the temperature ranges between 50 and 70 degrees. Paste waxes leave a durable coating of wax on finishes of metal-sided homes and provide protection from abrasion and minor scratches. The wax coating will also make your home much easier to wash.

## Vinyl Siding

Vinyl siding resists airborne dirt. Normal rainfall or a periodic rinsing with a hose will keep the siding free of loose dirt. Where an unusual amount of dirt accumulates on the siding, use an ordinary, nonabrasive household detergent. Use a rag, sponge or soft bristle brush with gentle rubbing action to clean the siding. Rinse thoroughly.

## ROOFS

The smallest leak or break in the roof or roof edges could result in damaged ceilings, interior panels, and even furnishings. Whenever your home is relocated make sure you seal the roof.

The cause of most costly roof troubles can be prevented:

1. The roof should not be walked upon unless absolutely necessary. When walking on the roof cannot be avoided, only use those sections supported by rafters or stringers, or use boards or panels to distribute weight. Take care when ladders are placed against the side of the house or roof to protect against damage to siding or roof shingles.

2. When sited, it is important that your home be properly leveled to avoid strain that can part seams and create buckling of the roof area.

3. Do not remove the furnace or furnace pipes and reinstall without also checking the roof stack outside. A crack in the stack caulking or a loosened stack could be a cause for a roof leak. A loose roof stack or related furnace pipe also could be a fire hazard. Check this thoroughly. Re-caulk stacks, if necessary.

4. The roof and roof edges should be inspected for leaks, breaks or openings at least twice yearly, and accumulated debris removed.

## Metal Roofs

Coat or paint roofs at least every other year with a roof preservative and preferably once a year for maximum life. Make sure you use a roof preservative that is of good quality so that in hot sunshine the preservative does not melt, run and streak the sides of your home. Some roof preservatives are guaranteed not to streak your pre-painted side panels. Check before you buy!

The roof seams should be checked for spreading, parting or buckling. If any of these seam conditions occur, take immediate corrective action to prevent roof leaks.

Rust, oxidation, breaks and cracks on the roof panels are all potential trouble points and are almost sure signs of roof panel wear. Scrape or wire brush affected areas and re-coat before additional damage occurs. Treat cracks and breaks in metal roof panels with a special conditioner before using the regular roof coating. Consult your local paint retailer for a recommended conditioner.



# EXTERIOR MAINTENANCE

## Shingled Roofs

Periodically inspect shingled roofs for any tearing, cracking or rolling of the individual shingles. Shingles that have been rolled up by the wind can be flattened out and cemented down with approved roof mastic. Replace any shingles that are cracked or torn. This is extremely important since it can curtail any leaks that could damage the interior of your home.

## Roof Moldings

All roof moldings should fit tightly to the roof, firmly held by screws or nails. Remove damaged moldings and either repair or replace them. Before moldings are reset, liberally apply a heavy coating of caulking to the underside with a small brush, putty knife or caulking gun. If the roof or roofline molding is tight, or after it has been reset, apply a preservative coating over the top of the entire molding. Give special attention to assure that all screws or nail heads are covered or coated with a preservative.

## Roof Stacks and Vents

If stacks or vents have rusted and fail to function properly, they should be replaced. Before replacing them, remove the old, dried caulking around them and apply new caulking. In setting stacks and vents, apply caulking to the underside of the base of the fixture and the roof where it is to be set.

The fixture should be firmly secured in place with screws, nails or other suitable fasteners. Apply caulking so that it completely covers all fasteners of the stacks or vents.

Even if stacks and vents don't have to be replaced, old, dried caulking around them should be scraped away and a new coating liberally applied from time to time, and as regular inspection dictates.

## Roof Maintenance

Accumulations of leaves, pine needles, ice and snow can damage your roof. In particular, ice or debris dams along the eaves can cause leaks that are not covered under the warranty. Inspect your roof frequently, especially during the winter and after heavy snow. Do not let buildups occur--remove the risk.



## SKIRTING

Before a covering or skirting is installed around the bottom of your home make sure the installation will not trap in moisture. Read the section titled *CONDENSATION, RELATIVE HUMIDITY AND VENTILATION* in this Guide, and the requirements and recommendations in the Installation Manual for direction.

Once the skirting is installed, do not close the air vents, even in the winter. That will also assure the needed combustion air for appliances.



## CAULKING

As in any type of house, your home should be caulked periodically. Caulk or seal all home-settling cracks and openings, no matter how small, which may occur around the moldings, joints, rails, windows, rooftop seams, doors and roof vents. Tighten or replace exposed or loose nails and screws so moisture cannot enter.

Sealing compounds are made in a variety of colors to match the existing finish. The best caulking compounds do not dry out hard, but instead remain elastic. These can be applied with a caulking gun or putty knife

## LOCKS

Interior and exterior door locks should be periodically lubricated using a powdered graphite type lubricant. The latch bolt and door strike must be maintained completely in alignment. If not, make adjustments so the



door strike and the latch bolt will mate properly. If the latch goes out of alignment, it may because of foundation settlement.

Keep a record of the identification number and make of the house lock so a locksmith can make new keys if the original keys are lost.

## WINTER PROTECTION DURING NON-OCCUPANCY

Drain all sink and lavatory traps or pour antifreeze into them. Always pour antifreeze into bathroom commode and tub traps. Do not allow water to remain in the commode tank.

In addition, completely drain all hot and cold water lines to prevent bursting. Close the shut-off valve below the frost line on the main water supply. Leave all faucets open and blow air through the lines to drain water from low spots in the traps.



## HOME RESALE

If you sell your home, go over this Guide with the purchaser before new possession and occupancy. It is important that consistent upkeep be maintained over the life of the home. Please make sure the second-time buyer fully understands the maintenance instructions within this Guide.

The second or third purchaser should also fill out and send in the Homeowner's Information Cards described in the front of this Guide.

## RELOCATING YOUR HOME

Manufactured homes should be moved by professional manufactured home movers. There are several firms that specialize in this activity. They have offices in all major cities.

### Ready for Moving

While you should never attempt to move your home yourself, there are certain procedures you can follow to prepare for the move. Pictures, clocks, radios, television sets, lamps and other fragile items can be tied on the couch in the living room or on a bed. Anything loose will slide forward on a quick stop. Some people prefer to put these small items in cartons. Pack dishes in cartons with towels and pillows. If latches are inclined to jolt open, secure them with masking tape.

Better yet, arrange for the mover to handle the entire procedure.

Consult with professional movers about the distribution of weights and loads within your home prior to moving. Loose articles within a moving home tend to shift to the front and to the right. Try to distribute the weight throughout the home with the heavy items at the front and over the axles and toward the center of the rooms.

Cap the water inlet and sewer outlet. Close all windows. Lock all doors.

The mover will check the entire undercarriage of the home and the tires for proper inflation.

### Do Not Overload Your Home

Remember, overloading means overweight, unnecessary stress and undercarriage sway, all of which result in extra cost to you for tire blowouts, structural damage and longer routing. Check and make sure after loading that the distance between the top of each tire and the bottom of the floor is three inches or more. This will prevent dangerous tire rubbing when the home is moving.

## YOUR HOME WAS NOT BUILT TO HAUL CARGO!

Do not carry such things as blocking apparatus, blocks, lawn mower or lawn equipment in your home. Ship heavy items such as pianos, freezers, large trunks, etc. separately.

When relocating a multiple section home, be sure shipping walls are secured in place in marriage wall openings to prevent damage during transportation.



## INSURANCE

No matter where you live or what your financial status is, protecting your home with adequate insurance is a good idea.

There are three basic types of insurance that you can buy:

*1. Physical Damage (or "Hazard") Insurance* - to protect the home itself, its physical contents, and associated structures such as carports, from covered losses. Normally, the covered losses will include fire, theft, hailstorm, collision, etc. Losses from floods and earthquakes are often optional.

*2. Liability Insurance (sometimes called "third party" insurance)* - to protect you (the "insured") from claims by other persons of injuries or property loss arising out of your ownership of your property.

*3. Credit Life, Accident and Health Protection* - to provide for continuous payments to the lending institution for certain conditions, such as severe injury, which may cause the borrower to be unable to make the payments. Your lending institution may request this type of coverage as a condition of the loan, or you may want to purchase it to protect your own financial status.

The specific policies and your needs, including the type and amount of coverage, should be thoroughly reviewed with an insurance agent of your choice. You may want to deal with an agent who has policies specifically designed for manufactured housing, but make sure that your coverage and the rates you pay factor in how your home is tied down and whether it is in a park or on private property. Also, if you intend to transport the home, make sure you have proper coverage.



PROBLEMS?   PLEASE READ THIS FIRST

As the owner of your new home, it is your responsibility, working in conjunction with your retailer, to see that your home is properly leveled at the site and setup properly, including all necessary tests and adjustments described in this Homeowner's Guide. It is also your responsibility to provide routine preventive maintenance as may be required. Minor adjustments to the home can usually be more effectively and efficiently made by you, the homeowner. This Trouble-Shooting Guide is intended to help you reduce

or eliminate minor service calls on your home. To use this Trouble-Shooting Guide, simply look up the basic heading under the particular Problem Area below. Scan the list of most-frequent problems in that area until you find your specific problem. Cross over to the solution section and use the method or recommendation as shown.

NOTE: We and your retailer will provide service to you at no charge, under the terms of our limited one-year warranty. After the one-year warranty period expires, you are responsible for all service requirements.

| PROBLEM AREA | SOLUTION |
|---|---|
| **PLUMBING** | |
| 1. Leak under sink at water line. | 1. Tighten fitting at connection to faucet. |
| 2. Leak under sink at drain. | 2. Tighten collars on trap fittings. |
| 3. Leak at showerhead. | 3. Turn off water. Contact home retailer or contractor. |
| 4. Leak at any gas fitting. | 4. Turn off gas. Contact home retailer or contractor. |
| 5. Leak on water line to commode. | 5. Tighten fitting at bottom of tank. |
| 6. Leak between tank & bowl in commode. | 6. Tighten nuts between tank and bowl. Do not over-tighten! |
| 7. Leak at base of commode at floor. | 7. Tighten nuts at floor level to seal wax ring. Do not over-tighten! |
| 8. No water to sinks, dishwasher, or washer. | 8. Check valves to insure open. |
| 9. Leak on sewer line. | 9. Contact home retailer or contractor. |
| **ELECTRICAL** | |
| 1. No power to home. | 1. Check main power source outside to insure breakers in "on" position. Check breaker box inside home to insure in "on" position. |
| 2. Partial power to home. | 2. Check main power source outside and breaker box inside to insure "on" position. |
| 3. No power to bathroom receptacles. | 3. Reset GFCI breaker. |
| 4. No power to isolated switches or receptacles. | 4. Do not use. Contact home retailer or contractor. |
| 5. Smoking or sparking at any switch or receptacle. | 5. Disconnect main breaker. Contact home retailer or contractor. |
| **DOORS AND WINDOWS** | |
| 1. Leak around doors or windows. | 1. Use a silicone based caulking around edges and top. Check level of home. |
| 2. Doors & windows that bind, sag, or will not close tightly. | 2. Check level of home. Adjust striker plates to catch plunger. |
| 3. Delaminating or warping of doors. | 3. Contact home retailer or contractor. |
| 4. Windows hard to open or close. | 4. Lubricate window hinges and guides with a light machine oil or WD 40 spray. |
| 5. Excessive condensation on glass. | 5. Refer to section on Condensation and Ventilation. |

| PROBLEM AREA | SOLUTION |
|---|---|
| **APPLIANCES** | |
| 1. No power to an appliance. | 1. Make sure power cord is plugged in. Check breakers for "on" position. |
| 2. Faulty operation of appliance. | 2. Contact manufacturer of appliance through a local appliance rep. |
| 3. Water heater not heating. . (elec.) | 3. Disconnect power. Contact home retailer for local appliance rep. |
| 4. Water heater not heating. (gas) | 4. Check gas source for "on" position. Check pilot light. Check burner operation. |
| **HEATING AND AIR CONDITIONING** | |
| 1. Heater not working. | 1. Check power source. Check fuel source. Check pilot light. Check thermostat. Contact home retailer or contractor. |
| 2. A/C not working. | 2. Check power source. Check breakers. Check thermostat. Contact home retailer or contractor. |
| 3. Heater smokes. | 3. This is common on initial start-up. Don't panic. Let heater run and ventilate home. |
| **FLOORS, WALLS, CEILINGS** | |
| 1. Loose moldings or trim. | 1. Re-nail as needed. |
| 2. Loose hinges, knobs, drawer pulls, etc. | 2. Tighten as needed. |
| 3. Walls, partitions, or floors buckle. | 3. Check: home's level; for water leaks; for excessive humidity; for openings in bottom board. |
| 4. Floor covering wrinkles or is loose. | 4. Check home's level. Contact home retailer or contractor. |
| 5. Floor feels soft and spongy underfoot. | 5. Check: home's level; for water leaks; for excessive humidity; for openings in bottom board. |
| 6. Floor squeaks | 6. Check for loose lag bolts or loose decking. |
| 7. Exterior siding bows or cracks. | 7. Check home for excessive humidity. Re-nail siding. |
| 8. Ceiling marked. | 8. Use very soft white chalk to cover. Use touch-up paint. Check for water leaks. |
| 9. Panels mildewed or stained | 9. Refer to section on Condensation and Ventilation. |
| **ROOFS** | |
| 1. Leak from roof. | 1. Check home's level. Seal around seams, edges, and vents with good quality roof coating. |
| 2. Roof rumble. | 2. Check home's level. Contact home retailer or contractor. |
| 3. Shingles torn, cracked or rolling. | 3. Replace torn or cracked shingles. Curled up shingles can be flattened back down with a roof mastic seal. |



This Homeowner Checkout Guide will help you conduct a simple inspection of your home. You can use the information to list things that your retailer should know about to help you settle into your home and make sure it is properly set-up. This Guide can also be used periodically to inspect your home after returning from an extended vacation or otherwise after the home has been unoccupied for a long time.

1. Thoroughly inspect your home inside and out. As you check items in the following list, make notes so you can tell your retailer.

2. List any items that appear to need service.

3. For any items that you list, contact your retailer to make an inspection and, if necessary, schedule any required repairs.

### INSIDE

☐ Try all light switches, vent fans and electrical outlets. Do they all work?

☐ Try each electrical appliance supplied with your home, such as the range, oven, refrigerator, and garbage disposal. Do they work? Is warranty information provided with each of them? Does each have an Owner's Manual?

☐ Check the smoke detector(s) by pressing the "TEST" button. Does the alarm sound? Do you have warranty documents and operating instructions?

☐ Try each plumbing fixture. Do all drains work? Does the toilet flush? Does anything leak?

☐ Try all windows. Do they open and close properly? Is one window in each bedroom clearly labeled as an emergency egress window?

☐ Try all interior doors and all cabinet doors and drawers. Do they open, close, and latch properly? Are they straight?

☐ Look at the wall coverings and ceiling in each room. Are there gouges or discolorations? Are there any bows, or droops, or other problems?

☐ Check the floor covering in every room. Is the vinyl floor covering free of gouges? Is the carpet tightly stretched?

☐ Check the surfaces and edges on all counter tops. Any chips or bubbles?

☐ Look at the trim or molding throughout the home. Is it straight, secure and undamaged?

☐ If your home came furnished, check each piece. Is there any damage?

### OUTSIDE

☐ Inspect the siding. Are there any serious dents or gouges?

☐ If your home is multi-sectional, are the siding and trim pieces properly installed where the sections join?

☐ Try all exterior doors, including water heater and furnace compartment doors, if applicable. Do they open, close and latch properly? Are there any large gaps around them? Do you have keys for all of them?

☐ Check all windows. Is there sealant at the top? Are there screens on each one?

☐ Check under the home. Any drain system leaks? Any holes or tears in the vapor retarder? If your home is multi-sectional, is the heat duct connected from one side to the other?

☐ Check your electrical panel box whether inside or outside. Are all circuits clearly labeled? Push the "TEST" button on the ground fault interrupter. The "RESET" should pop out. Press to reset.



The following procedures are listed to help in your home care. You may have others you wish to add.

### Spring
- Wash exterior, wax metal siding, repaint as necessary.
- Clean interior walls.
- Inspect roof; clean off debris; hose off with water.
- Check exhaust-fan systems.
- Check anchoring system.

### Summer
- Check air conditioner.
- Clean air filters.
- Check exterior caulk and sealants.
- Check condition of all appliances and connections.
- Check roof jacks, appliance exhausts.

### Fall
- Check/clean furnace.
- Check oil supply.
- Caulk all small openings.
- Check heat tapes on water lines, if installed.
- Recoat metal roof, if necessary.
- Check condition of ground cover.

### Winter
- Lubricate window slide tracks.
- Check furnace filters every 30 days.
- Clean filters, if necessary.
- Lubricate door locks.

### Weekly
- Test smoke detectors.*

### Monthly
- Test Ground Fault Circuit Interrupters.*
  * Or at other frequency as recommended by manufacturer

### Vacation Reminders
- Turn off water supply.
- Turn off and drain water heater if home will be unheated.
- During winter put approved antifreeze in kitchen, lavatory and toilet traps and drain water lines if home will be unheated.
- Unplug appliances.
- Close and lock windows.
- Lock the doors.
- Have fun!

NOTE: Manufacturer reserves the right to make changes at any time in prices, colors, materials, equipment, specifications and models and also to discontinue models without notice and/or obligations. Data shown is basic information for the prospective buyer effective at time of issuance of this literature. Retailer will provide complete up-to-date information on available equipment, specifications, etc. not shown here. Items referred to as options or available are at extra cost. Diagrams of the structural, electrical, plumbing and heating, cooling and transportation systems may be obtained by writing the manufacturer. All requests must be accompanied by a check or money order for $20.00 per diagram, plus $5.00 per request for postage and handling.



## LOCAL RETAILER AND SERVICE LOCATIONS FOR APPLIANCES

List the names, locations and phone numbers below of those whom you can quickly contact for the warranty or maintenance service on your homes various appliances and accessories. You can get this emergency information directly from the home retailer who sold you the home. This information also may be located in the warranty and operational instructions that usually accompany the various appliances.

### HOME RETAILER

Name _____
Address _____
Phone _____
Serial # _____

### REFRIGERATOR SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### RANGE SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### FURNACE SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### WATER HEATER SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### WASHER SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### DRYER SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### DISHWASHER SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### GARBAGE DISPOSER SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### AIR CONDITIONER SERVICE

Name _____
Address _____
Phone _____
Serial # _____

### OTHER EMERGENCY NUMBERS

Name _____
Address _____
Phone _____

Name _____
Address _____
Phone _____



ALABAMA - Alabama Manufactured Housing Commission, 351 So. Decatur St., Montgomery, AL 36104, (334) 242-4036

ARIZONA - Office of Manufactured Housing, 99 E. Virginia, Suite #100, Phoenix, AZ 85004, (602) 255-4072

ARKANSAS - Manufactured Home Commission, 523 S. Louisiana St. Suite 500, Little Rock, AR 72201, (501) 324-9032

CALIFORNIA - Manufactured Housing Section, Div. of Codes & Standards, Dept. of Housing and Community Development, P.O. Box 31, Sacramento, CA 95814, (916) 445-3338

COLORADO - Div. of Housing, Dept. of Local Affairs, 1313 Sherman St., #518, Denver, CO 80203, (303) 866-2033

FLORIDA - Bureau of Mobile Homes & R.V., Div. of Motor Vehicles, Room A 129, 2900 Apalachee Parkway, Tallahassee, FL 32399, (850) 488-8600

GEORGIA - State Fire Marshall's Office, Manufactured Homes Div., No.2 Martin Luther King, Jr. Dr., Atlanta, GA 30334, (404) 656-3205

IDAHO – Div. Of Building Safety & Admin., 277 No. Sixth St., Suite 100, Boise, ID 83720, (208) 334-3896

INDIANA - Dept. of Fire Prevention and Bldg. Safety, Codes Enforcement Div., 402 West Washington St. Rm W-246, Indianapolis, IN 42604, (317) 232-6422

IOWA - Iowa State Bldg. Code Bureau, Dept. of Public Safety, 621 East 2nd St., Des Moines, IA 50309, (515) 281-5821

KENTUCKY - Dept. of Housing, Bldg. and Construction, 1047 U.S.127 So. Bld., Frankfort, KY 40601, (502) 564-3626

LOUISIANA - Manufactured Housing Div., 5150 Florida Blvd., Baton Rouge, LA 70806, (225) 925-4911

MAINE - Manufactured Housing Board, Dept. of Professional and Financial Regulation, State House Station 35, Augusta, ME 04333, (207) 624-8603

MARYLAND - Bld. Codes Administration, Dept. of Housing and Community Development, 100 Community Place, Crownsville, MD 21032, (410) 514-7213

MICHIGAN - Mfg. Housing & Land Resources Div., Corporation & Securities Bureau, P.O. Box 30222, Lansing, MI 48909, (517) 334-6203

MINNESOTA - Dept. of Administration, Bld. Codes and Standards Div., 408 Metro Square Bld., St. Paul, MN 55101, (651) 296-4639

MISSISSIPPI - Office of the Fire Marshall, P.O. Box 22542, Jackson, MS 39205, (601) 359-1076

MISSOURI - Public Service Commission, Mobile Homes and Recreational Vehicles Div., P.O. Box 360, Jefferson City, MO 65102, (573) 751-7119

NEBRASKA - Dept. of Health, Div. of Housing and Recreational Vehicles, P.O. Box 94927, Lincoln, NE 68509, (402) 471-0518

NEVADA - Manufactured Housing Div., Nevada Dept. of Commerce, 250 E. Sahara NV, Suite 204, Las Vegas, NV 89104, (702) 486-4135

NEW JERSEY - Bureau of Code Services, Div. of Housing and Development, 3131 Princeton Pike - CN816, Trenton, NJ 08625, (609) 984-7974

NEW MEXICO - Regulation and Licensing Dept., Manufactured Housing Div., 725 St. Michael's Dr., Santa Fe, NM 87504, (505) 827-7070

NEW YORK – Code Div., Dept. of State, 41 State St., 11th Floor, Albany, NY 12231, (518) 474-4073

NORTH CAROLINA - Dept. of Insurance, Mfg. Housing Division, 410 N. Boylan Ave., Raleigh, NC 27603, (252) 733-3901

OREGON - Mfg. Structures & Parks Programs, Oregon Building Codes Div. 1535 Edgewater Dr. N.W., Salem, OR 97309, (503) 378-4133

PENNSYLVANIA - Div. of Manufactured Housing, Dept. of Community Affairs, Forum Bld. #314, Harrisburg, PA 17120, (717) 720-7413

RHODE ISLAND - Dept. of Administration, Bldg. Code Commission, One Capitol Hill, Providence, RI 02908, (401) 222-3033

SOUTH CAROLINA - SC Manufactured Housing Board, 110 Centerview Dr.., Suite 102, PO Box 11847, Columbia, SC 29211, (803) 896-4682

SOUTH DAKOTA - Dept. of Commerce and Regulation, Commercial Inspection, 118 W. Capitol, Pierre SD 57501, (605) 773-3697

TENNESSEE - Div. of Fire Prevention, Manufactured Housing Section, 500 James Robertson Parkway, Nashville, TN 37243, (615) 741-7190

TEXAS - Texas Dept. of Housing & Comm. Affairs Mfg. Housing Div., P.O. Box 12489, Austin, TX 78711, (512) 475-3983

UTAH - Dept. of Commerce Div. of Occupational & Professional Licensing, 160 E 300th St., Salt Lake City, UT 8411, (801) 530-6628

VIRGINIA - Mfg. Housing Office, Dept. of Housing and Community Development, Jackson Center, 501 N. Second St. Richmond, VA 23219, (804) 371-7160

WASHINGTON - Office of Manufactured Housing, P.O. Box 48300, 906 Columbia St., S.W., Olympia, WA 98504 (360) 586-0491

WEST VIRGINIA - West Virginia Division of Labor, 319 Bldg. Three, Capitol Complex, Charleston, WV 25305 (304) 558-7890

WISCONSIN - Manufactured Homes, Safety & Building Div., S3257 Buckhorn Rd., Reedsburg, WI 53959, (608) 355-0108

NON-SAA STATES-HUD - Office of Consumer & Regulatory Affairs, 451 7th St. SW, Rm. 9152, Washington, DC 20410 (202) 708-6423





# HOMEOWNER'S INFORMATION PACKET
## ACKNOWLEDGEMENT FORM

Manufacturing Facility: _____

Address: _____

City: _____ State: _____ ZIP: _____

Telephone Number: ( ___ ) _____

Home Serial Number _____

Retailer: _____

Address: _____

City: _____ State: _____ ZIP: _____

Telephone Number: ( ___ ) _____

Purchaser's Name: _____

Address: _____

City: _____ State: _____ ZIP: _____

Telephone Number: ( ___ ) _____

Alternate: ( ___ ) _____

As the Retail Purchaser(s), my/our signature(s) below indicates I/we have received the Homeowner's Information Packet.

Purchaser(s)
Signature:    _____ Date: _____

_____ Date: _____

IMPORTANT NOTE TO RETAILER: This acknowledgement form with an original Purchaser's signature must be returned to the Manufacturer listed above.

May 2001

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | |
|---|---|
| HAROLD KELLY MURPHY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:06-cv-618-MEF |
| | ) (WO - Do not publish) |
| SOUTHERN ENERGY HOMES, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on Defendant Southern Energy Homes, Inc.'s[1]

Motion for Judgment on the Pleadings (Doc. # 32). For the reasons stated herein, the

motion is due to be GRANTED.

### JURISDICTION AND VENUE

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because

the Plaintiff's claims arise under a law of the United States, specifically the Magnuson-

Moss Warranty Federal Trade Commission Improvement Act, 15 U.S.C. § 2310, *et seq.*,

and the National Manufactured Housing Construction and Safety Standards Act, 42

U.S.C. § 5401, *et seq.* The parties do not contest personal jurisdiction or venue, and the

---

[1] Plaintiff also names a number of fictitious defendants. Federal courts do not allow
fictitious party practice. *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th
Cir.1997) ("[F]ictitious party practice is not permitted in federal court."). Therefore, the
fictitious defendants are due to be dismissed. *See, e.g., Wiggins v. Risk Enterprise Mgmt. Ltd.*,
14 F. Supp. 2d 1279, 1279 n.1 (M. D. Ala. 1998) (DeMent, J.) (dismissing *sua sponte* fictitious
defendants).

Court finds adequate allegations in support of both.

## STANDARD OF REVIEW

"Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998); Fed. R. Civ. P. 12(c). The Court must accept facts in a complaint as true and views them in a light most favorable to the nonmoving party. *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996). The complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Slagle v. ITT Hartford*, 102 F.3d 494, 497 (11th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## FACTS AND PROCEDURAL BACKGROUND

The pleadings, when viewed in the light most favorable to the nonmoving party, establish the following facts:

Plaintiff purchased a manufactured home from Defendant on or about December 26, 2003. Complaint (Doc. # 1-2, ¶ 7). The purchase price was $45,639. (*Id.*). It is undisputed that Defendant constructed the exterior walls of Plaintiff's home with interior vapor barriers, which is expressly permitted under the HUD Code. 24 C.F.R. § 3280.504(b)(1).

On June 14, 2006, Plaintiff filed an eleven-count complaint in the Circuit Court of

2

Montgomery County, Alabama. (Doc. # 1-2). Plaintiff alleges that "[t]he manufactured

homes designed and manufactured by Defendant, including the manufactured home

purchased by Plaintiff, have an improper design and construction of exterior walls." (*Id.* ¶

4). On July 14, 2006, Defendant removed the case to this Court. Notice of Removal

(Doc. # 1).

## DISCUSSION

Defendants contend that Plaintiff's state law claims are preempted by the

Manufactured Housing Act. "Congress's intent to preempt state law may be explicitly

stated in the language of a federal statute or implicitly contained in the structure and

purpose of the statute." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th

Cir. 2004). There are three types of preemption: (1) express preemption; (2) field

preemption; and (3) conflict preemption. *Id.*

In this case, the Court finds that Plaintiff's claims are due to be dismissed because

of conflict preemption. "Conflict preemption exists where state law actually conflicts

with federal law, making it impossible to comply with both, or where the state law stands

as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 768 (11th Cir. 1998) (internal

quotation marks and citation omitted). The Manufactured Housing Act's implementing

regulations specify that the test for determining whether the state law stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of

3

Congress is "whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d).

Plaintiff's claims are based on Defendants' construction of the exterior walls of Plaintiff's home with interior vapor barriers, which is expressly permitted under the HUD Code. 24 C.F.R. § 3280.504(b)(1). Section 3280.504(b) provides for a range of authorized options for exterior wall construction. *See* § 3280.504(b). The regulations lay out "the requirements for condensation control, air infiltration, thermal insulation and certification for heating and comfort cooling." 24 C.F.R. § 3280.501. The language does not suggest that the regulation sets forth minimum standards, and Courts have suggested that regulations providing a range of options do not set forth minimum standards. *See Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 44 (D. Mass. 2002).

In a recent case, this Court held that similar claims were barred by conflict preemption because they would penalize the manufacturer for choosing a federally authorized option. *See Perry v. Fleetwood Enterprises, Inc.*, 2007 WL 2893410 (M.D. Ala. Sept. 28, 2008); *see also Guidroz v. Champion Enters., Inc.*, No. 05-1148 (W.D. La. January 26, 2007). The Court agrees and concludes that Plaintiff may not penalize Defendant for choosing an option permitted by § 3280.504(b).

Plaintiff argues, looking both to case law and the structure of the regulations

4

themselves, that the regulations at issue set forth are performance-based. Response (Doc. # 36, § A.2). In other words, the manufacturer is given several options to meet a performance-based requirement. Therefore, Plaintiff argues, the regulations set forth minimum standards. The Court disagrees. The regulation at issue in *Geier v. American Honda Motor Co.* also set a performance requirement. 529 U.S. 861, 878 (2000) ("[The regulation at issue] set[] a performance requirement for passive restraint devices and allow[ed] manufacturers to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies to satisfy that requirement.").

The *Geier* Court noted that the manufacturers were required to meet a performance requirement by choosing from a range of options. *See id.* at 878-79. Nonetheless, the plaintiff's claims were preempted because they penalized the manufacturer for choosing an option provided by the regulations. *See id.* at 881. Even if the regulations set forth performance requirements or a performance standard, the Court cannot agree that the regulations provide a minimum standard. Maintenance of Plaintiff's state court claims would "impair[] the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d). Therefore, Defendants' motion is due to be GRANTED.

## CONCLUSION

It is hereby ORDERED as follows:

(1) Defendant's Motion for Judgment on the Pleadings (Doc. # 32) is GRANTED.

(2) Plaintiff's claims in this case are DISMISSED WITH PREJUDICE.

(3) Defendant's Motion to Exclude Testimony and Opinions of Plaintiff's Expert Robert Kondner and Request for *In Limine* Heading (Doc. # 69), Motion to Exclude Testimony and Opinions of Plaintiff's Expert Bobby Parks and Request for *In Limine* Heading (Doc. # 70), and Motion for Summary Judgment (Doc. # 71) are DENIED as moot.

(4) All claims against the fictitious defendants are DISMISSED.

(5) The Court will enter a separate final judgment taxing costs.

Done on this the 6th day of March, 2008.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

6

# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JAMES PERRY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:06-cv-502-MEF |
| | ) (WO) |
| FLEETWOOD ENTERPRISES, INC., | ) |
| *et al.,* | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

James Perry (hereinafter "Plaintiff") brings this action against Fleetwood Enterprises,

Inc. and Fleetwood Homes of Georgia, Inc. (hereinafter collectively "Defendants").[1]

Plaintiff alleges violation of the Magnuson Moss Warranty Act, breaches of various

warranties, negligence, wantonness, and violation of the Alabama Extended Manufacturers

Liability Doctrine. This cause is presently before the Court on Defendants' Motion to

Dismiss (Doc. # 4). Therein, Defendants argue that Plaintiff's state law claims are

preempted by the National Manufactured Housing Construction and Safety Standards Act

of 1974, 42 U.S.C. §§ 5401 *et seq.* (hereinafter "the Manufactured Housing Act" or "the

Act"). The Court has considered the Complaint and the arguments in support of and in

---

[1] Plaintiff also names a number of fictitious defendants. Federal courts do not allow
fictitious party practice. *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th
Cir. 1997) ("[F]ictitious party practice is not permitted in federal court."). Therefore, the
fictitious defendants are due to be dismissed. *See, e.g., Wiggins v. Risk Enterprise Mgmt.
Ltd.*, 14 F. Supp. 2d 1279, 1279 n.1 (M.D. Ala. 1998) (DeMent, J.) (dismissing *sua sponte*
fictitious defendants).

opposition to the Motion. For the reasons set forth in this Memorandum Opinion and Order,

Defendants' Motion is due to be GRANTED IN PART and DENIED IN PART.

## I. JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 (diversity). The parties do not contest personal jurisdiction or venue, and the Court

finds adequate allegations in support of both.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. Prior to the

Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct.

1955 (2007), a motion to dismiss could only be granted if a plaintiff could prove "no set of

facts . . . which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 41, 45-46

(1957); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Wright v. Newsome*, 795

F.2d 964, 967 (11th Cir. 1986). Now, in order to survive a motion to dismiss for failure to

state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible

on its face." *Twombly*, 127 S. Ct. at 1974. Plaintiff's "[f]actual allegations must be enough

to raise a right to relief above a speculative level on the assumption that the allegations in the

complaint are true." *Id.* at 1965. It is not sufficient that the pleadings merely "le[ave] open

the possibility that the plaintiff might later establish some set of undisclosed facts to support

recovery." *Id.* at 1968 (internal quotation and alteration omitted). The court will accept as

true all well-pleaded factual allegations and view them in a light most favorable to the

2

plaintiff. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). Furthermore, the threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

## III. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Fleetwood Homes (hereinafter "Fleetwood Homes") manufactures and sells manufactured homes. Fleetwood Enterprises (hereinafter "Fleetwood Enterprises") is the parent corporation or alter ego of Fleetwood Homes. On or about May 2, 2002, Plaintiff purchased a manufactured home made by Fleetwood Homes. Defendants made a written express warranty to Plaintiff as part of the purchase of the home. In addition, Defendants warranted that any defects in the materials or workmanship of the home would be repaired or remedied at no cost to Plaintiff if Defendant received notice within the warranty period. Plaintiff alleges that the home failed in its intended purpose. He further alleges that Fleetwood Homes failed to repair the home, despite his notice of its deficiencies, and that the home as a result continues to deteriorate structurally. Plaintiff alleges that he has given Defendants notice of his breach of warranty claim prior to bringing this suit, pursuant to § 7-2-607(3) of the Alabama Code.

Plaintiff filed the Complaint on May 1, 2006 in the Circuit Court of Bullock County (Doc. # 1). In his Complaint, he alleges causes of action under the following theories: the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq*. (Count I); breach of express

3

warranty (Count II); breach of implied warranty of merchantability (Count III); breach of

fitness for particular purpose (Count IV); breach of warranty of habitability (Count V);

negligence (Count VI); wantonness (Count VII); and the Alabama Extended Manufacturers

Liability Doctrine (Count VIII).

On June 2, 2006, Defendants removed the action to this Court (Doc. # 1). Defendants

filed a Motion to Dismiss (Doc. # 4) on July 5, 2006.

## IV. DISCUSSION

Defendants contend that Plaintiff's state law claims are preempted by the

Manufactured Housing Act. "Congress's intent to preempt state law may be explicitly stated

in the language of a federal statute or implicitly contained in the structure and purpose of the

statute." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004). There

are three types of preemption: (1) express preemption; (2) field preemption; and (3) conflict

preemption. *Id.* The second and third types are collectively referred to as "implied

preemption." Defendants argue that Plaintiff's state law claims are both expressly and

impliedly preempted.

The Court's preemption analysis "start[s] with the assumption that the historic police

powers of the states are not superseded by federal law unless preemption is the clear and

manifest purpose of Congress." *Nat'l Ass'n of State Utility Consumer Advocates v. FCC*,

457 F.3d 1238, 1252 (11th Cir. 2006); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485

(1996) ("[W]e have long presumed that Congress does not cavalierly pre-empt state-law

4

causes of action."). "Therefore, [t]he purpose of Congress is the ultimate touchstone of preemption analysis." *Cliff*, 363 F.3d at 1122 (alteration and internal quotation omitted).

## A. Express Preemption

Defendants argue that Plaintiff's state law claims are barred by express preemption, whereby "Congress can define explicitly the extent to which its enactments pre-empt state law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). Express preemption may be found in the language of the statute, its legislative history, or the regulations promulgated pursuant to the statute. *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1556 (11th Cir. 1983). Congress must express a clear intent to preempt state law. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (U.S. 1986). "Federal preemption under [subsection § 5403(d) of the Manufactured Housing Act] shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter." 42 U.S.C. § 5403(d).

Defendants contend that Congress expressly preempted Plaintiff's claims when it provided in the Act that the "manufactured home construction and safety standards established by the Secretary under this section shall include preemptive energy conservation standards in accordance with this subsection." 42 U.S.C. § 5403(g)(1). Defendants also point to the fact that the regulations specifically set out "the requirements for condensation control, air infiltration, thermal insulation and certification for heating and comfort cooling."

5

24 C.F.R. § 3280.501.

In response, Plaintiff points to the saving clause, which provides, "Compliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from any liability under common law." 42 U.S.C. § 5409(c). Plaintiff argues that the saving clause exempts this action from preemption.

The statutory language instructs the Secretary to include "preemptive energy conservation standards." 42 U.S.C. § 5403(g)(1). The preemptive effect of the Act is set forth in subsection (d) of the same section:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding the construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). *See Ga. Manufactured Hous. Ass'n, Inc. v. Spalding County*, 148 F.3d 1304, 1308-09 (11th Cir. 1998) (noting that Congress defined the preemptive effect of the Act in § 5403(d)).

The United States Supreme Court has held that nearly identical language in another statute does not expressly preempt state law tort claims. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000). Further, several courts have held that identical language in the Manufactured Housing Act does not expressly preempt state law products liability claims.

6

*See, e.g., Choate v. Champion Home Builders Co.*, 222 F.3d 788, 793-94 (10th Cir. 2000); *Richard v. Fleetwood Enters., Inc.*, 4 F. Supp. 2d 650, 657 (E.D. Tex. 1998) ("The Manufactured Housing Act does not explicitly preempt state causes of action."). In addition, the regulations promulgated under the Act provide for the maintenance of state law claims. *See, e.g.*, 24 C.F.R. § 3282.402(a) ("Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any contract or applicable law.").

Defendants argue that the preemption provision here should be read broadly and that such a reading would preempt Plaintiff's state law claims. In *Geier v. Am. Honda Motor Co.*, the Supreme Court addressed this issue in the context of a nearly identical preemption provision and saving clause in the National Traffic and Motor Vehicle Safety Act.[2] The Court explained:

> [A] reading of the express pre-emption provision that excludes common-law tort actions gives actual meaning to the saving clause's literal language, while leaving adequate room for state tort law to operate-for example, where federal law creates only a floor, *i.e.*, a minimum safety standard. Without the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions, for, as we have just mentioned, it is possible to read the pre-emption provision, standing alone, as applying to standards imposed in common-law tort actions, as well as standards contained in state

---

[2] The saving clause at issue in *Geier* is nearly identical to that in the Manufactured Housing Act: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." *See* 49 U.S.C. § 30103(e); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 895 & n.11 (2000) (Stevens, J., dissenting) (quoting the saving clause and noting that it is now codified in 49 U.S.C. § 30103(e)).

7

> legislation or regulations. And if so, it would pre-empt all
> nonidentical state standards established in tort actions covering
> the same aspect of performance as an applicable federal
> standard, even if the federal standard merely established a
> minimum standard.

*Geier*, 529 U.S. at 868 (internal citation omitted). The presence of the saving clause,

however, did not permit a broad reading. The court stated that it did not find any convincing

evidence of congressional intent to preempt common-law tort actions, and therefore, a broad

reading of the preemption provision could not be correct. *Id.* Given the presence of the

saving clause, the court stated that the preemption clause must be read narrowly. *Id.*

Defendants argue that the saving clause analysis set forth above is only applicable

where the regulations set forth in the statute are minimum standards intended to provide a

"floor," or minimum safety standard. They contend that the specifications in the Act are

mandatory requirements, not minimum standards. Defendants point out that the Act states

that the manufactured home construction and safety standards are to "meet high standards

of protection," *see* 42 U.S.C. § 5403(a)(1)(A)(ii), and the relevant regulation is one of the

"requirements for condensation control, air infiltration, thermal insulation and certification

for heating and cooling," *see* 24 C.F.R. § 3280.501.

The Court does not agree that the saving clause only saves those actions challenging

regulations intended to provide a minimum safety standard. In *Geier*, the Court listed

regulations intended to provide a minimum safety standard as an example of a regulation that

might fall within the savings clause. *Geier* did not state that state law actions are barred if

8

the federal regulation goes beyond providing a minimum standard. In fact, the opinion suggests that the saving clause exempts tort actions generally. *See, e.g., Geier*, 529 U.S. at 868 ("The language of the pre-emption provision permits a narrow reading that excludes common-law actions."); *id.* at 869 ("We have just said that the saving clause *at least* removes tort actions from the scope of the express pre-emption clause."). *But see id.* at 870 ("[T]he saving provision still makes clear that the express pre-emption provision does not of its own force pre-empt common-law tort actions. And it thereby preserves those actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor.").

This view is supported not only by the language in *Geier*, but also by its analysis. The Court stated that the regulation at issue was not a minimum standard; rather, the regulation provided manufacturers of airbags with a "range of choices among different passive restraint devices." *Id.* at 874-75. *See also Griffith v. Gen. Motors Corp.*, 303 F.3d 1276, 1281 (11th Cir. 2002) ("In *Geier*, the Court found that the rule-making history of [the regulation at issue] makes clear that [the Department of Transportation] saw it not merely as a minimum standard, but as a comprehensive regulatory scheme."). If the saving clause only excluded from operation of the express exemption clause actions based on those regulations intended to provide a floor, the Court would have found express preemption. Instead, the Court found that the action was removed from the scope of the express exemption clause, and it concluded that the action was not expressly preempted. *Id.* at 868. The presence of a saving

9

clause therefore saves more than only actions based upon regulations intended to provide a minimum safety standard.

As Defendants point out, the statute also states that the standards promulgated under the Act "shall include preemptive energy conservation standards in accordance with this subsection." *See* 42 U.S.C. § 5403(g)(2). Given the presence of the saving clause, the Court is not persuaded that Congress intended to preempt common law actions rather than state statutes or regulations. *See Geier*, 529 U.S. at 868 ("We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances."). In any case, both the preemption clause and the saving clause are nearly identical to those that were found not to preempt common law actions in *Geier* and *Choate*. The Court concludes that the doctrine of express preemption does not bar Plaintiff's claims. Accordingly, Defendants' Motion is due to be DENIED on the basis of express preemption.

### B. Implied Preemption

Defendants also contend that Plaintiff's state law claims are barred by both types of implied preemption. The presence of an express preemption provision does not foreclose an implied preemption analysis. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-88 (1995). The Court turns first to field preemption, which occurs when "federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it." *Cliff*, 363 F.3d at 1122.

10

The presence of a saving clause suggests that Congress did not intend to occupy the field.[3] The decisions the Court has found addressing field preemption with respect to common law actions have concluded that federal regulation under the Act is not sufficiently pervasive to occupy the field. *See Choate*, 222 F.3d at 795 ("[T]he Manufactured Housing Act does not support [the] assertion" that "Congress intended for the Federal Government to occupy the field of construction and safety of manufactured homes exclusively . . . ."); *Richard*, 4 F. Supp. 2d at 657 ("[T]here is no clear or manifest congressional intent for the federal regulation of the safety and sale of manufactured housing to completely occupy the field."). The Court agrees.

As Defendants note, Congress has amended the Manufactured Housing Act since these cases were decided. Defendants note that the 2000 amendments to the Act "interjected a consensus-based process for the proposal, revision, and implementation of performance standards." (Doc. # 4 at 7). However, these amendments only changed the process of promulgating the standards, because before the amendments the Secretary was to establish such standards "after consultation with the Consumer Product Safety Commission." *See* 42 U.S.C. § 5403, Historical and Statutory Notes, Amendments. It is unclear why changing the

---

[3] While *Geier* and *Choate* held that the presence of a saving clause does not foreclose the operation of conflict preemption principles, neither addressed the effect of a saving clause on field preemption. *See Geier*, 529 U.S. at 869 (addressing the effect of the presence of a saving clause on conflict preemption but not field preemption); *Choate*, 222 F.3d at 794-95 (noting that the saving clause did not foreclose the question of conflict preemption and that the defendant did not raise the issue of field preemption).

process of promulgating performance standards would make the resulting regulations more pervasive. The Court concludes that even considering the effect of the amendments, Congress did not intend to occupy the field.

Defendants also assert that Plaintiff's state law claims are barred by conflict preemption.[4] "Conflict preemption exists where state law actually conflicts with federal law, making it impossible to comply with both, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 768 (11th Cir. 1998) (internal quotation marks omitted). The Act's implementing regulations specify that the test for determining whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress is "whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d).

At least some of Plaintiff's claims are based on Defendants' selection of an option permitted by § 3280.504(b). As Plaintiff states in his brief, "Plaintiff has alleged that these Defendants have knowingly chosen to build homes to a known defective optional standard (when other reasonable options existed) under 24 C.F.R. § 3280.504." (Doc. # 6 at 1-2.)

Rather than provide a minimum standard, Section 3280.504(b), like the regulation at

---

[4] As with an express preemption provision, the presence of a saving clause does not foreclose the operation of conflict preemption. *See Geier*, 529 U.S. at 869.

12

issue in *Geier*, provides for a range of authorized options for exterior wall construction. *See* 24 C.F.R. § 3280.504(b). The regulations lay out "the requirements for condensation control, air infiltration, thermal insulation and certification for heating and comfort cooling." 24 C.F.R. § 3280.501. The language does not suggest that the regulation sets forth minimum standards. They are also intended to "meet high standards of protection." *See* 42 U.S.C. § 5403(a)(1)(A)(ii). Courts have suggested that regulations providing a range of options do not set forth minimum standards. *See Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 44 (D. Mass. 2002). The Court concludes that § 3280.504(b) does not set forth a minimum standard. Further, the one case of which the Court is aware to have addressed this issue found that the plaintiff's claims were barred by conflict preemption because they would penalize the manufacturer for choosing a federally authorized option. *See Guidroz v. Champion Enters., Inc.*, No. 05-1148 (W.D. La. Jan. 26, 2007). The Court agrees and concludes that Plaintiff may not penalize Defendant for choosing an option permitted by § 3280.504(b).

Plaintiff argues, looking both to case law and the structure of the regulations themselves, that the regulations at issue set forth are performance-based. In other words, the manufacturer is given several options to meet a performance-based requirement. Therefore, Plaintiff argues, the regulations set forth minimum standards. The Court disagrees. The regulation at issue in *Geier* also set a performance requirement. *See Geier*, 529 U.S. at 878 ("[The regulation at issue] set[] a performance requirement for passive restraint devices and

13

allow[ed] manufacturers to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies to satisfy that requirement."). The *Geier* Court noted that the manufacturers were required to meet a performance requirement by choosing from a range of options. *See id.* at 878-79. Nonetheless, the plaintiff's claims were preempted because they penalized the manufacturer for choosing an option provided by the regulations. *See id.* at 881. Even if the regulations set forth performance requirements or a performance standard, the Court cannot agree that the regulations provide a minimum standard. Maintenance of Plaintiff's state court claims would "impair[] the Federal superintendence of the manufactured home industry as established by the Act." 24 C.F.R. § 3282.11(d). Defendants' motion to dismiss Plaintiff's state law claims is therefore due to be GRANTED to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b).

## V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

1. Defendants' Motion to Dismiss (Doc. # 4) is GRANTED IN PART and DENIED IN PART.

2. Plaintiff's state law claims are DISMISSED with prejudice to the extent that those claims seek to penalize Defendants for their choice of an option available under 24 C.F.R. § 3280.504(b). Any of Plaintiff's other state law claims remain pending.

14

3. All claims against the fictitious defendants are DISMISSED.

DONE this 28th day of September, 2007.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE

# EXHIBIT "F"

 DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

January 19, 2007

Mr. Brian D. Cooney
Vice President, Government Affairs
Manufactured Housing Institute
2101 Wilson Blvd., Suite 610
Arlington, VA 22201-3062

Dear Mr. Cooney:

Following up on our December meeting with you and your colleagues, we have had a chance to review the plaintiffs' pleadings you have provided us on various vapor barrier cases. As the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards, I can say that these pleadings consistently misrepresent HUD enforcement policy by arguing that HUD's general standard at 3280.303(b) should be applied to manufacturers' practices regarding the placement of vapor barriers even though these manufacturers have complied with HUD's more specific vapor barrier standard at 3280.504(b).

Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

Thank you again for bringing this situation to our attention. HUD has a distinct interest in maintaining an accurate understanding by arbitrators and the courts of HUD's enforcement policies and practices regarding the Manufactured Home Construction and Safety Standards. We would be especially concerned by a reported judicial decision that misstated HUD policy and practice, so please keep us advised of developments in these cases.

Sincerely,

William W. Matchneer III
Associate Deputy Assistant Secretary for
Regulatory Affairs and Manufactured Housing

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

JUN 2 1 2007

I, *Theodore A. Ford*, Director, employed by United States Department of Housing and Urban Development, certify that I have official duties in the United States Department of Housing and Urban Development, District of Columbia and have authority to make and issue this certificate. I further certify that the signature of William W. Matchneer III, Associate Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, United States Department of Housing and Urban Development, District of Columbia, appearing on the attached copy of the document is a copy of a genuine signature and that the signer has the official capacity indicated thereon.

Theodore Ford
Director

