IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NICHOLAS STRICKLAND, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case Number:  1:06-CV-00682-TFM |
| | * | |
| CHAMPION HOME BUILDERS CO., | * | |
| INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |

CHAMPION HOME BUILDERS CO.'S
MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF
PLAINTIFFS' EXPERT BOBBY PARKS AND REQUEST FOR *IN LIMINE* HEARING

**COMES NOW** the Defendant, Champion Home Builders, Co. ("CHB"), and hereby moves this Court to exclude under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1992), and Fed. R. Evid. 702, the expert testimony of Plaintiffs' expert Bobby Parks ("Parks"). Pursuant to Fed. R. Evid. 104, CHB requests a hearing on this motion. *See Daubert*, 509 U.S. at 592-93 (In conducting a Rule 104(a) inquiry, the court should assess "whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue"). As grounds for this motion, CHB states as follows:

<u>INTRODUCTION</u>

This lawsuit is one among dozens of individual and class action cases that have recently been brought before state and federal courts in Alabama, Louisiana, and Texas. In these actions, plaintiffs claim that manufactured homes sold in certain coastal and inland regions from Texas to

North Carolina[1] are defective because the exterior walls of such homes are constructed with interior vapor barriers. Plaintiffs Nicholas and Jennifer Strickland (collectively referred to herein as "the Stricklands" or "Plaintiffs") purchased a new CHB manufactured home in March 2003. (Compl. ¶ 6) (attached hereto as Exhibit A). The Stricklands allege that the design used for the exterior walls of the home is defective. (*Id.* at ¶ 13).

The two sections of the HUD Code primarily at issue in this lawsuit are Sections 303(b) and 504(b). Section 303(b) provides that "All construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades." 24 C.F.R. § 3280.303(b). Section 504(b) governs condensation control in the exterior walls of manufactured homes, and provides for four expressly allowed wall designs. 24 C.F.R. § 3280.504(b). One of the design options specifically allowed by § 504(b) is to construct the walls with a vapor barrier of 1 perm[2] or less on the living space side of the wall. *Id.* at § 504(b)(1). It was this design option that CHB used in the Stricklands' home, constructing some of the walls with vinyl-covered gypsum wallboard containing an interior (i.e. on the living side of the wall) vapor barrier with a permeability rating of less than one.

The Stricklands base their claims for liability primarily on the opinions and reports of specially-retained "expert" witness Bobby Parks.[3] Parks performed two inspections of the

---

[1] These areas are known as the "humid and fringe zone climates." The counties included in these regions were identified in the Federal Register at 67 F.R. 20402-20403 (April 24, 2002), and are now listed in 24 C.F.R. § 3280.504(b)(4).

[2] Permeance is the measure of the amount of water vapor (moisture) that can pass through a specified material in a certain amount of time. The measure and degree of permeability is expressed in units referred to as 'perms.' Materials with high perm levels will allow more moisture or water vapor to pass through than those with lower perm values.

[3] Plaintiffs also rely in part on the opinions and reports of specially retained "expert" witnesses Robert Kondner and Roy Bonney. Kondner, who has never inspected the Strickland home and who bases the vast majority of his conclusions on Parks' conclusions, is the subject of a separate *Daubert* motion. Bonney is offered exclusively for determining the cost involved in replacing any wallboard portions that are found to be defective. As a result,

Stricklands' home and concluded that the wall design violates the HUD Code Section 303(b) standards for accepted engineering practices and that some of the exterior walls in the Stricklands' home suffer from extreme moisture, fungal growth, and structural deterioration as a result. Parks' opinions are obviously crucial to Plaintiffs' claims, and they must be stringently evaluated by this Court in its capacity as a gatekeeper under *Daubert* and Rule 702.

## SUMMARY OF ARGUMENT

Parks' testimony and opinions should be excluded because he cannot satisfy the requirements for the admissibility of expert testimony under Rule 702 and *Daubert*. He does not have any education beyond high school, and his background and training is in HVAC, not engineering, design, or the biological sciences. He lacks familiarity with many basic principles and terms common in the areas of manufactured housing design, the HUD Code, and the interpretation of mold sampling data. As a result, Parks is not qualified to testify in these areas.

In addition, Parks' methodology in his investigation of the Stricklands' home was unreliable and without scientific merit. First, Parks misused critical instruments while recording his data. Second, Parks failed to follow industry standards in preparing and documenting the investigation. Third, Parks both employed mold sampling methods and promoted conclusions that have not been peer-reviewed for validity and are not generally accepted within the field. Fourth, Parks failed to rule out alternate sources of moisture. Any one of these methodological errors is enough to undermine the reliability of Parks' opinions. Taken together, however, these errors compound upon one another such that Parks' conclusions ultimately rest on no scientific basis whatsoever.

---

Bonney's testimony is not relevant to the issue of liability and is only relevant to damages in the event liability is found.

Finally, Parks relied on inaccurate and insufficient data in his investigation. Thus, his conclusions are not supported by the evidence he gathered. For example, Parks ignores the plain language of the HUD Code (and HUD's own interpretation of it) by offering the opinion that the wall design of the Stricklands' home violates the HUD Code. This is a remarkable opinion because *this wall design is specifically approved for all regions by the HUD Code*. Parks concludes that the Stricklands' walls suffered extensive water damage, yet he never tested their performance. In short, Parks makes inappropriate analytical leaps between his evidence and the opinions he forms on the basis of that evidence. In fact, the only court that has considered expert testimony from Parks in a moisture-related manufactured home case described Parks as "an extreme advocate" and concluded that "the Court cannot place weight on the testimony of this witness as it is not substantiated and corroborated by the evidence on the scene."[4] Parks is similarly attempting to introduce unqualified and unsupported opinions in this case. For all of these reasons, Parks' testimony and opinions are due to be excluded from evidence.

## STANDARD FOR ADMITTING EXPERT TESTIMONY

Federal Rule of Evidence 702 governs the use of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

---

[4] *See infra*; *Aucoin v. Southern Quality Homes, LLC*, No. 99791-C (La. Dist. 16 2005), aff'd by No. 06-979 (La. App. 3d Cir. 2006).

The amended Rule 702 codified the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786 (1993), and *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999). *See* Fed. R. Evid. 702 advisory committee's note. Rule 702 has three fundamental requirements. First, the expert must be qualified to testify. Second, the expert's opinion must be based on scientific, technical, or specialized knowledge. Third, the expert's testimony must "assist the trier of fact." *See Daubert*, 509 U.S. 579. The *Daubert* Court pointed out that a key indicator as to whether an expert's testimony assists the trier of fact is whether the method used by the expert is reliable. *Id*. at 589. Furthermore, the Advisory Committee's Notes to Rule 702 state that the codification of *Daubert* "provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702 advisory committee's note.

The Supreme Court has instructed the district courts to act as "gatekeepers" in screening expert testimony. *See General Electric v. Joiner*, 522 U.S. 136, 140 (1997) (upholding a district court decision to exclude expert testimony on the ground that it "did not rise above 'subjective belief or unsupported speculation'"); *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) (affirming district court's exclusion of accountant's lost profit calculations on the grounds that it "was based on flawed methodology that was unaccepted in the accounting community"); *KW Plastics v. U.S. Can Co*., 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001) (motion to exclude expert's testimony on damages granted on the grounds that the "cumulative effect of [the expert's] methodological errors render[ed] the lost profits calculations speculative, without foundation, and with an unknown error rate" and therefore, "the calculations [fell] outside of the range where experts may reasonably differ."); *Benkwith v. Matrixx Initiatives, Inc*., 467 F. Supp. 2d 1316, 1332 (M.D. Ala. 2006) (opinion by J. Fuller) (excluding

the proposed expert testimony of a doctor in a product liability action against a nasal spray manufacturer and distributor because the expert did not "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

When acting in this "gate keeping" role, the trial judge must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *See Daubert*, 509 U.S. 592. Moreover, the trial judge "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-137 (11th Cir. 1999) (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)).

In this case, the Stricklands bear the burden of proof as to the factual basis for Parks' conclusions, the reliability of his methods, and the reliable application of his methodology to the facts. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002); *Allison*, 184 F.3d at 1306 (the "burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."). As detailed below, the Stricklands cannot carry their burden.

## ARGUMENT

The testimony and reports of Bobby Parks should be excluded because Parks is not qualified as an expert in the design of manufactured housing, the interpretation of the HUD Code, or the interpretation of mold sampling data. Furthermore, the methodology used by Parks in his investigation of the Stricklands' home is unreliable and without scientific merit. Finally, Parks relies on inaccurate and insufficient data in his investigation, and his conclusions are not supported by the evidence he has gathered.

I.     **Parks Is Not Qualified to Testify to These Matters**

Parks' specialty is in HVAC, as he has more than twenty years of experience in the field. There is nothing in either Park's testimony or report that indicates he found any problems with the Strickland home's HVAC system that contributed to the problems that he alleges. Having found no significant issues with the HVAC system, Parks now proposes to testify that some of the exterior walls in the Stricklands' home are designed improperly, do not comply with HUD Code regulations, and are structurally unsound as evidenced by excessive moisture and fungal growth to the point that they will "eventually render the home unfit for it's [sic] intended purpose." (Parks Rep. 3) (attached hereto as Exhibit B).  Parks, however, is unqualified to testify about these matters.

To be sufficiently qualified to testify as an expert, a witness must have knowledge, skill, experience, training, or education in the subject for which his testimony is offered.  Fed. R. Evid. 702; *Maiz v. Virani*, 253 F.3d 641, 644 (11th Cir. 2001) (proponent's first burden is to show that its proposed expert is "qualified to testify competently regarding the matters he intends to address.").  ***Nothing*** in Parks' curriculum vitae indicates that he is qualified to express any opinion regarding wall designs in manufactured housing or the interpretation of mold sampling data.  In fact, Parks' work history shows that his experience comes as an *HVAC repairman*, and not as a design or mold expert.

A.     **Parks Is Not Qualified to Offer Design Opinions**

Parks is not qualified to testify regarding design issues in the Stricklands' home.  Parks is not an engineer or architect. He has no college education, and has had no training in any architectural or engineering programs that address how to properly design manufactured housing walls:

Q. You're not an engineer.

A. Not an engineer.

Q. You're not a design professional.

A. No. I've not been utilized as a design -- I've been utilized to offer opinions and test these designs, but I'm not an engineer or architect.

Q. You're not qualified under the HUD code to draw and stamp prints for walls.

A. No, sir.

Q. Never had any building-science classes on how to construct walls under the HUD code?
…

A. No, because I'm not aware of any that are available.

Q. But you've never gone to a day of college in building science.

A. No, sir.

Q. No engineering, no architectural experience.

A. Again, no, sir.

(Parks Dep. in *Murphy v. Southern Energy Homes*, 2007 WL 2080428 (M.D. Ala. 2007) 99:7-100:8, Nov. 27, 2007) (attached hereto as Exhibit C).

Despite his lack of any training or experience as an engineer or design professional, Parks opined that the Stricklands' home uses an "inappropriate wall design" that is responsible for significant structural damage. (Exhibit B p. 3.) Whatever experience Parks may have inspecting manufactured homes as an HVAC repairman, that does not qualify him to testify about design issues with the wall construction. *See Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472 (1st Cir. 1996) (holding that a non-engineer mechanic/consultant was not competent to testify as to design defect issues); *Smith v. Ford Motor Co.*, 882 F. Supp. 770 (N.D. Ind. 1995) (finding

that a body shop mechanic/accident investigator who had repaired electrical and fuel systems was not competent to testify as to electrical and fuel systems design issues); *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 762 F. Supp. 1016 (D.P.R. 1991) (holding that a civil engineer was not competent to testify as to crane design issues because he had no experience with the design or manufacturing of cranes; a mechanical engineer would be better suited to testify); *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1979) (upheld a lower court ruling that a mechanical engineer with no experience designing automobiles was not competent to testify as to design issues); *Hoban v. Grumman, Corp.*, 717 F. Supp. 1129 (E.D. Va. 1989) (holding that a licensed professional engineer with degrees in electrical and mechanical engineering who had done no aerodynamic design work or engine design work was not competent to testify on such design issues). Several of the witnesses in the cases just cited were in fact engineers, but were still deemed unqualified to testify as to design issues outside of their particular field. Parks, on the other hand, is significantly less qualified, as he not only has no design experience in the particular field of manufactured housing wall construction, but he has no design or engineering education or experience whatsoever in any field.

**B.    Parks Is Not Qualified to Offer Opinions Regarding HUD Code Compliance**

Parks' deposition testimony and conclusions display a fundamental lack of familiarity with, and misunderstanding of, the HUD Code. As discussed *supra*, HUD Code Section 504(b) governs condensation control in the exterior walls of manufactured homes and expressly allows four different wall construction designs. Parks claims that CHB's application of § 504(b) to the Stricklands' home provides the primary basis for liability in this case, yet Parks is not even familiar with the basic design principles employed by § 504(b). This is evident from Parks' inability to even identify the four construction methods expressly allowed by the HUD Code,

much less describe in detail how to design them. (Exhibit C 106:4-14.) Furthermore, as explained below, Parks does not understand how various provisions of the HUD Code relate to each other, as evidenced by his opinion that a wall construction method can violate § 303(b),[5] a general performance standard, even though it meets the requirements of Section 504(b), a specific prescriptive standard. (Parks Dep. vol. 1, 71:14-19, 72:2-12, Sept. 20, 2007) (attached hereto as Exhibit D).

HUD develops its safety standards for the Code through a consensus process that relies on professionals with engineering expertise who provide conclusive technical documentation on issues to establish sound engineering practices. (Tompos Decl. ¶ 7) (attached hereto as Exhibit E). As a result, the Code embodies sound engineering practices, and meeting the specific requirements of this Code that is developed in this manner therefore conforms to sound and accepted engineering practices. *Id*.

Section 504(b) of the Code allows for four alternative designs for exterior walls in mobile homes: 1) walls with an interior vapor barrier of one perm or less, or 2) unventilated wall cavities sealed by a pressure envelope of at least five perms, or 3) ventilated wall cavities, or 4) for homes in Zone 1,[6] a vapor barrier *may* be placed on the opposite side of the wall from the living space. *See* 24 C.F.R. § 3280.504(b). Each of these alternative construction designs has been deemed by HUD to represent good engineering practices. *Id.* at ¶ 8. Nothing in the Code prohibits the use of a 504(b)(1) wall construction in Zone 1. *See generally* 24 C.F.R. § 3280. Furthermore, HUD has stated that it does not have data, research, or other information that would

---

[5] As mentioned *supra*, Section 303(b) provides that "All construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades." 24 C.F.R. § 3280.303(b).

[6] The HUD Code divides the United States into three geographic regions, called 'thermal zones.' Zone 1 encompasses much of the Southeastern U.S. from Texas to North Carolina, Zone 2 extends across the country's midsection from North Carolina to California, and Zone 3 encompasses most of the northern half of the country. 24 C.F.R. § 3280.506.

substantiate restricting § 504(b)(1) to Zones 2 and 3.  (Exhibit E ¶ 8; Parks Dep. in *Deese v. Champion Enters., Inc.*, No. 1:06-CV-643-MHT (M.D. Ala. filed June 19, 2006) 176:12-20, Feb. 19, 2007 (attached hereto as Exhibit F).)  Indeed, the wall designs utilized in the Stricklands' home are the most widely used condensation control method in the industry for all climactic conditions and have been approved by a third party inspection agency comprised of engineer design professionals as required by the HUD regulations.  (Exhibit E ¶ 9.)

Parks argues that because Section 303(b) requires all manufactured homes to be built in accordance with "accepted engineering practices," placing an interior vapor barrier in a hot and fringe zone climate violates the HUD Code even though Section 504(b)(1) specifies interior vapor barriers as an appropriate design option for every climate zone.  *See* 24 C.F.R. at §§ 3280.303(b), 3280.504(b)(1).  Parks' opinion fundamentally misrepresents HUD's own code interpretation and its enforcement policy.  As HUD has explicitly stated as recently as 2007:

> Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction.  Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

HUD Letter from Assoc. Deputy Asst. Sec. for Reg. Affairs and Mfr'd Housing, January 19, 2007 (attached hereto as Exhibit G).[7]

Because Parks does not have an engineering background and because his statements and opinions exhibit a fundamental misunderstanding of basic principles contained within the HUD Code, Parks should not be allowed to opine that the Stricklands' wall construction violates the HUD Code.

---

[7] CHB wishes to bring to the attention of the Court that in a separate Memorandum Opinion and Order (Doc. No. 75) in *Murphy*, the letter was stricken as it was determined that it did not satisfy one of the hearsay exceptions in Rule 803(8).

C.     **Parks Is Not Qualified to Offer Opinions Related to the Interpretation of Mold Sampling Data**

Parks also lacks the qualifications necessary to interpret mold sampling data.  Parks himself admits that he is not a mold expert and would not hold himself out to be one in federal court.  (Exhibit C 34:18-35:4.)  He has no college education, no training in biology or the environmental sciences, and little or no training in mold remediation.  *Id.* at 19:10-22:19.  While Parks appears to hold a mold remediation license from the state of Louisiana, he admits that he has never actually performed a single mold remediation:

> Q.  How many jobs have you served as a licensed mold remediator for where you've actually remediated a building?
>
> A.  None.

*Id.* at 29:5-8.  Parks also admits that he has no more than fifteen days of training in the area of mold interpretation.  *Id.* at 35:8-37:9.

Notwithstanding his lack of training, education, and experience, Parks believes he is qualified to testify about the interpretation of mold sampling data.  This claim is refuted by The Institute of Inspection, Cleaning and Restoration Certification S520 Standard and Reference Guide for Professional Mold Remediation ("IICRC S520") (attached hereto as Exhibit K) which is accepted by the scientific community as a primary authority for industry standards in the field of mold evaluation and remediation of indoor environments.  Professionals performing indoor fungal evaluations should be familiar with these industry standards and their terminology and recommended procedures.  Parks agrees that the IICRC S520 represents acceptable industry standards (Parks Dep. in *Ford v. Champion Enters.*, 231 Fed. Appx. 902 (11th Cir. 2007) vol. 2, 150:21-151:02) (attached hereto as Exhibit I), but nonetheless displays a fundamental lack of

knowledge and familiarity with basic terminology and concepts in the mold remediation and evaluation field.

In the area of mold remediation, mold sampling and mold data interpretation, the IICRC S520 is the work accepted by the scientific community as a primary authority for industry standards. When questioned, Parks acknowledged this to be the case:

> Q. Are you familiar with the IICRC 520?
>
> A. Yes, sir.
>
> Q. Do you consider that to be an authoritative work?
>
> A. I would consider it to be, yes, sir.

(Exhibit I 150:21-151:02)   Parks feels that he is competent to interpret mold sampling data because he is a mold remediator. However, as mentioned above, he has never actually remediated a building.  Even if he was an experienced remediator he still would not be qualified to interpret mold sampling data.  The IICRC S520 clearly indicates that remediators are not qualified to interpret mold data. (Exhibit K p.69). The IICRC S520 indicates that Indoor Environmental Professionals ("IEP") are the ones qualified to interpret mold data. Parks recently testified that he has never heard the term and does not know what an IEP is.  (Exhibit C 169:1-9.) Parks admitted that he is not an IEP.  *Id.* at 24:16-22.  The IICRC S520 defines an IEP as:

> "an individual who is qualified by knowledge, skill, education, training and/or experience to perform an assessment of the fugal ecology of property, systems, and contents of the job site, create a sampling strategy, sample the indoor environment, interpret laboratory data and determine Condition 1, 2 and 3 for the purpose of establishing a scope of work and verifying the return of the fungal ecology to a Condition 1 status."

Exhibit K p. 129.  In spite of the above Parks has endeavored to provide many of the functions of an IEP without the appropriate qualifications.  In his report he illustrates his

sampling strategy which he concocted himself. (Exhibit F 277:5-286:23; Exhibit B p. 7-8; Conlin Decl. ¶ 9, attached hereto as Exhibit H.)  His methods have never been peer reviewed or used by anyone else, they are his own invention. (Exhibit F 277:5-286:23; Exhibit B p. 7-8; Exhibit H ¶ 9.)  He also samples the environment and offers an interpretation of that data in his report. (Exhibit B p. 7-8). Further, the IICRC S520 indicates that only an IEP can be trusted to select and use mycology/microbiology laboratories.  (Exhibit K p.132).  Terms such as "normal fungal ecology," "primary, secondary, and tertiary fungal colonizers," and "Condition 1, Condition 2, and Condition 3" are defined in the IICRC S520 and are used as the industry standard to describe various types and levels of fungal contamination found in an indoor environment (Exhibit K pp. 14, 36-38), but Parks shows in his deposition that he is unfamiliar with these basic, fundamental terms:

> Q.  Can you tell me the difference between a primary, secondary, and tertiary colonizer of fungi?
>
> A.  No, sir...
>
> Q.  Do you know what a Condition 1, Condition 2, or Condition 3 environment in a home is relative to mold infiltration or contamination?
>
> A.  No, sir, I'm not familiar with that terminology.
>
> Q.  What is normal fungal ecology?
>
> A.  Normal fungal ecology?
>
> Q.  Yes, sir.
>
> A.  I don't know that I can specifically define that for you here.

(Exhibit C 12:10-13, 13:15-20, 29:22-30:3.)  Parks' lack of knowledge of these basic concepts of mold investigations demonstrates that he is unqualified to perform such investigations.  (Exhibit

K p. 129.)  According to the IICRC S520, IEPs are qualified to interpret laboratory data on the mold samples taken in the course of a fungal ecology assessment, but mold remediators (which Parks claims to be) are not.  *Id.* at p. 69.  Because Parks is not an IEP, he is not qualified to interpret mold laboratory data according to industry standards.  *Id.* at p. 69.  Therefore, he cannot satisfy the Rule 702 requirements for expert testimony in this area.

## II.    Parks' Methodology Is Unreliable

As previously stated, the reliability of an expert's methodology is critical to determining whether expert testimony assists the trier of fact.  *Daubert*, 509 U.S. at 589.  Rule 702 imposes a duty upon district courts to act as "gatekeepers" and ensure that speculative and unreliable opinions do not reach the trier of fact.  *McCorvey*, 298 F.3d at 1257; *Daubert*, 509 U.S. at 589 (requiring that courts "ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable").  Fulfilling this "gatekeeper" duty requires a court to "assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003).

In considering the methodology employed by the proffered expert, "*any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible*.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 n.11 (5th Cir. 1998), *cert. denied*, 526 U.S. 1064 (1999) (emphasis added) (internal citations omitted).

To aid in this inquiry, the Supreme Court has identified four factors that bear on the reliability of expert testimony.  *Daubert*, 509 U.S. at 592-94.  Those factors include: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review

and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id*. These factors are neither definitive nor exhaustive, and a federal court should consider any additional factors that may advance its Rule 702 analysis. *Kumho*, 526 U.S. at 150.

When these standards are applied to Parks' methodology, it becomes clear that Parks' methods are not scientifically reliable. In fact, Parks makes multiple methodological errors, any one of which by itself renders his analysis unreliable. *Benkwith*, 467 F. Supp. 2d at 1322 ("any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible") (internal citations omitted). Taken together, Parks' multiple errors only compound the problems with his analysis. As such, his conclusions are unreliable and without any scientific merit.

### A. Parks' Use of Moisture Meters in the Stricklands' Home is Unreliable

Parks employed unreliable methodology in his attempt to use moisture meter readings to show excessive moisture accumulation within the walls. It is well established that moisture meters are unreliable and cannot properly measure the actual moisture content of gypsum wallboard. (Exhibit H ¶ 6.) Moisture meters such as the one used by Parks on the Stricklands' home measure the dielectric strength, called the capacitance, of a material in its proximity. *Id.* Water content influences capacitance, but it is an electrical property of the gypsum wallboard that is actually being measured by the device, not the moisture level itself. *Id.* If a moisture meter is properly calibrated, it is possible to compare the moisture content of one portion of a wall to another, but to determine the actual moisture content of gypsum wallboard, it is necessary to remove a piece of the wallboard and bake it to measure the amount of water that is removed in

the baking process. *Id.* Parks admits that he did not calibrate his meter until some time after he did his inspection of the Stricklands' home. (Exhibit D vol. 1, 46:7-15.) Parks' relaxed attitude toward the proper maintenance (and therefore reliability) of his moisture meter was illustrated in another case where he indicated: "Q. You've used the meter for years and you've never calibrated it. A. This one, that's correct." (Exhibit C 127:21-23.) He later went on to say:

> Q. Now, you would agree with me if you found moisture readings of 25 to 40 percent, you can't say what the absolute percentage of moisture in those walls is because you didn't cut and bake the sample.
>
> A. That is correct.
>
> Q. And cutting and baking is the only authoritative way to know for sure.
>
> A. That's correct.

(Exhibit C 131:20-132:6.) Therefore, any attempt by Parks to make claims about the absolute moisture content of the walls based on moisture meter readings is improper, unreliable, and not based on any scientific standards.

However, despite Parks' acknowledgement that his moisture meter readings do not, and cannot, measure the actual moisture content in these gypsum walls, Parks nonetheless relies on his moisture meter readings to opine that the walls had too much moisture on an absolute scale. Parks knew how to determine the actual moisture content, but he did not perform the cut and bake test necessary to do so. Instead, despite knowing that moisture meters, even when used properly on gypsum wallboards, are only good for comparative studies, Parks, without reference to any scientifically accepted standards or peer-reviewed methodology, relied on the moisture meter readings to opine that the Stricklands' walls were prematurely deteriorating because of moisture accumulation. (Exhibit B 4.) His report states that the walls' moisture levels in the Stricklands' home were found to exceed 25%. *Id.* This finding is laughable because gypsum

board does not exist as a solid at moisture contents above 10%. (Exhibit H ¶ 6.)  If Parks' findings were accurate then the walls would have been reduced to puddles.  Simply put, Parks' use of moisture meters in his investigation is unreliable and inadmissible.  *See Benkwith*, 467 F. Supp. 2d at 1328 (refusing to admit proposed expert testimony when the expert "leap[s] from an accepted scientific premise to an unsupported one").

**B.    Parks' Did Not Conform to Industry Standards in His Thermographic Imaging of the Stricklands' Home**

Parks' use of an infrared camera in his investigation is similarly unreliable.  Parks used an infrared camera to measure the temperature distribution of the wallboard (Exhibit D vol. 2 214:18-21.), but he failed to adhere to industry standards in doing so.  Infrared cameras can be set at different levels to focus on temperature variations of different magnitudes.  (Exhibit H ¶ 7.)  For example, a camera can be programmed to highlight temperature differences as small as one degree Fahrenheit, or it can be programmed to only display variations of ten degrees or more.  *Id.* Translating this temperature profile into reliable information on moisture content requires removal of the specific portion of the wallboard in question to examine the quality of insulation, the presence of extra thermal bridging, and possible air leakage in the wall.  *Id.*

The ASTM (American Society for Testing and Materials) Standard Practice for Thermographic Inspection provides the accepted industry standards in the field of thermographic imaging.  *Id.* at ¶ 8.

> Parks holds only a Level I thermography certification.  The American Society of Nondestructive Testing describes Level I training with the following limitations: "Level I infrared thermographer … shall perform inspections under the cognizance of a Level II or Level III… Level I shall not independently perform nor evaluate inspection results… when such inspection results are for the purpose of verifying compliance to code or regulatory requirements."  These actions by Parks violate the standard reporting expectations of thermographic inspections as indicated by the ASTM Standards for Thermographic Inspection and by the American Society of Nondestructive Testing.

*Id.* These standards call for certain criteria to be met before an infrared camera can be used reliably. *Id.* at ¶ 7. For example, the difference between the indoor and outdoor temperature should be at least 18 degrees Fahrenheit for at least four hours prior to inspection. *Id.* In addition, an inspector should not allow any direct sunlight on an inspected surface for at least three hours prior to the inspection. *Id.*

Parks, however, testified that he does not know what settings were used in his thermographic imaging of the Stricklands' home. (Exhibit D vol. 1 56:4-8; Exhibit B.) Parks cannot state the magnitude of the temperature differentials captured by the camera. (Exhibit D vol. 1 56:4-8; Exhibit B). Parks cannot point to, and did not document, any attempt to measure or control for sunlight exposure prior to the moisture meter use. (Exhibit D vol. 1 56:4-8; Exhibit B). Parks cannot point to, and did not document, any attempt to measure the difference between the inside and outside temperature, either at the time of testing or for the several hours before testing. (Exhibit D vol. 1 56:4-8; Exhibit B). Parks did not take the time to remove a small part of the gypsum wallboard to inspect it for moisture content. (Exhibit D vol. 2 225:7-11; Exhibit B). These actions by Parks violate the ASTM industry standards for thermographic imaging. (Exhibit H ¶ 8.)

Parks' reports and opinions regarding his use of the infrared camera also ignore the fact that the HUD Code explicitly allows for a certain amount of heat transfer within the walls of a manufactured home. *Id.* These areas are known as "thermal shorts." Thermal shorts are present in all wall construction, and the HUD Code allows thermal shorts to cover up to one percent of the total exterior wall surface area. 24 C.F.R. § 3280.508(c). The areas identified in Parks' infrared pictures that display temperature differentials of an unknown magnitude compose an aggregate area of far less than one percent of the exterior wall surface area. (Exhibit E ¶ 11.)

The fact that Parks does not acknowledge that thermal shorts are allowed under the HUD Code underscores his lack of familiarity with the Code and his lack of thoroughness in the thermographic inspection. *Id.*

Without adhering to industry standards in either the preparation for, or documentation of, thermographic imaging, Parks' methodology cannot be relied upon for useful or accurate information.

### C.    Parks' Methodology for Mold Sampling in the Stricklands' Wall Cavities Lacks Scientific Validity

Parks claims that the presence of mold within certain portions of the Stricklands' wall cavities proves there is a defect in the structural integrity of the walls. There are several problems with this approach. Though Parks is able to find mold spores in wall cavities he is unable to determine whether or not his findings represent "normal fungal ecology" or "Condition 1." (Exhibit K p. 14). As discussed above he is not an IEP and therefore lacks the training to make such an assessment. His assessments are not based on any training or special competence and therefore amount to mere conjecture. One has to ask, if Parks cannot say what normal fungal ecology is then how can he say what is high or abnormal? "Q. What is normal fungal ecology? A. Normal fungal ecology? Q. Yes, sir. A. I don't know that I can specifically define that for you here." (Exhibit C 29:22-30:3.) Parks' lack of training indicates that he would not recognize normal fungal ecology if he saw it. Accordingly, any conclusion Parks draws from the presence of fungal spores in the wall is not based on established industry standards. As such, Parks is engaging in conjecture and his opinions are not the product of the scientific method. Parks, being unable to favorably apply any standard from the IICRC S520, appears to have tumbled to the Baxter/ETS and National Allergy Bureau standards, which he cites in his report. However, not

only do these standards not apply to wall cavities, but they employ a methodology (set mold contamination action levels) which has been specifically rejected by the IICRC S520:

> Thus, S520 represents a philosophical shift away from setting numerical mold contamination action levels. Instead, it establishes mold contamination definitions, conditions (1, 2, 3) and general guidance, which, when properly applied, can assist remediators and others in determining criteria that trigger remediation activities or confirm remediation success.

(Exhibit K p. 6.)  Parks application of these "standards" to wall cavity air samples is therefore misleading and unreliable.  Parks even admits that he has no authoritative source that supports his methodology:

> Q.  You don't have any authoritative source to indicate one way or the other whether indoor wall or -- whether wall sampling that you took can be applied to these standards.
>
> A.  I agree.  That's my opinion.

(Exhibit C 142:4-9).

In general, Parks' wall cavity sampling methodology lacks scientifically valid standards and procedures.  By pushing the insulation away from the gypsum wallboard to obtain an air sample, Parks compromises the air samples.  (Exhibit H ¶ 9.)  According to Parks himself, he created his own sampling methodology, which did not include true random sampling.  (Exhibit F 277:5-286:23.)  Parks' methodology has not been peer-reviewed for validity or generally accepted by other scientists in the field.  (Exhibit F 277:5-286:23; Exhibit H ¶ 9.)  As a result, his methodology is unreliable and the results derived from that methodology should not be admitted into evidence.

### D.     Parks Failed to Account for Alternate Sources of Moisture

Perhaps Parks' greatest methodological error was his failure to account for alternate sources of moisture.  Parks' contention is that the vinyl covered gypsum wallboard caused

condensation to accumulate within the wall cavity. However, Parks failed to consider, much less rule out, several factors that are known to regularly influence moisture levels in manufactured home walls. Standard industry practice and standard scientific methods require testing for alternative explanations for any observed moisture accumulation in a case like this. (Exhibit H ¶ 5; *see Benkwith*, 467 F. Supp. 2d at 1325 ("Scientific methodology is based on generating hypotheses and testing them to see if they can be falsified … This experiment appears to have been undertaken more to bolster a conclusion than to test a hypothesis.")). Without controlling for these factors, it is impossible to evaluate the cause for the alleged moisture problem. (Exhibit H ¶ 5.) Indeed, with Parks' inadequate methodology, it is impossible to tell whether the interior vapor barrier is even contributing to any problem at all. Omission of these factors in Parks' analysis is a fatal flaw that renders the report's conclusions unreliable. In the Plaintiffs' deposition, Becky Hunt described bulk water leaks behind the kitchen sink and at the front door. (Strickland Dep. 114:22-23, 115:1-13, 139:17-23, Oct. 29, 2007) (attached hereto as Exhibit J).[8] Despite this information, Parks did not indicate that he asked the Plaintiffs about the presence of bulk water leaks. Parks also did not rule out other alternate sources of moisture, such as weather events or setup issues. (Exhibit D vol. 1 146:16-23, 147:1-9; vol. 2 187:15-17, 190:2-9.) All of these factors should have been taken into account in a proper investigation of potential moisture problems in manufactured housing walls. (Exhibit H ¶ 5.)

## III.    Parks' Conclusions Do Not Reasonably Flow from His Data

*Daubert* requires that the court focus primarily on the principles and methods employed by the expert. 509 U.S. at 594-595. At the same time, though, it is well settled law that expert testimony must be "more than belief or unsupported speculation." *See id*. at 590. The Eleventh

---

[8] It should be noted that the Plaintiffs are both hearing impaired and their depositions were taken together in one transcript with the aide of an interpreter, Ms. Becky Hunt.

Circuit has likewise held that the district court's role is to "ensure that the proposed expert testimony is 'relevant to the task at hand,' … i.e., that it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999), quoting *Daubert* (on remand), 43 F.3d at 1315. Therefore, the evidence must have a valid scientific connection to the disputed facts in the case. *Daubert*, 509 U.S. at 591. This connection has been appropriately denominated as "fit." *Id.* The Supreme Court has recognized that:

> *Conclusions and methodology are not entirely distinct from one another.* Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner v. General Electric*, 522 U.S. 136, 146 (1997); *see also Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based on no research at all. Both analyses result in pure speculation.").

"[T]he court is now obliged to screen expert testimony to ensure it stems from, not just reliable methodology, but also a sufficient factual basis and reliable application of the methodology to the facts." *Rudd v. General Motors Corp.*, 127 F. Supp. 2d 1330, 1336 (M.D. Ala. 2001).

Several of Parks' conclusions are "connected to existing data only by the *ipse dixit* of the expert." *See Joiner*, 522 U.S. at 146. Parks' conclusion that HUD Code violations are causing structural deterioration is one of those conclusions that is not supported by Parks' investigation. Rather, it is refuted not only by the HUD Code issues previously discussed, but it is also in direct conflict with Parks' own deposition, in which he admitted that the HUD Code does in fact still allow 504(b)(1) walls in the humid and fringe zone climate, as well as Parks' own unsuccessful

efforts to change the Code to prohibit the use of such walls in Zone 1.  (Exhibit C 182:2-21.)
Parks' claim of structural deterioration also suffers from a complete lack of physical evidence of
problems in the walls themselves.  Instead, Parks relies on uncalibrated relative moisture meter
readings to conclude that the walls have excessive moisture accumulation, but he never tested the
actual moisture content of the walls.  (Exhibit H ¶ 6.)

Parks' conclusions regarding condensation as the cause of moisture accumulation in the
walls similarly do not comport with the existing data.  In addition to Parks' failure to consider
several viable alternate sources of moisture, discussed *supra*, Parks also failed to take into
account the actual weather data for the area.  *Id.* at ¶ 10.  An analysis of historical weather data
for Dothan, Alabama (the closest NOAA station to the Stricklands' home) shows that there has
been only one (1) day over the past four years when the outside daily dew point average was
above 78 degrees, which is typically the wall temperature of manufactured homes in the
summertime based on a thermostat setting of 75 degrees.  *Id.*  at ¶ 10.  Parks himself admits that
when the wall cavity surface is warmer than the dew point of the outside air, condensation in the
wall cavity is impossible.  (Exhibit C 177:7-11 ("The surface temperatures would have to be
below the dew point of the outside air in order for the actual state of – act of condensation to
occur")).

Parks in the past has asserted without justification that the presence of mold in a wall
cavity proves that the walls themselves are already or will eventually become structurally
unsound:

> Q.  Now, on page 2 of the report, you say the moisture has caused structural
> deterioration.
>
> A.  In my opinion, yes, sir, it has.
>
> Q.  Where in your report do you provide evidence of that?

A. I would say that the mold sampling, the fact that the -- we have mold present.

Q. Has affected the structure?

A. The gypsum board structure, in my opinion, yes, sir.

Q. Can you show me any picture of any wallboard anywhere where the back paper of the wallboard has been deteriorated and degraded? … Specifically. Can you show me where exactly?

A. Okay. Based on the testing showing there was mold growth, Figure 1, Figure 2 --

Q. Well, that's indication of mold growth, not that the structure's been compromised; right?

A. In my opinion, if we've got moisture and mold growth, then we've compromised the structure of that gypsum board.

(Exhibit C 128:1-129:4.) Yet after his investigation, Parks could not provide any evidence of "soft" walls (Q: Did you find any soft walls in the Strickland home? A. I don't recall… Q. You didn't note anything in your expert report finding soft walls in either the Ford or Strickland homes; right? A. I did not write in my report of either one that the walls were soft. (Exhibit D vol. 1 59:1-19.)) or any evidence of actual moisture content, and as a result, he was forced to base his claim of structural deterioration on the mere presence of mold. However, the presence of mold by itself does not prove that moisture is currently present, and it certainly does not necessarily mean the walls will deteriorate in the future. (Exhibit K p. 14, definitions of Condition 1, 2, 3) It only shows that mold spores are present, but their source is unknown and can only be determined by a proper scientific investigation. *Id.*

Indeed, Parks cannot say whether any mold that was present in the Stricklands' wall cavities was viable or not:

Q. Is that mold growth viable or not?

A. The air samples test both viable and non-viable. So I don't know that.

(Exhibit D vol. 1 127:12-14.)  Consequently, Parks has no way of determining whether any mold that may exist in the wall cavity resulted from a one-time bulk water leak or resulted instead from regularly occurring condensation within the wall cavity.  Given the "analytical gap between the data and the opinion proffered," this Court must take seriously its gatekeeper role and ensure that Parks "has a sufficient factual basis and reliable application of the methodology to the facts" to support any conclusions before admitting them into evidence.  *See Rudd*, 127 F. Supp. 2d at 1336; *Joiner*, 522 U.S. at 146; *Aucoin v. Southern Quality Homes, LLC*, No. 99791-C (La. Dist. 16 2005), aff'd by No. 06-979 (La. App. 3d Cir. 2006) (describing Bobby Parks as "an extreme advocate" whose "testimony went well beyond the scope of his written report... the Court cannot place weight on the testimony of this witness as it is not substantiated and corroborated by the evidence on the scene").[9]  An objective analysis of the record clearly demonstrates that in this case, Parks has neither the qualifications, a sufficient factual basis, reliable methodology, nor a reliable application of that methodology.

---

[9]  The trial court decision, along with the appellate decision affirming it, is attached as Exhibit L.  In a deposition given by Parks December 21, 2007 in *Dugas v. CMH Manufacturing, Inc., et al.* pending with the American Arbitration Association, Case No. AAA 69 420 04155 07, Parks conceded that he has never been admitted as an expert by any federal court and that the *Aucion* court was the only state court in which he was admitted as an expert for something other than in his HVAC field of expertise.

**CONCLUSION**

For the reasons set out in this brief, Defendant Champion Home Builders, Co., respectfully moves this Court to exclude the testimony and opinions of Bobby Parks.

**ORAL ARGUMENT IS REQUESTED**

Respectfully submitted,

RITCHEY & SIMPSON, PLLC

/s/ Gregory S. Ritchey
Gregory S. Ritchey, Esquire {ASB-8193-H68G}
Richard S. Walker, Esquire {ASB-8719-L70R}
Counsel for Champion Home Builders Co.

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:        205.876.1600
Facsimile     205.876.1616

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on the 28th day of March, 2008, I electronically filed the foregoing with the Clerk of Court using the electronic filing system which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
C. Lance Gould, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103

/s/ Gregory S. Ritchey
OF COUNSEL

# EXHIBIT "A"

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA **FILED**

NICHOLAS STRICKLAND AND JENNIFER
STRICKLAND

      Plaintiffs,

v.

CHAMPION ENTERPRISES, INC.,
CHAMPION HOME BUILDERS CO., INC.
AND Fictitious Defendants "A", "B", and "C",
whether singular or plural, are those other
persons, firms, corporations, or other entities
whose wrongful conduct caused or contributed
to cause the injuries and damages to the
Plaintiffs, all of whose true and correct names
are unknown to Plaintiffs at this time, but will
be substituted by amendment when ascertained,

      Defendants.

**JUN 26 2006**

Judy Byrd

\* Civil Action No.:
\* CV-2006-__389A__

JUDY BYRD, CLERK
HOUSTON CO., AL

\* **TRIAL BY JURY REQUESTED**

## COMPLAINT

### PARTIES

1.  Plaintiff Nicholas Strickland is over the age of nineteen (19) and is a resident of Houston County, Alabama.

2.  Plaintiff Jennifer Strickland is over the age of nineteen (19) and is a resident of Houston County, Alabama

3.  Defendant Champion Enterprises, Inc ("Champion") upon information and belief is Michigan corporation, who does business by agent in Houston County, Alabama.

4.  Defendant Champion Home Builders Company, Inc. ("Champion Home") upon information and belief is a Michigan corporation, who does business by agent in Houston County, Alabama

5. Fictitious Defendants "A," "B," and "C," whether singular or plural, are those other persons, firms, corporations, or other entities whose wrongful conduct caused or contributed to cause the injuries and damages to Plaintiffs, all of whose true and correct names are unknown to Plaintiffs at this time, but will be substituted by amendment when ascertained.

## BACKGROUND FACTS

6. On or about March 30, 2000, the Director, Manufactured Housing and Standards Division, Office of Consumer and Regulatory Affairs, Room 9156, Department of Housing and Urban Development (hereinafter the "Department") published a proposed waiver to 24 CFR 3280.504 of the Manufactured Home Construction and Safety Standards on March 30, 2000 (65FR 17110).

7. The proposed waiver was issued in response to information received from manufacturers and certain State Administrative Agencies (SAAs) in southeastern States concerning an increase in the number and severity of consumer complaints caused primarily by moisture build-up and condensation in homes located in the south. At that time, § 3280.504 of the Standards did not distinguish among climates for requirements for condensation control and installation of vapor barriers.[1] Thus, for example, the Standards did not separately address homes placed in humid and fringe environments or climates, which are predominantly located in the southeastern part of the United States. In these climates, it was determined that it may be beneficial to prevent the outside, moisture-laden air from entering through the warm (exterior) side of the home's exterior

---

[1] The term "vapor barrier" is now commonly referred to as a "vapor retarder". Accordingly, the term "vapor retarder" will be used in all subsequent references throughout the text of this waiver.

2

wall and condensing and collecting on the cold (living space or interior) side of the wall assembly One means of preventing moisture from entering the exterior wall cavity from the outside, would be to install a vapor retarder on the warm or exterior side of the wall instead of on the interior or living space side of the exterior wall.

8. The interior surface of the exterior wall should also then need to be constructed of a permeable material This would permit any moisture-laden air that may have entered the wall cavity through a discontinuity in the exterior vapor retarder to be dissipated through the interior permeable material. In such cases, use of vapor retarder paints, vinyl-covered gypsum wallboard, or other impermeable materials or finishes on the interior side of exterior walls could be detrimental, because they would trap moisture within the wall

9 HUD in fact issued a waiver that applied to the first of the alternatives available under § 3280.504(b), the then current condensation control and vapor barrier installation requirements for exterior walls in humid and fringe climates. Specifically, this waiver allowed manufacturers of homes for humid and fringe climates to install the vapor retarder on the exterior side, rather than the interior or living space side, of the exterior wall, provided: (1) The exterior side of the exterior wall is constructed with a vapor retarder or exterior covering and sheathing that has a permeance not greater than 1.0 perm, and (2) the interior finish and interior wall panels are designed with a 5 perm or higher rating. The waiver also required manufacturers to add a statement and a map to the data plate indicating that the home is only suitable for installation in humid and fringe climates (the map designated the acceptable locations for which the waiver is applicable)

3

10 The waiver that was urged by many manufacturers in the industry and approved by HUD stated: § **3280.504 Condensation control and installation of vapor retarders:** (4) Homes manufactured to be sited in "humid climates" or "fringe climates" as shown on the Humid and Fringe Climate Map in this paragraph shall be permitted to have a vapor retarder specified in paragraph (b)(1) of this section installed on the exterior side of the wall insulation or be constructed with an external covering and sheathing with a combined permeance of not greater than 1.0 perm, provided the interior finish and interior wall panel materials have a combined permeance of not less than 5 0 perm

11. The Humid and Fringe Climate Map stated that "following areas of local governments (counties or similar areas, unless otherwise specified), listed by State are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map in paragraph (b)(4) of this section, and the vapor retarder specified in paragraph (b)(4) of this section may be applied to homes built to be sited within these jurisdictions"

> **Alabama** – Baldwin, Barbour, Bullock, Bulter, Chootaw, Clarke, Cofee, Conecuh, Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox.
> **Florida** - All counties and locations within the State of Florida
> **Georgia** - Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, Glynn, Wayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman, Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth
> **Louisiana**
> All counties and locations within the State of Louisiana.
> **Mississippi**
> Adams, Amite, Clairbourne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson
> **North Carolina**

4

Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender
**South Carolina**
Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown, Horry
**Texas** Anderson, Angelina, Aransas, Atacosa, Austin, Bastrop, Bee, Bexar,
Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass,
Chambers, Cherokee, Colorado, Comal, De Witt, Dimmit, Duval, Falls, Fayette,
Fort Bend, Franklin, Freestone, Frio, Gavelston, Goliad, Gonzales, Gregg,
Grimes, Guadalupe, Hardin, Harris, Harrison, Hays, Henderson, Hidalgo,
Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes,
Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty,
Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen,
Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces,
Orange, Panola, Polk, Rains, Refugion, Robertson, Rusk, Sabine, San Augustine,
San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler,
Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington,
Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala

These respective Counties shall hereinafter be referred to as the "Gulf Coast Region "

12. As the acting Director of Product Engineering for Fleetwood Homes stated in

commenting to HUD on the proposed waiver:

[t]o be able to put the vapor barrier on the exterior side (warm side) of the wall in
hot, humid climates is very necessary to properly handle potential moisture
problems . [w]ithout these exceptions the vapor barrier will remain on the inside
in the hot, humid climate and moisture will be trapped in the home."

(Comments by William Farish, P.E. in a letter dated January 17, 2005, to the Department

of Housing and Urban Development).

13 The manufactured homes designed and manufactured by Defendants,

including the manufactured home purchased by Plaintiffs, have an improper design and

construction of exterior walls in violation of HUD Manufactured Home Construction and

Safety Standards as stated above. The defect existed at the time of sale and Plaintiffs

were provided with a written manufacturer warranty that expressly warranted that the

home was free from defect.

14.    Defendants have known of the defect in the design and manufacturer of

homes sold in the respective State and Counties indicated above since at least the mid

5

1990's and actually lobbied HUD to allow a waiver of the HUD Code because of it in the late 1990's   Despite lobbying for the waiver and actually obtaining it in 2001, Defendants failed to take advantage of the waiver HUD agreed was required. Defendants disingenuously allege that it is impracticable to comply with the waiver   Regardless, Defendants chose to sell homes to consumers in the "Gulf Coast" region without informing them of this known defect and thus chose profit over conscience.

15.    Because of the design defect, moisture condensation will become trapped within the walls and result in "sweating walls" - a condition wherein water will begin to seep out of openings that may exist in the wall like the screw holes for a smoke detector or nail holes for a picture hanger   The defect results in "soft walls" throughout the home because the moisture problems associated with this design defect literally make it possible to poke a finger through the gypsum wallboard a/k/a sheetrock in the home Black mold and various other types of fungal growth will appear as a result of this defect. The home is rendered worthless   Because this phenomenon occurs in the Gulf Coast Region, this condition is known to some within the industry as "Gulf Coast Syndrome "

16    Any and all complaints to Defendants have resulted in inadequate relief and despite a reasonable opportunity and repeated complaints by countless individuals, Defendants merely at most offer to replace the gypsum wallboard on occasion  This does not remedy the cause of the problem as the new gypsum wallboard will deteriorate in the same manner as the replaced gypsum wallboard did.   Defendants never inform the consumer of the known defect and fail to offer a full refund of the purchase price.

6

17      Defendant Champion is the parent corporation and/or alter ego of Defendant Champion Home Builders, Co. Defendants manufactured a manufactured home, which the Plaintiffs purchased in March of 2003.

18      As part of the purchase price, Defendants made a written express warranty to the Plaintiffs Defendants further warranted that any defects in the materials or workmanship in the home, which they were given notice of within the warranty period, would be repaired or remedied at no cost to the Plaintiffs

19.      The manufactured home manufactured by Defendants failed to perform, failed to serve as a suitable place of residence, and failed in its intended purpose.

20.      Subsequent to the failure of the manufactured home and notice by the Plaintiffs to Defendants of such failure, Defendants have failed to effectuate all repairs to the manufactured home. As such, the manufactured home continues to deteriorate structurally.

21.      Defendants have failed to honor the warranty or repair in that the manufactured home purchased was not fit for its intended use, was not merchantable at the date of the purchase and has continued to not be fit for its particular purpose, not withstanding efforts to repair the structure by Defendants

22.      Pursuant to Code of Alabama, 1975 § 7-2-607(3), Plaintiffs have given the Defendants notice of Plaintiffs' breach of warranty claim prior to bringing this suit.

## COUNT ONE
## MAGNUSON MOSS WARRANTY ACT
## 15 U.S.C. § 2301, et seq.

23.      Plaintiffs incorporate by reference all of the preceding paragraphs

7

24    At the time of the manufacture, Defendants were merchants, Defendants expressly and/or impliedly warranted that the manufactured home would be merchantable and/or fit for the ordinary purposes for which it was to be used and did expressly warrant that the manufactured home was expressly fit, designed, and built as directed by Plaintiffs, and that the manufactured home was free from defects in materials and workmanship or any defects would be repaired or replaced under the warranty

25.    The manufactured home, as delivered, was not free from defects in materials or workmanship.

26.    Defendants have failed or refused to correct the defects in the manufactured home and/or the warranty has failed in its essential purpose causing Plaintiffs to suffer injury and damages.

27.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have been proximately damaged as follows: the defects in the manufactured home have substantially and severely impaired its use; the home is of decreased or lesser value than represented when purchased; Plaintiffs have suffered mental anguish and emotional distress, anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, inconvenience; Plaintiffs will be caused to expend money in attempts to have the respective manufactured home repaired, and Plaintiffs have been subject to mold resulting from the defects.

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, and their costs, as well as reasonable attorney fees as allowed under 15 U.S.C. § 2301, et seq

8

## COUNT TWO
## BREACH OF EXPRESS WARRANTY

28. Plaintiffs incorporate by reference all of the preceding paragraphs.

29. Defendants expressly warranted that the manufactured home would be merchantable and/or fit for the ordinary purposes for which it was to be used and did expressly warrant that the manufactured home was expressly fit, designed, and built as directed by Plaintiffs, and that the manufactured home was free from defects in materials and workmanship or any defects would be repaired or replaced under the warranty.

30. The manufactured home, as delivered, was not free from defects in materials or workmanship

31. Defendants have failed or refused to correct the defects in the manufactured home and/or the warranty has failed in its essential purpose causing Plaintiffs to suffer injury and damages.

32. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have been proximately damaged as set forth in paragraph 27.

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, and their costs

## COUNT THREE
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

33. Plaintiffs incorporate by reference all of the preceding paragraphs.

34. Defendants breached the implied warranty in that the manufactured home was not merchantable, was not fit for ordinary purposes, and was not built as represented or ordered

9

35    Plaintiffs provided notice to Defendants for the breach of implied warranty and has given Defendants opportunity to cure or attempt to cure the numerous defects, but Defendants have failed or refused to do so.

36    As a direct result of the breach of implied warranty or merchantability by Defendants, Plaintiffs were damaged as set forth in Paragraph 27.

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, and their costs, as well as reasonable attorney fees

## COUNT FOUR
## BREACH OF FITNESS FOR PARTICULAR PURPOSE

37.    Plaintiffs incorporate by reference all of the preceding paragraphs.

38    Defendants breached the implied warranty in that the manufactured home was not merchantable, was not fit for ordinary purposes, and was not built as represented or ordered.

39    Plaintiffs provided notice to Defendants for the breach of fitness for particular purpose and has given Defendants opportunity to cure or attempt to cure the numerous defects, but Defendants have failed or refused to do so.

40    As a direct result of the breach of fitness for particular purpose by Defendants, Plaintiffs were damaged as set forth in Paragraph 27.

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, and their costs, as well as reasonable attorney fees.

## COUNT FIVE
## BREACH OF WARRANTY OF HABITABILITY

41.    Plaintiffs incorporate by reference all of the preceding paragraphs

42.    Defendants breached the implied warranty in that the manufactured home was not merchantable, was not fit for ordinary purposes, and was not built as represented or ordered

43    Plaintiffs provided notice to Defendants for the breach of warranty of habitability and have given Defendants opportunity to cure or attempt to cure the numerous defects, but Defendants have failed or refused to do so

44.    As a direct result of the breach of warranty of habitability by Defendants, Plaintiffs were damaged as set forth in Paragraph 27

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, and their costs, as well as reasonable attorney fees.

## COUNT SIX
## NEGLIGENCE

45    Plaintiffs incorporate by reference all of the preceding paragraphs.

46    Defendants negligently manufactured, designed, built, and/or assembled the manufactured home which the Plaintiffs purchased from Defendants.

47.    Defendants owed a duty to use due and ordinary care in the manufacture, design, building, and/or assembly of the manufactured home purchased by the Plaintiffs.

48.    The Defendants breached the duty owed to the Plaintiffs by failing to use ordinary and due care in the manufacture, design, building, and/or assembly of the manufactured home which was purchased by the Plaintiffs

11

49. As a direct and proximate result of the Defendants' negligence, Plaintiffs were damaged as set forth in Paragraph 27

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, and their costs, as well as reasonable attorney fees.

## COUNT SEVEN
### WANTON

50. Plaintiffs incorporate by reference all of the preceding paragraphs.

51. Plaintiffs allege Defendants are guilty of wanton construction of the manufactured home.

52. The workmanship and design are inferior, wantonly performed or done, leaving the manufactured home in a defective condition, thereby causing injury to the Plaintiffs

53. As a direct and proximate result of the Defendants' wantonness, Plaintiffs were damaged as set forth in Paragraph 27.

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, a separate amount as punitive damages, and their costs, as well as reasonable attorney fees

## COUNT EIGHT
### UNJUST ENRICHMENT

54. Plaintiffs incorporate by reference all of the proceeding paragraphs.

55. Defendants, by its acts and omissions described herein, has wrongfully appropriated, retained or otherwise possessed funds that rightfully in justice and equity belong to Plaintiffs    Defendants have earned enormous profits from this deceptive act.

12

56     Defendants should be required to disgorge all sums (e.g. the money earned from this practice) received from Plaintiffs as a result of the illegal and improper manner in which they placed for use by consumers a product (the Plaintiffs' home) into a region in which they knew the home would become worthless     Plaintiffs are also entitled to pre-judgment interest.

## COUNT NINE
## FRAUDULENT CONCEALMENT

57.     Plaintiffs incorporate by reference all of the preceding paragraphs

58.     Defendants failed to disclose the known defect (as set forth in the Background Facts) of the manufactured home to Plaintiffs in connection with the purchasing of the manufactured home.

59     The fraudulent concealment and omissions by Defendants were known and deliberate and were purposely designed to deceive Plaintiffs.

60     The concealment and omissions by Defendants were material in that Plaintiffs would not have purchased the manufactured home absent the concealment and omissions of material facts by Defendants. Plaintiffs reasonably believed that Defendants had accurately and adequately disclosed all material facts

61     As a direct and proximate result of Defendants' fraudulent concealment and omissions, Plaintiffs were damaged as set forth in paragraph 27

62.     Defendants fraudulent conduct was willful, wanton, and malicious, thereby entitling Plaintiffs to recover an amount to be determined at the trial of this action.

13

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as deemed appropriate, a separate amount as punitive damages, and cost, as well as reasonable attorney fees

## COUNT TEN
## ALABAMA EXTENDED MANUFACTURERS LIABILITY DOCTRINE

63.    Plaintiffs incorporate by reference all of the preceding paragraphs.

64.    Defendants manufactured the manufactured home and placed it in the stream of commerce where Plaintiffs ultimately purchased the manufactured home in March of 2003.

65    The manufactured home reached the Plaintiffs as the ultimate users or consumers without any substantial change in its condition from the time it was manufactured by Defendants.

66.    Plaintiffs used the manufactured home for its intended purpose, as a residence

67    The manufactured home, when it reached the Plaintiffs, was in a defective condition and/or in a condition that was unreasonably dangerous to the Plaintiffs as the ultimate users or consumers.

68    As a direct and proximate result of Defendants placing a defective and/or unreasonably dangerous manufactured home in the stream of commerce, Plaintiffs were damaged as set forth in Paragraph 27.

WHEREFORE, Plaintiffs demand judgment against the Defendants in such an amount of compensatory damages as a jury may award, a separate amount as punitive damages, and their costs, as well as reasonable attorney fees

Dated: 22nd day of June, 2006.

14

C. 3U

JERE L. BEASLEY (BEA020)
W. DANIEL MILES, III (MIL060)
C. GIBSON VANCE (VAN025)
Attorneys for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343
(334) 954-7555 (fax)

## JURY DEMAND

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.**

C. 3U

OF COUNSEL

15

# EXHIBIT "B"

# Healthy Homes of Louisiana, llc
## PO Drawer 3127
### West Monroe, La. 71294

318-397-1974          Fax 318-397-2123          Bobby@Parksmobileair.com

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Gibson Vance
218 Commerce Street
Montgomery, AL 36104



**Figure 1** The Hunt/Strickland home in Cowarts, al

1

# Healthy Homes of Louisiana, llc
## PO Drawer 3127
### West Monroe, La. 71294

318-397-1974        Fax 318-397-2123        Bobby@Parksmobileair.com

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Gibson Vance
218 Commerce Street
Montgomery, AL 36104

re: inspection of the Champion factory built
home belonging to the Hunt/Strickland family.

## Summary

An inspection was completed at the above mentioned home,
Champion serial number SRP011-03-621-20853, located Cowarts, Al
on 06-06-2006. The purpose of this inspection was to investigate
concerns of possible structural issues within the home. These
issues included;

1) Elevated moisture content within the perimeter walls causing
structural softening and deflections.
2) Possible fungal-like growth within the home.


 The following conclusion is based on information gathered from
this investigation. This home was found to have structural
deterioration and mold growth. The issue of concern is;

  Improper application of the wall construction standards.
 Does not concur with basic engineering practices or meet the
prescriptive standards which requires *"home producers in
assuring that homes built and sited in humid and fringe climates
are durable and free of moisture-related problems."
*24 CFR Part 3280 [Docket No. FR-4578-F-02]   / 3280.504(b)

2

## Conclusion

The above problem has created extremely moist conditions within
the perimeter walls. This moisture has caused structural
deterioration and created fungal growth within the wall
structure. Due to this inappropriate wall design being utilized
within the geographical location of this home, the conditions
will only worsen with time and eventually render the home unfit
for it's intended purpose. Remediation of this home should be
performed by licensed professionals in order to preserve
structural integrity and prevent any further occupant exposure.
 (SEE FUNGAL SAMPLE REPORT)


Further details are contained within the entirety of this report

*Healthy Homes of Louisiana, llc*
*Robert Parks, mm*

3

## Issue

Improper application of the wall construction standards.
Does not concur with basic engineering practices or meet the
prescriptive standards which requires *"home producers in
assuring that homes built and sited in humid and fringe climates
are durable and free of moisture-related problems."
*24 CFR Part 3280 [Docket No. FR-4578-F-02]    / 3280.504(b)



**Figure 3**    3280.504(b)(1) which is the
wall structure utilized within the subject
home.



**Figure 2** 3280.504(b)(2) is a wall standard
which would meet the prescribed
requirements of the Manufactured Home
Construction and Safety Standards.

Figure 3 depicts the wall standard which was
found to be utilized in the construction of the Hunt/Strickland home. This standard requires *"a vapor barrier not greater than 1 perm (dry cup method) installed on the living space side of the wall"*. This wall construction offers little resistance to the moisture laden outdoor air found within the "Hot Humid"/"Fringe" climates, yet requires an almost completely restrictive barrier on the cold indoor side (a.k.a. *"living space side")* of the wall structure. This serves to trap the moisture within the wall cavity area and cause "cold in summer" side of the wall to condensate much like a "glass of ice tea in the summertime".

This moisture then becomes the source for the fungal growth which occurs. Because of the severe climate conditions of the south, this scenario usually occurs from early May through September. This prolonged exposure to moisture can and has caused premature deterioration of the wall structure. Typical moisture content within the interior partition walls of this home were in the 10% -12% range. Consistent readings within the Hunt/Strickland's perimeter gypsum walls were found to exceed 25%mc.

4

## EXAMPLES OF AIR INFILTRATION
## FOUND WITHIN THE HUNT/STRICKLAND'S HOME



**Figure 4** Perimeter wall within the end bedroom.



**Figure 5** Areas of air/heat infiltration are visible via infrared thermography.



**Figure 6** Perimeter wall near kitchen areas.



**Figure 7** Air/heat infiltration was found consistently around the perimeter wall structure.

5



Figure 8 Perimeter wall structure.



Figure 9 Infrared picture on Figure 8.



Figure 10 Perimeter wall area.



Figure 11 Infrared picture of Figure 10.

6

# FUNGAL SAMPLE REPORT

**Points of reference;**

1. **Contamination levels of non-specific toxic or allergenic fungal spores.** Mold contamination is considered present in a building when the total mold spore concentration per cubic meter is above **10,000. (*Baxter, ETS*).**

2. *The National Allergy Bureau* considers mold counts in air of 0 - 900 as low, 900 to 2500 as moderate, 2500 to 25,000 as high, and **above 25,000 as very high.** At "high" levels most individuals with any sensitivity will experience symptoms. Acceptable levels for individual species vary since species toxicity varies widely as does spore size, weight, and other features which affect risk to building occupants.

    A total of four(4) air samples were retrieved from the Hunt/Strickland residence.

 Outdoor air sample
#10987396

Master bath w/c
#10987400

Middle BR w/c
#10987431



End BR w/c
#10987447

7

## Air Sample Comparison

| | | | |
|---|---|---|---|
| Alternaria | 4 | 33 | 0.3 |
| Ascospores | 53 | 1233 | 11.4 |
| Aspergillus/Penicillium-like | 25 | 556 | 4.9 |
| Basidiospores | 330 | 7333 | 64.7 |
| Bipolaris/Drechslera | 3 | 67 | 0.6 |
| Chaetomium | <1 | <22 | NA |
| Cladosporium | 57 | 1267 | 11.2 |
| Curvularia | 2 | 44 | 0.4 |
| Epicoccum | 1 | 22 | 0.2 |

**Figure 13** Exert from outdoor air sample # 10987396

* Initial air sampling has prescribed a need for additional evidence to be retrieved from the home. After defense inspection has been completed, large samples of gypsum board, from various locations, will be removed and sampled for fungal growth.

An indication of fungal growth observed from the sampling;

Aspergillus/Penicillium, was found to dominate some of the samples by 76%-99% respectively (see Figure 14-16). This was not found to be the case within the outdoor sampling. The outdoor sample was extremely diversified, as would be expected. (see Figure 13)

| | | | |
|---|---|---|---|
| Aspergillus/Penicillium-like | 34000 | 2266667 | 99.3 |
| Basidiospores | 34 | 2267 | 0.1 |

**Figure 15** Exert from wall cavity sample#10987431

| | | | |
|---|---|---|---|
| Ascospores | 1 | 67 | 0.3 |
| Aspergillus/Penicillium-like | 107 | 7133 | 90.7 |
| Basidiospores | 8 | 533 | 6.8 |

**Figure 14** Exert from wall cavity sample # 10987447

| | | | |
|---|---|---|---|
| Aspergillus/Penicillium-like | 40 | 2667 | 76.9 |
| Basidiospores | 7 | 467 | 13.5 |

**Figure 16** Exert from wall cavity sample # 10987400

8

Mr. Bobby Parks                                          June 15, 2006
Healthy Homes of LA, LLC
P.O. Drawer 3127
West Monroe, LA 71294


DOH ELAP# 11626            Account# 15609            Login# L134675

Dear Mr. Parks:

Enclosed are the analytical results of the samples received by our laboratory June 13, 2006. All test results meet the quality control requirements of AIHA and NELAC unless otherwise stated in this report. All samples on the chain of custody were received in good condition unless otherwise noted.

Results in this report are based on the sampling data provided by the client and refer only to items tested. Unless otherwise requested, all samples will be discarded 14 days from the date of this report.

Please contact Client Services at (888) 432-5227, if you would like any additional information regarding this report.

Thank you for using Galson Laboratories.

Sincerely,

Galson Laboratories

*F. Joseph Unangst*

F. Joseph Unangst
Laboratory Director


Enclosure(s)

# Galson
# Laboratories

6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client          : Healthy Homes of LA, LLC
Site            : Hunter
Project No.     : B A

Date Sampled    : 06-JUN-06
Date Received   : 13-JUN-06
Date Analyzed   : 14-JUN-06

Account No.: 15609
Login No.   : L134675
Incubation Temp : NA

Client ID : 10987396          Lab ID : L134675-1          Air Volume : 0.045 m3
Analysis  : Standard Spore Trap          Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|---|---|---|---|
| Mycelial Fragments | 16 | 358 | NA |
| Pollen | 2 | 44 | NA |
| Total Fungal Spores | 510 | 11333 | NA |
| ------------------------ | | | |
| Acremonium-like | <1 | <22 | NA |
| Alternaria | 4 | 89 | 0.8 |
| Ascospores | 53 | 1289 | 11.4 |
| Aspergillus/Penicillium-like | 25 | 556 | 4.9 |
| Basidiospores | 330 | 7333 | 64.7 |
| Bipolaris/Drechslera | 3 | 67 | 0.6 |
| Chaetomium | <1 | <22 | NA |
| Cladosporium | 57 | 1267 | 11.2 |
| Curvularia | 2 | 44 | 0.4 |
| Epicoccum | 1 | 22 | 0.2 |
| Fusarium | <1 | <22 | NA |
| Memnoniella | <1 | <22 | NA |
| Nigrospora | <1 | <22 | NA |
| Paecilomyces-like | <1 | <22 | NA |
| Pithomyces | <1 | <22 | NA |
| Rusts/Smuts | 2 | 44 | 0.4 |
| Scopulariopsis | <1 | <22 | NA |
| Stachybotrys | <1 | <22 | NA |
| Torula | <1 | <22 | NA |
| Trichoderma-like | <1 | <22 | NA |
| Ulocladium | <1 | <22 | NA |
| Other/Unidentified | 28 | 622 | 5.5 |

COMMENTS: SOPs:  ib-airocell(4)
          Sample results were not corrected for the lab blank.

## Outdoor Air sample

Level of quantitation: 1 Spore
Analytical Method   : GALSON IB-AIROCELL
Sampler             : Spore Trap

Submitted by: RF
Approved by : ABS
Date: 15-JUN-06
QC by: Tom Burgess

<  -Less Than          >  -Greater Than     m3  -Cubic Meters   NA -Not Applicable
cm2 -Square Centimeters  CFU -Colony forming units  g  -Grams       NS -Not Specified
ND  -Not Detected

# Galson
# Laboratories
6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client       : Healthy Homes of LA, LLC
Site         : Hunter
Project No.  : B A

Date Sampled   : 06-JUN-06
Date Received  : 13-JUN-06
Date Analyzed  : 14-JUN-06

Account No.: 15609
Login No.  : L134675
Incubation Temp : NA

Client ID : 10987400        Lab ID : L134675-2        Air Volume : 0.015 m3
Analysis  : Standard Spore Trap        Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|---|---|---|---|
| Mycelial Fragments | 4 | 267 | NA |
| Pollen | <1 | <67 | NA |
| Total Fungal Spores | 52 | 3467 | NA |
| ------------------------- | | | |
| Acremonium-like | <1 | <67 | NA |
| Alternaria | <1 | <67 | NA |
| Ascospores | <1 | <67 | NA |
| Aspergillus/Penicillium-like | 40 | 2667 | 76.9 |
| Basidiospores | 7 | 467 | 13.5 |
| Bipolaris/Drechslera | <1 | <67 | NA |
| Chaetomium | <1 | <67 | NA |
| Cladosporium | 4 | 267 | 7.7 |
| Curvularia | <1 | <67 | NA |
| Epicoccum | 1 | 67 | 1.9 |
| Fusarium | <1 | <67 | NA |
| Memnoniella | <1 | <67 | NA |
| Nigrospora | <1 | <67 | NA |
| Paecilomyces-like | <1 | <67 | NA |
| Pithomyces | <1 | <67 | NA |
| Rusts/Smuts | <1 | <67 | NA |
| Scopulariopsis | <1 | <67 | NA |
| Stachybotrys | <1 | <67 | NA |
| Torula | <1 | <67 | NA |
| Trichoderma-like | <1 | <67 | NA |
| Ulocladium | <1 | <67 | NA |
| Other/Unidentified | <1 | <67 | NA |

COMMENTS: SOPs: ib-airocell(4)
Sample results were not corrected for the lab blank.

## Master bath wall cavity

Level of quantitation: 1 Spore
Analytical Method  : GALSON IB-AIROCELL
Sampler            : Spore Trap

Submitted by: RF
Approved by : ABS
Date: 15-JUN-06
QC by: Tom Burgess

< -Less Than        > -Greater Than     m3 -Cubic Meters  NA -Not Applicable
cm2 -Square Centimeters  CFU -Colony forming units g  -Grams        NS -Not Specified
ND -Not Detected

# Galson
# Laboratories
6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client        : Healthy Homes of LA, LLC
Site          : Hunter
Project No.    : B A

Date Sampled   : 06-JUN-06
Date Received  : 13-JUN-06
Date Analyzed  : 14-JUN-06

Account No.: 15809
Login No.  : L134675
Incubation Temp : NA

Client ID : 10987431       Lab ID : L134675-3       Air Volume : 0.015 m3
Analysis  : Standard Spore Trap              Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|---|---|---|---|
| Mycelial Fragments | 45 | 3000 | NA |
| Pollen | <1 | <67 | NA |
| Total Fungal Spores | 34086 | 2271087 | NA |
| ------------------------ | | | |
| Acremonium-like | <1 | <67 | NA |
| Alternaria | <1 | <67 | NA |
| Ascospores | <1 | <67 | NA |
| Aspergillus/Penicillium-like | 34000 | 2266667 | 99.8 |
| Basidiospores | 34 | 2267 | 0.1 |
| Bipolaris/Drechslera | <1 | <67 | NA |
| Chaetomium | <1 | <67 | NA |
| Cladosporium | 21 | 1400 | 0.1 |
| Curvularia | 1 | 67 | <0.1 |
| Epicoccum | 1 | 67 | <0.1 |
| Fusarium | <1 | <67 | NA |
| Nemnoniella | <1 | <67 | NA |
| Nigrospora | <1 | <67 | NA |
| Paecilomyces-like | <1 | <67 | NA |
| Pithomyces | <1 | <67 | NA |
| Rusts/Smuts | 1 | 67 | <0.1 |
| Scopulariopsis | <1 | <67 | NA |
| Stachybotrys | <1 | <67 | NA |
| Torula | <1 | <67 | NA |
| Trichoderma-like | <1 | <67 | NA |
| Ulocladium | <1 | <67 | NA |
| Other/Unidentified | 8 | 533 | <0.1 |

COMMENTS: SOPs: ib-aircell(4)
          Sample results were not corrected for the lab blank.

## Middle BR wall cvity

Level of quantitation: 1 Spore
Analytical Method    : GALSON IB-AIROCELL
Sampler              : Spore Trap

Submitted by: RF
Approved by : APS
Date: 15-JUN-06
QC by: Tom Burgess

< -Less Than      > -Greater Than      m3 -Cubic Meters   NA -Not Applicable
cm2 -Square Centimeters  CFU -Colony forming units  g  -Grams   NS -Not Specified
ND -Not Detected

# Galson
# Laboratories
6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client        : Healthy Homes of LA, LLC
Site          : Hunter
Project No.   : B A

Date Sampled  : 06-JUN-06           Account No.: 15609
Date Received : 13-JUN-06           Login No.  : L134675
Date Analyzed : 15-JUN-06           Incubation Temp : NA

---

Client ID : 10987447        Lab ID : L134675-4       Air Volume : 0.015 m3
Analysis  : Standard Spore Trap              Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|---|---|---|---|
| Mycelial Fragments | 6 | 400 | NA |
| Pollen | 4 | 267 | NA |
| Total Fungal Spores | 118 | 7867 | NA |
| -------------------------- | | | |
| Acremonium-like | <1 | <67 | NA |
| Alternaria | <1 | <67 | NA |
| Ascospores | 1 | 67 | 0.8 |
| Aspergillus/Penicillium-like | 107 | 7133 | 90.7 |
| Basidiospores | 8 | 533 | 6.8 |
| Bipolaris/Drechslera | <1 | <67 | NA |
| Chaetomium | <1 | <67 | NA |
| Cladosporium | <1 | <67 | NA |
| Curvularia | <1 | <67 | NA |
| Epicoccum | 1 | 67 | 0.8 |
| Fusarium | <1 | <67 | NA |
| Memnoniella | <1 | <67 | NA |
| Nigrospora | <1 | <67 | NA |
| Paecilomyces-like | <1 | <67 | NA |
| Pithomyces | <1 | <67 | NA |
| Rusts/Smuts | <1 | <67 | NA |
| Stropulariopsis | <1 | <67 | NA |
| Stachybotrys | <1 | <67 | NA |
| Torula | <1 | <67 | NA |
| Trichoderma-like | <1 | <67 | NA |
| Ulocladium | <1 | <67 | NA |
| Other/Unidentified | 1 | 67 | 0.8 |

COMMENTS: SOPs: ib-airocell(4)
          Sample results were not corrected for the lab blank.

## End BR wall cavity

---

Level of quantitation: 1 Spore              Submitted by: RF
Analytical Method    : GALSON IB-AIROCELL    Approved by : APS
Sampler              : Spore Trap            Date: 15-JUN-06
                                             QC by: Tom Burgess

---

< -Less Than        > -Greater Than    m3 -Cubic Meters  NA -Not Applicable
cm2 -Square Centimeters  CFU -Colony forming units  g  -Grams    NS -Not Specified
ND -Not Detected

# Galson
# Laboratories

6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

```
Client        : Healthy Homes of LA, LLC
Site          : Hunter
Project No.   : B A

Date Sampled   : 06-JUN-06              Account No.: 15609
Date Received  : 13-JUN-06              Login No.  : L134675
Date Analyzed  : 14-JUN-06              Incubation Temp : NA
```

Client ID : BLANK          Lab ID : L134675-5          Air Volume : NA
Analysis  : Standard Spore Trap          Crowding Factor : 0

| Parameter | Total Count | Percent % |
|---|---|---|
| Mycelial Fragments | <1 | NA |
| Pollen | <1 | NA |
| Total Fungal Spores | <1 | NA |
| ------------------------ | | |
| Acremonium-like | <1 | NA |
| Alternaria | <1 | NA |
| Ascospores | <1 | NA |
| Aspergillus/Penicillium-like | <1 | NA |
| Basidiospores | <1 | NA |
| Bipolaris/Drechslera | <1 | NA |
| Chaetomium | <1 | NA |
| Cladosporium | <1 | NA |
| Curvularia | <1 | NA |
| Epicoccum | <1 | NA |
| Fusarium | <1 | NA |
| Memnoniella | <1 | NA |
| Nigrospora | <1 | NA |
| Paecilomyces-like | <1 | NA |
| Pithomyces | <1 | NA |
| Rusts/Smuts | <1 | NA |
| Scopulariopsis | <1 | NA |
| Stachybotrys | <1 | NA |
| Torula | <1 | NA |
| Trichoderma-like | <1 | NA |
| Ulocladium | <1 | NA |
| Other/Unidentified | <1 | NA |

COMMENTS: SOPs: ih-aircell(4)
        Sample results were not corrected for the lab blank.

## BLANK

```
Level of quantitation: 1 Spore          Submitted by: RF
Analytical Method  : GALSON IB-AIROCELL   Approved by : ABS
Sampler            : Spore Trap           Date: 15-JUN-06
                                          QC by: Tom Burgess
```

< -Less Than          > -Greater Than     m3 -Cubic Meters   NA -Not Applicable
cm2 -Square Centimeters   CFU -Colony forming units  g  -Grams      NS -Not Specified
ND -Not Detected

INDUSTRIAL HYGIENE ANALYTICAL LABORATORY
SAMPLING AND ANALYSIS GUIDE

GALSON LABORATORIES
6601 Kirkville Rd
East Syracuse, NY 13057-9672
Tel: 315-432-5227
Fax: 315-437-0571
www.galsonlabs.com

Check if change of address ☐
New Client? ☐ yes ☒ no
Client Account #: 15609

**Report To:** Healthy Homes of Louisiana, llc
PO Box 3127
West Monroe, La 71294

**Phone No.:** 318-397-1974

**Invoice To:** Same

**Phone No.:**
**Fax No.:**

**Sampled By:** Robert Parks

| Need Results By: | (surcharge) |
|---|---|
| 5 Business Days | 0% |
| 4 Business Days | 25% |
| 3 Business Days | 50% |
| 2 Business Days | 75% |
| Next Day by 5pm | 100% |
| Next Day by Noon | 150% |
| Same day | 200% |

Verbal Authorization:
Purchase Order No.:
Credit Card No.: 372527450814001
Card Holder Name: Robert Parks
Email Results To: bobby@parksmobileair.com

**Site Name:** Hunter
**Project:** B/A

**Exp.:** 07/08

**Fax No.:**

| Sample Identification | Date Sampled | Collection Medium | *Air Volume (liters)/ Passive Monitors (Min) | Analysis Requested | Method Reference | Specific DL Needed |
|---|---|---|---|---|---|---|
| 1098 7396 | 06-06-06 | AirCell | 45 Lts | Airs | | |
| 1098 7400 | 06-06-06 | AirCell | 15 Lts | Airs | | |
| 1098 7431 | 06-06-06 | " | 15 Lts | Airs | | |
| 1098 7442 | 06-06-06 | AirCell | 15 Lts | Airs | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

☒ IF YOU DO NOT WANT A LABORATORY BLANK ADDED PLEASE CHECK BOX. If blanks are not submitted or box is not checked, our policy states that a laboratory blank will be added for each analyte and it will be charged at normal rate.

List description of industry or process / interferences present in sampling area:

| Chain of Custody | Print Name | Signature | Date/Time |
|---|---|---|---|
| Relinquished by: | Robert Parks | [signature] | 06/06/06 5:10 pm |
| Received by LAB: | M Kramer | M Kramer | 6/13/06 @ 9:45 |

Login #: 4 34675

Samples received after 3pm will be considered as next day's business

* sample collection time X LPM = Air Vol. (L)

47

GALSON LABORATORIES

# Healthy Homes of Louisiana, llc

PO Box 3127
West Monroe, La. 71294
*A Building Science Company*

*Ph. 318-397-1974      Fax 318-397-2123      Bobby@Parksmobileair.com*

### Mold Remediation Estimate
### Summary

The purpose of this document is to provide an estimate for mold remediation in Mr. Deese's manufactured homes which was built with interior vinyl covered wallboard. While following New York City guidelines, a conservative and common sense approach was utilized.

The following steps and cost were applied;

1) Storage container (personal contents removed from the home)....      300.00 per mo

2) Initial "Base Line" air testing.....      500.00

3) Mold Remediation.....      9,785.00

4) Final air testing for re-entry clearance.....      500.00

                   Total*      11,085.00

* This total is for mold remediation and re-entry clearance only. It does NOT include any allowances for the re-construction of the home nor the return of personal contents to the home.

Healthy Homes of Louisiana, llc
Robert Parks, mm

This page
intentionally left
blank

000002

# Healthy Homes of Louisiana, llc
## PO Drawer 3127.
## West Monroe, La. 71294

Ph. 318-397-1974        Fax 318-397-2123        Bobby@ParksMobileAir.com

Alan Wozniak, CIAQP, CIEC
President/CEO
Pure Air Control Services                              www.pureaircontrols.com
                                                       1-800-422-7873 ext 802

re: Single section manufactured housing remediation project estimate.

Dear Sir,

   As we discussed, I am enclosing a mold remediation protocol for a manufactured housing project. I would appreciate an estimate for this project which will get us to the outlined stage of completion. I understand that there may be slight variances depending upon a specific job location and exact size of home. Another consideration which may vary the estimate would be the amount of personal belongs within the home which will need to be removed for storage and actual storage availability in a specific area.

   For the intended purpose of this estimate, I would appreciate a conservative estimate approach. Any actual jobs which may result from this project will be bid individually for a more exact cost estimate.

Thank you,
Healthy Homes of Louisiana, llc
Robert Parks, mm

## General guidelines to be followed for mold remediation in all manufactured housing projects.

1) Turn off the air handler (furnace or air conditioner) supplying the work area.

2) It is assumed that the air ducts **have not** been contaminated so they should be sealed to protect them during the remediation

3) Evacuate the entire home of all personal belongings. This includes, but is not limited to, furniture, clothing and appliance. These items my be stored in an onsite containment or in an off site storage facility.

4) **ALL** carpeting throughout the home should be removed.

5) Maintain proper ambient air pressure balances from room-to-room as required depending upon protocol used.

6) Personal protective equipment: gloves, eye protection without vents, disposable protective clothing that also covers the head and feet and at a minimum a N95 respirator. Consider use of full-face mask respirators with HEPA filtration canisters. The final decision form proper PPE will be left up to the professional judgement of the remediation professional and/or their company protocol.

7) Remove all vinyl covered gypsum board from the perimeter wall structure from within the home interior wall structure.

8) Vacuum while cutting the gypsum board using a HEPA vacuum or a vacuum with a high efficiency collection bag and vent the vacuum to the outside.

9) All contaminated material should be placed in plastic bags at least 6 mil in thickness, double bagged and disposed of as regular trash.

10) Vacuum all moldy surfaces thoroughly. Vacuum surfaces before damp wiping or scrubbing.

11)Damp wipe all surfaces with disposable wipes.

12)Scrub any wood that has mold growth using soapy water and thoroughly rinse.

13) Drying can be accelerated by using heat lamps and a dehumidifier. Do not use fans blowing against the wall surfaces.

14) Allow the wood to thoroughly dry before installing new gypsum board. This will usually mean returning at least a day later, or longer. Measure the moisture content with a moisture meter. Wooden materials should be less than 15 per cent moisture content by weight.

15) You are done when all visible mold is removed and no dust is present.


Thank you,
Healthy Homes of Louisiana, llc
Robert Parks, mm

003005



Figure 1 Example of single wide manufactured home.

000006

This page
intentionally left
blank

003007

# INDOOR AIR QUALITY REMEDIATION QUOTE

### Type of Indoor Environmental Service:

☐ Building Diagnostics ☐ Environmental Laboratory
☐ Environmental Project Management ☑ Building/HVAC Remediation
☑ Environmental HVAC Maintenance ☐ Mold-Contaminated Drywall Removal
☐ Topical Treatment



 Contract Holder
FSS Contract 10F-0486R

**Prepared For:**

Healthy Homes of Louisiana, llc
c/o Mr. Robert Parks
PO Drawer 3127
West Monroe, LA 71294
PH: 318-397-1974
FX: 318-397-2123
EMAIL: bobby@parksmobileair.com

**Project Quote:**
BRS No. 06R-4949

Mobile Home Remediation, Various Locations

**Prepared by:**









*A Division of Pure Air Control Services*
**Kevin W. McKee**
**Director of Building Remediation Sciences**


EMLAP #102705

*Indoor Environmental Diagnostic, Environmental Laboratory and Remediation Specialists*

1(727) 572-4550
1(800) 422-7873

**E-mail: iaq@pureaircontrols.com**
**Web Site: www.pureaircontrols.com**

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CAC067992





 Contract Holder


8 (a) Certified

PURE AIR
CONTROL SERVICES INC.

**IAQ Advisory Board**

* Alan L. Wozniak, CIAQP
  *President CEO*

* Mark D. Wozniak, M.B.A.,
  CIAQP
  *Vice President*

* Rajiv Sahay, Ph.D.
  *Laboratory Manager*

* Ambuj Kumar, M.D., M.P.H.
  *Environmental Health Consultant*

* Francisco T. Aquirre
  *Senior IAQ Diagnostician
  Certified St. Lic. Class A*

* Cynthia M. Bailey
  *Business Manager*

* Dr. Monroe J. King, P.A.
  *Allergist / Immunologist
  Medical Consultant*

Mechanical Division:
U.S. ENERGY SERVICES
St. Lic #CACO57992

Publisher of:
THE IEQ REVIEW


Home of the:
evalu-aire
Screen Test Kit


Building Health Check


Building Remediation
Sciences, Inc.

November 21, 2006

Healthy Homes of Louisiana, llc
Mr. Robert Parks
PO Drawer 3127
West Monroe, LA 71294

RE:  **IAQ Improvement Program: Removal of Mold Contaminated Materials +
     Environmental Cleaning - Quality Assurance/Quality Control (QA/QC) for Mobile
     Home Remediation, Various Locations, , ,**

Dear Mr. Parks:

We appreciate the opportunity to provide you and Healthy Homes of Louisiana, llc with
professional mechanical HVAC remediation. As requested, the attached contract proposal
(PACS 06R-4949) has been submitted.

**Background:** Pure Air Control Services has been requested to provide a quote to perform
professional environmental remediation in various singlewide and doublewide mobile homes.
The condition and the origin of these conditions have been described as follows by Bobby
Parks of Healthy Homes of Louisiana.

These homes were built utilizing a vinyl-covered gypsum board on the interior portion of all the
outer perimeter walls and the mating walls of the doublewide mobile homes. Moisture has
somehow penetrated the exterior walls and become trapped in the wall cavity and mold has
grown on the interstitial side of the gypsum board. The proposal will cover costs to remove the
furnishings and other personal belongings from the homes to a portable storage unit to be
positioned at each jobsite. The portable storage units will not be the responsibility of the
remediation contractor, they will be provided by someone other than the remediation contractor.
We have been instructed to assume that the furnishings and personal belonging are free of
contaminants. The remediation contractor (Pure Air Control Services) will be responsible for
removing the furnishings from the mobile homes to the storage containers, Positioned on the
job site.

The air conditioning system will be turned off prior to any work and the supply and return vents
will be sealed off with visqueen. If any of these mobile homes utilize split systems the air
handlers will be protected by covering with 6 mil visqueen. Any other appliances in the home
will be protected with 6 mil visqueen in the same manner. Any appliance that emits heat or
needs circulation of air to operate will be turned of at the breaker panel. Any cabinetry that is
affixed to or obstructs the removal of any outer perimeter gypsum board will be removed. The
remediation contractor will not assume any responsibility for damage occurring during the
removal of cabinetry or furnishings. All prudent precautionary measures will be taken to protect
the appliances and furnishings.

*"Indoor Air Diagnostic, Environmental Laboratory and Remediation Experts"*

**Corporate Office**
4911 Creekside Drive · Suite C · Clearwater, FL 33760 · (727) 572-4550 · Toll Free: 1-800-422-7873 · Fax: (727) 572-5859
E-mail: iaq@pureaircontrols.com · Web Site: www.pureaircontrols.com

**Scope of Work:** Provide a professional environmental remediation crew trained in remediation protocol for the removal of mold-contaminated materials while utilizing containment protocol.

- All furnishings will be removed from the mobile homes and placed in the on site portable storage units.
- The air conditioner will be turned off and all A/C vents will be sealed off with tape and 6 mil visqueen such as the refrigerator, stove, hot water tank etc.
- Air scrubbers will be positioned through out the mobile home prior to the removal of any building materials. Since all areas of the Mobile home will be affected by the remediation work the entire mobile home will be treated as one large containment area.
- All carpet will be removed from the home; the carpet will be cut and bagged prior to removal from home.
- All vinyl-covered gypsum board will be removed from outer perimeter walls any cabinetry obstructing the removal of the gypsum board will be removed cleaned, bagged in 6 mil visqueen and brought to storage container.
- On the doublewide mobile homes the mating wall where the two halves of the trailer are adjoined, the gypsum board will be removed from both sides of the wall.
- All inner wall cavities will be cleaned utilizing HEPA vacuums, wet wiping techniques, wire brushing and possibly encapsulating with a antimibrobial coating if visibly stained.
- Once all contaminated materials have been removed from the home, a complete environmental cleaning of the home will be performed utilizing HEPA fitted vacuums, and wet wiping techniques.
- The flooring will then be treated with an antimicrobial bound solution such as multicide.
- Air scrubbers will remain in the home for a period of 48 hours. At this phase it is recommended that the post remediation clearance test be performed.

All remediation work will be performed in accordance with remediation protocol included in this proposal.

003011

Healthy Homes of Louisiana, llc
Mr. Robert Parks
November 21, 2006
Page 2

All of these remedial recommendations must be completed under strict containment specifications which includes applications to address OSHA (Labor) 29 C.F.R. regulations:

| | |
|---|---|
| ☑ **Respiratory Protection Program:** | **1910.134** |
| ☑ **Confined Space Program:** | **1910.146** |
| ☑ **Hazard Communication Program:** | **1910.1200** |
| ☑ **Lock Out-Tag Out Program:** | **1910.147** |

A final recommendation with respect to the remediation work includes a post remediation Quality Assurance/Quality Control (QA/QC) effort to ensure all IAQ concerns have been successfully resolved.

We look forward to working with you and Healthy Homes of Louisiana, llc on this important task. If you have any questions, please call me at (800) 422-7873 ext. 803.

Sincerely,

PURE AIR CONTROL SERVICES


_____
Kevin W. McKee
Director of Building Remediation Sciences

Enclosures

cc:    Alan L. Wozniak, CIAQP, President/CEO
       Edgar D. Ziegler, Business Development Manager

11/21/06   E:\Sales\Ward\ACT Documents\RY Proposals\2006\parv_4949.DOC

*"Indoor Air Diagnostic, Environmental Laboratory and Remediation Experts"*

**Corporate Office**
*4911 Creekside Drive · Suite C · Clearwater, FL 33760 · (727) 572-4550 · Toll Free: 1-800-422-7873 · Fax: (727) 572-5859
E-mail: iaq@pureaircontrols.com · Web Site: www.pureaircontrols.com*

000011



Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992





EMLAP No. 102795

QUOTE:    PACS No. 06R-4949

CLIENT:   Healthy Homes of Louisiana, llc - Mr. Robert Parks

DATE:     November 21, 2006

SUBJ:     Mold Contaminant Drywall Removal, and Topical Treatment for Mobile Home Remediation,
          Various Locations, , ,

**Standard Mold Contaminant Drywall Removal, Air Handler, Ductwork Remediation and Topical Treatment Protocols:**

## Standard Remediation of Mold-Contaminated Drywall In Indoor Environments Protocols:

A.  Different levels of containment are necessary depending on the extent of the contamination problem. In all situations, the underlying cause of water accumulation must be rectified or the problem will recur. There must be a mechanism in place for ensuring an immediate response to these problems. Clean up should be conducted when the affected area is unoccupied. In all remediation, a routine follow-up inspection at 6-12 months or sooner if visible mold contamination or water damage recurs should be conducted. Emphasis should be on ensuring proper repair of the building infrastructure, so that water damage and moisture buildup does not recur.

Four different levels of abatement, as described below, are identified, based on the extent of mold contamination.

### Level I: Small Isolated Areas (10 SF or less)

*   Remediation can be conducted by regular building maintenance staff, if they have received training on the proper clean-up methods, personal protection and potential health hazards of indoor mold. This training can be performed as part of a program to comply with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200).

*   Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA Respiratory Protection Standard (29 CFR 1910.134), is suggested. Gloves and eye protection should be worn in accordance with OSHA Personal Protection Equipment Standards (29 CFR 1910.133 and 1910.138).

*   The remediation area should be unoccupied. Vacating people from spaces adjacent to the work area is not necessary but, is recommended in the presence of infants, persons recovering from recent surgery, immune suppressed individuals or individuals with chronic inflammatory lung diseases such as, asthma, hypersensitivity pneumonitis and severe allergies. Containment of the remediation area is not necessary. Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are suggested. Contaminated materials that cannot be cleaned should be removed from the building in a sealed plastic bag. There are no special requirements for the disposal of moldy materials.

*   The remediation area and adjacent areas used by remedial workers for egress should be cleaned with a damp cloth and/or mop and a detergent solution.

*   Areas should be left dry and visibly free from contamination and debris.

009012

Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992



ACCREDITED
LABORATORY
EMLAP No. 102795

### Level II: Mid-Sized Isolated Areas (10 - 30 SF)

- Remediation can be conducted by regular building maintenance staff, if they have received training on the proper clean-up methods, personal protection and potential health hazards of indoor mold. This training can be performed as part of a program to comply with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200).

- Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA Respiratory Protection Standard (29 CFR 1910.134), is suggested. Gloves and eye protection should be worn in accordance with OSHA Personal Protection Equipment Standard (29 CFR 1910.133 and 1910.138).

- The remediation area should be unoccupied. Vacating people from spaces adjacent to the work area is not necessary but is recommended in the presence of infants, persons having undergone recent surgery, immune suppressed individuals, or people with chronic inflammatory lung diseases such as, asthma, hypersensitivity pneumonitis and severe allergies.

- The remediation area should be covered with a plastic sheet and sealed with tape before remediation, to contain dust/debris.

- Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are suggested.

- Contaminated materials that cannot be cleaned should be removed from the building in sealed plastic bags. There are no special requirements for the disposal of moldy materials.

- The remediation area and areas used by remedial workers for egress should be HEPA vacuumed (a vacuum equipped with a High-Efficiency Particulate Air filter) and cleaned with a damp cloth and/or mop and a detergent solution.

    - Areas should be left dry and visibly free from contamination and debris.

### Level III: Large Isolated Areas (30 - 100 SF)

A health and safety professional with experience performing microbial investigations should be consulted prior to remediation activities to provide oversight for the project.

The following procedures at a minimum are suggested:

- Personnel trained in the handling of hazardous materials and equipped with respiratory protection, (e.g., N95 disposable respirator), in accordance with the OSHA Respiratory Protection Standard (29 CFR 1910.134), is suggested.

- Gloves and eye protection should be worn in accordance with OSHA Personal Protection Equipment Standards (29 CFR 1910.133 and 1910.138).

- The remediation area and areas directly adjacent should be covered with plastic sheets and sealed with tape before remediation, to contain dust/debris.

- Seal ventilation ducts/grills in the work area and areas directly adjacent with plastic sheeting.

**Building Remediation
Sciences, Inc.**

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992



EMLAP No. 102795

- The remediation area and areas directly adjacent should be unoccupied. Further vacating of people from spaces near the work area is suggested in the presence of infants, persons having undergone recent surgery, immune suppressed individuals, or people with chronic inflammatory lung diseases (e.g., asthma, hypersensitivity pneumonitis and severe allergies.)

- Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are suggested.

- Contaminated materials that cannot be cleaned should be removed from the building in sealed plastic bags. There are no special requirements for the disposal of moldy materials.

- The remediation area and surrounding areas should be HEPA vacuumed and cleaned with a damp cloth and/or mop and a detergent solution.

- Areas should be left dry and visibly free from contamination and debris.

  If abatement procedures are expected to generate dust (e.g., abrasive cleaning of contaminated surfaces, demolition of plaster walls) or the visible concentration of the mold is heavy (blanket coverage as opposed to patchy), then it is suggested that the remediation procedures for Level IV be followed.

### Level IV: Extensive Contamination (> 100 SF)

A health and safety professional with experience performing microbial investigations should be consulted prior to remediation activities to provide oversight for the project. The following procedures are recommended:

- Personnel trained in the handling of hazardous materials equipped with:

  1. Full-face respirators with high efficiency particulate air (HEPA) cartridges,

  2. Disposable protective clothing covering both head and shoes, and

  3. Gloves.

- Containment of the affected area:

  1. Complete isolation of work area from occupied spaces using plastic sheeting sealed with duct tape (including ventilation ducts/grills, fixtures, and any other openings);

  2. The use of an exhaust fan with a HEPA filter to generate negative pressurization; and

  3. Airlocks and decontamination chamber.

Vacating people from spaces adjacent to the work area is not necessary but is suggested in the presence of infants, persons having undergone recent surgery, immune suppressed individuals, or people with chronic inflammatory lung diseases such as, asthma, hypersensitivity pneumonitis and severe allergies.

Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992



EMLAP No. 102795

Contaminated materials that cannot be cleaned should be removed from the building in sealed plastic bags. The outside of the bags should be cleaned with a damp cloth and a detergent solution or HEPA vacuumed in the decontamination chamber prior to their transport to uncontaminated areas of the building. There are no special requirements for the disposal of moldy materials.

The contained area and decontamination chamber should be HEPA vacuumed and cleaned with a damp cloth and/or mop with a detergent solution and be visibly clean prior to the removal of isolation barriers.

Air monitoring should be conducted prior to occupancy to determine if the area is safe to reoccupy.

**Topical Treatment:**

A.  Set up Negative Air Machine (NAM) HEPA fitted of 99.97% of 0.3 microns rated at 2,000 CFM.
B.  Visqueen mold affected walls and duct tape.
C.  Visqueen floors and duct tape at edge of carpeted area.
D.  *Remove mold-effected drywall.  Double bag, goose neck and dispose.
E.  Hand HEPA vacuum mold affected wall spaces.
F.  Treat wall areas with Microbshield, a bound antimicrobial solution.
G.  Treat carpeted areas with Microbshield, a bound antimicrobial solution.

003015

Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992



EMLAP No. 102795

## Project Quote: PACS No. 06R-4949

| CLIENT: | Healthy Homes of Louisiana, llc |
| IAQ REMEDIATION PROJECT: | Mobile Home Remediation, Various Locations |

| | Location | Size | Type of IAQ Remediation | Total Unit Rate |
|---|---|---|---|---|
| A) | Various Locations within Louisiana | Singlewide Mobile | • Removal of furnishing and personal belongings from mobile home to on-site storage container<br>• Removal of mold contaminated gypsum board and carpets.<br>• Complete environmental cleaning of interior surfaces.<br>• Provide air scrubbers | $9,785 |
| B) | Various Locations within Louisiana | Doublewide Mobile | • Removal of furnishing and personal belongings from mobile home to on-site storage container<br>• Removal of mold contaminated gypsum board and carpets.<br>• Complete environmental cleaning of interior surfaces.<br>• Provide air scrubbers | $12,375 |
| | Total Cost | | | TBD |

---

Healthy Homes of Louisiana, llc, Client Acceptance

Date

---

Kevin W. McKee
Director of Building Remediation Sciences
U.S. Energy Services,; Pure Air Control Services

Date

11/21/06   F:\Sales\Word\ACT Documents\RX Proposals\2006\pacr-4949.DOC

003916



Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992





EMLAP No. 102795

## GENERAL TERMS, CONDITIONS AND LIMITATIONS:

1. Field Samples:
   This contract proposal is limited to the number of field samples and types of tests described above. Should additional field samples or tests be required, due observations in the field, or within the discretion of PACS, you will be notified of such additional work, and if acceptable, will be charged at a per unit rate. If you declir additional recommended testing, you understand that the accuracy of the final analysis will be limited accordingly.

2. Testing Schedule:
   To promote the greatest level of confidence in the report that will be provided hereunder, PACS shall determine the schedule for collection of Field Samples, attemptir to reflect typical ambient conditions found at the premises. Healthy Homes of Louisiana, llc shall provide access to all areas of the premises, and make suitab arrangements for access into areas designated by Healthy Homes of Louisiana, llc as restricted access. Whenever possible, collection of field samples will b undertaken at mutually convenient times.

3. Site Conditions:
   PACS does not specifically assume the responsibility for evaluating the HVAC system for deficiencies unless specifically described within the Scope of Work portion of this proposed contract.

4. Governing Specifications:
   The collection of field samples, analysis of the same, and reports of findings undertaken for will be performed in accordance with PACS specifications as outlined herei ("PACS Specifications"). PACS Specifications shall govern and control the scope and the standard of the work to be performed, unless otherwise specifically stated i this proposed contract.

5. Property:
   PACS shall not be held responsible for any damages incurred or sustained by client which are not directly caused by the negligence of PACS, including, but not limite to, actions for damages brought against client by an employee, agent contractor or subcontractor of Client. PACS shall not be held responsible for the condition of, c damage to, the premises or property of Client caused by violations of any applicable building, housing, electrical or mechanical codes, either existing or created by client its employees, agents, contractors or subcontractors. Client shall indemnify and hold PACS harmless for any damages or liability to PACS related to said conditions o events, and shall reimburse PACS for all costs and attorney fees expended by PACS in defending or settling such claims or enforcing the provisions of this paragraph.

6. Time For Performance:
   PACS time for completion of performance under this proposed contract shall be subject to reasonable adjustments in the event of delay caused by any of the following third parties, including client; delays occasioned by the owner and/or tenant of the premises; governmental entities; weather; acts of God; and war or insurrection.

7. Site Preparation:
   Client shall take all necessary precautions and measures to ensure that PACS is provided safe and secure job conditions as established and required by governmenta regulations. Compliance with all regulatory safety conditions by Healthy Homes of Louisiana, llc is a condition precedent to performance by PACS of the work described in this proposed contract. In the absence of specific laws or regulations, client shall provide work conditions free from latent or concealed hazards, which may cause injury to persons or property performing with, or at the direction of, PACS, and client shall secure the work area to prevent theft of materials and supplies.

8. Early Termination:
   In the event Healthy Homes of Louisiana, llc terminates this agreement, for any reason, after PACS takes action to commence performance hereunder, but prior to completion of the Diagnostic Report, Healthy Homes of Louisiana, llc shall be responsible to PACS for all expenses incurred, and labor performed, under this agreement including the costs of enforcement of this agreement, and payment hereunder, as provided for in paragraph 11.

9. Travel Time and Expenses:
   Travel expenses are normally billed as out-of pocket expenses. The only exceptions involve per diem rates agreed upon for meals and lodging, or when government regulations necessitate such an agreement. Lodging, meals and incidental expenses will be kept reasonable and will relate to regional rates. The client will be billed the hourly rates previously described (See Professional IAQ Consulting Fee Schedule). Travel fees may reflect first class air ticket expenses. *Note: Governmenta Accounts-All automobile mileage expenses, per diem and lodging shall be reimbursed in accordance with Florida Statute Chapter 112.061.*

10. Payment:
    Payment for services rendered are payable Net 15 from invoice date unless otherwise stipulated per authorized Contract terms and conditions. A finance charge of 1.5% per month is assessed on all amounts if payment is not received within Contract terms. Pure Air Control Services reserves the right to invoice for 1.) Field Work - Sample Collection upon completion of field work; and 2.) Lab Support Services, Report Writing - Consultation Services upon completion of services.

11. Attorney Fees/Enforcement:
    Should PACS, its successors or assigns, have to retain the services of an attorney for the enforcement of any term, condition or stipulation of this agreement, the prevailing party shall be entitled to award of attorney fees and taxable costs incurred, including costs incurred in any bankruptcy or appellate proceedings.

In the event of a dispute under the terms of this agreement, or the services provided, the parties hereto agree that venue for legal action instituted shall be Pinellas County, Florida, (where payment is to be made). All parties agree to subject themselves to the jurisdiction of the courts in Pinellas County, Florida and waive any objection to venue or jurisdiction.

In executing this contract proposal, Healthy Homes of Louisiana, llc acknowledges that PACS interpretations are based upon the results of sample analyses, taken from specific locations and at specific points in time. Other conditions elsewhere in the subject premises may differ from the areas tested, and such conditions are unknown, which conditions may change over time. PACS will not be responsible for the interpretation or use of this data by others developed from this diagnostic report.

_____

Healthy Homes of Louisiana, llc, Client Acceptance          Date

_____

Kevin W. McKee          Date
Director of Building Remediation Sciences
U.S. Energy Services/Pure Air Control Services

11/21/06  F:\Sales\Word\ACT Documents\RX Proposals\2006\pacr-4949.DOC

000917

Healthy Homes of Louisiana, llc. / Parks Mobile Air, llc.
PO Drawer 3127
West Monroe, La 71294

Ph. 318-397-1974          Fax  318-397-2123
Bobby@ParksMobileAir.com

www.ParksMobileAir.com

**Robert Parks**
**President**

Graduate:  Calhoun High School, 1981 Class Valedictorian
          Calhoun, Louisiana
Employment:
          Parks Air, Heat, And Electrical -Installer/Service Tech.  1981-1984
          Holiday Manufactured Housing - Operations Manager     1984-1987
          Parks Air and Heat, Inc. / Parks Mobile Air, LLC        1987- 2005
                    Owner and President
          Healthy Homes of Louisiana, llc - Managing Member 2003 - Present

Short Biography:

Robert Parks has over 25 years experience in Manufactured Housing, Modular Homes, Residential Site Built Homes and Light Commercial. Specialties include Air Conditioning, Heating, Ventilation, Condensation Control and Building Failure Analysis with an excess of 500 buildings analyzed and documented since 1998.  Cases have ranged from product liability to wrongful death with experience in litigation support, deposition, discovery / production, and testimony.

Consultant for:

The Louisiana Governor Office :
          Louisiana State Administrative Agency (SAA) - Administrative Consultant 2003- Present
          Louisiana Manufactured Housing Commission  - Technical Consultant 2003-2005
          National Consultant for Cavalier Homes Inc and subsidiaries, Addison, Alabama.2003- Present
          National Consultant for Liberty Homes and subsidiaries, Goshen, Indiana. 2003-Present
                    Also (non-contracted) consultant for Southern Energy Homes and subsidiaries
2000-2004, Lexington Homes 2005 - Present, Skyline Homes 2004 -Present,  Karsten Homes
2005, Horton Homes 2004 - Present.

          Technical Advisor,  Manufactured Housing Institute an The Mfg. Housing Research
Alliance- (Project) **Alternatives for Minimizing Moisture Problems in Homes Located in
Hot, Humid Climates** 2001-2004

1

Committee Volunteer, Mfg. Housing Research Alliance- (Project) Energy Star Cooling Equipment Sizing Guidelines 2004-2005

**Seminars and Presentations Presented:**

1999 Council of State Administrative Agencies, (Regional Conference) Myrtle Beach, SC (Mfg. Housing Ventilation Systems - Field Study)

1999 Mfg. Housing Air Distribution Systems - Field Study

2000 Council of State Administrative Agencies, Featured Speaker(Regional Conference) Perdido Beach, AL (Indoor Air vs Outdoor Air -Field Study)

2000 La State Fire Marshall -Baton Rouge, La (Building Inspection in Hot Humid Climates, Training Class)

2001 La. Mfg. Housing Association, Annual Conference - Baton Rouge, La. Featured Speaker, (Indoor Air vs Outdoor Air -Field Study)

2001 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)

2001 National Manufactured Housing Congress - Las Vegas NV (Building Failure in Hot Humid Climate, Workshop Speaker)

2002 La. Mfg. Housing Commission - Inspector Training, Baton Rouge, La.

2002 La. Mfg. Housing Association - Continuing Education Class for Home Installers Alexandria, La.

2003 La. Mfg. Housing Association - Continuing Education Class for Home Installers Baton Rouge, La.

2003 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)

2003 Cavalier Homes, Addison AL (Building Practices for Hot Humid Climates)

2003 Buccaneer/Home Repair Service, Hamilton Al. (Building Practices for Hot Humid Climates)

2003 Waverlee Homes, Hamilton, Al. (Building Practices for Hot Humid Climates)

2003 La. Mfg. Housing Commission - Inspector Training, Baton Rouge, La.

2003 Cavalier Homes, Millen, Ga. (Building Practices for Hot Humid Climates)

2004 Cavalier Homes, Nashville, N.C. (Building Practices for Hot Humid Climates)

2004 Cavalier Homes, Ft. Worth, Texas (Building Practices for Hot Humid Climates)

2004 La. Mfg. Housing Association - Continuing Education Class for Home Installers Baton Rouge, La. (Building Practices for Hot Humid Climates)

2004 La. Mfg. Housing Association - Continuing Education Class for Home Installers Alexandria, La. (Simplifying Home Installation Manuals )

2004 La. Mfg. Housing Association - Continuing Education Class for Retail Dealers Baton Rouge, La. and Alexandria, La. (Building Practices for Hot Humid Climates)

## Industry Service, Completed Courses and License Held

**Manufactured Housing:**

Louisiana Manufactured Housing Association - State Board of Directors 1999-2004

Northeast Chapter -La Mfg. Housing -Chapter President 1999-2004

Appointment, National Fire Protection Association (NFPA)
              Mechanical for Manufactured Housing Committee  2000-2002

## HVAC:

Louisiana State Mechanical License 1994-Present
Louisiana State Electrical License 1994-Present
Refrigeration Service Engineers Society  Type 1, Type 2, Type 3, Universal
Evcon Mfg. Housing Furnace Certification Course 1994
Manufactured Housing Installation Course 1995
Evcon Mfg. Housing Special Training Course/Application, Installation ,and Service 1996
Mechanical Application of Refrigeration  1997
American Standard  -A.S.S.E.T. Program   1998
American Standard  - 16 SEER H/P & A/C Certification   1998
Evcon Furnaces and Heat Pump Application Certification    1998
Nordyne Mfg. Housing Furnace Seminar 1998
Mfg. Housing Installer Certification Course 1998
Nordyne  -Mfg. Housing Seminar 1999
Air Conditioning Contractors of America (ACCA) -Fundamental of Load Calculation and
                    System Design.  Certified in <u>Manual J</u> and <u>Manual D</u>
Aces/Coleman/Evcon Dealer Council          1996-98

## Building Science:

Home Energy Rating - *Kansas Building Science Institute, Manhattan KS*
Infrared Thermography (Level 1) - *Snell Infrared , Phoenix Ar.*
Member Energy & Environmental Building Association (EEBA)
Co-operative project work - *Florida Solar Energy Center, Orlando, Florida*
Co-operative project work - *Mfg. Housing Research Alliance,*
Building Science: Understanding and Controlling Moisture in Buildings;
       *American Industrial Hygiene Association (AIHA) ,San Francisco, Ca. 02-2005*
Member of American Society of Heating, Refrigeration, A/C and Electrical (ASHRAE)
Listed, Building Science Consultant for the American Industrial Hygiene Association
Associate Member - Northeast La, Louisiana, and National Home Builders Association

## Indoor Air Quality:

Environmental Inspector Certification - Certified by The Environmental Assessment
                    Association Certification number # 74080
Member Environmental Assessment Association 2002 -Present
Member American Industrial Hygiene Association (AIHA) 2003-Present

3

Member Indoor Environmental Standards Organization(IESO) - 2003 - Present

continued;

Indoor Air Quality: continued

Louisiana's Unfair Trade Practices and Consumer Protection Law -
                    (Mold Remediation/Consultant Ethics and Standards) - 2004
Medical University of South Carolina - College Of Health Professions Program in
                    Environmental Health Sciences
            Certified At The Medical University of South Carolina;
A) Indoor Air Quality Investigations - Certification number # IAQI27120-21801
B) Microbial Remediation: Design and Abatement - Certification number # MR27120-
                                                                        22273

Louisiana State Mold Remediation Contractor - Licences Number #250061

Civic Involvement:
        Christ Church - Executive Board of Directors    1995-2001
        Graduate   - Leadership Ouachita    1997
        Leadership Council  - Leadership Ouachita 1998
        West Monroe Chamber of Commerce - 2000- 2004
                    Adopt-A-School Task Force
                    Economic Development Committee
                    Chairman  - Work Force Development Task Force
        Boys and Girls Club of West Monroe  - Board of Directors 1999-Present
                    Nominated for "New Board Member of Year" at National Convention 1999
                    "Board Member of Year" - 2000
                    Achievement award for "Meritorious Service"  - 2001
                    Board President-Elect  - 2001-03

4

Robert Parks
111 Green Rd.
West Monroe, La 71291

5

# Healthy Homes of Louisiana, llc
## PO Drawer 3127
### West Monroe, La. 71294

Ph. 318-355-1918            Fax 318-397-2123            Bobby@ParksMobileAir.com

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Lance Gould
218 Commerce Street
Montgomery, AL 36104

Re: Previous testimony and depositions

The following represents a listing of cases in which testimony or depositions were given within the last four years:

DEPOSITIONS;

1)    Joseph and Shelly Miller Vs. Belmont Homes, et al

2)    Courtney Tassin Vs Cappaert Homes, Inc

3)    Benjamin Gotte and Any Gotta Vs Bellcrest Homes, Inc., et al

4)    Kelly G. Aucoin, et ux Vs. Southern Quality homes, LLC and Dynasty Homes, Inc.

5)    Herbert Zenon III Vs Nationwide Housing Systems and
                        American Homestar of Lancaster, et al

6)    Cathy Chauvin Vs Fleetwood Homes, et al

1

# EXHIBIT "C"

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE MIDDLE DISTRICT OF ALABAMA

 3                NORTHERN DIVISION
                                        ORIGINAL
 4
          HAROLD KELLY MURPHY,
 5
              Plaintiff,
 6                                  CASE NUMBER
              vs.                   2:06-cv-618-MEF
 7
          SOUTHERN ENERGY HOMES,
 8        INC., et al.,

 9            Defendants.

10     *     *     *     *     *     *     *     *

11

12

13        DEPOSITION OF BOBBY PARKS, taken

14    pursuant to stipulation and agreement

15    before Barbara A. Howell, Certified

16    Court Reporter and Commissioner for the

17    State of Alabama at Large, ACCR No. 123,

18    in the Law Offices of Beasley, Allen,

19    Crow, Methvin, Portis & Miles, P.C., 272

20    Commerce Street, Montgomery, Alabama, on

21    Tuesday, November 27, 2007, commencing

22    at approximately 11:00 a.m.

23
```

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 2

```
 1              A P P E A R A N C E S

 2

         FOR THE PLAINTIFF:
 3
         Mr. C. Lance Gould
 4       Beasley, Allen, Crow, Methvin,
         Portis & Miles, P.C.
 5       Attorneys at Law
         272 Commerce Street
 6       Montgomery, Alabama   36104

 7
         FOR THE DEFENDANTS:
 8
         Mr. W. Scott Simpson
 9       Mr. Gregory S. Ritchey
         RITCHEY & SIMPSON, P.C.
10       Attorneys at Law
         3288 Morgan Drive
11       Suite 100
         Birmingham, Alabama   35216
12

13

14

15

16

17

18

19

20

21

22

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

1                    I N D E X

2
       EXAMINATION BY:                          PAGE
3
       MR.  SIMPSON......................          5
4

5      EXHIBITS                                 PAGE

6      DEFENDANTS'  EXHIBIT  #1...........          5

7      DEFENDANTS'  EXHIBIT  #2...........          6

8      DEFENDANTS'  EXHIBIT  #3...........          6

9      DEFENDANTS'  EXHIBIT  #4...........          7

10     DEFENDANTS'  EXHIBIT  #5...........          8

11     DEFENDANTS'  EXHIBIT  #6...........        149

12

13

14

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 4

```
 1           S T I P U L A T I O N S

 2          It is hereby stipulated and agreed

 3     by and between counsel representing the

 4     parties that the deposition of BOBBY

 5     PARKS is taken pursuant to the Federal

 6     Rules of Civil Procedure and that said

 7     deposition may be taken before

 8     Barbara A. Howell, Court Reporter and

 9     Commissioner for the State of Alabama at

10     Large, without the formality of a

11     commission; that objections to questions

12     other than objections as to the form of

13     the questions need not be made at this

14     time but may be reserved for a ruling at

15     such time as the deposition may be

16     offered in evidence or used for any

17     other purpose as provided for by the

18     Federal Rules of Civil Procedure.

19          It is further stipulated and agreed

20     by and between counsel representing the

21     parties in this case that said

22     deposition may be introduced at the

23     trial of this case or used in any manner
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

1    by either party hereto provided for by

2    the Federal Rules of Civil Procedure.

3

4       *     *     *     *     *     *     *     *

5

6                    BOBBY PARKS

7       The witness, having first been duly

8    sworn or affirmed to speak the truth,

9    the whole truth, and nothing but the

10        truth, testified as follows:

11              THE REPORTER:   Usual

12                 stipulations?

13           MR. SIMPSON:   Sure.

14              EXAMINATION

15    BY MR. SIMPSON:

16    Q.   Almost good afternoon.  Good morning.

17    A.   Yes, sir.

18    Q.   We've met before.  Let me start by

19         marking some exhibits and we'll just

20         jump right into this.  Let me mark

21         Exhibit #1.

22                 (Defendants' Exhibit #1 was

23                  marked for identification.)

Page 12

1   A.   Toxigenic.  Well, no, sir.  I can't

2        accurately define that in the manner

3        you're asking.

4   Q.   Can you tell me what a phylloplane mold

5        is, P-H-Y-L-L-O-P-L-A-N-E?

6   A.   No, sir.

7   Q.   Can you tell me what xerophilic fungi

8        are, X-E-R-O-P-H-I-L-I-C?

9   A.   No, sir.

10  Q.   Can you tell me the difference between

11       a primary, secondary, and tertiary

12       colonizer of fungi?

13  A.   No, sir.  I believe that to be

14       information that a mycologist would

15       know.  But as I've already stated

16       previously, my training is limited to

17       the acquisition of sampling and the

18       interpretation of that data.

19  Q.   Do you know what equilibrium relative

20       humidity is, or ERH?

21  A.   Yes, I do.

22  Q.   What is that?

23  A.   That's water activity between materials

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

| | | |
|---|---|---|
| 1 | | in the atmosphere that it's exposed to. |
| 2 | Q. | Do you know what water activity is, |
| 3 | | which is usually identified as A with a |
| 4 | | subscript W after it? |
| 5 | A. | Yes, sir.  That's -- that's the amount |
| 6 | | of water movement between that material |
| 7 | | as it's exposed to surroundings. |
| 8 | Q. | Do you know what the minimum |
| 9 | | requirement of Aw most fungi require? |
| 10 | A. | No, sir, I don't. |
| 11 | Q. | Do you have any knowledge about what |
| 12 | | kinds of molds grow in what kinds of |
| 13 | | ERH conditions? |
| 14 | A. | No, sir. |
| 15 | Q. | Do you know what a Condition 1, |
| 16 | | Condition 2, or Condition 3 environment |
| 17 | | in a home is relative to mold |
| 18 | | infiltration or contamination? |
| 19 | A. | No, sir.  I'm not familiar with that |
| 20 | | terminology. |
| 21 | | (Brief pause) |
| 22 | Q. | Do you know what primary colonizers |
| 23 | | require in terms of an Aw level? |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 19

1          of mold?

2     A.   I did not do any invasive testing,

3          correct, for the purpose of water

4          leakage.

5     Q.   And is it fair to say you didn't do any

6          invasive testing to rule out water

7          damage from roof leaks as a potential

8          cause of mold?

9     A.   That is correct, no invasive testing.

10    Q.   Is it fair to say that you're not a

11         microbiologist?

12    A.   That is correct.

13    Q.   You're not a mycologist?

14    A.   No, sir.

15    Q.   Do you know the difference between a

16         microbiologist and a mycologist?

17    A.   No, sir.

18    Q.   Do you know what kind of training or

19         education is required to become either

20         a microbiologist or a mycologist?

21    A.   No, sir.

22    Q.   Are you a public health professional?

23    A.   Never been identified as that, no, sir.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 20

| | | |
|---|---|---|
| 1 | Q. | Are you a biologist? |
| 2 | A. | No, sir. |
| 3 | Q. | Are you a medical technologist? |
| 4 | A. | No, sir. |
| 5 | Q. | Do you have any credentials in |
| 6 | | industrial hygiene? |
| 7 | A. | No, sir. |
| 8 | Q. | How about environmental sciences? |
| 9 | A. | Can you be more specific what -- |
| 10 | Q. | Are you an environmental scientist? |
| 11 | A. | No, sir. |
| 12 | Q. | All right. Do you have any experience, |
| 13 | | training, or education in toxicology? |
| 14 | A. | No, sir. |
| 15 | Q. | You're not an engineer? |
| 16 | A. | No, sir. |
| 17 | Q. | Your building-science background |
| 18 | | relates to HVAC training and |
| 19 | | experience; correct? |
| 20 | A. | Partially. In addition to a lot of |
| 21 | | other stuff having to do with moisture |
| 22 | | migration, building sciences typically |
| 23 | | deals with durability, health and |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

```
 1        comfort, and energy efficiency.

 2   Q.   Do you tell people you're a building

 3        scientist?

 4   A.   I've been offered as a building-science

 5        expert and I've identified myself as a

 6        building-science expert.  I don't

 7        really -- I don't know the definition

 8        of what building scientist would be.  I

 9        assume that to be more along the lines

10        of Joseph Lstiburek or John Straube.

11   Q.   Do you have any advanced training in

12        building science?

13   A.   I've had a lot of training as well

14        as -- the majority of my training has

15        come from work experience.

16   Q.   Well, let me ask it this way.  Do you

17        have any college coursework in building

18        science?

19   A.   I don't hold any kind of degrees, no,

20        sir.

21   Q.   Any college coursework?

22   A.   No, sir.

23   Q.   I know you went through this with Greg
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1          a few minutes ago.   Forgive me for

2          hitting it up again.   The credentials

3          that serve as the basis for your expert

4          knowledge in this case, one would be

5          thermography, correct, thermographic

6          imaging?

7    A.    It's utilized as a tool in my

8          investigations; that's correct.

9    Q.    And how many days' course did you take

10         in thermography?

11   A.    Four, four and a half days.

12   Q.    Mold remediation, you've done some

13         coursework in that?

14   A.    Correct.

15   Q.    And how many days of training have you

16         received for that?

17   A.    I don't recall specifically.   I want to

18         say at least possibly three weeks, two

19         to three weeks, maybe more.

20   Q.    All right.   What other qualifications

21         do you possess that lend yourself to

22         your expertise for purposes of this

23         case?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 24

```
 1        very big portion of it.  But, again, I

 2        go back to the majority is based on my

 3        experience with this issue in the

 4        industry.

 5   Q.   Well, I understand that.  I'm just

 6        trying to figure out of everything else

 7        that doesn't come from just experience.

 8        I'm talking about formal training,

 9        education.  I'm just trying to get my

10        arms around that.  How long was your

11        coursework to become an HVAC

12        contractor?

13   A.   Shoot.  I mean, I've been doing that

14        for 25 years or longer.  The actual

15        coursework --

16   Q.   Was it a year, two years, six months?

17   A.   I mean, I've had a lot of periodic

18        training through the years.  And, now,

19        as far as actual --

20   Q.   For the license, what did --

21   A.   Test to take license, I think I only

22        went through a few days, but I was able

23        to pass the test on the first -- first
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 29

1          there is.  If you hire yourself out as

2          a licensed mold remediator, then you

3          are supposed to hold their contractors

4          license.

5     Q.   How many jobs have you served as a

6          licensed mold remediator for where

7          you've actually remediated a building?

8     A.   None.  The work that I do and the work

9          that I've -- as I've said before, I

10         don't actually tear out the materials

11         and do that type of work.  My function

12         in that is doing the testing, the --

13         writing the protocol of how to do it,

14         and then the clearance testing

15         afterwards.

16    Q.   Do you know what normal building flora

17         is, F-L-O-R-A?

18    A.   Vaguely.  But I'm not --

19    Q.   Can you tell me what you know about it?

20    A.   I'm sorry.  Like I said, it's vaguely,

21         but I can't recall at this time.

22    Q.   What is normal fungal ecology?

23    A.   Normal fungal ecology?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 30

1    Q.   Yes, sir.

2    A.   I don't know that I can specifically

3         define that for you here.

4    Q.   What is the goal of mold remediation?

5    A.   The goal of mold remediation is to

6         remove -- first off, identify and

7         eliminate the source of moisture.

8         Secondly, it is to remove any affected

9         materials and items without -- while

10        maintaining containment without -- I

11        don't want to say infecting, but

12        without contaminating or causing

13        cross-contamination, exposing other

14        areas that have not experienced

15        problems.  The clearance testing is to

16        ensure that the levels are below what

17        is considered to be or what was found

18        to be normal levels in surrounding

19        areas that are believed -- or that have

20        not experienced problems.

21   Q.   What is gypsum made of?

22   A.   I don't know that I could give you the

23        total contents.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

| | | |
|---|---|---|
| 1 | A. | I don't understand what you mean by |
| 2 | | that question. |
| 3 | Q. | Well, water activity is a ratio of two |
| 4 | | things.  Do you know what that ratio of |
| 5 | | those two things are? |
| 6 | A. | Right.  The relative humidity to the |
| 7 | | surrounding material and the absorption |
| 8 | | rate of the material. |
| 9 | Q. | You sure about that? |
| 10 | A. | Well, it's an equilibrium process.  So |
| 11 | | if the material -- I mean, I understand |
| 12 | | the process.  I don't know if I'm |
| 13 | | defining it or giving you the |
| 14 | | parameters that you're looking for. |
| 15 | Q. | You're not comfortable with doing the |
| 16 | | math. |
| 17 | A. | No, sir. |
| 18 | Q. | And I think we talked about this in the |
| 19 | | last trial.  You're not holding |
| 20 | | yourself out to be a, quote/unquote, |
| 21 | | mold expert? |
| 22 | A. | No, sir, not as you define mold expert. |
| 23 | Q. | And I believe you testified previously |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 35

1          that you don't think you could be

2          qualified in federal court as a mold

3          expert?

4     A.   I agree.  That's more of a mycologist,

5          someone like that.  My training is in

6          collecting the samples and interpreting

7          the data.

8     Q.   And what coursework have you taken to

9          interpret data?

10    A.   The same -- same ones that -- that we

11         spoke of earlier.  Specifically through

12         the Medical University of South

13         Carolina.  And I guess that would be

14         the coursework as well as maybe some --

15         you know, it's -- it's highlighted in

16         some building-science applications as

17         well.

18    Q.   Be specific, if you can.  Tell the

19         Court what coursework, how many days

20         you took to create an expertise in data

21         interpretation.

22    A.   The actual coursework, not the

23         experience, work experience?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 36

1    Q.    Yes, sir.

2    A.    The actual coursework, the -- the

3          course at the American Industrial

4          Hygienist Association in San Francisco,

5          that was a very large focus of that.

6          The two courses at --

7    Q.    How many days?

8    A.    That was a week-long course, I believe,

9          four, four and a half days.

10   Q.    Some of that course had to do with

11         mold?

12   A.    Yes, sir.  Very large portion of it.

13         The building science --¬ I mean, the --

14         I apologize -- Medical University of

15         South Carolina, that was the crux of

16         both of those courses.

17   Q.    And what was the length of the other

18         course at South Carolina?

19   A.    I believe they were -- I believe they

20         were four-day courses.  If I remember

21         correctly -- I mean, it's been some

22         time ago.  But it seems like they were

23         four-day courses and we tested on a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1          half a day, out by noon to catch

2          flights and what have you, if I recall

3          correctly.

4     Q.   Fair to say that the entire number of

5          days of coursework you've taken for

6          data interpretation is fifteen days or

7          less?

8     A.   That I can recall at this point in

9          time, yes, sir.

10    Q.   I mean, you wouldn't have any reason

11         not to recall it?  I've got your resumé

12         here if you need to look at it.  Is

13         there any other coursework?

14    A.   Well, as I said in some of the other

15         coursework, that there were sections

16         that were highlighted in that.  But

17         from actual coursework, yes, I would

18         say that's pretty close -- a pretty

19         close statement.

20    Q.   Can you tell me what material

21         degradation means?

22    A.   Material degradation, decomposition of

23         the material that takes it from its

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 99

1          this home?

2     A.   There are many designs out there that

3          I've learned are DAPIA-approved that

4          would -- that I believe would function

5          properly.

6     Q.   You're not an engineer.

7     A.   Not an engineer.

8     Q.   You're not a design professional.

9     A.   No.  I've not been utilized as a

10         design -- I've been utilized to offer

11         opinions and test these designs, but

12         I'm not an engineer or architect.

13    Q.   You're not qualified under the HUD code

14         to draw and stamp prints for walls.

15    A.   No, sir.

16    Q.   Never had any building-science classes

17         on how to construct walls under the HUD

18         code?

19    A.   I don't know that there's a

20         building-science class offered that

21         specifically addresses the HUD code,

22         that I'm aware of.

23    Q.   Is that a no?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 100

1    A.    No, because I'm not aware of any that

2          are available.

3    Q.    But you've never gone to a day of

4          college in building science.

5    A.    No, sir.

6    Q.    No engineering, no architectural

7          experience.

8    A.    Again, no, sir.

9    Q.    So let me see if I can ask the question

10         and get just an answer other than

11         everything else in the world.  Do you

12         have a specific design in mind for this

13         home that Southern Energy should have

14         utilized as an alternative feasible

15         design that would have been better than

16         what they used?

17                    MR. GOULD:  Are you limiting

18                        it to one?

19                    MR. SIMPSON:  I want him to

20                        identify which one and

21                        why.

22    Q.    Just telling me all of them that work,

23          that's not an answer.  Just tell me

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 106

1        going to be here all day.  (B)(2).

2   A.  You're wanting a definitive answer;

3       right?

4   Q.  I just want to know if you've seen a

5       (b)(2) wall.  And that to me seems like

6       a yes or no question.  Have you ever

7       seen a (b)(2) wall?  Yes or no.

8   A.  Not that I can definitively identify as

9       a (b)(2).  I may have seen (b)(2)'s

10      and -- and --

11  Q.  So you don't know.

12  A.  -- don't recognize it.

13  Q.  You don't know.

14  A.  No, I don't know.

15  Q.  Have you ever seen a (b)(3) wall with

16      vinyl siding and blackboard?

17  A.  I've seen the DAPIA approval for it.

18  Q.  Have you ever seen one in the field?

19  A.  Again, I've not examined those DAPIA

20      documents to see how it was -- yes, I

21      have seen walls that had vinyl siding

22      exterior sheathing, whether it be

23      plywood, OSB, or blackboard, and the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 127

```
 1         meters.
 2    A.   It depends.  According, again, to
 3         Tramex, it depends on what your intent
 4         and purpose is.  If you're trying to
 5         get quantitative measurement and using
 6         it specifically for wood, possibly yes.
 7         But if you're making relative readings,
 8         then --
 9    Q.   Well, that's Tramex.  But what about
10         Professional?
11    A.   I've not had anything from them to say.
12    Q.   So you don't know whether they
13         recommend calibration or not.
14    A.   No.  I'm simply, as I stated over and
15         over, making comparative measurements
16         to the inside, to the outside, based on
17         my -- I've used this meter for years.
18         And based on my experience, it's my
19         opinion that those walls were extremely
20         moist.
21    Q.   You've used the meter for years and
22         you've never calibrated it.
23    A.   This one, that's correct.
```

Page 128

1    Q.    Now, on page 2 of the report, you say

2          the moisture has caused structural

3          deterioration.

4    A.    In my opinion, yes, sir, it has.

5    Q.    Where in your report do you provide

6          evidence of that?

7    A.    I would say that the mold sampling, the

8          fact that the -- we have mold present.

9    Q.    Has affected the structure?

10   A.    The gypsum board structure, in my

11         opinion, yes, sir.

12   Q.    Can you show me any picture of any

13         wallboard anywhere where the back paper

14         of the wallboard has been deteriorated

15         and degraded?

16   A.    In my opinion --

17   Q.    Specifically.  Can you show me where

18         exactly?

19   A.    Okay.  Based on the testing showing

20         there was mold growth, Figure 1,

21         Figure 2 --

22   Q.    Well, that's indication of mold growth,

23         not that the structure's been

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 129

1       compromised; right?

2   A.  In my opinion, if we've got moisture

3       and mold growth, then we've compromised

4       the structure of that gypsum board.

5   Q.  At any level, any amount of mold?

6   A.  Yes.  If we've got mold growth -- if

7       we've got moisture and mold growth,

8       then yes.  I don't think that that --

9   Q.  Even a light dusting is going to

10      compromise the structure?

11  A.  You're kind of exaggerating.  The -- my

12      statement is that if we have moisture

13      accumulation and mold growth, that is

14      compromising the materials, yes, sir.

15      That's -- that's eating away at the

16      materials.  Now, I'm not saying that

17      it's falling off the wall right now.

18      But I'm saying that it's not proper and

19      that is structurally compromising the

20      materials.  They're not -- those

21      materials are not intended to

22      accumulate moisture and grow mold.  And

23      it will eventually lead to the complete

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 131

1    compare the (b)(1) to the (b)(2) wall;

2    correct?

3    A.   Correct.

4    Q.   Is there anywhere in either of your two

5         reports or in your field notes where

6         you actually make an opinion that

7         another design -- (b)(2), (b)(3),

8         waiver, AC, whatever -- is a better

9         alternative feasible design than

10        (b)(1)?  Do you say that anywhere in

11        your reports?

12   A.   I think I depict that the (b)(2), in --

13        in theory and intent, is a much more

14        appropriate wall structure than the

15        (b)(1).

16   Q.   And we've already established you don't

17        know that you've ever seen one of

18        these.

19   A.   I can't say that I have or haven't.

20   Q.   Now, you would agree with me if you

21        found moisture readings of 25 to 40

22        percent, you can't say what the

23        absolute percentage of moisture in

Page 132

```
 1         those walls is because you didn't cut

 2         and bake the sample.

 3    A.   That is correct.

 4    Q.   And cutting and baking is the only

 5         authoritative way to know for sure.

 6    A.   That's correct.

 7    Q.   Now, you did thermographic imaging in

 8         this home.

 9    A.   Correct.

10    Q.   And do you agree with me that -- have

11         you looked at the standard that we

12         talked about from the last trial?

13    A.   No, I have not.

14    Q.   So you don't know sitting here today

15         whether your thermographic protocols

16         comport with or violate the standard

17         for imaging in homes such as this?

18    A.   Well, that particular standard you're

19         referencing is -- is describing test

20         methods for insulation values in -- in

21         (unintelligible).  And that's not what

22         my intent was in this home.  So I never

23         in any way intended to test or identify
```

MERRILL LEGAL SOULTIONS
Court Reporting\*Legal Videography\*Trial Services

Page 142

1          should not expect as being abnormal.

2     Q.   But that's your opinion.  You don't --

3     A.   That is my opinion.

4     Q.   You don't have any authoritative source

5          to indicate one way or the other

6          whether indoor wall or -- whether wall

7          sampling that you took can be applied

8          to these standards.

9     A.   I agree.  That's my opinion.

10    Q.   I think we've already established

11         whatever is inside that wall, in your

12         judgment, you have no way of knowing

13         whether it's communicating to the

14         inside air.

15    A.   That's correct.  I wouldn't expect it

16         to be.  But, I mean, I did not test

17         that so . . .

18    Q.   And you're not here to say that

19         whatever mold in the air you found in

20         the walls is causing anyone any health

21         problems in the house?

22    A.   No, sir.  I speak to no health issues

23         whatsoever.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 169

```
 1    Q.   And you don't know what a qualified IEP

 2         even is, do you?

 3    A.   I've told you I've not -- I've not

 4         heard that acronym.  There's many

 5         acronyms out there.

 6    Q.   You don't know what a qualified indoor

 7         environmental professional is.

 8    A.   No.  Like I said, I'm not familiar with

 9         that acronym or term.

10    Q.   Let's look at your field notes; then

11         we'll call it a day.  How about that?

12              Oh, you've made almost two

13         hundred thousand dollars from this law

14         firm, haven't you?

15    A.   I'm not -- I'm not sure.  But I know

16         it's less than that.  I believe it to

17         be less than that.

18    Q.   Bumping up pretty close, though; right?

19    A.   I'm not sure.

20    Q.   More than a hundred fifty thousand.

21    A.   I would -- I would think so by now,

22         yes, sir.

23    Q.   More than a hundred and seventy-five?
```

**MERRILL LEGAL SOULTIONS**
**Court Reporting\*Legal Videography\*Trial Services**

Page 177

1    Q.    Yeah.

2    A.    Yes.

3    Q.    So the outside air has to be a

4          different temperature than the inside

5          air, right --

6    A.    The --

7    Q.    -- for there to be condensation?

8    A.    The surface temperatures would have to

9          be below the dew point of the outside

10         air in order for the actual state of --

11         act of condensation to occur.

12   Q.    And you don't know sitting here today

13         what the dew-point ranges are in

14         Montgomery?

15   A.    No.  I've not committed those to

16         memory.

17   Q.    Where would I go find those if I wanted

18         to look them up?

19   A.    There are numerous weather data

20         locations that you could find via the

21         Internet.

22   Q.    If these people testify they keep their

23         air conditioning at 72, does that have

**2100 3rd Avenue North, Suite 960\*Birmingham, AL 35203\*www.merrillcorp.com**
**1-800-888-DEPO**

Page 182

1          consensus committee; right?

2    A.    If afforded the opportunity, yes, sir.

3    Q.    And the intent of your presentation to

4          the consensus committee, if you're

5          given that opportunity, is to create a

6          geographical restriction to the

7          application of (b)(1) walls.

8    A.    Simply -- simply as an exemption that

9          (b)(1) should not be utilized in areas

10         identified as (b)(4).  (B)(4) was

11         offered as an alternative to (b)(1);

12         therefore, it doesn't make sense that

13         both options would be proper.

14   Q.    So you want the code to change so that

15         you can't build a (b)(1) wall in the

16         humid and fringe-zone climate.

17   A.    I believe that would be the proper

18         thing to do, yes, sir.

19   Q.    And until that change happens, it's

20         still okay to build one there, by code.

21   A.    By code.  If they're silly enough to

22         keep doing it, then I guess so.

23   Q.    Now, page 1 of your report, this is

1          REPORTER'S CERTIFICATE

2

3     STATE OF ALABAMA  )
                        )
4     ELMORE COUNTY     )

5

6          I do hereby certify that the above

7     and foregoing transcript was taken down

8     by me in stenotype, and the questions

9     and answers thereto were transcribed by

10    means of computer-aided transcription,

11    and that the foregoing represents a

12    true and correct transcript of the

13    testimony given by said witness.

14         I further certify that I am

15    neither of counsel, nor of any relation

16    to the parties to the action, nor am I

17    anywise interested in the result of

18    said cause.

19

20

21    _____
      Barbara A. Howell, Certified
      Court Reporter and Commissioner
22    for the State of Alabama at Large
      ACCR NO. 123 - Expires 9/30/08
23    MY COMMISSION EXPIRES:  12/27/08

# EXHIBIT "D"

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5     CIVIL ACTION NO.:  1:06-CV-00682-TFM

6     NICHOLAS STRICKLAND, et al.,

7              Plaintiff(s),

8     vs.

9     CHAMPION ENTERPRISES, INC., et al.,

10             Defendant(s).

11     * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12    CIVIL ACTION NO:  1:06-CV-423-BH-C

13    ROBERT FORD, et al.,

14             Plaintiff(s),

15    vs.

16    CHAMPION ENTERPRISES, INC., et al.,

17             Defendant(s).

18                  DEPOSITION OF

19                  BOBBY PARKS

20                  JOB NO. 55250

21    BEFORE:  Sabrina L. Nimmer, CSR

22             Court Reporter and

23             Notary Public

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

1           In accordance with Rule 5(d) of The

2      Alabama Rules of Civil Procedure, as

3      Amended, effective May 15, 1988, I, Sabrina

4      L. Nimmer, am hereby delivering to MR.

5      GREGORY S. RITCHEY the original transcript

6      of the oral testimony taken on the 20th day

7      of September, 2007, along with exhibits.

8           Please be advised that this is the

9      same and not retained by the Court Reporter,

10     nor filed with the Court.

11

12           S T I P U L A T I O N

13

14           IT IS STIPULATED AND AGREED, by and

15     between the parties through their respective

16     counsel, that the deposition of BOBBY PARKS

17     may be taken before Sabrina L. Nimmer,

18     Commissioner, at 272 Commerce Street,

19     Mongomery, Alabama 36104 on the 20th day of

20     September, 2007.

21           IT IS FURTHER STIPULATED AND AGREED

22     that the signature to and the reading of the

23     deposition by the witness is waived, the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

1    deposition is to have the same force and

2    effect as if full compliance had been had

3    with all laws and rules of Court relating to

4    the taking of depositions.

5        IT IS FURTHER STIPULATED AND AGREED

6    that it shall not be necessary for any

7    objections to be made by counsel to any

8    questions, except as to form or leading

9    questions, and that counsel for the parties

10   may make objections and assign grounds at

11   the time of trial, or at the time said

12   deposition is offered in evidence, or prior

13   thereto.

14       IT IS FURTHER STIPULATED AND AGREED

15   that notice of filing of the deposition by

16   the Commissioner is waived.

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 4

```
1                        I N D E X

2   EXAMINATION BY:           PAGE  NUMBER:

3   MR. RITCHEY:

4

5

6   EXHIBITS:                 PAGE  NUMBER:

7   Defendant's Ford # 1           8

8   Defendant's Strickland # 1     8

9   Defendant's Ford # 2          36

10  Defendant's Strickland # 2    37

11  Defendant's Ford # 3          36

12  Defendant's Strickland # 3    38

13  Defendant's Ford # 4         134

14  Defendant's Strickland # 5   149

15  Defendant's Strickland # 6   149

16

17

18

19

20

21

22

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

```
 1              A P P E A R A N C E S

 2      FOR THE PLAINTIFF(S):

 3              Mr. C. Lance Gould

 4              BEASLEY, ALLEN, CROW, METHVIN,

 5              PORTIS & MILES

 6              272 Commerce Street

 7              Montgomery, Alabama 36104

 8

 9      FOR THE DEFENDANT(S):

10              Mr. Gregory S. Ritchey

11              RITCHEY & SIMPSON

12              3288 Morgan Drive

13              Suite 100

14              Birmingham, Alabama 35216

15

16      ALSO PRESENT:   Francis

17

18                      * * * * * * * * * * * * * * *

19

20              I, Sabrina L. Nimmer, a Court

21      Reporter of Mobile, Alabama, acting as

22      Commissioner, certify that on this date, as

23      provided by the Alabama Rules of Civil
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1  Procedure and the foregoing stipulation of

2  counsel, there came before me at the law

3  office of C. Lance Gould, 272 Commerce

4  Street, Montgomery, Alabama 36104,

5  commencing at 9:07 a.m., BOBBY PARKS in the

6  above cause, for oral examination, whereupon

7  the following proceedings were had:

8

9

10          THE VIDEOGRAPHER:  Here begins

11  videotape number one in the deposition of

12  Bobby Parks in the matter of Nicholas

13  Strickland, et al., versus Champion

14  Enterprises, et al., Case Number

15  1:06-CV-00682-TFM and Robert Ford, et al.,

16  versus Champion Enterprises, et al., Case

17  Number 1:06-CV-423-BHC.

18          We are on the record at 9:10 a.m.

19  on Thursday, September 20, 2007.  This

20  deposition is taking place at Beasley, Allen

21  in Montgomery, Alabama and the videographer

22  is Jeff Tetherow.

23          Would counsel please identify

Page 7

1    yourselves and state whom you represent.

2                MR. GOULD:  Lance Gould for the

3    plaintiffs.

4                MR. RITCHEY:  Greg Ritchey for

5    Champion Builders in each case.

6                THE VIDEOGRAPHER:  Would the court

7    reporter please swear in the witness.

8

9

10                    ROBERT PARKS,

11           having been first duly sworn,

12      was examined and testified as follows:

13

14                    EXAMINATION

15   BY MR. RITCHEY:

16       Q.   Mr. Parks, I'm Greg Ritchey.  Can I

17   get you to give us your full name for the

18   record.

19       A.   Robert Lynn Parks.

20       Q.   Okay.  You've been deposed before,

21   have you not?

22       A.   Yes, sir.

23       Q.   In fact, we deposed you recently in

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 46

1    Tramex meter since we last talked?

2       A.    Yes, I have.

3       Q.    When did you calibrate it?

4       A.    Within the last month, and I have

5    the before and after calibrations for all of

6    that and those certificates.

7       Q.    Okay.  So the calibration of your

8    Tramex meter that you are using in all of

9    the pictures, if I recall correctly, had not

10   been calibrated at the time all of the

11   pictures were made for either the Ford Parks

12   or Strickland Parks reports; is that

13   correct?

14      A.    It had not been calibrated since I

15   purchased it new, that's correct.

16      Q.    Okay.  And when did you purchase

17   the Tramex meter new?

18      A.    I don't recall.  It was a couple of

19   years old.

20      Q.    Okay.

21      A.    To the best that I can remember.

22      Q.    And then approximately two months

23   ago you calibrated your Tramex meter?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 56

1    camera.  The picture you can adjust it and

2    it automatically calibrates.  So it could

3    change at any time.

4        Q.   All right.  Well, what were your

5    temperature settings when you did the Ford

6    home and the Strickland home?

7        A.   I don't recall.  If they are not in

8    the picture, I don't recall.

9        Q.   Okay.  So you don't know whether or

10   not the temperature from the red to blue is

11   one degree or ten degrees?

12       A.   I would assume it to be a whole lot

13   more than one but I don't know the specific

14   temperatures.

15       Q.   As we sit here today, you don't

16   know whether it's one degree or ten degrees?

17       A.   As I said, I don't know.  I would

18   assume it's much greater than one, but I do

19   not know the specific temperatures, as I

20   said.

21       Q.   Okay.  Is there anything that would

22   lead you to believe that it would be greater

23   than five degrees?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 59

1       Q.   Did you find any soft walls in the

2   Strickland home?

3       A.   I don't recall.  Typically, again,

4   pushing on a wall with my hand is not

5   something that I would typically do.  I

6   would look for deflections in the wall.  If

7   there were any deflections found, they would

8   be noted in my notes.

9       Q.   And I didn't see any notes or

10  anything in your reports noting any problems

11  with any of the walls in these houses.  I

12  would expect to see that, I guess, in your

13  expert report, if you found something.

14      A.   I don't understand what you --

15      Q.   You didn't note anything in your

16  expert report finding soft walls in either

17  the Ford or Strickland homes; right?

18      A.   I did not write in my report of

19  either one that the walls were soft, and

20  again, as I stated, pushing on the walls

21  with my hand is something that I would not

22  normally do.

23      Q.   Okay.  All right.  What testing did

Page 71

1    feeding the mold growth.

2        Q.    And it's a ventilated wall cavity

3    in the Strickland home?

4        A.    It is.

5        Q.    Okay.    Why don't we -- let's stick

6    with the Ford home right now.

7        A.    Okay.    Sure.

8        Q.    Your first opinion is improper

9    application of the wall construction

10   standards.    Now, will you agree with me that

11   a manufacturer can build a 504 B-1 wall and

12   place it anywhere in the country under the

13   HUD code?

14       A.    Under the HUD code, that option to

15   build a B-1 wall is not geographically

16   specific.    So they can build that wall and

17   send it anywhere they would like, but the

18   standards also require that that wall

19   perform.

20       Q.    Okay.    So if they build that wall

21   in that particular home --

22       A.    Uh-huh.    Yes, sir.

23       Q.    -- that can be sold anywhere in

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 72

1    the United States?

2         A.    Just because they build that

3    wall -- let me -- I don't -- I know where we

4    are going here but -- or at least I think.

5    They are allowed to build that wall but they

6    have to make that wall perform.  If it's

7    accumulating moisture and significant enough

8    moisture to sustain mold growth, then it's

9    not performing to the HUD standard; but as

10   far as building that wall, they can build it

11   but it still has to perform.  They have to

12   make it work.

13        Q.    Okay.  And there are other design

14   applications that are out there with regard

15   to building a 504 B-1 wall other than just

16   the vinyl or the one perm requirement;

17   right?  Am I not making sense?

18        A.    Right.  If you are going to put

19   that one perm requirement on the inside,

20   then you've got to build that wall to where

21   the storage capacity of that wall does not

22   exceeded.  In other words, you don't get as

23   much -- whatever gets in has to be able to

Page 127

1    has become the dominant type in the wall.

2    From a level perspective, would I say that

3    those -- based on those two samples are

4    those walls contaminated or, you know, -- or

5    whatever, no, but I can -- but they do

6    exhibit the fact that there's been

7    significant enough moisture there to

8    establish a mold -- this mold growing in

9    there.  So again, it goes back to how fast

10   is it going to grow, how fast is it going to

11   deteriorate.

12        Q.    Is that mold growth viable or not?

13        A.    The air samples test both viable

14   and non-viable.  So I don't know that.

15        Q.    Okay.  Would the same be true for

16   figure 15?

17        A.    Yes, sir.

18        Q.    Okay.  For figure 15, did you

19   eliminate any other bulk water entry source

20   that could be causing the higher amount of

21   water?

22        A.    I found no bulk water leaking.  To

23   the best of my knowledge, in the Strickland

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 146

1    bag or whatever?

2        A.    Keep it room temperature.   I

3    usually carry it in a house if I go in a

4    house and I carry it back out to the car

5    when I leave.   I keep them in a case.

6        Q.    Just in a case?

7        A.    Uh-huh.

8        Q.    So if you go to eat lunch, do you

9    keep it in the car?

10       A.    I don't know that I ever left any

11   in the car while I ate lunch.   And I don't

12   remember that we ever really stopped and ate

13   lunch.   If we did, it was eating on the go.

14   But I never left them exposed to any extreme

15   temperatures that I can recall.

16       Q.    Did you do any testing of the attic

17   cavities of any of these houses?

18       A.    No, sir.

19       Q.    Did you do any testing of the crawl

20   space cavities of any of those houses?

21       A.    No, sir.

22       Q.    Did you do any testing of the

23   marriage line of any of these houses  --

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 147

1    well, I guess on the Ford house?

2        A.    The Ford house.  None other than

3    what's been depicted.

4        Q.    Other than putting the moisture

5    meter on them?

6        A.    Correct.

7        Q.    Did you do any mold testing or

8    sampling in the marriage line?

9        A.    Not that I can recall.

10       Q.    Did you do any negative or positive

11   pressure testing?

12       A.    Yes, sir, I would have.

13       Q.    Is that going to be reflected in

14   your notes that we don't have today?

15       A.    Yes, sir, it will.

16       Q.    If there was something out of the

17   ordinary, would you expect to put it in your

18   expert report?

19       A.    It would.  If there would have been

20   something detected -- the pressure testing

21   that you are referring to is the initial

22   testing with the gauge from inside to

23   outside the negative pressure of the

```
1              C E R T I F I C A T E

2   STATE OF ALABAMA      )

3   COUNTY OF JEFFERSON )

4

5              I hereby certify that the

6   above and foregoing proceeding was taken

7   down by me by stenographic means, and that

8   the content herein was produced in

9   transcript form by computer aid under my

10  supervision, and that the foregoing

11  represents, to the best of my ability, a

12  true and correct transcript of the

13  proceedings occurring on said date at said

14  time.

15             I further certify that I am

16  neither of counsel nor of kin to the

17  parties to the action; nor am I in anywise

18  interested in the result of said case.

19

20

21

22      Court Reporter and Commissioner

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5   NICHOLAS STRICKLAND, et al.,          COPY

6        Plaintiffs,
                        CASE NO.
        vs.             1:06-CV-00682-TFM
7

    CHAMPION ENTERPRISES, INC.,
8   et al.,

9        Defendants.

10

11    *    *    *    *    *    *    *    *

12

13        DEPOSITION OF BOBBY PARKS,

14   VOLUME II, taken pursuant to stipulation

15   and agreement before Barbara A. Howell,

16   Certified Court Reporter and

17   Commissioner for the State of Alabama at

18   Large, ACCR No. 123, in the Law Offices

19   of Beasley, Allen, Crow, Methvin,

20   Portis & Miles, P.C., 272 Commerce

21   Street, Montgomery, Alabama, on Tuesday,

22   November 27, 2007, commencing at

23   approximately 9:00 a.m.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 170

1                A P P E A R A N C E S

2

    FOR THE PLAINTIFF:
3
    Mr. C. Lance Gould
4   Beasley, Allen, Crow, Methvin,
    Portis & Miles, P.C.
5   Attorneys at Law
    272 Commerce Street
6   Montgomery, Alabama   36104

7
    FOR THE DEFENDANTS:
8
    Mr. Gregory S. Ritchey
9   Mr. W. Scott Simpson
    RITCHEY & SIMPSON, P.C.
10  Attorneys at Law
    3288 Morgan Drive
11  Suite 100
    Birmingham, Alabama   35216
12

13

14

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 171

1                    I N D E X

2
     EXAMINATION  BY:                              PAGE
3
     MR.  RITCHEY......................            173
4

5    EXHIBITS                                      PAGE

6    DEFENDANTS'  EXHIBIT  #7............          173

7    DEFENDANTS'  EXHIBIT  #8............          179

8    DEFENDANTS'  EXHIBIT  #9............          201

9    DEFENDANTS'  EXHIBIT  #10...........          229

10   DEFENDANT'S  EXHIBIT  #11...........          246

11   DEFENDANT'S  EXHIBIT  #12...........          265

12   DEFENDANTS'  EXHIBIT  #13...........          268

13   DEFENDANT'S  EXHIBIT  #14...........          268

14   DEFENDANT'S  EXHIBIT  #15...........          272

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 172

1              S T I P U L A T I O N S

2          It is hereby stipulated and agreed

3      by and between counsel representing the

4      parties that the deposition of BOBBY

5      PARKS, VOLUME II, is taken pursuant to

6      the Federal Rules of Civil Procedure and

7      that said deposition may be taken before

8      Barbara A. Howell, Court Reporter and

9      Commissioner for the State of Alabama at

10     Large, without the formality of a

11     commission; that objections to questions

12     other than objections as to the form of

13     the questions need not be made at this

14     time but may be reserved for a ruling at

15     such time as the deposition may be

16     offered in evidence or used for any

17     other purpose as provided for by the

18     Federal Rules of Civil Procedure.

19         It is further stipulated and agreed

20     by and between counsel representing the

21     parties in this case that said

22     deposition may be introduced at the

23     trial of this case or used in any manner

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 173

1       by either party hereto provided for by

2       the Federal Rules of Civil Procedure.

3

4           *       *       *       *       *       *       *       *

5

6                       (Defendants' Exhibit #7 was

7                       marked for identification.)

8                   BOBBY PARKS

9           The witness, having first been duly

10      sworn or affirmed to speak the truth,

11      the whole truth, and nothing but the

12              truth, testified as follows:

13                  THE REPORTER:   Usual

14                      stipulations?

15                  MR. GOULD:   Yes, ma'am.

16                  MR. RITCHEY:   Yes.

17

18                  EXAMINATION, continued

19      BY MR. RITCHEY:

20  Q.  Mr. Parks, Greg Ritchey again.   I

21      represent Champion Home Builders.   This

22      is a continuation of a previous

23      deposition we had scheduled.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 187

```
 1          calculation, the baseload calculation,

 2          came in at, like, two and a half.  And

 3          by the time you figure in your actual

 4          margin of error, your calculations for

 5          air flow, I wouldn't consider that to

 6          be oversized, no, sir.

 7    Q.    So about a half ton is not a big deal?

 8    A.    No, sir.  I wouldn't consider it to be

 9          oversized or an issue in this house.

10    Q.    Is there any reason why -- and I'm

11          looking at your Hunter-Strickland.

12          This is the Wrightsoft Project Summary

13          Entire House?

14    A.    Yes, sir.

15    Q.    You've got the weather as Monroe,

16          Louisiana.  Did you notice that?

17    A.    No, I did not.

18    Q.    If you'll look to your Wrightsoft

19          Project Summary Entire House.

20    A.    Give me one second to find it here.

21                    (Brief pause)

22    Q.    I got it toward the end.

23    A.    I'm sorry.  It was in the other stack.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 190

1   A.   That's fair enough.  Yes, sir.

2   Q.   -- whether your J calculations are

3        correct for this particular house

4        because you don't know whether or not

5        the Monroe, Louisiana, settings are the

6        same as Dothan.

7   A.   Correct.  I'd have to look back to

8        verify that I did have those settings

9        correct.

10  Q.   Have you done that at all in this

11       particular case since then?

12  A.   No, I haven't looked at it since I ran

13       these.

14  Q.   All right.  And I think you also did

15       a -- looks like a building leakage

16       test?

17  A.   Yes, sir.

18  Q.   And what were your findings?  And

19       that's just a few pages above that.

20  A.   Correct.  Pretty much typical for this

21       type of structure.  Most weatherization

22       programs if you get over one CFM per

23       square feet of the home, that's when

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 214

1          continuous barrier there that's not

2          allowing the wall to dry properly.

3    Q.   You have some more infrared shots that

4          I believe you took in this house that

5          were in your -- in your other report.

6          Let me ask, when did you first become

7          a -- I guess get certified as a

8          thermographer, what year?

9    A.   I don't recall specifically.  It's been

10         six, seven, eight years ago maybe.  I

11         really don't recall specifically.  I've

12         had my current camera for four years.

13         At least I would say six.

14   Q.   And if I understand you correctly, you

15         don't know the difference between the

16         degrees of the red and the degrees of

17         the blue.

18   A.   No.  Those pictures are just simply for

19         illustration purposes and show that we

20         have the heat movement through the

21         wall, to show that it's there.

22   Q.   All right.  One other thing you

23         mentioned earlier is that the gypsum

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 225

```
 1        growth, then I think it's

 2        inappropriate.

 3    Q.  So you can't point me to anything that

 4        will say what is very minute?

 5    A.  Again, I'd have to go back and review

 6        those Gypsum Association's -- I don't

 7        recall specifically.  And as I said, I

 8        didn't cut any samples and weigh them.

 9        I'm basing my opinions on my

10        investigation and on my experience in

11        the past.

12    Q.  Well, again, if -- to cut away the

13        panels would be the only safe and

14        effective -- well, not the only safe,

15        but the only effective way to determine

16        whether or not that gypsum can or can't

17        store moisture effectively?

18    A.  I don't think it would be safe, because

19        then if there's mold growth back there,

20        wet mold growth, then you have exposed

21        it.

22    Q.  I'm not saying safe.

23    A.  If that's the only way to put a
```

1              REPORTER'S CERTIFICATE

2

3        STATE OF ALABAMA  )
                           )
4        ELMORE COUNTY     )

5

6             I do hereby certify that the above

7        and foregoing transcript was taken down

8        by me in stenotype, and the questions

9        and answers thereto were transcribed by

10       means of computer-aided transcription,

11       and that the foregoing represents a

12       true and correct transcript of the

13       testimony given by said witness.

14            I further certify that I am

15       neither of counsel, nor of any relation

16       to the parties to the action, nor am I

17       anywise interested in the result of

18       said cause.

19

20

21       Barbara A. Howell, Certified
         Court Reporter and Commissioner
22       for the State of Alabama at Large
         ACCR NO. 123 - Expires 9/30/08
23       MY COMMISSION EXPIRES:  12/27/08

# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

NICHOLAS STRICKLAND, *et al.,*          *
                                        *
    Plaintiffs,                      *
                                        *
v.                                      *          Case Number: 1:06-CV-00682-TFM
                                        *
CHAMPION ENTERPRISES, INC., *et al.,*    *
                                        *
    Defendants.                      *

## DECLARATION OF DAVID TOMPOS, PE

1.    My name is David Tompos. I am over the age of eighteen years and make this declaration based upon my personal knowledge.

2.    I am a practicing professional engineer with approximately 37 years of engineering experience in the manufactured housing industry. I am a registered engineer in 23 states, including Alabama. My *curriculum vitae* is attached as Exhibit 1.

3.    I was retained by Gregory S. Ritchey, counsel for Champion Home Builders Co., to assist in evaluating the reports and opinions of Bobby Parks (hereinafter referred to as "Parks") and Robert Kondner (hereinafter referred to as "Kondner") regarding the manufactured home owned by the Stricklands, which is located at 272 Bluff Springs Road, Cowarts, Alabama. I have prepared a written report of my findings, a copy of which is attached as Exhibit 2.

4.    Based on my personal inspection of the property and a careful review of the investigation and conclusions of Parks, it is my professional opinion, to a reasonable degree of scientific certainty, that Parks and Kondner do not have a firm grasp of the design and engineering principles embodied in the HUD Code or of how the HUD Code operates. It is also my opinion that Parks' and Kondner's conclusions regarding the Strickland home's Code

compliance and structural deterioration of the walls are not justified by the methodology or the data collected in their investigations.

5.    First, Parks does not appear to be qualified to speak to design issues in the Strickland home, and his deposition testimony and conclusions display a fundamental misunderstanding of how the HUD Code operates. Parks is not an engineer, has no college education whatsoever, and has had no training in any architectural or engineering programs that address how to properly design a manufactured home. Parks' experience is that of a HVAC repairman, not of an engineer or design expert. Furthermore, he is not familiar with the basic design principles employed by HUD Code section 3280.504(b) or with the proper interpretation of the HUD Code generally.

6.    Parks concludes that the wall construction standards used for the exterior walls in the Strickland home violate HUD Code Sections 303(b) and 504(b). This conclusion is false, and its reasoning shows that Parks does not understand how the HUD Code operates.

7.    HUD develops its safety standards for the Code through a consensus process that relies on professionals with engineering expertise who provide conclusive technical documentation on issues to establish sound engineering practices. As a result, the Code embodies sound engineering practices, and meeting the specific requirements of this Code that is developed in this manner therefore conforms to sound and accepted engineering practices.

8.    Section 504(b) of the Code allows for 4 alternative designs for exterior walls in manufactured homes: 1) living side vapor barrier of one perm or less, or 2) unventilated wall cavities sealed by a pressure envelope of at least five perms, or 3) ventilated wall cavities, or 4) homes in Zone 1 may place the vapor barrier on the opposite side of the wall from the living space. Each of these alternative construction designs has been deemed by HUD to represent

good engineering practices.    Nothing in the Code prohibits the use of a 504(b)(1) wall construction in Zone 1. Furthermore, HUD does not have data, research, or other information that would justify restricting the use of 504(b)(1) homes to Zones 2 and 3.

9.    The Strickland exterior walls are constructed with vinyl covered gypsum wallboard with a perm rating of less than 1 on the living side of the walls. This construction method complies explicitly with Section 504(b)(1). The wall designs utilized in the Strickland home are the most widely used condensation control method in the industry for all climactic conditions and have been approved by a third party inspection agency comprised of engineer design professionals as required by the HUD regulations.

10.    HUD has explicitly stated that the specific requirements of Section 504(b) trump the general requirements in Section 303(b). Parks' and Kondner's arguments to the contrary fundamentally misrepresent HUD's code interpretation and its enforcement policy.

11.    In addition, HUD Code Section 508(c) explicitly allows for thermal shorts that cover up to one percent of the total exterior wall surface area. The areas identified in Parks' infrared pictures that display temperature differentials of an unknown magnitude compose an aggregate area of far less than one percent of the exterior wall surface area. Therefore, the walls conform to that aspect of the HUD standards as well. The fact that Parks does not acknowledge that thermal shorts are allowed under the HUD Code underscores his lack of familiarity with the Code.

12.    In addition to Parks' and Kondner's lack of qualifications as design experts or HUD Code experts, their facts and data do not logically support their conclusions.    The conclusion that "serious non-compliant code issues" are "causing structural deterioration" is refuted not only by the HUD Code issues previously discussed, but also by a lack of evidence of

structural deterioration in the walls themselves. Parks relies on moisture meter readings to conclude that the walls have excessive moisture accumulation, but he never tests the actual moisture content of the walls.

13.    In short, to a reasonable degree of scientific certainty, it is my opinion that both Parks and Kondner are unqualified to offer any opinions that relate to the code compliance or design aspects of the Strickland home, and that their conclusions are unsupported by the facts.

I declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed on this the _____ 2 1 _____ day of March 2008.

David Tompos

# EXHIBIT "F"

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NUMBER

1:06-CV-643-MHT


TERRY DEESE,

    Plaintiff(s),

vs.

CHAMPION ENTERPRISES, INC., et al.,

    Defendant(s).


DEPOSITION TESTIMONY OF:

ROBERT PARKS


February 19, 2007

9:10 a.m.


COURT REPORTER:

DEBORAH B. TOWNSEND, CSR

Page 2

1              S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED by and

3     between the parties through their respective

4     counsel that the deposition of ROBERT PARKS, may

5     be taken before Deborah B. Townsend, Certified

6     Shorthand Reporter and Notary Public, State at

7     Large, at the offices of BEASLEY, ALLEN, CROW,

8     METHVIN, PORTIS & MILES, Montgomery, Alabama, on

9     February 19, 2007, commencing at approximately

10    9:10 a.m.

11             IT IS FURTHER STIPULATED AND

12    AGREED that the signature to and the reading of

13    the deposition by the witness is waived, the

14    deposition to have the same force and effect as

15    if full compliance had been had with all laws

16    and rules of Court relating to the taking of

17    depositions.

18             IT IS FURTHER STIPULATED AND

19    AGREED that it shall not be necessary for any

20    objections to be made by counsel to any

21    questions, except as to form or leading

22    questions, and that counsel for the parties may

23    make objections and assign grounds at the time

Page 3

1    of trial or at the time said deposition is

2    offered in evidence, or prior thereto.

3                    In accordance with Rule 5(d) of

4    the Alabama Rules of Civil Procedure, as

5    amended, effective May 15, 1988, I, Deborah B.

6    Townsend, am hereby delivering to Gregory S.

7    Ritchey the original transcript of the oral

8    testimony taken February 19, 2007, along with

9    exhibits.

10                    Please be advised that this is the

11   same and not retained by the Court Reporter, nor

12   filed with the Court.

13

14

15

16                    EXAMINATION INDEX

17

18   ROBERT PARKS

19       BY MR. RITCHEY                    8

20

21

22

23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 4

1                            EXHIBIT INDEX
2                                                         PAGE
3    Defendant's
4
     1    Notice of Deposition                            14
5
     2    Curriculum Vitae                                 18
6
     3    Retainer Agreement and Invoices                  35
7
     4    List of Testimony                                39
8
     5    List of Retained Cases                           40
9
     6    List of Attorneys                                42
10
     7    Parks' Report on the Deese Home                  84
11
     8    Parks' File on the Deese Home                   102
12
     9    Data Collection Protocol                        105
13
     10   8/10/05 Letter to HUD and Response              126
14
     11   Tools Utilized                                  137
15
     12   8/10/05 Letter to HUD and Response              174
16
     13   Correspondence Dealing with F-1-76              179
17
     14   Excerpt of Trial Testimony from                 217
18        Aucoin Case
19   15   Report from Aucoin Case                         219
20   16   Indoor Air Quality Report                       297
21   17   Mold Remediation Summary                        311
22   18   Healthy Homes Report on FEMA                    334
          Mobile Homes
23

**www.AmericanCourtReporting.com**
**February 19, 2007**

American Court Reporting
toll-free (877) 320-1050

Page 5

```
1              A P P E A R A N C E S

2

3    FOR THE PLAINTIFF(S):

4            C. Lance Gould, Esquire

5            BEASLEY, ALLEN, CROW, METHVIN,

6            PORTIS & MILES

7            218 Commerce Street

8            Montgomery, Alabama   36104

9

10   FOR THE DEFENDANT(S):

11           Gregory S. Ritchey, Esquire

12           RITCHEY & RITCHEY

13           1910 28th Avenue South

14           Birmingham, Alabama   35209

15

16           W. Scott Simpson, Esquire

17           Simpson Law Firm

18           3288 Morgan Drive, Suite 112

19           Birmingham, Alabama   35216

20

21   ALSO PRESENT:   BRAD CAMPBELL, Videographer

22                   JACK HENRY   *   PARKER HOLLOWAY

23                   DAVE TOMPOS  *   FRANCIS CONLIN
```

Page 6

1           I, Deborah B. Townsend, a Certified

2    Shorthand Reporter of Birmingham, Alabama, and a

3    Notary Public for the State of Alabama at Large,

4    acting as Commissioner, certify that on this

5    date, pursuant to the Federal Rules of Civil

6    Procedure, and the foregoing stipulation of

7    counsel, there came before me at the offices of

8    BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,

9    Montgomery, Alabama, commencing at approximately

10   9:10 a.m. on February 19, 2007, ROBERT PARKS,

11   witness in the above cause, for oral

12   examination, whereupon the following proceedings

13   were had:

14

15           THE VIDEOGRAPHER:   This marks the

16   beginning of videotape number one in the

17   deposition of Bobby Parks.   Today's date is

18   February the 19th of the year 2007.   The time is

19   9:12 a.m.   This is in the matter of Terry Deese,

20   plaintiff, versus Champion Enterprises, Inc., et

21   al., defendants.   Case number is 1:06-CV-643-

22   MHT.   It's being held in the United States

23   District Court for the Middle District of

Page 7

1  Alabama, Southern Division.

2              Will counsel please state who you

3  are and who you represent?

4                    MR. GOULD:   Lance Gould for

5  the plaintiffs.

6                    MR. RITCHEY:   Greg Ritchey for

7  the defendants, and also Scott Simpson.

8                    THE VIDEOGRAPHER:   Will the

9  court reporter please swear in the witness?

10                   ROBERT PARKS,

11 After having first been duly sworn, was examined

12 and testified as follows:

13                   THE REPORTER:   Do you want

14 usual stipulations?

15                   MR. RITCHEY:   Yes.

16                   MR. GOULD:   Yes.

17             Before we get started, I'd like

18 for Mr. Ritchey to identify all the individuals

19 in attendance for the deposition that they have

20 brought today.

21                   MR. RITCHEY:   All right.   Dave

22 Tompos, Parker Holloway, Francis Conlin, and

23 Jack Henry.

Page 176

1    the use of (b)(1) walls in Thermal 1 Zone,

2    correct?

3         A.    I don't -- I can't say that they

4    didn't have a problem with the use.  What they

5    stated was that there was no geographic

6    specificity --

7         Q.    Correct.

8         A.    -- to where -- But then again,

9    they put it back to the -- that it was the

10   manufacturer's responsibility to make the

11   appropriate option.

12        Q.    Well, didn't they also say -- and

13   I'll just quote it for you -- the department

14   does not have data, research, or other

15   information that would substantiate restricting

16   the use of alternative condensation control

17   method written in the Manufactured Home

18   Construction and Safety Standards as codified in

19   3280.504(b)(1) to only Thermal Zones 2 and 3.

20        A.    Correct.

21        Q.    Okay.  And it also, if I'm reading

22   this correctly, suggested to you that if you

23   have anything or would like to propose a

**American Court Reporting**
**toll-free (877) 320-1050**

Page 277

1    working probably.

2        Q.    I don't think you're understanding

3    my question.

4        A.    Okay.  I'm sorry.

5        Q.    I'm asking for like a control home

6    or something with which to use as a comparison

7    to these houses.

8        A.    I'm sorry.  Not -- not as you're

9    defining it, not as I understand your question.

10        Q.    This isn't a scientific test of

11    any type, is it?

12        A.    No.  This is an accumulation of

13    the data that -- from looking at all the houses

14    that I've looked at to establish that

15    consistency between the moisture in the walls

16    and the mold growth.

17        Q.    Okay.  So it's not any type of

18    publication you'd ever want to put out and have

19    a peer review or anything like that?

20        A.    I think the data is -- is very

21    conclusive and a lot of good information is --

22    could be -- could come of it if it was available

23    or could get permission to use it at a later

Page 278

1    date.

2        Q.    But you don't have any intention

3    of doing that?

4        A.    Not at this point in time.  I

5    don't have permission.

6        Q.    It's not been peer reviewed, to

7    your knowledge?

8        A.    No, sir, it hasn't.

9        Q.    And is -- If I understand

10   correctly, you only have taken samples of the

11   interior wall cavity and outdoor samples, right?

12       A.    Correct.

13       Q.    You didn't take any indoor

14   samples?

15       A.    Indoor air samples, no, sir.

16       Q.    Okay.  Did you take control

17   samples or blank samples for each --

18       A.    Yes.

19       Q.    -- one of these?

20       A.    Yes, sir.

21       Q.    For every one that's in there?

22       A.    Blank samples were sent in with

23   the -- with the sample kits.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 279

1          Q.      Did you take any marriage wall

2     samples?

3          A.      I think there were some marriage

4     wall samples at times, yes.

5          Q.      Did you classify those as marriage

6     wall samples?

7          A.      I believe I did, yes, sir.

8          Q.      How do you -- If I understand you

9     correctly on the mold testing, after you drill

10    two holes in, push back the insulation, and then

11    you stick in a -- what do you --

12         A.      It's an air stem.  It's designed

13    specifically for the purpose of taking wall

14    cavity air samples.

15         Q.      Okay.  What kind -- who makes it?

16         A.      All of my supplies come from

17    Galson, G-A-L-S-O-N, Laboratories out of East

18    Syracuse, New York.

19         Q.      So what's -- what's the name of

20    the air stem or whatever?

21         A.      I haven't seen a specific name on

22    it, but I believe it's built by the same company

23    that builds Zeflon Air-O-Cells, Z-E-F-L-O-N.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 280

1     Q.     Okay.  Well, go -- If you will,

2   step me through the steps that you would go

3   after you first get to the house.  You

4   immediately go -- go in and -- I mean, let's

5   strike that.

6         Let's just say when you're doing your

7   mold testing --

8     A.     Uh-huh.

9     Q.     -- is your first step to drill the

10  holes?

11    A.     Well, my first step would be to

12  consult with the homeowner; let them know what

13  my intent was in drilling the holes, taking some

14  air samples from inside the wall when

15  investigating an area that we can't see

16  visually, although I do have a camera that I can

17  get in there and look at now.  But -- Then I

18  would walk through with the homeowner and pick

19  out spots that were suitable for them,

20  typically, behind pictures or areas where they

21  said they could hang a picture or -- you know,

22  after that was located.

23    Q.     I'm talking about your sampling.

**www.AmericanCourtReporting.com**
**February 19, 2007**

Page 281

1        A.        Okay.

2        Q.        Let me -- let's go with that.

3        A.        Okay.  After the area was

4    identified, then we would drill two holes

5    approximately eight millimeters in size.  A tool

6    was inserted into the lower hole to push back

7    the insulation.  In taking an air sample, you

8    want to minimize the debris that the sample may

9    pick up, so that was the purpose of pushing back

10   the insulation, to clear out a cavity area that

11   it could pull.

12       We then pulled 15 liters of air for one

13   minute.  That's actually 15 liters per minute,

14   so we pulled that for -- at that rate for one

15   minute.  We -- I would first turn on the pump

16   and verify that it was calibrated at 15 liters

17   per minute.  I would attach the Air-O-Cell, the

18   stem, install it into the top hole.  Then I have

19   a stopwatch that I would start simultaneously

20   with the pump, run for one minute, turn the pump

21   off, seal the Air-O-Cell back up, label and bag.

22       Q.        Okay.  Is there some type of

23   protocol that you got this from, or is this just

Page 282

1    your own --

2          A.     Galson Laboratories.

3          Q.     Okay.  Did you follow each and

4    every step?

5          A.     Yes, sir.

6          Q.     Have we gone over each and every

7    step?

8          A.     I believe so, yes, sir.

9          Q.     How do you calibrate the pump?

10         A.     It's a manual calibration, and

11   then I also carry a separate -- I believe it's

12   referred to as a bubble tube to double check the

13   calibration to make sure that it's -- it is

14   seeing the same on both ones.  It's calibrated

15   before the testing, viewed during the testing to

16   assure that it stays there.

17         Q.     All right.

18         A.     And then after that, the holes are

19   then sealed with caulk.  And then the final test

20   was done outside of the home at three minutes of

21   sampling.

22         Q.     Okay.  At the same 15 liters per

23   minute?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 283

1          A.      Yes, sir.

2          Q.      Why did you choose one minute and

3   three minutes as the sampling times?

4          A.      Because you're trying to control

5   the debris.  You would expect to have a lot more

6   debris inside that wall cavity, and if you

7   overload the sample with debris, then it's --

8   it's not as legible.

9          Q.      How about the outside?

10         A.      The outside, three to five minutes

11  is a typical recommendation.

12         Q.      Why did you pick three?

13         A.      It's sufficient.

14         Q.      Sufficient based on what?

15         A.      Based on the recommendations from

16  Galson Laboratory.

17         Q.      Where did you go to take the

18  outside sampling?

19         A.      Typically, we got upwind of the

20  house and at least 20 to 25 foot away from the

21  house, as far as our extension cord would

22  reach.  Tried to stay in open areas.

23         Q.      Were you on grass areas or

Page 284

1    concrete areas?

2        A.    It would vary.  In this particular

3    home, we were on a grass area.  The Deese home

4    we were in a grassy area.  The home is located

5    kind of in an open area, pasture or field.

6        Q.    Did you do a control sample for

7    the interior wall?

8        A.    And by that you mean -- Can you --

9        Q.    Do you know what a control sample

10   is?

11       A.    Are you talking about a sample

12   from a partition wall like on the inside?  No,

13   sir, I did not.  I was only investigating the

14   areas around the perimeter that -- where

15   moisture was located.  It was to solidify and

16   substantiate the fact that the moisture was

17   present in the walls.

18       Q.    Did you have a concern about

19   contaminated samples by pushing back the

20   insulation?

21       A.    Yes.  That's why we ran them at

22   one minute.

23       Q.    Well, is it possible that that

Page 285

1    pushing back of the insulation could have

2    contaminated the samples?

3         A.    No.  Because virtually all of our

4    samples came back with -- none of them came back

5    with an overcrowding, a debris of overcrowding.

6    Most of them stayed within the -- the level one

7    or level two of crowding, which is sufficient

8    for the laboratory to analyze.

9         Q.    Well, did Galson Labs suggest

10   pushing back the insulation in its protocol?

11        A.    No.  I think that -- that's pretty

12   much common sense.  You can't stick the probe up

13   in the insulation or your debris is going to

14   insert your tube.  And -- and again, insulation

15   in itself is not made out of mold, so, you

16   know -- That's what we were trying to read was

17   the mold, to find out if there, in fact, was

18   significant mold spores within the wall, which

19   would indicate and solidify the -- the fact that

20   the walls were wet.

21        Q.    Okay.  So Galson Labs didn't

22   recommend pushing back the insulation.  Do you

23   have any generally-accepted publication,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 286

1    protocol of any type that says you need to first

2    push back the insulation?

3        A.    No.  Again, that's professional

4    judgment and common sense.

5        Q.    Yours?

6        A.    Yes.

7        Q.    What's the air -- air rate on mold

8    testing?

9        A.    I'm not sure.

10        Q.    Would it surprise you that it's

11    plus or minus 200 percent?

12        A.    That would surprise me.

13        Q.    Well, what reference material do

14    you have that supports the way you have done

15    this cavity testing?

16        A.    I -- There's a couple of -- one

17    from Zeflon Air-O-Cell and one from Galson

18    Laboratories, as well as consulting with them in

19    the past as far as that being an appropriate

20    method.

21        Q.    Other than that, that's all you

22    have?

23        A.    Uh-huh.

Page 342

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA)

4    JEFFERSON COUNTY)

5

6            I hereby certify that the above

7    and foregoing deposition was taken down by me in

8    stenotype, and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the deposition

12   given by said witness upon said hearing.

13           I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in anywise interested in

16   the result of said cause.

17                    *Deborah B. Townsend*

18

19              DEBORAH B. TOWNSEND, CSR

20              Certificate No. AL-CSR-207

21

22   My Commission expires

23   March 3, 2008

# EXHIBIT "G"



DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

January 19, 2007

Mr. Brian D. Cooney
Vice President, Government Affairs
Manufactured Housing Institute
2101 Wilson Blvd., Suite 610
Arlington, VA 22201-3062

Dear Mr. Cooney:

Following up on our December meeting with you and your colleagues, we have had a chance to review the plaintiffs' pleadings you have provided us on various vapor barrier cases. As the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards, I can say that these pleadings consistently misrepresent HUD enforcement policy by arguing that HUD's general standard at 3280.303(b) should be applied to manufacturers' practices regarding the placement of vapor barriers even though these manufacturers have complied with HUD's more specific vapor barrier standard at 3280.504(b).

Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

Thank you again for bringing this situation to our attention. HUD has a distinct interest in maintaining an accurate understanding by arbitrators and the courts of HUD's enforcement policies and practices regarding the Manufactured Home Construction and Safety Standards. We would be especially concerned by a reported judicial decision that misstated HUD policy and practice, so please keep us advised of developments in these cases.

Sincerely,

William W. Matchneer III
Associate Deputy Assistant Secretary for
Regulatory Affairs and Manufactured Housing



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

JUN 2 1 2007

I, _Theodore A. Ford_, Director, employed by United States Department of Housing and Urban Development, certify that I have official duties in the United States Department of Housing and Urban Development, District of Columbia and have authority to make and issue this certificate. I further certify that the signature of William W. Matchneer III, Associate Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, United States Department of Housing and Urban Development, District of Columbia, appearing on the attached copy of the document is a copy of a genuine signature and that the signer has the official capacity indicated thereon.

Theodore Ford
Director



# EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **NICHOLAS STRICKLAND,** *et al.,* | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Case Number: 1:06-CV-00682-TFM** |
| | * | |
| **CHAMPION ENTERPRISES, INC.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

## DECLARATION OF FRANCIS CONLIN

1.    My name is Francis Conlin. I am over the age of eighteen years and make this declaration based upon my personal knowledge.

2.    I am a practicing professional engineer and certified mold remediator with more than twenty years experience. My *curriculum vitae* is attached as Exhibit 1.

3.    I was retained by Gregory S. Ritchey, counsel for Champion Home Builders Co., to assist in evaluating certain performance aspects of the manufactured home owned by the Stricklands, which is located at 272 Bluff Springs Road, Cowarts, Alabama. I was also asked to review the deposition, conclusions and reports of Bobby Parks (hereinafter referred to as "Parks"). I have prepared a written report of my findings, a copy of which is attached as Exhibit 2.

4.    Based on one personal inspection of the property and a careful review of the investigation and conclusions of Parks, it is my professional opinion, to a reasonable degree of scientific certainty, that Parks failed to meet the standard of care in the performance of his investigation, and that Parks' conclusions are not based on sufficient data or sound scientific principles.

5.     Parks contends that the vinyl covered gypsum wallboard caused condensation to accumulate within the wall cavity, but he failed to consider several factors that can heavily influence moisture levels. Standard industry practice and standard scientific methods require testing for alternative explanations for any observed moisture accumulation. Parks failed to consider or rule out such alternative explanations. For example, Parks does not consider, much less rule out, alternate sources of moisture such as bulk water leaks. Parks also contends that the wall suffered structural deterioration. However, no measurement or other quantitative indication of structural damage was given by Parks. Without controlling for these factors, it is impossible to attribute a perceived problem to the interior vapor barrier. Indeed, it is impossible to tell whether the interior vapor barrier is even contributing to any problem at all. Omission of these factors in Parks' analysis is a fatal flaw that renders the report's conclusions unreliable.

6.     Parks used unreliable methodology in his attempted use of moisture meter readings to show excessive moisture accumulation within the walls. Moisture meters such as the one used by Parks on the Strickland home measure the dielectric strength, called the capacitance, of a material in its proximity. Water content influences capacitance, but it is an electrical property of the gypsum wallboard that is actually being measured, not the moisture level itself. The Gypsum Association clearly states that, because formulas for gypsum differ, moisture meters do not provide accurate moisture content readings for gypsum wallboard. To determine the actual moisture content of gypsum wallboard, it is necessary to remove a piece of the wallboard and bake it to measure the amount of water that is removed during the baking process. Parks did not do this. Therefore, any attempt by Parks to make claims about the absolute moisture content of the walls based on moisture meter readings would be improper and

unreliable. Furthermore, gypsum board does not exist as a solid at moisture contents above 10%
Parks claimed he measured moisture content up to 25%, which is not possible.

7.      Parks' use of an infrared camera in his investigation is similarly flawed. Parks
uses an infrared camera to measure the temperature distribution of the wallboard. Infrared
cameras can be set at different levels to focus on temperature variations of different magnitudes.
For example, a camera can be programmed to highlight temperature differences as small as one
degree Fahrenheit, or it can be programmed to only display variations of ten degrees or more.
Translating this temperature profile into reliable information requires removal of the specific
portion of the wallboard in question to examine the quality of insulation, the presence of extra
thermal bridging, possible air leakage in the wall, etc. to determine the source of the temperature
variation. Industry standards call for certain criteria to be met before an infrared camera can be
used reliably to investigate wood frame construction. The difference between the indoor and
outdoor temperature should be at least 18 degrees Fahrenheit for at least four hours prior to
inspection. In addition, an inspector cannot allow any direct sunlight on an inspected surface for
at least three hours prior to the inspection.

8.      Parks did not indicate what settings were used in his thermographic imaging of
the Strickland home. He could not state the magnitude of the temperature differentials the
camera would capture. He did not account for the Code's allowance of thermal shorts in up to
one percent of total exterior surface area. He does not appear to have made any attempt to
measure or control for sunlight exposure on the home prior to the infrared camera use. Parks
does not appear to have made any attempt to measure the difference between the inside and
outside temperature, either at the time of testing or for the several hours before testing. Parks
does not appear to have removed any portion of the gypsum wallboard to inspect it for moisture

content or to determine alternative causes of observed temperature variations. Parks conducted his thermography investigation outside the recommended practice guidelines limits for his level of certification. Parks holds only a Level I thermography certification. The American Society of Nondestructive Testing describes Level I training with the following limitations: "Level I infrared thermographer ... shall perform inspections under the cognizance of a Level II or Level III... Level I shall not independently perform nor evaluate inspection results... when such inspection results are for the purpose of verifying compliance to code or regulatory requirements." These actions by Parks violate the standard reporting expectations of thermographic inspections as indicated by the ASTM Standards for Thermographic Inspection and by the American Society of Nondestructive Testing.

9.    Parks' mold sampling methodology also lacks merit. Pushing insulation away from the gypsum wallboard to obtain an air sample is problematic as is the sample site selection method. This sampling protocol is unreliable and is apparently made up by Parks and has not been subjected to peer review or scientific testing. Parks contends that the wall cavity has an elevated level of mold and that the elevation is caused by the vapor retarder. However, Parks does not demonstrate what 'normal levels' of mold spores typically are found in such wall cavities, nor does he consider that normal outdoor spores are easily blown into a vented wall cavity (especially near the outside air conditioner condenser fan) to accumulate in the insulation and will result in some variation in observed levels.

10.    Parks' conclusions regarding condensation as the cause of moisture accumulation in the walls do not comport with an analysis of historical weather data for nearby Dothan, Alabama. Over the past four years, there have only been 9 days reported when the outside daily dew point average was above the thermostat set point in the Strickland home, which Parks

reported as 75°F.  Typically the wall is several degrees higher than the thermostat setting; this will result in there being only 1 day between 2004-2007 when outside daily dew point average was above the wall cavity temperature.  When the wall cavity surface is warmer than the dew point of the outside air, condensation in the wall cavity is impossible.

11.    In short, to a reasonable degree of scientific certainty, it is my opinion that Parks' methodology lacks scientific validity and reliability, and his conclusions are unsupported by his data.

I declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed on this the 20th day of March 2008.

Francis Conlin

# EXHIBIT "I"

**Ford v Champion**

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE SOUTHERN DISTRICT OF ALABAMA
 3             SOUTHERN DIVISION
 4
 5   ROBERT FORD, et al.,
 6       Plaintiffs,
 7
 8   vs.        Case No.: 1:06-cv-423-BH-C
 9
10   CHAMPION ENTERPRISES, INC., et al.,
11       Defendants.
12
13          *   *   *   *   *   *
14      DEPOSITION OF BOBBY PARKS, taken
15   pursuant to notice and stipulation on
16   behalf of the Defendants, at Beasley,
17   Allen, 272 Commerce Street, Montgomery,
18   Alabama, before Bridgette Mitchell,
19   Shorthand Reporter and Notary Public in
20   and for the State of Alabama at Large,
21   on December 17, 2007, commencing at
22   2:25 p.m.
23
```

**Ford v Champion**

Page 2

```
 1                    APPEARANCES
 2
 3
 4   FOR THE PLAINTIFF:
 5   C. Lance Gould, Esquire
 6   BEASLEY, ALLEN, CROW, METHVIN,
 7       PORTIS & MILES, P.C.
 8   272 Commerce Street
 9   Montgomery, Alabama  36104
10
11
12   FOR THE DEFENDANTS:
13   W. Scott Simpson, Esquire
14   RITCHEY & SIMPSON, P.C.
15   3288 Morgan Drive
16   Birmingham, Alabama  35216
17
18
19
20
21
22
23
```

**Ford v Champion**

Page 3

```
 1                    STIPULATIONS
 2          It is hereby stipulated and
 3     agreed by and between counsel
 4     representing the parties that the
 5     deposition of BOBBY PARKS is taken
 6     pursuant to notice and stipulation on
 7     behalf of the Defendants; that all
 8     formalities with respect to procedural
 9     requirements are waived; that said
10     deposition may be taken before
11     Bridgette Mitchell, Shorthand Reporter
12     and Notary Public in and for the State
13     of Alabama at Large, without the
14     formality of a commission; that
15     objections to questions, other than
16     objections as to the form of the
17     questions, need not be made at this
18     time, but may be reserved for a ruling
19     at such time as the deposition may be
20     offered in evidence or used for any
21     other purpose as provided for by the
22     Civil Rules of Procedure for the State
23     of Alabama.
```

**Ford v Champion**

Page 4

```
 1          It is further stipulated and
 2    agreed by and between counsel
 3    representing the parties in this case
 4    that the filing of the deposition of
 5    BOBBY PARKS is hereby waived and that
 6    said deposition may be introduced at
 7    the trial of this case or used in any
 8    other manner by either party hereto
 9    provided for by the Statute, regardless
10    of the waiving of the filing of same.
11          It is further stipulated and
12    agreed by and between the parties
13    hereto and the witness that the
14    signature of the witness to this
15    deposition is hereby waived.
16                    INDEX
17    EXAMINATION                    Page
18    By Mr. Simpson.................... 5
19    EXHIBITS:                       Page
20    Defendant's Exhibit #5 ........... 6
21    Defendant's Exhibit #6 ........... 6
22    Defendant's Exhibit #7 ........... 10
23    Defendant's Exhibit #8 ........... 45
```

**Ford v Champion**

Page 5

```
 1              COURT REPORTER:  Usual
 2     stipulations?
 3              MR. SIMPSON:  Sure.
 4              BOBBY PARKS, having first been
 5     duly sworn or affirmed to speak the
 6     truth, the whole truth, and nothing but
 7     the truth, testified as follows:
 8              MR. SIMPSON:  Let's see.  This
 9     is a continuation from a prior
10     deposition.  This is the Ford case.
11     Lance, I'm covering today, but I think
12     I'll probably enter an appearance just
13     so we have clarity.
14              MR. GOULD:  No problem.
15                   EXAMINATION
16     BY MR. SIMPSON:
17  Q. Mr. Parks, you were deposed, I think
18     partially, on this case, and there were
19     four exhibits.  And I want to show you
20     a few other documents to make sure I've
21     got everything that is generated by you
22     and relevant.  This is another document
23     I will hand to you.  I think that is
```

**Ford v Champion**

Page 150

```
 1   A. And, again, I have not researched that,

 2      so I'm not aware.

 3   Q. You hold a mold remediation credential

 4      from the State of Louisiana?

 5   A. That's correct.

 6   Q. And I think we've also established

 7      you've never remediated a home?

 8   A. I write -- I don't do the physical

 9      tearing out of the materials.  I do the

10      inspections before and after and write

11      the protocols, but I don't actually do

12      the physical tearing out of the

13      materials.

14   Q. Are you aware of any generally-accepted

15      authoritative treatise for mold

16      remediation?

17   A. There's a lot of published information

18      out there.  I don't know which

19      specifically would apply in the manner

20      that you speak to it.

21   Q. Are you familiar with the IICRC 520?

22   A. Yes, sir.

23   Q. Do you consider that to be an
```

**Ford v Champion**

Page 151

```
 1      authoritative work?
 2   A. I would consider it to be, yes, sir.
 3   Q. Is that the book that Louisiana uses to
 4      train people for mold remediation?
 5   A. Louisiana doesn't train people for mold
 6      remediation.
 7   Q. All right.  Maybe I misunderstood.  I
 8      thought you have a credential from the
 9      state?
10   A. Right.  But you -- they have a list of
11      entities who do provide the training
12      which they accept.  But the State of
13      Louisiana doesn't do the training.
14   Q. Okay.  It's some third party, but it's
15      approved by the state?
16   A. There's a number of them that they have
17      approved, that's correct.
18   Q. Is the IICRC 520 the standard work that
19      you used in your training?
20   A. I know it was referenced, but I don't
21      know in its entirety if that was it.
22   Q. What is your familiarity with that
23      work?
```

**Ford v Champion**

Page 160

```
 1              *  *  *  *  *  *  *  *  *  *
 2                 REPORTER'S  CERTIFICATE
 3              *  *  *  *  *  *  *  *  *  *
 4         STATE OF ALABAMA
 5         COUNTY OF MONTGOMERY
 6            I do hereby certify that the above
 7         and foregoing transcript was taken down
 8         by me in stenotype, and the questions
 9         and answers thereto were transcribed by
10         means of computer-aided transcription,
11         and that the foregoing represents a
12         true and correct transcript of the
13         testimony given by said witness.
14            I further certify that I am neither
15         of counsel, nor any relation to the
16         parties to the action, nor am I anywise
17         interested in the result of said case.
18
19
20         _____
           Bridgette W. Mitchell,
21         Certified Court Reporter and
           Commissioner for the State of
22         Alabama at Large
           ACCR No. 231 - Expires 9/30/08
23         MY COMMISSION EXPIRES 1/25/2010
```

# EXHIBIT "J"

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF ALABAMA

3                SOUTHERN DIVISION

4

5    NICHOLAS STRICKLAND, et al.,    ORIGINAL

6        Plaintiffs,

7

8    vs.   CIVIL ACTION NO. 1:06-CV-00682-TFM

9

10   CHAMPION ENTERPRISES, INC., et al.,

11       Defendants.

12            *    *    *    *    *    *

13       DEPOSITION OF BECKY HUNT, NICHOLAS

14   STRICKLAND, and JENNIFER STRICKLAND,

15   taken pursuant to notice and

16   stipulation on behalf of the

17   Defendants, at Beasley, Allen, at 272

18   Commerce Street, Montgomery, Alabama,

19   before Bridgette Mitchell, Shorthand

20   Reporter and Notary Public in and for

21   the State of Alabama at Large, on

22   October 29, 2007, commencing at

23   10:15 a.m.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

```
 1                    A P P E A R A N C E S

 2

 3

 4     FOR THE PLAINTIFFS:

 5     C. Lance Gould, Esquire

 6     BEASLEY, ALLEN, CROW, METHVIN,

 7         PORTIS & MILES, P.C.

 8     218 Commerce Street

 9     Montgomery, Alabama  36106

10

11

12     FOR THE DEFENDANTS:

13     Gregory S. Ritchey, Esquire

14     RITCHEY & SIMPSON

15     3288 Morgan Drive

16     Suite 100

17     Birmingham, Alabama  35216

18

19

20

21

22

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

1                    STIPULATIONS

2          It is hereby stipulated and

3     agreed by and between counsel

4     representing the parties that the

5     deposition of BECKY HUNT, NICHOLAS

6     STRICKLAND, and JENNIFER STRICKLAND,

7     are taken pursuant to notice and

8     stipulation on behalf of the

9     Defendants; that all formalities with

10    respect to procedural requirements are

11    waived; that said deposition may be

12    taken before Bridgette Mitchell,

13    Shorthand Reporter and Notary Public in

14    and for the State of Alabama at Large,

15    without the formality of a commission;

16    that objections to questions, other

17    than objections as to the form of the

18    questions, need not be made at this

19    time, but may be reserved for a ruling

20    at such time as the deposition may be

21    offered in evidence or used for any

22    other purpose as provided for by the

23    Civil Rules of Procedure for the State

Page 4

1    of Alabama.

2            It is further stipulated and

3    agreed by and between counsel

4    representing the parties in this case

5    that the filing of the deposition of

6    BECKY HUNT, NICHOLAS STRICKLAND, and

7    JENNIFER STRICKLAND, is hereby waived

8    and that said deposition may be

9    introduced at the trial of this case or

10   used in any other manner by either

11   party hereto provided for by the

12   Statute, regardless of the waiving of

13   the filing of same.

14           It is further stipulated and

15   agreed by and between the parties

16   hereto and the witness that the

17   signature of the witness to this

18   deposition is hereby waived.

19

20                   INDEX

21

22   EXAMINATION                    Page

23   By Mr. Ritchey...................  7

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

| 1 | EXHIBITS: | | Page |
|---|---|---|---|
| 2 | DX-1 | Plaintiffs' Disclosure | 14 |
| 3 | DX-2 | Contract | 15 |
| 4 | DX-3 | Arbitration Provision | 16 |
| 5 | DX-4 | Homeowner's Guide | 16 |
| 6 | DX-5 | PX Supplemental Response | 61 |
| 7 | DX-6 | Bill of Sale | 61 |
| 8 | DX-7 | Evidence of Insurance | 62 |
| 9 | DX-8 | Important Instructions | 66 |
| 10 | CHB-3 | Data Plate | 6 |
| 11 | CHB-11 | Owner's registration card | 6 |
| 12 | CHB-12 | Walk-through complaint | 6 |
| 13 | CHB-13 | Customer survey | 6 |
| 14 | CHB-16 | Service work order | 6 |
| 15 | CHB-17 | Walk-through list | 6 |
| 16 | CHB-20 | Service work order | 6 |
| 17 | CHB-23 | Complaint list | 6 |
| 18 | CHB-26 | Service work order | 6 |
| 19 | CHB-28 | Homeowner's guide | 6 |
| 20 | CHB-29 | Installation manual | 6 |
| 21 | CHB-41 | Customer deposit form | 6 |
| 22 | CHB-42 | Check | 6 |
| 23 | CHB-43 | Dealer installed options | 6 |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

```
 1     CHB-44    Site prep requirements      6

 2     CHB-45    Contract                    6

 3     CHB-46    Dealer closing agreement    6

 4     CHB-47    Disclosure statement        6

 5     CHB-48    American Modern Ins. Group  6

 6

 7         (All CHB Exhibits were pre-marked

 8          for identification.)

 9

10              BECKY HUNT, having been first

11     duly sworn to translate the spoken word

12     into Sign language and Sign language

13     into the spoken word, to the best of

14     her ability:

15

16              BECKY HUNT, NICHOLAS

17     STRICKLAND, and JENNIFER STRICKLAND,

18     having first been duly sworn or

19     affirmed to speak the truth, the whole

20     truth, and nothing but the truth,

21     testified as follows:

22

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 114

1          MR. STRICKLAND:   Like the wind

2     blow it and will make an awful noise.

3          (Conversation between Ms. Hunt

4          and Mr. Strickland in English

5          and in Sign.)

6          MS. HUNT:   He's saying that

7     there -- he had a question to do with

8     the way that the wind blew through the

9     home in the metal part, the noise and

10    some issues there that, you know, he

11    was sensitive to.   But the man told him

12    that's normal, that's how it is, blah,

13    blah, blah, so they didn't do anything

14    there.

15          MR. RITCHEY:   Okay.   Is there

16    anything else that they can think of?

17          MS. HUNT:   Do you remember

18    anything else?   When -- and I don't

19    know where in the process, but I do

20    know --

21          MR. RITCHEY:   April '03.

22          MS. HUNT:   I'm not really sure,

23    but we had a problem with a leak in the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 115

1    sink behind the kitchen, kept pouring

2    water down the back.  And when they

3    came, their solution to fixing what

4    seemed to be water that builds up on

5    the back and leak was that they sealed

6    it with a rubber/plastic caulking kind

7    of thing and they didn't deal with the

8    issue of the leak, of how the water ran

9    or why the water was building up there.

10   They just put the caulk and they said

11   that would stop the water from going

12   down the back.  And so I do know that

13   that was one thing.

14           (Conversation between Ms. Hunt

15           and Mr. Strickland in English

16           and in Sign.)

17           MS. HUNT:  Did you ask anybody

18   to come and look at that?

19           MRS. STRICKLAND:  It was after

20   warranty.

21           MS. HUNT:  Oh, it was after

22   warranty.  He's saying after the period

23   had gone.

Page 139

1   get fixed right?

2           MRS. STRICKLAND:   No.

3           MS. HUNT:   In the kitchen.

4           MR. STRICKLAND:   They fixed the

5   cabinet, but the problem still

6   (unintelligible).

7           MS. HUNT:   Yeah.

8           MR. RITCHEY:   Did you say the

9   carpet?

10           MR. STRICKLAND:   The carpet

11   still wrinkled.

12           MS. HUNT:   The carpet's still

13   wrinkled.   The wind --

14           (Conversation between the

15           plaintiffs in English and in

16           Sign.)

17           MS. HUNT:   He's saying that --

18   which is not a complaint in here, but

19   that -- that I'm aware of, but there is

20   a leak of water that comes in the front

21   door and that the man came, he sealed

22   it and he told him, Well, you just have

23   to do this yourself once a year because

1          REPORTER'S CERTIFICATE

2

3     STATE OF ALABAMA )
                       )
4     ELMORE COUNTY    )

5

6          I do hereby certify that the above

7     and foregoing transcript was taken down

8     by me in stenotype, and the questions

9     and answers thereto were transcribed by

10    means of computer-aided transcription,

11    and that the foregoing represents a true

12    and correct transcript of the testimony

13    given by said witness.

14         I further certify that I am neither

15    of counsel, nor of any relation to the

16    parties to the action, nor am I anywise

17    interested in the result of said cause.

18

19              *Bridgette W. Mitchell*
20    ────────────────────────────────
      Bridgette W. Mitchell, Certified
      Court Reporter and Commissioner
21    for the State of Alabama at Large
      ACCR NO. 231 - Expires 9/30/08
22    MY COMMISSION EXPIRES 1/25/2010

23

# EXHIBIT "K"

# IICRC S520

# Standard and Reference Guide for Professional Mold Remediation



*First Edition*
*December 2003*

**Contributing Organization**



**Contributing Organization**





# IICRC
# Standard and Reference
# Guide for Professional
# Mold Remediation
# S520

*First Edition*
*Published 2003*

Copyright © 2003 by the Institute of Inspection, Cleaning and Restoration Certification (IICRC). All rights reserved. No part of this publication may be used or reproduced in any manner whatsoever without written permission from the IICRC, except in the case of brief quotations embodied in articles, reports or critical reviews.

**Institute of Inspection, Cleaning and Restoration Certification (IICRC)**
**2715 East Mill Plain Boulevard**
**Vancouver, Washington 98661 USA**
**Phone (360) 693-5675  •  www.iicrc.org**

**Printed in USA**

# *Table of Contents*

**Preface**..................................................................................................................................5

**Acknowledgments**.................................................................................................................7

**Important Definitions**........................................................................................................10

**Standard and Reference Guide Cross-Reference Table**..................................................11

# IICRC Standard for Professional Mold Remediation (S520)

**Section 1** – Scope, Purpose and Application..............................................................13

**Section 2** – References ...............................................................................................13

**Section 3** – Definitions................................................................................................14

**Section 4** – Principles of Mold Remediation...............................................................15

**Section 5** – Contractor Qualifications ........................................................................16

**Section 6** – Safety and Health ...................................................................................17

**Section 7** – Administrative Procedures and Insurance ..............................................18

**Section 8** – Limitations, Complexities, Complications and Conflicts...........................20

**Section 9** – Inspection and Preliminary Determination..............................................21

**Section 10** – Structural Remediation..........................................................................22

**Section 11** – HVAC Remediation ............................................................................... 26

**Section 12** – Contents Remediation ...........................................................................27

**Section 13** – Post-Remediation Verification ...............................................................31

**Section 14** – Final Documentation ............................................................................. 31

**Section 15** – Indoor Environmental Professional ....................................................... 31

# Reference Guide for Professional Mold Remediation

Introduction .................................................................................................................................... 35

Chapter 1 – The Fungal Ecology of Indoor Environments .................................................... 36

Chapter 2 – Health Effects from Indoor Mold Contamination .............................................. 40

Chapter 3 – Principles of Mold Remediation ........................................................................... 52

Chapter 4 – Administrative Procedures and Insurance ........................................................... 55

Chapter 5 – Limitations, Complexities, Complications and Conflicts ................................... 62

Chapter 6 – Inspection and Preliminary Determination ......................................................... 65

Chapter 7 – Structural Remediation ........................................................................................ 70

Chapter 8 – HVAC Remediation .............................................................................................. 85

Chapter 9 – Contents Remediation .......................................................................................... 90

Chapter 10 – Tools, Equipment and Materials ...................................................................... 104

Chapter 11 – Safety and Health .............................................................................................. 121

Chapter 12 – Indoor Environmental Professionals and Assessments ................................... 129

Appendix A – Mold Remediation Certification Authorities ................................................. 133

Appendix B – Suggested Guidance for the Selection and Use of Respiratory Protection
During Mold Remediation ......................................................................................... 134

Glossary of Terms .................................................................................................................... 143

Sources ...................................................................................................................................... 166

Abbreviations ........................................................................................................................... 168

Industry Acronyms .................................................................................................................. 169

Source Acknowledgement ........................................................................................................ 170

Index ..................................................................................................................................... 172

and Reference Guide is appropriate.    When in doubt, apply caution and seek additional professional opinion.

IICRC S520 is presented in a two-part format: the procedural standard and a supplementary reference guide. The Standard is printed first within the document on colored pages, followed by the longer Reference Guide section. The Standard summarizes most of the significant and important procedures and methodologies of a mold remediation project, while the Reference Guide restates, embellishes and further explains those procedures and methodologies, and provides additional background information which supports the Standard. Although the material in the Reference Guide does not carry the official status of a standard, the two sections complement one another and should always be considered in tandem. The S520 does not attempt to teach mold remediation procedures, but rather provide the principles and foundation for understanding proper remediation practices. The S520 is not a substitute for the remediation training and certification programs that are necessary to attain competence in the field of mold remediation and properly apply this Standard.

S520 is not intended to establish procedures or criteria for assessing mold contamination in an indoor environment. These issues are most appropriately addressed by professional organizations that represent Indoor Environmental Professionals (IEPs). Since these professional organizations have not agreed upon threshold exposure limits or levels of visible mold growth that constitute a concern for occupant and worker safety, the IICRC Mold Remediation Standard Committee decided not to establish action levels or procedures based upon the quantity or size of the area of visible mold growth.

Remediators and other parties to the remediation process often request specific guidance regarding quantities of mold or mold spores that trigger remediation activities or confirm remediation success. Quantifying visible levels of mold growth alone is not feasible as an action level decision criterion, because of the wide range of occupant susceptibility and the inability to precisely measure exposure, along with insufficient science to support conclusions in this area at the time of publication.

Thus, S520 represents a philosophical shift away from setting numerical mold contamination action levels. Instead, it establishes mold contamination definitions, conditions (1, 2, 3) and general guidance, which, when properly applied, can assist remediators and others in determining criteria that trigger remediation activities or confirm remediation success.

S520 is a living document; subject to change as more information regarding mold contamination and remediation becomes available, and as scientific developments occur and advancements are made in remediation technology and practice. The S520 will be reviewed, evaluated and validated through application in the field. Thereafter, it is hoped that the S520 will be revised and improved, and then again reviewed, evaluated and validated through application in the field. This process and further professional and public review will allow our industry to develop a body of mold remediation science and achieve our overall goal of improving the environments in which people live and work.

The IICRC invites and encourages professional and public review and comment. Please send comments and suggestions for S520 revisions or additions to:

IICRC Mold Remediation Standard Committee
2715 East Mill Plain Blvd.
Vancouver, WA 98661, USA

Institute of Inspection, Cleaning and Restoration Certification Standard                    IICRC S520

Other reference materials used in S520 are listed in the Source Acknowledgements of this publication.

## 3    Definitions

**actual growth:**  molds that have colonized a substrate, formed fungal mycelia, growth structures and spores; are active or dormant; visible or hidden.

**air filtration device (AFD):**  depending on the mode of use, an AFD that filters (usually HEPA) and recirculates air is referred to as an air scrubber. One that filters air and creates negative pressure is referred to as a negative air machine.

**assessment:**  a process performed by an Indoor Environmental Professional (IEP) that includes the evaluation of data obtained from a building history and inspection to formulate an initial hypothesis about the origin, identity, location and extent of amplification of mold contamination. If necessary, a sampling plan is developed, and samples are collected and sent to a qualified laboratory for analysis. The subsequent data is interpreted by the IEP. The IEP or other qualified individual may then develop a remediation plan.

**Condition:**  for the purpose of this Standard, Conditions 1, 2, and 3 are defined for indoor environments relative to mold.

**Condition 1 (normal fungal ecology):**  an indoor environment that may have settled spores, fungal fragments or traces of actual growth whose identity, location and quantity are reflective of a normal fungal ecology for a similar indoor environment.

**Condition 2 (settled spores):**  an indoor environment which is primarily contaminated with settled spores that were dispersed directly or indirectly from a Condition 3 area, and which may have traces of actual growth.

**Condition 3 (actual growth):** an indoor environment contaminated with the presence of actual mold growth and associated spores. Actual growth includes growth that is active or dormant, visible or hidden.

**containment:** a precaution used to minimize cross-contamination from affected to unaffected areas by traffic, material handling or airborne distribution. Containment normally consists of 6-mil polyethylene sheeting, often in combination with negative air pressure, to prevent cross contamination.

**contaminated (contamination):**  the presence of indoor mold growth and/or mold spores, whose identity, location and quantity are not reflective of a normal fungal ecology for similar indoor environments, and which may produce adverse

health effects, cause damage to materials and/or adversely affect the operation or function of building systems.

**cross-contamination:**  the spread of contaminants from an affected area to an unaffected area.

**due diligence:** proper care, attention or persistence in doing a thing; such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable person under the particular facts and circumstances.

**engineering controls:**  the utilization of methods, equipment or containment in such a manner that they limit the exposure of remediation workers and occupants to contaminants and prevent the introduction of contaminants to surrounding uncontaminated areas and contents.

**fungus (plural "fungi"):** one of the five kingdoms into which living things are categorized. The other kingdoms are Animal, Plant, Bacteria, and Protista. Fungi have distinct nuclei and include a variety of types, such as molds, mildews, yeast, and mushrooms.  Fungi range in size generally from 2 to 20 microns and are ubiquitous in soils, water and air.  Unicellular fungi are called *yeasts*.  Fungi formed by long chains of cells are called *molds*. Fungi are ubiquitous and are found in moist environments.

**HEPA:**  an acronym for "high efficiency particulate air/arrestance", which describes an air filter that removes 99.97% of particles at 0.3 microns in diameter.

**highly recommended:**  when the term *highly recommended* is used in this document, it means that the practice or procedure is a component of the accepted "standard of care" to be followed, while not mandatory by regulatory requirement.

**HVAC:**  an acronym for "heating, ventilation and air-conditioning".

**Indoor Environmental Professional (IEP):** an individual that is qualified by knowledge, skill, education, training and/or experience to perform an assessment of the fungal ecology of property, systems and contents at a job site, create a sampling strategy, sample the indoor environment, interpret laboratory data and determine Condition 1, 2 and 3 status for the purpose of establishing a scope of work and verifying the return of the fungal ecology to a Condition 1 status.

**materially interested parties:**  an individual or entity substantially and directly affected by the mold remediation project.

14

# Chapter 1

## *The Fungal Ecology of Indoor Environments*

### INTRODUCTION

It is highly recommended that those responsible for the remediation of mold-contaminated environments understand how water damage promotes fungal and related microbial growth and amplification (rapid growth under optimum environmental conditions). Such amplification may affect structural, finishing and furnishing materials and create a health risk for both remediation workers and occupants. Measures to minimize health risks may require containment of work spaces, controlled airflow, personal protective equipment and immunization.

### FUNGAL BIOLOGY

There are approximately 60,000 to 80,000 described species of fungi (molds and yeasts). The majority of fungi are saprobes; that is, they utilize non-living organic material for food. Molds, as referred to in this document, are those commonly described as microfungi, differentiating them from macrofungi, such as mushrooms and other fleshy organisms. Molds develop from unique, microscopic seed-like structures called spores. Spores are not visible to the unaided eye. When spores settle on a surface under appropriate moisture and temperature conditions, they absorb water, swelling to 2-3 times their original size, and begin to form thread-like structures known as hyphae. As the hyphae grow, they interweave to form a tangled mass known as a mycelium. With continued growth, a mycelium, unlike a spore, becomes visible to the naked eye. The mycelium extends across the surface material, generally in a circular pattern, with hyphae growing above and below the food source. When the fungus matures, spores will form within specialized structures or individually on the aerial hyphae. The spores can then be carried away by air currents, moisture droplets or insects to new environments to start the reproductive cycle over again. The distinctive, microscopic appearance of the sporulating aerial hyphae of some common molds is shown in the following illustrations (©David Malloch, Department of Botany, University of Toronto).



### THE BUILDING ECOSYSTEM

Each indoor environment is an ecological system of interaction between the non-living or physical environment, the living or biological environment, and their products and/or components. The

physical environment includes structural objects, finishing and furnishing materials, paints, coatings, and sealants, as well as temperature, moisture and airflow. The living or biological indoor environment typically includes bacteria, fungi, insects, arachnids (spiders and mites), mammals (rodents, pets) and humans. The products and components of the living environment include proteins, enzymes, glucans, endotoxins, mycotoxins, and volatile organic compounds.

## Microenvironments

The indoor ecosystem is comprised of an interrelated complex of microenvironments, each of which has its own mix of physical and biological factors, and can serve as a reservoir for a variety of pollutants that can potentially affect the quality of the air in occupied spaces. Some microenvironments are structural components such as interior and exterior wall cavities, ceiling spaces, air-handling systems and crawl spaces. Some microenvironments serve as reservoirs that readily collect dusts, soil, and associated microorganisms on a routine basis. Examples include flooring materials, upholstered furniture, textile furnishings, ceiling tiles, bathrooms and pet areas and HVAC systems

## Microbial Flora

Normal building flora usually associated with microenvironments include viable (living) and non-viable (dead) microorganisms, such as environmental and human source bacteria and common fungi (yeasts and molds) and their associated antigens, spores, toxins, volatile metabolites and enzymes. In the absence of rapid attention to water damage (intrusion and/or accumulation) and preventive programs of routine climate control, maintenance, and cleaning, microenvironmental reservoirs can quickly become sources of contamination through extensive accumulation of settled spores (Condition 2) and mold amplification (Condition 3).

Molds are microorganisms that utilize organic substrates as nutrient sources in the presence of moisture. Their spores germinate, grow and amplify when indoor moisture is uncontrolled through chronic water damage (intrusion or condensation), catastrophic flooding or simple neglect (lack of routine maintenance and cleaning). Under such circumstances, molds can grow and produce massive numbers of spores on a variety of surfaces such as wood, gypsum board and paint. Additionally, many soil bacteria, especially gram-negative bacteria and actinomycetes, thrive in damp indoor conditions and are routinely found in environments where mold amplification is identified.

## SHIFTING ECOLOGY

As available moisture increases over time, such as moisture intrusion into ceiling spaces and wall cavities, the microbial ecology of materials and surfaces changes. Competition among organisms begins to favor those with increasingly higher moisture requirements. If a water-damaged environment is not promptly and properly remediated, many environmental mold spores that are typically present, such as *Aspergillus, Penicillium, Aureobasidium* and *Stachybotrys* will germinate, grow and multiply on building materials, eventually leading to material degradation and potential negative effects upon the quality of the indoor air. Thus, the goal of mold remediation is to return the indoor environment to a state of normal fungal ecology (i.e. types and concentrations of molds typically found in non-water damaged, environmentally well-maintained structures, and reflective of the ecological and climatic elements of the geographical region in which the building is located). The ***accompanying photograph***

of wallboard, wet for three weeks from flooding, shows a shift in fungal ecology as water wicks up the wall.



## Water Activity

The amount of free water available to microorganisms for growth on a substrate (food source) or microenvironment is described as water activity ($a_w$). Water activity is the ratio of the vapor pressure of water in the substrate to the vapor pressure of pure water at the same temperature and it can be compared to the equilibrium relative humidity (ERH) of a material. Many fungi have a minimum requirement of $a_w$ of 0.88 (88% ERH). Some have a limit that can be considerably below 0.80 (80% ERH), meaning they require less water to germinate and multiply. These lower water activity condition or "xerophilic" fungi are often "primary colonizers" and are best represented by *Penicillium* species, *Aspergillus versicolor and Wallemia*. "Secondary colonizers" typically have $a_w$ between 0.80-0.90 (80-90% ERH), and include molds such as *Cladosporium, Paecilomyces, Scopulariopsis* and a variety of *Aspergillus* species. Lastly, extremely wet microenvironments, particularly those with cellulose-based materials (such as wallpaper, gypsum board and books), favor the growth of "tertiary colonizer" fungi with high $a_w$ >0.90 (90% ERH), such as *Stachybotrys*, *Acremonium, Ulocladium, Fusarium*, *Trichoderma*, *Chaetomium* and a variety of yeasts. Thus, as uncontrolled moisture intrudes or accumulates in a building, the normal fungal ecology shifts to favor the growth and amplification of those molds that optimize high water activity conditions. A variety of bacteria, molds and yeasts can also grow in stagnant water reservoirs of HVAC systems. Depending upon their location, fungi and bacteria may multiply significantly without notice to the occupants (i.e., non-visible contamination), such as within wall cavities, ceiling spaces or HVAC units.

| Possible Tasks | Remediator | IEP | Other* |
|---|:---:|:---:|:---:|
| | | | |
| Initial determination | X | X | X |
| Occupant information | X | X | X |
| Occupant characterization and complaints | X | X | X |
| | | | |
| Detailed health-related interview (follow-up) | | X | X |
| Occupant health evaluation | | | X |
| Building history | X | X | X |
| Site safety evaluation | X | X | X |
| Moisture detection | X | X | X |
| Intrusive investigation | X | X | X |
| Pre-remediation assessment | | X | |
| Data interpretation and report | | X | |
| Scope development | X | X | |
| Simple Occupant Health Profile | X | X | X |
| Technical specifications | X | X | |
| Remediation | X | | |
| Quality control | X | X | X |
| Monitoring work environment | X | X | |
| Post remediation verification | | X | |
| | | | |

* Qualified and licensed health or medical professional

It is important that individuals who perform the above tasks have sufficient training and experience for those specific tasks and that conflicts of interest between remediation activities and assessment activities be avoided.

# Chapter 12

## *Indoor Environmental Professionals and Assessments*

### WHAT IS A QUALIFIED IEP?

The IICRC S520 defines an "IEP" as an individual who is qualified by knowledge, skill, education, training and/or experience to perform an assessment of the fungal ecology of property, systems, and contents at the job site, create a sampling strategy, sample the indoor environment, interpret laboratory data and determine Condition 1, 2 and 3 for the purpose of establishing a scope of work and verifying the return of the fungal ecology to a Condition 1 status.

The determination of conditions by the IEP provides for the establishment of a general scope of work. The Indoor Environmental Professional may or may not be engaged to develop a set of detailed protocols and technical specifications. Using the IICRC *S520*, an experienced mold remediation project manager may be able to develop an internal work specification that can be used on a mold remediation project.

There is no single designation, license, or certification that qualifies an IEP. Remediation firms and others who hire Indoor Environmental Professionals should consider the individual's knowledge, skill, education, training and experience to best judge their ability and qualifications.

### INDOOR ENVIRONMENTAL PROFESSIONAL QUALIFICATIONS

### Education and Training

Many IEPs possess technical degrees or professional credentials in industrial hygiene, medical technology, biology, microbiology, mycology, public health, environmental science, toxicology, building science, or engineering. While this may be a good place to begin looking for IEPs, these are such broad fields of study that no single field by itself guarantees competence. It is highly recommended that individuals with advanced degrees and certifications also have additional education in industry-related subjects including, but not limited to:

- indoor environmental quality (IEQ);
- water damage restoration;
- occupational health and safety;
- environmental monitoring and assessment;
- construction basics;
- construction failure;
- building science;
- mechanical systems operation and maintenance;
- mechanical systems testing and remediation; and
- mold remediation.

- Research;
- Remediation assessment of:
  - Level of Personal Protection Equipment (PPE)
  - Salvability of materials
  - Pre-existing conditions unrelated to the damage
  - Hidden conditions unrelated to the damage
  - Scope of work
  - Specifications
  - Protocols
  - Interim assessments
  - Post-remediation verification without a pre-remediation assessment

Non-investigative tasks may include assistance in establishing necessary work procedures and oversight of specific issues or entire projects.

Although it is important for an IEP to be qualified, it is equally important for those who provide other activities or services involved in mold remediation projects to be qualified. It is highly recommended that remediators be technically competent in the areas of their requested performance, keep the interests of all materially interested parties in the project in mind, including the IEP, and not work outside their area of competence.

**Mycology/Microbiology Laboratories**

It is the IEP's responsibility to select and use qualified mycology/microbiology laboratories.

After a sampling plan has been designed, and air, surface, dust and/or bulk samples have been appropriately collected, it is highly recommended that they be submitted to a qualified environmental microbiological laboratory for analysis. While a hospital or clinical microbiology laboratory is required for specimens collected from humans for the diagnosis or management of infectious disease, an environmental microbiological laboratory is necessary for air, surface, fluid and bulk samples collected from the ambient or work environment.

A qualified environmental microbiological laboratory will employ mycologists and/or microbiologists who are trained in isolating and identifying environmental organisms, and can use appropriate media, incubation conditions and a variety of tests specific to environmental isolates. They will be familiar with the microscopic morphology of fungi associated with the built environment.