IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NICHOLAS STRICKLAND, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case Number:  1:06-CV-00682-TFM |
| | * | |
| CHAMPION HOME BUILDERS CO., | * | |
| INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |

CHAMPION HOME BUILDERS CO.'S MOTION TO EXCLUDE
TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT
ROBERT KONDNER AND REQUEST FOR *IN LIMINE* HEARING

COMES NOW, the defendant, Champion Home Builders, Co., (referred to herein as "CHB" or "Defendant") and hereby move this Court to exclude under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1992), and Fed. R. Evid. 702, the expert testimony of Plaintiff's proposed expert Robert Kondner ("Kondner").  Pursuant to Fed. R. Evid. 104, CHB requests a hearing on this motion.  As grounds for this motion, CHB states as follows:

### INTRODUCTION

Robert Kondner ("Kondner") has been named as an expert in this matter at one time. It is unclear as to whether the plaintiffs intend to rely on his testimony as no deposition has been taken and indications have been made that he will not be used as an expert in this matter. However, plaintiffs Nicholas and Jennifer Strickland (collectively referred to herein as "the Stricklands" or "Plaintiffs") did produce an expert report from Kondner in this matter.  This report may have been produced by accident as his report references an incorrect address for the Stricklands' home. (Kondner Report, p. 6, attached hereto as Exhibit B).  In any event, based on recent testimony set forth below, Kondner appears to just have one report for all of the cases in

1

which he is involved: "Other than your last paragraph and the names and the dates, your reports are virtually identical one to the other, right? A. Pretty much so." Kondner Deposition in *Murphy*, attached hereto as Exhibit A, 147:7-10. In an abundance of caution the instant motion is before the Court.

This lawsuit is one among dozens of individual and class action cases that have recently been brought before state and federal courts in Alabama, Louisiana, and Texas. In these actions, plaintiffs claim that manufactured homes sold in certain coastal and inland regions from Texas to North Carolina[1] are defective because the exterior walls of such homes are constructed with interior vapor barriers.

The Stricklands purchased a new CHB manufactured home in March 2003. (Compl. ¶ 6). The Stricklands allege that the home has defectively designed and constructed exterior walls. *Id.* at ¶ 13.

The two sections of the HUD Code primarily at issue in this lawsuit are Sections 303(b) and 504(b). Section 303(b) provides that "All construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades." 24 C.F.R. § 3280.303(b). Section 504(b) governs condensation control in the exterior walls of manufactured homes, and provides for four expressly allowed wall designs. 24 C.F.R. § 3280.504(b). One of the design options specifically allowed by § 504(b) is to construct the walls with a vapor barrier of 1 perm[2] or less on the living space side of the wall. *Id.* at § 504(b)(1). It

---

[1] These areas are known as the "humid and fringe zone climates." The counties included in these regions were identified in the Federal Register at 67 F.R. 20402-20403 (April 24, 2002), and are now listed in 24 C.F.R. § 3280.504(b)(4).

[2] Permeance is the measure of the amount of water vapor (moisture) that can pass through a specified material in a certain amount of time. The measure and degree of permeability is expressed in units referred to as 'perms.'

was this design option that CHB used in the Stricklands' home, constructing the walls with vinyl-covered gypsum wallboard containing an interior (i.e. on the living side of the wall) vapor barrier with a permeability rating of less than one.

The Stricklands base their claims for liability primarily on the opinions and reports of three specially-retained "expert" witnesses: Bobby Parks, Robert Kondner, and Roy Bonney.[3] Kondner concludes without actually inspecting the Stricklands' home that the wall design violates HUD Code § 303(b) and that the exterior walls in the Stricklands' home suffer from fungal growth and structural deterioration as a result.  *See* Kondner Report, Exhibit B, p. 6. These opinions must be stringently evaluated by this Court in its capacity as a gatekeeper under *Daubert* and Rule 702.

## SUMMARY OF ARGUMENT

Kondner's testimony and opinions should be excluded because he cannot satisfy the requirements for the admissibility of expert testimony under Rule 702 and *Daubert*.  He has no experience with engineering design in the manufactured housing industry and has never even seen a manufactured home built in a HUD Code setting.  (Kondner Deposition in *Ford v. Champion Enters., Inc.,* attached hereto as Exhibit C, 10:16-11:5.)  He lacks familiarity with many basic principles and provisions of the HUD Code, and cannot even claim to have read all of the Code provisions at issue. *Id.* at 27:3-13.  He does not claim to be an expert, nor does he claim to have any experience, in the areas of HVAC, mold analysis or interpretation, moisture

---

Materials with high perm levels will allow more moisture or water vapor to pass through than those with lower perm values.

[3] Parks performed two inspections of the Strickland home and concluded that the wall design violates the HUD Code Section 303(b) standards for accepted engineering practices and that the exterior walls in the Strickland home suffer from extreme moisture, fungal growth, and structural deterioration as a result.  Parks is the subject of a separate *Daubert* motion that will be referenced frequently in this motion because Kondner's opinions are based almost entirely on Parks' unqualified and unreliable opinions.  Bonney is offered exclusively for determining the cost involved in replacing any wallboard portions that are found to be defective.  As a result, Bonney's testimony is not relevant to the issue of liability and is only relevant to damages in the event liability is found.

meters, thermographic imaging, or gypsum. *Id.* at 12:1-13, 33:7-8, 92:15-17, 93:4-10, Exhibit A 27:12-14, 131:21-23, 152:20-22. As a result, Kondner is not qualified to offer opinions in any of these areas.

In addition, Kondner did not rely on sufficient facts or data in his investigation. First and foremost, Kondner has never even visited, much less inspected, the Stricklands' home, nor has he conducted any independent research into the performance of the Stricklands' exterior walls. (Exhibit A 13:14-17). Instead, he relies entirely on the unreliable and unsupported conclusions of HVAC repairman Bobby Parks.[4] *Id.* at 14:10-12, 18:20-19:3, 48:17-21. Kondner also ignores the plain language of the HUD Code (and HUD's own interpretation of it) by offering the opinion that the wall design of the Stricklands' home violates the HUD Code. This is a remarkable opinion because *this wall design is specifically approved for all regions by the HUD Code*. In short, Kondner's qualifications and the factual basis for his contentions are entirely inadequate.

Finally, even if Kondner were to have the necessary qualifications (which he does not), and even if Kondner were to base his opinions on sufficient facts (which he does not), his testimony still must be excluded because it is cumulative and duplicative of Parks' proposed testimony. Kondner's conclusions are exactly the same as Parks', and because Kondner conducted no independent research or analysis, the conclusions are based on the same data collected by Parks. *Id.* at 14:10-12, 18:20-19:3, 48:17-21. The only reason Kondner may be called is to use an engineer to try to bolster the credibility of HVAC repairman Bobby Parks' unqualified and unsupported opinions regarding the design, Code compliance and performance of the Stricklands' walls.

---

[4] CHB hereby adopts by reference and incorporates into this motion all arguments regarding Parks' qualifications, methodology, and conclusions contained in CHB's separately filed *Daubert* motion to exclude Parks' testimony and opinions.

For all of these reasons, CHB respectfully requests that this Court exclude the testimony and opinions of proposed 'expert' Robert Kondner.

### STANDARD FOR ADMITTING EXPERT TESTIMONY

Federal Rule of Evidence 702 governs the use of expert testimony.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has instructed the district courts to act as "gatekeepers" in screening expert testimony.  *See General Electric v. Joiner*, 522 U.S. 136, 140 (1997) (upholding a district court decision to exclude expert testimony on the ground that it "did not rise above 'subjective belief or unsupported speculation'"); *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) (affirming district court's exclusion of accountant's lost profit calculations on the grounds that it "was based on flawed methodology that was unaccepted in the accounting community"); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001) (motion to exclude expert's testimony on damages granted on the grounds that the "cumulative effect of [the expert's] methodological errors render[ed] the lost profits calculations speculative, without foundation, and with an unknown error rate" and therefore, "the calculations [fell] outside of the range where experts may reasonably differ."); *Benkwith v. Matrixx Initiatives, Inc.*, 467 F. Supp. 2d 1316, 1332 (M.D. Ala. 2006) (opinion by J. Fuller) (excluding the proposed expert testimony of a doctor in a product liability action against a nasal spray

manufacturer and distributor because the expert did not "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

In this case, the Stricklands bear the burden of proof as to the factual basis for Kondner's qualifications and conclusions. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002); *Allison*, 184 F.3d at 1306 (the "burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."). As detailed below, the Stricklands cannot carry this burden.

## **ARGUMENT**

The testimony and opinions of Robert Kondner should be excluded because Kondner is not qualified as an expert in the design of manufactured housing or the interpretation of the HUD Code. Furthermore, Kondner relies on insufficient and inaccurate facts and data to reach his conclusions. Finally, Kondner's testimony is cumulative and must be excluded under Rule 403.

## I.    **Kondner Is Not Qualified to Testify to These Matters**

Kondner proposes to testify that the exterior walls in the Stricklands' home are designed improperly, do not comply with HUD Code regulations, and are suffering from structural deterioration and fungal growth as a result of excess moisture accumulation. *See* Exhibit B, p. 6. Kondner, however, even by his own admission, is unqualified to testify as an expert about these matters:

> Q.    You're not a HUD Code expert?
> A.    That's correct.
> Q.    You're not a mold expert?
> A.    That's correct.
> Q.    You're not a gypsum expert?
> A.    That's correct.
> Q.    And you're not a thermographic imaging expert?
> A.    That's correct.

Q. You've never designed a wall system in a HUD Code home in your life?
A. That's correct.
…
Q. Are you an expert in moisture meters?
A. No, I'm not.

Exhibit C 12:1-13:1, 33:7-8.

### A.     Kondner Is Not Qualified to Offer Design Opinions

To be sufficiently qualified to testify as an expert, a witness must have the knowledge, skill, training and education in the subject for which his testimony is offered.  Fed. R. Evid. 702; *Maiz v. Virani*, 253 F.3d 641, 644 (11th Cir. 2001) (proponent's first burden is to show that its proposed expert is "qualified to testify competently regarding the matters he intends to address.").  Whatever general experience Kondner may have as an engineer, it does not qualify him to testify about design issues with the wall construction in manufactured housing.  *See Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 762 F. Supp. 1016 (D.P.R. 1991) (holding that a civil engineer was not competent to testify as to crane design issues because he had no experience with the design or manufacturing of cranes; a mechanical engineer would be better suited to testify); *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1979) (upheld a lower court ruling that a mechanical engineer with no experience designing automobiles was not competent to testify as to design issues); *Hoban v. Grumman, Corp.*, 717 F. Supp. 1129 (E.D. Va. 1989) (holding that a licensed professional engineer with degrees in electrical and mechanical engineering who had done no aerodynamic design work or engine design work was not competent to testify on such design issues).

In this case, Kondner has no design experience in the manufactured housing or wall construction field:

Q.   Have you ever rendered a design opinion as to manufacturing standards in a manufactured home?

A.   I don't think so.  Could be.  I've been around a long time.

…

Q.     I think you've testified previously you don't have any experience in the manufacturing housing industry itself, do you?

A.   Manufactured housing?  Well, not trailers, no.  I don't think so.

Exhibit A 88:10-89:2.  Furthermore, Kondner admits that he has never even seen a manufactured home constructed in a factory setting, and he does not know how long it takes to build one. Exhibit C 10:16-11:5.  Pursuant to *Tokio Marine, Perkins, and Hoban*, then, Kondner is not competent to testify as to design issues in an unfamiliar field.

**B.     Kondner Is Not Qualified to Offer Opinions Regarding HUD Code Compliance**

Kondner's deposition testimony and conclusions display a fundamental lack of familiarity with, and misunderstanding of, the HUD Code.  As discussed *supra*, HUD Code Section 504(b) governs condensation control in the exterior walls of manufactured homes and expressly allows four different wall construction designs.  Kondner claims that CHB's application of § 504(b) to the Stricklands' home provides the primary basis for liability in this case, yet Kondner is not even familiar with the basic design principles employed by § 504(b).  In addition to Kondner's own admission that he is not an expert in the HUD Code, his lack of knowledge about the Code is evident from Kondner's inability to even identify the four construction methods expressly allowed by the HUD Code, much less describe in detail how to design them.  *See* Exhibit A 45:22-46:13.

Kondner's testimony raises serious doubt as to whether Kondner has ever even read the relevant provisions of the Code, much less understands them at an expert level:

Q.   Do you have any idea where the waiver actually is?

A.   Where the waiver of what is?  Oh, in this code?

Q.   The wall design waiver; have you ever read it?

A.   It would have to be back in 504.  Let's go back to 504.

Q.   Doctor, it's not in there.  Have you ever read it?

A.   I don't know whether I ever have or not.

Exhibit C 27:3-13.   Kondner devotes more than one-fifth of his entire written report to this waiver, describing it in detail and rendering opinions on it that he claims to have reached on his own, yet he cannot even identify where it is in the Code, or that he has even read it.  *See* Exhibit B.

Furthermore, as explained below, Kondner does not understand how various provisions of the HUD Code relate to each other, as evidenced by his opinion that a wall construction method can violate § 303(b),[5] a general performance standard, even though it meets the requirements of Section 504(b), a specific prescriptive standard.   Exhibit A 42:2-6.

HUD develops its safety standards for the Code through a consensus process that relies on professionals with engineering expertise who provide conclusive technical documentation on issues to establish sound engineering practices.   Declaration of David Tompos, P.E., Exhibit D ¶ 7.   As a result, the Code embodies sound engineering practices, and meeting the specific requirements of this Code that is developed in this manner therefore conforms to sound and accepted engineering practices.  *Id*.

Section 504(b) of the Code allows for four alternative designs for exterior walls in mobile homes: 1) walls with an interior vapor barrier of one perm or less, or 2) unventilated wall cavities sealed by a pressure envelope of at least five perms, or 3) ventilated wall cavities, or 4) for

---

[5]   As mentioned *supra*, Section 303(b) provides that "All construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades."   24 C.F.R. § 3280.303(b).

homes in Zone 1,[6] a vapor barrier *may* be placed on the opposite side of the wall from the living space. *See* 24 C.F.R. § 3280.504(b). Each of these alternative construction designs has been deemed by HUD to represent good engineering practices. Exhibit D ¶ 8. Nothing in the Code prohibits the use of a 504(b)(1) wall construction in Zone 1. *See generally* 24 C.F.R. § 3280. Furthermore, HUD has stated that it does not have data, research, or other information that would substantiate restricting § 504(b)(1) to Zones 2 and 3. Exhibit D ¶ 8. Indeed, the wall designs utilized in the Stricklands' home are the most widely used condensation control method in the industry for all climactic conditions and have been approved by a third party inspection agency comprised of engineer design professionals as required by the HUD regulations. Exhibit D ¶ 9.

Kondner argues that because Section 303(b) requires all manufactured homes to be built in accordance with "accepted engineering practices," placing an interior vapor barrier in a hot and fringe zone climate violates the HUD Code even though Section 504(b)(1) specifies interior vapor barriers as an appropriate design option for every climate zone. *See* 24 C.F.R. at §§ 3280.303(b), 3280.504(b)(1). Kondner's opinion fundamentally misrepresents HUD's own code interpretation and its enforcement policy. As HUD has explicitly stated as recently as 2007:

> Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

---

[6] The HUD Code divides the United States into three geographic regions, called 'thermal zones.' Zone 1 encompasses much of the Southeastern U.S. from Texas to North Carolina, Zone 2 extends across the country's midsection from North Carolina to California, and Zone 3 encompasses most of the northern half of the country. 24 C.F.R. § 3280.506.

HUD Letter from Assoc. Dep. Asst. Sec. for Reg. Affairs and Mfr'd Housing, January 19, 2007, attached hereto as Exhibit E.[7]

Based on Kondner's own admission that he is not a HUD Code expert, as well as his statements and opinions exhibiting a fundamental misunderstanding of basic principles contained within the HUD Code, Kondner should not be allowed to opine that the Stricklands' wall construction violates the HUD Code.

> **C.    Kondner Is Not Qualified to Offer Opinions Related to the Interpretation of Mold Sampling Data, Moisture Meter Readings, Thermographic Imaging Results, and HVAC testing**

Kondner also lacks the qualifications necessary to interpret mold sampling data, moisture meter readings, thermographic imaging, and HVAC testing. As noted above, Kondner himself admits that he is not a mold expert or a thermographic imaging expert. *See supra*, Exhibit C 12:1-13:1. Kondner further admits that he is not an expert in HVAC testing or the standard of care for determining moisture content of gypsum:

> Q.    Sir, are you an expert on the standard of care with regard to moisture content
>
> in gypsum?
>
> A.    No, I wouldn't say I was.
>
> …
>
> Q.    You're not an air conditioning / heating ventilation expert, are you?
>
> A.    No, no, no.

Exhibit A 27:12-14, 152:20-22. Kondner goes on to admit that he has no training whatsoever in thermographic imaging. *Id*. at 131:21-23. He displays his lack of understanding of moisture meter readings by stating his belief that they convey the absolute moisture content of gypsum, as

---

[7] CHB wishes to bring to the attention of the Court that in a separate Memorandum Opinion and Order (Doc. No. 75) in *Murphy,* the letter was stricken as it was determined that it did not satisfy one of the hearsay exceptions in Rule 803(8).

opposed to relative readings. *See Id.* at 19:19 ("To me, it's an absolute value."). This is a crucial admission, as even Parks agrees that moisture meter readings are only relative and not absolute. *See* Bobby Parks Deposition 131:20-132:7 attached hereto as Exhibit H. Discussing the HVAC system in the Stricklands' home, Kondner not only admits that he is not an HVAC expert, but also that he has no independent expertise with fundamental components of the system at issue:

> Q.  You're not an air conditioning HVAC expert, are you?
>
> A.  No.
>
> …
>
> Q.  And I think that we established this morning you're not sure what a positive operating system is, correct?
>
> …
>
> A   Positive operating system? That would be speculation on my part.

Exhibit C 92:15-17; 93:4-10.

Notwithstanding his own admissions that he is not an expert in these fields, Kondner proposes to opine that moisture accumulation has caused fungal growth and structural deterioration of gypsum wallboard in the Stricklands' home. Without having expertise in any of these areas, however, Kondner's opinions on these matters are not based on scientific, technical, or specialized knowledge as required by *Daubert*, nor will they "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. 579. Therefore, the Court must exclude Kondner's testimony and opinions.

**II.      Kondner's Opinions Are Not Based on Sufficient Facts or Data**

In addition to being unqualified as an expert, Kondner failed to rely on sufficient facts or data in his investigation. First and foremost, Kondner conducted no independent research into

the performance of the Stricklands' exterior walls.  Exhibit A 13:14-17.  Instead, he relied almost exclusively on the unreliable and unsupported conclusions of Bobby Parks.  *Id.* at 14:10-12, 18:20-19:3, 48:17-21.  In short, Kondner's conclusions are not supported by the evidence he gathered.

It is well settled law that expert testimony must be "more than belief or unsupported speculation."  *See Daubert*, 509 U.S. at 590.  The Eleventh Circuit has likewise held that the district court's role is to "ensure that the proposed expert testimony is 'relevant to the task at hand,' … i.e., that it logically advances a material aspect of the proposing party's case."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999), quoting *Daubert* (on remand), 43 F.3d at 1315.  Therefore, the evidence must have a valid scientific connection to the disputed facts in the case.  *Daubert*, 509 U.S. at 591.  This connection has been appropriately denominated as "fit."  *Id.*  The Supreme Court has recognized that:

> *Conclusions and methodology are not entirely distinct from one another*.  Trained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner v. General Electric*, 522 U.S. 136, 146 (1997); *see also Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based on no research at all.  Both analyses result in pure speculation.").

"[T]he court is now obliged to screen expert testimony to ensure it stems from, not just reliable methodology, but also a sufficient factual basis and reliable application of the methodology to the facts."  *Rudd v. General Motors Corp.*, 127 F. Supp. 2d 1330, 1336 (M.D. Ala. 2001).

Each of Kondner's conclusions is "connected to existing data only by the *ipse dixit* of the expert."  *See Joiner*, 522 U.S. at 146.  Kondner has been retained to render opinions in several manufactured housing cases involving claims of moisture problems resulting from the use of interior vapor barriers, but he admits that he has not actually seen a single home about which he is rendering opinions, and he has no field experience with Parks to assess the reliability or accuracy of Parks' investigations on which Kondner relies:

Q.    Have you seen any of the homes that you've rendered opinions on in the hot and humid climate litigation?

A.    I have not personally seen any of them.

…

Q.    Okay. Is it fair to say that you have relied on [Parks'] opinions in rendering yours?

A.    I've relied on his findings.

…

Q.    [H]ave you had any field experience with Mr. Parks or Mr. Bonney in the series of cases I'm questioning you about today, the hot and humid climate cases?

A.    Field experience with them on those? No, because I have not been to Alabama and I did not see the particular house.

…

Q.    I want to know what you know.

A.    I don't know anything about the house, physical house itself, because I was never there.  I have never seen it.  I have to rely on Bonney's report.

Exhibit A 13:14-17, 14:10-12, 18:20-19:3, 48:17-21.  Without having seen any of the homes or talked to the homeowners, *see Id.* at 104:11-15, it is no surprise that Kondner produces reports that he admits are "virtually identical to one another," with the names, dates, and addresses being the only information specific to each home.  *See Id.* at 147:7-10; Exhibit B; Kondner Reports in *Murphy, Ford,* and *Deese*, attached hereto as Exhibit F.  Indeed, Kondner's conclusions in his report about the Stricklands' home can be boiled down into just two opinions: 1) the interior vapor barrier caused moisture accumulation, resulting in "structural deterioration and … fungal (mold) growth within the wall structure," and 2) "Such construction in direct violation of accepted engineering practice … does not meet the performance requirements of 24 C.F.R. 3280.303(b)."  Exhibit B, p. 6.

Kondner's claims are refuted not only by the HUD Code issues previously discussed, but they also suffer from a complete lack of physical evidence of problems in the walls themselves. Kondner, of course, has no independent evidence of structural deterioration or fungal growth, and bases that conclusion solely on Parks' report.  *See, e.g.,* Exhibit C 42:11-18, ("Q.   Do you know what kind of mold testing Mr. Parks did in the Ford home?  A. Well, I think if you go back and look at the results that are reported by the testing laboratory, it will tell you. Q. I'm wondering if you know. A. If I know? Oh, the only thing that I know is what he's reported.")  As explained in the separately filed *Daubert* motion to exclude Parks, Parks similarly has no valid evidence of structural deterioration.  Kondner has formed all of his opinions without ever having exposed himself to scintilla of physical evidence in the case.  Ignoring the actual physical condition of the walls in the Stricklands' home is a fatal flaw in Kondner's conclusions.

Given the "analytical gap between the data and the opinion proffered," this Court must take seriously its gatekeeper role and ensure that Kondner "has a sufficient factual basis" to

support any conclusions before admitting them into evidence. *See Rudd*, 127 F. Supp. 2d at 1336; *Joiner*, 522 U.S. at 146. In this case, a review of the record makes clear that Kondner cannot pass the *Daubert* standard for admissibility of expert testimony. First, he lacks the qualifications necessary to offer the opinions contained in his report. Second, rather than conducting an independent investigation of the Stricklands' home that could support his conclusions, he instead bases his opinions on a "fictitious set of facts," which is itself based on the unreliable, unqualified and unsubstantiated opinions of Bobby Parks. *See Guillory*, 95 F.3d 1320 ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based on no research at all. Both analyses result in pure speculation."). As a result, Kondner's testimony and opinions are inadmissible.

### III.    Kondner's Opinions Are Cumulative and Duplicative of Parks' Opinions

Finally, even if Kondner were to have the necessary qualifications (which he does not), and even if Kondner were to base his opinions on sufficient facts (which he does not), his testimony still must be excluded because it is cumulative and duplicative of Parks' proposed testimony.

"Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying [Fed. R. Evid.] Rule 403." *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (internal citations omitted). Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. If expert testimony is cumulative or duplicative, exclusion of the evidence is appropriate under Rule 403. *Frazier*, 387 F.3d at 1263.

In this case, Kondner's conclusions are exactly the same as Parks'.  *See* Exhibit B, p. 6; Parks Report, attached hereto as Exhibit G, p. 3.  Furthermore, because Kondner conducted no independent research or analysis, the conclusions are based on the same data collected by Parks and offer no new information.  The only reason Kondner is being called to testify is that the Stricklands are attempting to use an engineer to bolster the credibility of HVAC repairman Bobby Parks' unqualified and unsupported opinions regarding the design, Code compliance and performance of the Stricklands' walls.

Allowing Kondner's testimony and opinions into evidence would not assist the trier of fact in any way.  His conclusions are already being offered by another proposed expert.  His opinions are no different and offer no new data as compared to Parks' proposed testimony.  The probative value of Kondner's testimony is even lower than that of Parks' proposed testimony because Kondner has no personal knowledge of the conditions of the Stricklands' walls.  In short, the virtually non-existent probative value of Kondner's testimony is substantially outweighed by high potential to confuse the jury through Plaintiff's attempt to cloak Parks' unqualified and unsupported opinions with an engineer's blessing.  Consequently, Kondner's opinion and reports must be excluded from evidence under Rule 403.

<u>CONCLUSION</u>

For the reasons set out in this brief, Defendant Champion Home Builders, Co. respectfully moves this Court to exclude the testimony and opinions of Robert Kondner.

<u>ORAL ARGUMENT IS REQUESTED</u>

17

Respectfully submitted,

RITCHEY & SIMPSON, PLLC


/s/ Gregory S. Ritchey
Gregory S. Ritchey, Esquire {ASB-8193-H68G}
Richard S. Walker, Esquire {ASB-8719-L70R}
Counsel for Champion Home Builders Co.

OF COUNSEL:
RITCHEY & SIMPSON, PLLC
3288 Morgan Drive, Suite 100
Birmingham, AL 35216-3084
Phone:        205.876.1600
Facsimile     205.876.1616


## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the 28th day of March, 2008, I electronically filed the foregoing with the Clerk of Court using the electronic filing system which will send notification of the foregoing upon the following:

Jere L. Beasley, Esquire
W. Daniel Miles, III, Esquire
C. Gibson Vance, Esquire
C. Lance Gould, Esquire
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, AL  36103


/s/ Gregory S. Ritchey
OF COUNSEL

# EXHIBIT "A"

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                     Northern Division

4      - - - - - - - - - - - - - - -+
                                    |          COPY
5      HAROLD KELLY MURPHY,         |
                                    |            ,
6                   Plaintiff,      |
                                    |
7        vs.                        |     Case No.:
                                    |     2:06-CV-618-MEF
8      SOUTHERN ENERGY HOMES, INC., |
       et al,                       |
9                                   |
                    Defendants.     |
10     - - - - - - - - - - - - - - -+

11
                     Videoconference
12        Deposition of Dr. Robert L. Kondner, P.E.

13                   Washington, D.C.

14            Friday, December 21, 2007

15                    10:00 a.m.

16

17

18

19

20

21     Job No. 22-118855

22     Pages 1 - 174

23     Reported by:  Laurie Bangart-Smith

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 2

1                        Deposition of

2                Dr. Robert L. Kondner, P.E.

3

4    Held at the offices of:

5                L.A.D. REPORTING
                 1100 Connecticut Avenue
6                Suite 850
                 Washington, D.C. 20036
7                (800)292-4789

8

9

10

11

12

13

14

15

16

17                Taken pursuant to the Federal Rules of Civil

18        Procedure, by notice, before Laurie

19        Bangart-Smith, Registered Professional Reporter

20        and Notary Public in and for the District of

21        Columbia.

22

23

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

```
 1                    A P P E A R A N C E S

 2    ON  BEHALF  OF  THE  PLAINTIFF:

 3              JON  D.  PELS,  ESQUIRE

 4              PELS,  ANDERSON  &  LEE,  L.L.C.

 5              4833  Rugby  Avenue

 6              Fourth  Floor

 7              Bethesda,  Maryland  20814

 8              (301) 986-5570

 9

10    ON  BEHALF  OF  THE  DEFENDANT:

11              R.  SCOTT  SIMPSON,  ESQ.  (via  videoconference)

12              RITCHEY  &  SIMPSON

13              3288  Morgan  Drive

14              Suite  100

15              Birmingham,  Alabama  35216

16              (205) 876-1600

17

18

19

20

21

22

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 4

1                    EXAMINATION INDEX

2                                                    PAGE

3  EXAMINATION BY MR. SIMPSON . . . . . . . . . . .    6

4  EXAMINATION BY MR. PELS . . . . . . . . . . . .   160

5  REDIRECT BY MR. SIMPSON . . . . . . . . . . . .   162

6

7

8

9                    E X H I B I T S

10              (Attached to the Transcript)

11  DEPOSITION EXHIBIT                              PAGE

12  No. 1    Notice of deposition duces tecum         7

13  No. 2    Kondner's expert report, 10/18/07       74

14

15

16

17

18

19

20

21

22

23

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

```
 1                    P R O C E E D I N G S

 2            MR. SIMPSON:  The usual stipulations okay,

 3       Jon?

 4            MR. PELS:  That's fine, Scott.  Do you mind

 5       if I just interpose a quick objection?

 6            MR. SIMPSON:  Sure.

 7            MR. PELS:  Okay.  Just on the -- I noticed

 8       the duces tecum.  I know we've got Beasley Allen

 9       involved and I'm involved.  We just got the duces

10       tecum part of this deposition, so I object based

11       on timeliness and some of them are overbroad.

12            That said, we believe you have the learned

13       treatises, a lot of those documents with you, but

14       I had him bring everything related to this case I

15       think that's possibly responsive.  We had them

16       brought today, and I thought, you know -- like

17       you said, I think we'll be able to work it out,

18       but I just wanted to put that out there.

19            MR. SIMPSON:  Okay.  Well, for the record,

20       this is the second time this Notice has been

21       served, and I think you had notice of it for

22       about three or four weeks, but that being said, I

23       trust we can work if out and we won't have any
```

Page 6

1          problem.

2                MR. PELS:  Okay.

3                     DR. ROBERT L. KONDNER, P.E.,

4    having been first duly sworn, testified upon his oath

5    as follows:

6                EXAMINATION BY COUNSEL FOR DEFENDANT

7    BY MR. SIMPSON:

8          Q    Dr. Kondner, we have not met before today, I

9    don't think.

10         A    No, not that I recall.

11         Q    All right.  I'd like to start with some

12    background information from you if I may, sir.

13                MR. SIMPSON:  Do you have a -- Jon, do you

14           have a CV or something on your side you could

15           attach as an exhibit for the deposition?

16                THE WITNESS:  I don't know whether I brought

17           one or not.  It's the same thing for the Deese

18           deposition, exactly the same.

19                MR. SIMPSON:  All right.  Madam Court

20           Reporter, will you do me a favor.  Do you have

21           the deposition notice for this case?

22                MR. PELS:  I brought it, Scott.

23                MR. SIMPSON:  All right.  May I ask that

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 12

1        wallboard, but you can answer.

2              MR. SIMPSON:  Jon, if we can agree on a

3        term, I don't care what we call it.  I just want

4        him to understand where I'm coming from.

5              MR. PELS:  Okay.  Maybe we can call it the

6        "hot humid climate litigation."

7              MR. SIMPSON:  Okay.

8              THE WITNESS:  As far as I am aware, it's the

9        three:  Deese, Murphy and Ford.

10   BY MR. SIMPSON:

11        Q    Have you been paid any money in connection

12   with those cases?

13        A    Deese, but I don't know how much it adds up

14   to.

15        Q    How do you charge?  What's the basis of your

16   fee?

17        A    I go by an hourly basis.

18        Q    And what is your hourly rate, sir?

19        A    It's $150 an hour unless it's involving

20   litigation.  Then it's double.

21        Q    Are you currently a professional engineer?

22        A    Yes.

23        Q    In what states are you licensed currently?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

1          A      State of Maryland.

2          Q      Have you ever traveled to Alabama in your

3     career?

4          A      Yes, I have.

5          Q      When?

6          A      Well, I know I've worked on a project in

7     Mobile and Montgomery, and I've worked on some things

8     that are defense-oriented over the years related to

9     things at Huntsville and some of the testing labs for

10    equipment in nuclear power plants.

11         Q      Have you ever traveled to Alabama in

12    connection with the hot and humid climate litigation?

13         A      This particular litigation?  No.

14         Q      Have you seen any of the homes that you've

15    rendered opinions on in the hot and humid climate

16    litigation?

17         A      I have not personally seen any of them.

18         Q      Have you seen or relied on any other expert

19    reports in connection with the opinions you intend to

20    rely on in the Murphy case?

21         A      Yes.

22         Q      Which reports have you seen and do you

23    intend to rely on?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 14

```
 1        A     Bobby Parks' report.

 2        Q     Which one?  He has two.  Are you aware of

 3   that?

 4        A     He has two that I'm aware of in the Ford

 5   case, and I'm aware of one in the Murphy case.

 6        Q     So you've only seen his first report in

 7   Murphy?

 8        A     Yes.  Well, it's either the first or the

 9   second, but I haven't seen two of them.

10        Q     Okay.  Is it fair to say that you have

11   relied on his opinions in rendering yours?

12        A     I've relied on his findings.

13        Q     What specific findings have you relied upon

14   in rendering your opinions?

15        A     Well, I'd have to go through his report to

16   pick out everything, but if you want a

17   generalization . . .

18        Q     I'm not going to pin you down.  I just want

19   to know what impressions you came away from his report

20   with that you think are relevant to yours.

21        A     Well, the Murphy report is that there is

22   moisture within the walls, at least some of the walls,

23   and that there's mold growth within the walls.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

1        Q    Was that a moisture-related case?

2        A    That was -- well, there's moisture, but it's

3    not necessarily a moisture-related case.  It's a

4    support case, tie-down and pier footing.

5             MR. PELS:  Scott, if you want, I can help

6        you out, but I don't want to -- I can interject

7        what we used him for.

8             MR. SIMPSON:  No, that's okay.  Go ahead.

9             MR. PELS:  The tie-down, what you were

10       calling the tie-down case, the foundation case,

11       part of it is the impact it has on the actual

12       structure of the home as well, and so Dr. Kondner

13       was talking about Bobby Parks was one of -- we

14       had about nine or ten experts, I think, in that

15       case, but he was one of them, to show kind of the

16       structural deterioration of the walls, et cetera,

17       related to the installation issues.

18             MR. SIMPSON:  Okay.

19   BY MR. SIMPSON:

20       Q    Dr. Kondner, have you had any field

21   experience with Mr. Parks or Mr. Bonney in the series

22   of cases I'm questioning you about today, the hot and

23   humid climate cases?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 19

1      A      Field experience with them on those?   No,

2   because I have not been to Alabama and I did not see

3   the particular house.

4      Q      When's the last time you've been to Alabama?

5      A      I really don't know.   I could probably give

6   you an estimate.   Probably about ten years ago.

7      Q      Let me refer you to Page 3 of Mr. Parks'

8   report.   Down at the bottom of the report do you see

9   where he's catalogued his moisture readings there?

10     A      Yes.

11     Q      Okay.   Do you have a judgment as to whether

12  those are absolute or relative moisture readings?

13     A      He says, "Typical moisture content within

14  the interior partition walls of this home were in the

15  ten percent, 12 percent range.   Consistent readings

16  within Murphy's perimeter gypsum walls were in the

17  25 percent to 40 percent range."

18            He doesn't specify it, but moisture content

19  means moisture content.   To me it's an absolute value.

20     Q      So you think those are absolute values?

21     A      I think they are.   I haven't seen anything

22  other than that, unless he defines it in here a little

23  better.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 27

1    don't know what your definition of standard of care

2    is.  Which standard of care?  You tell me what

3    standard of care you're talking about.

4        Q    Well, that's my question to you.  Do you

5    know any?  Do you know any standard of care that

6    relates to gypsum and moisture content anywhere in the

7    universe?

8        A    Well, in the literature that you have in

9    your possession I believe it talks about that effect.

10   I don't have it in front of me here, but go back and

11   look.

12       Q    Sir, are you an exert on standard of care

13   with regard to moisture content in gypsum?

14       A    No, I wouldn't say I was.

15       Q    And the truth is, without going and doing

16   research, you don't know sitting here today whether

17   any of these ranges of moisture violate any standard

18   of care, correct?

19            MR. PELS:  Objection; form and foundation,

20       mischaracterization.

21            You can answer.

22            THE WITNESS:  It is my opinion that when you

23       have these moisture contents that are two to

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 33

1      Q     Do you have any familiarity at all with a

2   test dealing with compaction or compression in the

3   gypsum industry?

4      A     Not in the gypsum industry.

5      Q     Do you have any familiarity with anything

6   called a flex test in the gypsum industry?

7      A     No, but I've experienced other flex tests.

8      Q     Hypothetically speaking, if we removed a

9   large area of exterior wallboard from the exterior

10  wall from this home and had it tested by an ASTM

11  approved lab, and that lab came back with testing

12  results saying that the gypsum was in very good

13  condition, no problem, could you explain that kind of

14  result in relation to what Mr. Parks has said?

15          MR. PELS:  Objection to form and foundation.

16      Also can you be more specific about the time

17      frame limitation?

18          THE WITNESS:  How about the test, type of

19      test?

20  BY MR. SIMPSON:

21      Q     The test I just described.

22      A     I'd like to have more details of it, such as

23  the sample, the dimensions, the loading, the loading

Page 42

1    field and it's not performing.

2         Q    Which HUD code provision do you think is

3    violated in that sense?

4         A    Well, I think it's -- the manufacturer has

5    made a choice under the 504, and I think the failure

6    is under the 303.

7         Q    So you think that 3280.303 is violated?

8         A    It doesn't perform.

9         Q    Is that your judgment?

10        A    It doesn't perform.  If you've got water

11   condensing on the inside of the wall, it's not

12   performing.

13        Q    Sir, let's see if you can stick to my

14   question.  My question is:  Just give me a list of the

15   HUD code provisions which you think are violated in

16   this particular home.

17        A    Well, let me pull out the HUD code here and

18   take a look.

19        Q    You don't know without looking?

20        A    Yeah, I know.  I just told you.  Now you

21   want details on it.

22        Q    Just give me a list.  Just start with a

23   list, one, two, three, four, however many you got.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 45

1    the material here in 504, and it could have been

2    ventilated.  You could have had an exception.  You

3    could have --

4         Q    Let's start with ventilated.  What HUD code

5    section is that?

6         A    That's 504(b)(2), unventilated.

7         Q    All right.  So which one is ventilated and

8    which one is unventilated?

9         A    Uh, (b)(3).

10        Q    Is ventilated?

11        A    Yeah.

12        Q    Okay.  Can you tell me for the record what a

13   (b)(3) wall looks like.

14        A    Well, you would have to have some kind of an

15   air flow within that wall structure.  It says right

16   here, "Wall cavities shall be constructed so that

17   ventilation is provided to dissipate any condensation

18   occurring in the cavities."

19        Q    So what's it look like?  Have you ever laid

20   eyes on one?

21        A    I don't know that I have or haven't.

22        Q    Have you ever seen a (b)(2) wall?

23        A    (b)(2) wall, unventilated wall cavity.

Page 46

1    Well, I don't know that I've ever torn any of them

2    apart. I don't know that I've ever seen any of them

3    cut open if that's what you're asking.

4        Q    Have you ever seen a (b)(2) wall anywhere in

5    the world?

6        A    Unventilated wall cavity --

7        Q    This shouldn't be hard. You're supposed to

8    be the expert on this. Have you ever seen a mobile

9    home with a (b)(2) wall?

10            MR. PELS:  Objection; move to strike the

11        soliloquy.

12            THE WITNESS:  I don't know that I have or

13        haven't, quite frankly.

14    BY MR. SIMPSON:

15        Q    Have you ever seen a (b)(1) wall?

16        A    Yes.

17        Q    Where?

18        A    In units here in Maryland.

19        Q    Tell me what the Murphy wall is constructed

20    with. Go from the inside to the outside of the wall

21    and give me each layer.

22            You're not going to find that on any of the

23    papers you're shuffling around.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 48

1          Q     Do you know what kind of sheeting this home

2    has, or are you just guessing?

3          A     That's what I'm looking for.  I haven't been

4    down here.  I haven't seen it.

5          Q     So you don't know sitting here without

6    looking up what someone else says what's it made of,

7    right?

8          A     That's right, and that's what I relied upon.

9          Q     Okay, but you don't even know what you

10   relied upon, because you can't tell me?

11         A     I can't find it in here right now.

12         Q     What's underneath the OSB?

13         A     You got insulation in there.

14         Q     How thick is the insulation?

15         A     This particular?  I don't think he's got it

16   in here.

17         Q     I want to know what you know.

18         A     I don't know anything about the house,

19   physical house itself, because I was never there.  I

20   have never seen it.  I have to rely on Bonney's

21   report.

22         Q     You're saying these walls are going to fail,

23   and you can't even tell me what they're made of.

Page 88

1    anywhere else.

2                (Discussion was held off the record.)

3    BY MR. SIMPSON:

4        Q    Do you have any health problems that would

5    prevent you from testifying today?

6        A    No, no.  I got a broken rib that I'm

7    carrying right now, but go ahead.  That's fun.  And

8    I've got a cold and I'm not walking.  I've got no

9    cartilage in my knee, but go ahead.

10       Q    Have you ever rendered a design opinion as

11   to manufacturing standards in a manufactured home?

12       A    I don't think so.  Could be.  I've been

13   around a long time.

14       Q    Do you know anything about HUD's oversight

15   or audit process in DAPIA and IPIA work?

16       A    No, I don't.

17       Q    Do you know what IBTS is?

18       A    IBTS?  Offhand, no.

19       Q    I think you've testified previously you

20   don't have any experience in the manufacturing housing

21   industry itself, do you?

22                MR. PELS:  Objection; form and foundation.

23                You can answer.

Page 89

```
 1              THE WITNESS:   Manufactured housing?   Well,
 2       not trailers, no.   I don't think so.
 3   BY MR. SIMPSON:
 4       Q    Do you know what the difference between a
 5   trailer and a manufactured home is?
 6       A    Well, there's some rather elaborate
 7   manufactured homes which are compartmentalized, and
 8   you just bring them into the site and you pick them up
 9   and set them in place.
10       Q    Can manufactured homes be constructed to
11   local building codes?
12       A    You've got to follow the HUD code.
13       Q    Is there ever a setting when you can use a
14   local building code instead of the HUD code?
15       A    Probably, if it exceeds the HUD code.
16       Q    Do you know what an AC Letter is?
17       A    An AC Letter?   Atlantic Coast Conference.   I
18   don't know.
19       Q    Have you ever asked for or obtained an AC
20   Letter?
21       A    What is it?
22       Q    Alternate Construction Letter.
23       A    Oh, okay.   No, I have never asked for one.
```

Page 92

1    can, from a scientific standpoint, how the walls in

2    the Murphy home are accumulating excess moisture.

3    Explain to me the physical/chemical processes as if

4    you were teaching a Ph.D. course.

5        A    No, this is high school and introductory

6    course physics, which I taught for about five years.

7    Let's see.  It's a -- I guess it would be in the -- it

8    may be for five or six months of the year, at least,

9    in that climate down there, you're going to have a

10   continuous situation where you got hot temperatures,

11   high humidity, and the people want to cool down, so

12   they got air conditioning going.

13           And in this Murphy house where you got the

14   vinyl, the hot air is going to come through the vinyl,

15   it's going to go through the wallboard, through the

16   insulation.  It's going to hit on the back.  It's

17   going to condense, it's going to run down and it's

18   going to keep doing this, and it's going to

19   accumulate.  And over a period of time the mold is

20   developed, the mold has accumulated, the moisture

21   accumulates.  It starts affecting the structural

22   integrity of the gypsum wallboard, and it continues.

23   It continues unless somebody does something about it,

Page 93

1    and it gets progressively worse and worse.

2        Q    Do you know what a cyclometric chart is?

3        A    A cyclometric chart?

4        Q    Cyclometric chart.

5        A    I'm not sure what you're defining there.  I

6    may know it as something else.

7        Q    Do you know how the hot air is going to get

8    inside the wall, as your explanation just posited?

9        A    Well, what happens is things want to

10   neutralize.  Heat goes to cold, okay, and when that

11   happens with a situation that you got, then you get

12   condensation, because you're cooling down all that

13   warm hot air which holds moisture vapor, water vapor,

14   and in this house I think that's the process.

15       Q    I think you testified -- and correct me if

16   I'm wrong -- that the hot air from the outside gets

17   into the wall cavity.  What I'm trying to figure out

18   is:  Based on what you know about the design of this

19   wall, where is it getting in and how is it getting in?

20       A    It's getting in -- it's got vinyl siding on

21   it, I believe this one has, and that's not airtight

22   and it's not sealed, so that air gets in there.

23       Q    Does the sheathing play any role in keeping

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 104

1    report.

2        Q    What else can cause a wall to get wet?

3        A    You mean inside, behind the vinyl?

4        Q    Well, the exterior walls, yeah.  What other

5    things can happen to a wall that might cause the

6    presence of moisture to be in a wallboard?

7        A    Well, if you lost part of your vinyl

8    covering on the outside and the wind beat the water

9    in, it probably would -- but we're not talking about

10   that kind of thing.  We're talking about water vapor.

11       Q    Do you know any history of this home

12   relative to storms?

13       A    No, I don't.

14       Q    Did you question the homeowners at all?

15       A    I never talked to them.

16       Q    What about a bulk water leak; do you know

17   what that is?

18       A    A bulk water leak?

19       Q    Yes.

20       A    I would think that that would be free water

21   that's leaked into the house somewhere from maybe a

22   pipe broken or a leak in a roof or something like

23   that.  You're talking about bulk water.  You're not

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 131

1          (Whereupon, a short recess was taken.)

2          THE WITNESS:  On Page 5 in Bobby Parks'

3      report he's got two photographs there.  One of

4      them looks like it's up near the marriage line.

5      The other one looks like it's up in a corner

6      somewhere.

7  BY MR. SIMPSON:

8      Q    Do you know what those pictures mean?

9      A    Well, yeah, I've seen him do it, and the

10  brighter the red, the more infiltration you got.

11     Q    Are you sure that's just not heat

12  differences?

13     A    Well, where do heat differences come from?

14     Q    The sun.

15     A    It comes from that hot air.

16     Q    The sun, insulation voids, a variety of

17  other sources.

18     A    Concentrated like that?  Huh-uh.

19     Q    You don't think so?

20     A    No.

21     Q    Have you ever been trained in thermographic

22  imaging?

23     A    No, I don't believe so.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 132

1    Q    You don't know the first thing about it, do

2    you?

3         MR. PELS:  Objection; form and foundation.

4         THE WITNESS:  I know when I see his

5         photographs, and I've asked him about these

6         photographs, that's where the air is coming in,

7         and that's the hot, that's the heat, that's --

8         the hot air is coming through.

9    BY MR. SIMPSON:

10   Q    So what picture is it that you're seeing hot

11   air come in?

12   A    Well, look at Figures 7 and 9, and he's got

13   the undeveloped areas on the opposite photographs.

14   Q    Look at Figure 9.  Do you know where that is

15   in the house?

16   A    That's by the marriage line.

17   Q    Is that an exterior wall?

18   A    No, it's not an exterior wall.

19   Q    So you don't know whether that picture --

20   that picture doesn't even show air coming into an

21   exterior wall, does it?

22   A    No, but it shows a source of leakage.

23   Q    You can't link that source of leakage to any

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 147

```
1          A     You mean of the Murphy home?

2          Q     Well, your report from one case to the next

3    are virtually identical, aren't they?

4          A     Yeah, but these are generalities, and then

5    on the last page, the last paragraph I go to the

6    individual home.  I mean this is in general.

7          Q     Right.  Other than your last paragraph and

8    the names and the dates, your reports are virtually

9    identical one to the other, right?

10         A     Pretty much so.

11         Q     Okay, but at the bottom of Page 5 and

12   continuing to Page 6, these are all the things that

13   you think can contribute to condensation problems in

14   the walls of this home, right, in a general sense?

15              MR. PELS:  Objection; form and foundation,

16         mischaracterization.

17              You can answer.

18              MR. SIMPSON:  Well, he can correct me if I'm

19         wrong.  I mean it's his report.

20              THE WITNESS:  Yeah, it says what it says.

21         What do you want?  I mean it says, "These

22         individual point defects include leaks and holes

23         in the heating and cooling system, air duct
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 152

1      Q    Where is it supposed to be?

2      A    Well, it's supposed to be where it is,

3   according to Figure 11.

4      Q    Well, he says it's inappropriately

5   installed.  Do you know why?

6           MR. PELS:  Objection.

7           You can answer.

8           THE WITNESS:  Where does he say that?

9   BY MR. SIMPSON:

10     Q    Next to the picture.

11     A    Oh, wait a minute.  It may have to do with

12  the flow characteristics of the air through that loop

13  in that system, but you have to ask Parks.  That's my

14  interpretation of it.

15     Q    Have you ever read the installation

16  instructions for that particular unit?

17     A    I've seen it.  I don't recall reading all of

18  it.  I think it's in the Bonney report.  I think it's

19  coupled in there.

20     Q    You're not an air conditioning/heating

21  ventilation expert, are you?

22     A    No, no, no.

23     Q    I'm not going to push you on that.  I'm just

VIDEOCONFERENCE DEPOSITION OF DR. ROBERT L. KONDNER, P.E.
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

174

1
2
3    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
4         I, Laurie Bangart-Smith, Registered
         Professional Reporter, the officer before whom
5         the foregoing deposition was taken, do hereby
         certify that the foregoing transcript is a true
6         and correct record of the testimony given; that
         said testimony was taken by me stenographically
7         and thereafter reduced to typewriting under my
         supervision; and that I am neither counsel for,
8         related to, nor employed by any of the parties to
         this case and have no interest, financial or
9         otherwise, in its outcome.
10             IN WITNESS WHEREOF, I have hereunto set my
         hand and affixed my notarial seal this 3rd day of
11         January, 2008.
12
13
14         My commission expires:   March 14th, 2011
15
16         *Laurie Bangart Smith*
17         _____
18    LAURIE BANGART-SMITH
     NOTARY PUBLIC IN AND FOR
19    THE DISTRICT OF COLUMBIA
20
21
22
23

MERRILL LEGAL SOLUTIONS
(800) 888-3376

# EXHIBIT "B"

09/11/2003  05:48   4103295548          KONDNER ENGINEERING                    PAGE

**CONSTRUCTION INDUSTRY CONSULTANTS** · · 151

## KONDNER ENGINEERING AND TECHNICAL SERVICES

19624 Downes Road                    Phone:  410 (301) 329-6548
Parkton, MD 21120

**Officers and Key Personnel**

Dr. Robert L. Kondner, P.E., President

**Contact Person**

Dr. Robert L. Kondner
(301) 329-6548
410

**Background and History**

Doctorate, MSE, and B.E. in Engineering. Graduate and undergraduate teacher. Over 125 publications in areas of expertise. Has provided expert testimony in federal, state, and local courts, and for arbitration. Sponsored by governmental and industrial organizations in researching the static and dynamic response properties of soils and soil-foundation systems, highway pavements, concrete footings, dewatering of soils, cutting and excavation of soils, and stress distributions in soils.

Dr. Kondner's extensive and unique personal hands-on experience over a period of 35 years in construction troubleshooting, construction-damage claims, design, analysis, teaching, and research in a number of fields combine to bring a broad interdisciplinary engineering-construction-materials background to bear on design-construction-site interaction problems, including their cause and solution, as a service to owners, developers, government agencies, contractors, architects, engineers, surety companies, and their attorneys. Importance is placed on proper homework to support assertion of cause-mitigation of problem and formulation in simple, basic, understandable terms.

**Special Expertise and Approach**

Soils
Foundations
Geotechnical engineering
Structural Engineering
Forensic Engineering
Materials - Rheology
Groundwater
Engineering geology
Subsurface studies

Underground utilities and structures
Bulkheads - Cofferdams
Sheeting-shoring
Landfill systems
Highway pavements
Site-environmental studies
Vibration-dynamic seismic
   studies-designs
Damage-failure investigations

Dr. Kondner's expertise in a number of disciplines eliminates the need for multiple experts and provides for more effective continuity among various areas of a case as well as more effective communication with both contractor and attorney. Dr. Kondner has assisted attorneys in selection of subject matter for depositions and cross-examinations as well as evaluation of depositions and technical strategy.



EXHIBIT
C

09/11/2003  05:48   4103296548             KONDNER ENGINEERING                    PAGE

152                          CONSULTANTS DIRECTORY

**Technical Projects and Assignments**

Damage-Failure investigations and assessments: piers, bridges, buildings, tunnels, pipelines, bulkheads, roadways, slabs, piles, walls, retaining systems, machine foundation vibrations.

Changed subsurface conditions claim, expert testimony: dredging project, Tenn-Tombigbee Waterway.

Failure investigation, expert testimony: Lewistown, PA.

Vibration-Seismic investigation, foundation design; Westinghouse Defense & Electronics Systems Center.

Bulkhead-Tieback system failure investigation; Christiana River, Wilmington, DE.

Bridge foundations design, construction guidance; Deal Island, MD.

Patapsco sewage pumping station: subsurface evaluation, Baltimore, MD.

Shooting-Shoring failure claims, expert testimony: building excavations, Washington, D.C.

Investigation of retaining wall failure, expert testimony: Pittsburgh, PA.

**Representative Clients**

| | |
|---|---|
| Alamosa Construction Co. | Koppers Company, Inc. |
| Armco Steel Corporation | Pepper, Hamilton & Schoetz (attorneys) |
| Blake Construction Co. | Counsel, U.S. Army Corps of Engineers |
| Maroon Construction Co. | Blum, Yumkas, Mailman, |
| Slaptand, Kobart, | Gutman (attorneys) |
| November & Hurka | Michael S. Simon (attorney) |
| Hensel Phelphs Construction Co. | Walt, Tieder Killian & Hoffar (attorneys) |
| The Hartford Insurance Group | Mandelbaum, Salsburg, Gold & |
| Corson & Gruman | Lazris (attorneys) |
| Construction Co. | Braude, Margulies, Sacks & |
| Westinghouse Electric Corporation | Rephan (attorneys) |
| Maryland Casualty Co. | Dept. of Justice, Land-Natural |
| Bechtel Power Corporation | Resource Div. |
| Fidelity and Deposit Companies | Steptoe & Johnson (attorneys) |
| Weeks Dredging and | Venable, Baetjer & Howard (attorneys) |
| Contracting Inc. | Pipper & Marbury (attorneys) |
| D.A. & L. Caruso Inc. | Cohen, Milstein & Hausfeld (attorneys) |
| Gruen Associates | Peliso & Leotz (attorneys) |
| Williams Construction Co. | Semmes, Bowen & Semmes (attorneys) |
| Cutter Laboratories | Melnicove, Kaufman, Weiner (attorneys) |

## BIOGRAPHIC NOTE
## Dr. Robert L. Kondner, P.E.
### President, Kondner Engineering And Technical Services

**Education:** Bachelor and Master's Degrees in Civil Engineering and Doctorate from the Department of Mechanics of The Johns Hopkins Univ., with special emphasis in Deformable Mechanics, Geotechnical Engineering, Structures, Foundation Engineering, Rheology, and Geology.

**Teaching-Research:** Professorships at Technological Institute of Northwestern Univ., Univ. of Maryland, The Johns Hopkins Univ., Loyola College - Teaching at both the undergraduate and graduate levels, Director of numerous projects and programs of Ph.D. and Master Degree graduates.

**Publications:** Author of more than 125 publications in areas of expertize in various national and international journals, symposia, proceedings, texts, etc.

**Areas of Expertize:** Geotechnical Engineering, Mechanics and Rheology, Hydrogeotechnical Engineering, Materials, Structural Mechanics, Soil Mechanics and Foundation Engineering, Environmental Studies, Underground Construction, Damage Assessments, Hydrology-Erosion Studies, Dynamics of Soil-Water-Structure Systems, Highway Design, etc. Registered Professional Engineer and Consultant to private, industrial and Governmental organizations with over 35 years experience as a troubleshooter on construction projects.

**Expert Testimony:** City, County, State Courts, U.S. District Courts, U.S. Court of Claims, Legislative Hearings, Arbitration Proceedings, Insurance Investigations.

**National Committee Service:** U.S. Academy of Sciences Committees on "Soil and Rock Properties" and "Mechanics of Earth Masses and Layered Systems" - Secretary American Society of Civil Engineers Technical Conference on Design of Foundations For Control of Settlements - Director of applied research project under National Cooperative Highway Research Program.

**Awards and Honors:** Alfred A. Raymond International Award for Soil Mechanics and Foundation Engineering, Collingwood Prize of the American Society of Civil Engineers, Chicago One of Ten Outstanding Young Men of 1963 and Nominee for U.S., Numerous Fellowships, etc.

**Utility Construction Projects:** Buchanan Co. Va. Water Distribution System 25 Miles 6-16 inch; Fairfax Co. Va. 42", 48", 72" Sanitary - 30" Force Main projects; Staten Island New York 10" thru 18" Sanitary-Water; Hampton Roads Va. 54", Subaqueous Sanitary; Washington Suburban Sanitary Com. 42", 48", 72", 96", 108" Sanitary-Water; Bergen Co. N.J. Interceptor Sewer; Pumping Stations in Va., Md., Del.; Tunnels in Md., Pa., N.J.; Box Culverts in Md.; Balto. Co., 42", 48", 54", 66", 72" Sanitary Projects; Wash. Co. Sanitary Dist. 8"-12" Sewer, 3"-10" Main, etc.

09/11/2003  05:48   4103295548         KONDNER ENGINEERING                        PAGE

**Hydrogeotechnical Engineering:** Direct planning, location, analyses, and drilling of groundwater wells, develop wells, conduct multi-day well test programs, analyses of test data, develop design parameters and construction recommendations associated with potable and chemically acceptable cooling waters for underground self sustained nuclear defense facilities subject to close-down under nuclear attack in Florida, California, Massachusetts, Wisconsin, Maryland, and Wyoming; Plan, direct, analyses and installation of hundreds of shallow and deep well groundwater pumping-drawdown projects associated with construction-property protection contracts; Groundwater-well pollution investigation at various landfill projects; Industrial groundwater-spills, pollution hydrogeotechnical investigations associated with industrial spills of chemicals, oil, gas, acid, etc.; Teaching groundwater-seepage-well flow-dewatering and other hydrogeotechnological subjects at both graduate and under-graduate levels; Expert hydrogeotechnical testimony in various courts, legislative hearings, arbitration proceedings and insurance claim investigations; Invited lecturer on hydrogeotechnical matters before governmental, professional, environmental, educational, and community groups.

**Bridge Foundations:** Deal Island Bridge. Md. Rt. 363 – 1500 ft 54 inch concrete cylinder piles; Pepco-Benning Road Bridge, Wash. D.C. – 300 ft skew span at Anacostia River channel; Md. Rt. 198 Multi-Span Bridge over B & O Railroad; National Freeway U.S. 48 over U.S. 40 – 1000 ft, pier footings and piles; Md. Rt. 198 Multi-Span Bridge over Patuxent River; Baltimore Region Rapid Transit System, Elevated Structures, Rogers Ave. – Cold Spring and Reisterstown Sections – soils – foundations consultant, design concrete formwork; Wye Narrows Bridge Md. Rt. 838 – 700 ft, pile foundations; Wash. Metro. Area Rapid Transit System, Aerial Structures – embankment sections

**Environmental-Groundwater Projects:** BFI Hazardous Chemical Processing Center – Landfill Dundalk Maryland; SCA Landfill Hydrogeotechnical Investigation Windsor-Lower Windsor Township York Co. Pa., Groundwater Investigation Leonardtown Sewage Works Leonardtown Maryland, Alpha Ridge Landfill Howard Co. Md., Hernwood Landfill Balto. Co. Md., Parkton Landfill Balto. Co. Md., Kerr McGee Acid Spill Balto. City Md., Industrial Underground Oil Spill, Balto. Md.

Vibration-Dynamic-Seismic Projects:  Underground Defense Structures Subject To Nuclear Attack - California, Mass., Wisconsin, Florida, Maryland, Wyoming; Seismic Analyses - Certifications Of Control Structures For Nuclear Power Plants Various U.S. Locations; Super Sensitive Machine Systems Foundation Design - Westinghouse Defense; Blasting Control Interstate I-795 and I-83 Projects; Hydraulic Dynamic Failures Of Pipelines - Virginia, PA.; Dynamics Of Air Compressors-Foundations Systems - Kaiser Aluminum, Koppers Co.; Pile Driving And Construction Equipment Vibration Monitoring And Control - Virginia, Interstate I-83, I-170, Lakewood Relief Drain; Extensive Research Studies-Nuclear Weapons Effects Board, Defense Atomic Support Agency;External Examiner, School Of Earthquake Engineering Roorkee India., etc.

Groundwater-Well Projects; Well Development For Underground Nuclear Defense Facilities in Florida, California, Mass., Wisconsin, Maryland, Wyoming; Numerous Construction Dewatering-Well Drawdown Projects; Groundwater Pollution Investigations at Various Landfill Projects; Industrial Pollution Hydrogeotechnical Investigations; Expert Hydrogeotechnical Testimony - Various Courts, Legislative Hearings, Arbitration Proceedings, Insurance Investigations.

Damage-Failure Investigations And Assessments:  Armco Wall - Pittsburg PA, Eastern Vo. Tech. High School, Cutter Labs - Holabird Industrial Park, Koppers Co., Ashland Oil Co. Neal West Virginia, Pipe Arch Westminster, Buildings Savannah Georgia, Building Mobile Alabama, Numerous Building: In Staten Island New York, Federal Hill Balto., Water Distribution System - 25 Miles Virginia, Fairfield Balto., Lakewood Ave. Balto., Belle View Apartment Complex Fairfax Co. Virginia, Piers U.S. Coast Guard Yard Curtis Bay Md., 800 Block Lombard Street Balto., Blocks Of Buildings Carrollton Ave. And Cross Streets West Balto., Historical Sites - Carroll Mansion - Flag House - War Memorial Building - Shot Tower - Saint Vincent DePaul Church - Balto., Paradise Manor Apartment Complex Anacostia Park Washington, Building Montgomery Alabama, Culvert-Bridge At Polk Creek - Anacostia, Industrial Buildings - Russell Street West Balto., etc.

Seismic Analyses Control Structures - Nuclear Power Plants:  Include Beaver Valley - Unit 2 Pittsburgh, North Anna Units 3 - 4 Virginia, Watts Bar TVA, Joseph M. Farley Units 1 - 2 Alabama, Bellfonte Units 1 - 2 TVA, Sequoyah Units 1 - 2 TVA, Arkansas Unit 2, etc.

Sheeting-Shoring:   Patapsco Pumping Station - Steel Sheet Pile Circular Cofferdam with Reinforced Concrete Ring Wales 50 ft deep, 122 ft in diameter, next to river; Medical Clinic Coal Bunker, U.S. Naval Academy; Md. Rt. 176 Bridge Over Amtrak, Steel Sheeting with anchor tie-back system; North Hospital Building, Univ. of Md. Balto., Slurry Wall Retaining System with tie-back system; Numerous Soldier Pile-Wood Lagging and Steel Sheet Pile Retaining Systems for Alluvion Street Storm Drain Outfall, I-170, Balto.; Steel Sheet Pile River Crossing, Hooff's Run, Va.; Oil-Water Separator Facility Sheeting, Naval Comm. Cheltenham Md.; Steel Sheet Pile System, Pumping Station, Belle View, Va.; Steel Sheet Pile River Crossing, Cameron Run, Va.; Harbor Field Bulkhead, Md. Port Authority, Retaining - Dead man anchor system; Soldier Pile-Wood Lagging And Vertical Wood Sheeting-Timber Retaining Systems, Barrett-Decker Avenues, Staten Island, N.Y.; Steel Sheet Pile, Rts. 273 & 4 Bridge, Delaware; Western Md. Railroad Retaining Systems, Balto. Metro. Construction Reisterstown Section, Steel Sheet Pile and Soldier Pile-Wood Lagging; Entrance Pit - 96 Inch Tunnel, Kenilworth Ave., Wash. D.C., Steel Sheet Pile-Vertical Wood Sheeting-Soldier Pile & Wood Lagging Combined Design; Henderson's Wharf Bulkhead, Balto., Md., Steel Sheet Pile-Timber Pile-Pipe Pile System; Dorsey Run Sewerage Pumping Station, Howard Co., Md., Circular Steel Sheet Pile Cofferdam with Reinforced Concrete Circular Interior Rings, 45 ft deep - 70 ft diameter; Cofferdam, Md. Rt. 335 Bridge Over Blackwater River, Steel Sheet Pile System, Dorcester Co., Md.; Steel Plate - Cross Brace Systems, Lombardee Beach and Chalk Point Pumping Stations, Anne Arundel Co., Md.; Steel Sheet Pile Cofferdam, Md. Rt. 450 Bridge Over North River, Annapolis, Md.; etc.


Hydrology-Erosion-Sedimentation:   Tennessee-Tombigbee Waterway Aliceville Lake Navigation Channel Deposition-Dredging, Alabama-Miss.; Western Prince George's Co. Transportation Alternatives Study-Water Quality, Flood Plain, Hydrologic-Sedimentation Processes of Runoff-Erosion-Yield-Transport-Deposition; Hampton Roads VA. Dredging-Foundation Placement 54 Inch Subaqueous Sanitary System; Alluvion Street Storm Drain Outfall, Balto. MD; U.S. Coast Guard Piers-Bridge, Underwater Study Using U.S. Navy's UDATS-3 System, Curtis Bay MD; Guilford Ave. Bridge, Jones Falls Flood Plain, Balto. MD; Lake Hiawatha-Rockaway River Flood Control Walls-Embankments, Lake Hiawatha, N.J.; Deal Island Bridge-Chesapeake Bay, Deal Island, MD; Cabin Branch Industrial Center-Storm Water Management Facility Prince George's Co.; Hydrogeologic Investigations Frankford Arsenal Delaware River Phil. PA; Big Timber Creek-Ballmawr Interceptor System-Camden, N.J.; Md. Rt. 450 Bridge Over North River, Cofferdam, A.A. Co. MD; Cameron Run River Pipeline Crossing Alexandria, VA; Ramapo River Interceptor Sewer System, Bergen Co. N.J.; etc.!

Construction Dewatering Systems: Compost Building, Waste Water Authority, Camden, New Jersey; North Hospital Building, Univ. of Md. Hospital, Balto. Md.; Ramapo River Interceptor Sewer System, Bergen Co., N.J.; Biomedical Research Center, D-Building Annex, City Hospital, Balto. Md.; Warehouse-Sales-Office Building, Hampton Park, Prince Georges Co. Md.; Pipeline, Town of Pittsville, Md.; Patapsco Pumping Station, Balto. Co., Md.; Bridge Foundation Constructions, Rt. 38, Rt. 636, Mason's Creek, New Jersey; Lakewood Storm Water Drain, Balto. Md.; Carolyn Building, Jessup, Md.; Dorsey Run Sewerage Pumping Station, Howard Co., Md.; Greenbriar Apartment Development, Columbia, Howard Co., Md.; Frankford Arsenal, U.S. Army Corps of Engr., Delaware River, Phil. Pa.; Pumping Station, Bell View, Virginia; Alluvion Street Storm Drain Outfall, Balto., Md.; Cabin Branch Industrial Center - Storm Water Management Facility, Prince Georges Co., Md.; See Hydrogeotechnical Engineering, Environmental - Groundwater Projects, Groundwater - Well Projects.

Concrete Technology Projects: Baltimore Rapid Transit System; Cold Spring Station, investigation-rehabilitation, Honeycomb-voids in deep cross over beam structures; Lindley Packaging, 1401 West Patapsco Ave., Balto. Md., warehouse reinforced concrete slab-on-grade crack, displacement investigation, rehabilitation recommendations; Port of Wilmington, Delaware, investigation of cracking of 375 ft by 75 ft reinforced concrete slab on structural fill at wharf-pier system; J. Edgar Hoover FBI Building, Pennsylvania Ave. - Tenth Street N.W., Washington, D.C., design sequence of concrete pours with raker and bracing removal with waterproofing and backfilling operations - develop and supervise field concrete wall displacement control procedures and criteria; Mid-Atlantic Toyota Distribution Warehouse, Anne Arundel Co., Md., Investigation of slab cracking, deteriorated slab joint systems; Baltimore Beltway-Baltimore Washington Expressway, concrete mix investigation bridge deck rehabilitation; Cutter Laboratories, Holabird Industrial Park, Balto. Md., investigation of structural distress in floor slab; Aberdeen Proving Ground, U.S. Army, Aberdeen, Md., design reinforced concrete footings and column pedestals for six building complex; Baltimore Rapid Transit System, Balto., Md., Concrete formwork design for elevated plaza stations - aerial structures Rogers Ave. and Reisterstown Stations; Baltimore Travel Plaza Hotel, Balto. Md., investigation of building reinforced concrete slab-on-grade distress-cracking-displacement; Midway Industrial Park Warehouse, Anne Arundel Co., investigation of structural distress-cracking-displacement; of reinforced concrete slab-on-grade; Ebenezer Road

Bridge Over Amtrack, Balto. Co. Md., investigation - correction of honeycomb - voids of reinforced concrete beams-columns;  Kaufman Products, Curtis Ave., Balto. Md., design reinforced concrete slabs-walls-pedestals- containment facilities, etc.;  Lock Raven Dam, Balto. Co., Md., investigation of deteriorated concrete, anchorage of wire mesh-shotcrete repairs, grout evaluations, etc.;  Quality Inn, Ocean City, Md., investigation of cracking in concrete balcony slabs, multi story structure expert testimony;  Patapsco Pumping Station, Balto. Co. Md., investigation of cracking in 72 inch reinforced concrete influent pipe; South Walter Reed Drive, Arlington, Va., investigation-rehabilitation of warehouse building with cracked-settled concrete floor slabs-on-grade;  Westinghouse Sykesville, Md., evaluation of damage to reinforced concrete floor slab and special equipment foundation, Aegis near field anechoic chamber;  Locker Storage Facility, Reisterstown Road, Balto., Md., investigation of masonry wall construction-cracking storm water leakage;  Sandpiper Dunes Hotel, Ocean City, investigation of cracking in concrete balcony slabs, multi story structure;  Walbrook Professional Building, Balto., Md., investigation of reinforced concrete slab-on-grade cracking;  West Patapsco Ave. - 2100 and 2200 Blocks, investigation of building - concrete slab-on-grade crack patterns with correction recommenda-tions;  U.S. Coast Guard Yard Building No. 40B, Curtis Bay, Md., redesign reinforced concrete spread footings with pile foundations using existing footings; Rossville Medical Center, Baltimore Co., Md., investi-gation of reinforced concrete floor distress and rein-forced concrete column piers-pedestals;  Parkway Drive Office Building, Howard Co., investigation of rein-forced concrete floor slab cracking-distress-vibration deflection, study of connections of beams-deck pans-shear heads - etc.;  Dorsey Run Sewerage Pumping Station, Howard Co., Md., design 70 ft circular steel sheet pile - reinforced concrete ring wale cofferdam; William & Heinz Co., Prince Georges Co., Md., design auger in-place concrete grout piles;  AEGIS Anechoic Test Chamber, Westinghouse Sykesville, Md., design con-crete foundations for special vibration sensitive criteria;  Tindeco Wharf, 2809 Boston Street, Baltimore, investigation of concrete pile caps;  Deal Island Bridge 1500 Feet Long, Chesapeake Bay, design 54 inch reinforced concrete cylinder piles;  Steel Reinforce-ment configuration-form arrangement, North End-West Gallery, Patapsco Waste Water Treatment Plant;  Center Trunnion Pier, State Street Bridge Perth Amboy, N.J. Deteriorated Concrete, Cement-Coarse Aggregate alkali-silica reaction, weak zones and freeze-thaw reactions;

Guilford Ave. Bridge, Balto., Md., deteriorated concrete north abutment;  Lake Hiawatha-Rockaway River Flood Control Walls - Lake Hiawatha, New Jersey, concrete-grout stabilization of precast wall sections; U.S. Coast Guard Concrete Pier-Bridge, Curtis Bay, Md., investigation of damages to substructure concrete bents, concrete beams, concrete piles, etc. and repair recommendations; U.S. Marine Corps Barricks, Washington, D.C., investigation of reinforced concrete footings-foundation walls, compressive strength; reinforcement-concrete bond, etc.; Blackwater River Bridge at Rte. 335, Structural Analyses of reinforced concrete slab-beam system for construction sequence; Guilford Ave. Bridge, Balto., Md., design and direct installation of reinforced concrete grout auger in-place piles for bridge support during pier-deck rehabilitation; Holiday Inn, Ocean City, Md., investigation of cracking in concrete balcony slabs in multi story building, expert testimony; Camden, N.J., redesign of pile-reinforced concrete pile cap installation in roadway for support of pipe line construction; Allied-Signal Aerospace Co., East Joppa Road, Balto., Co., Md., design reinforced concrete equipment slab.

Waterfront Projects: Harbor Field Bulkhead, Maryland Port Authority, Balto. Ship Unloading Facility - subsurface investigation, evaluation and analyses of earth retaining system, dead man anchorage system, tie bars, etc.; U. S. Coast Guard Piers No. 1, 2, and 3, U. S. Coast Guard Yard Curtis Bay, Maryland - investigation of structural integrity and general condition of the substructural systems of above major facilities with detailed study of substructural elements under the general deck systems including piles, pile caps, bent beams, span beams, cap-beam connections, underside of decking, bolts, fender piles, etc., directed-monitored underwater study using UDATS-3 System (Underwater Damage Assesments Television Systems) with two way communications with diver, T.V. monitor and magnetic tape record, analyses of findings, report - recommendations for repair - cost estimates; Anchorage Marina - 2500 block Boston St., Balto. Md., evaluation of subsurface conditions, earth pressure-stability analyses, lateral pile resistence, bulkhead-pier design for 420 slip commercial marina; Tindeco Bulkhead - Balto. Harbor, 2508 Boston Street, soil test borings, laboratory testing, evaluation of boring-test results, earth pressure - stability analyses, recommendations design details; Building No. 40B - U.S. Coast Guard

09/11/2003  05:48   4103296548          KONDNER ENGINEERING                    PAGE

Yard, Curtis Bay, Md. - soil test borings load-stress analyses, lateral stability, pile foundation design, construction factors - cost evaluations;   Bridge - Md. Rt. 304 over Corsica River, Centreville, Md. - evaluate soil test borings, earth-water pressures, design steel sheet pile retaining - cofferdam systems; Concrete Bridge, Arundel Cove, U.S. Coast Guard Yard Curtis Bay, Md. - investigation of structural integrity and damage to bridge including underwater phases, engineering report, recommendations for repairs-cost estimates;  Cameron Run Sheet Pile - Tieback Bulkhead System, Fairfax County, Virginia - investigation of stability of river bulkhead-tieback system and design of retaining system for construction thru bulkhead;    Steel Sheet Pile Cofferdam Design - Crossing at Hooff's Run Fairfax County, Virginia - evaluation of soil test boring results, earth pressure-stability analyses,  design of cofferdam;    South Bulkhead, U.S. Coast Guard Yard, Curtis Bay, Maryland - investigation of structural integrity and damage assessment to sheet pile and facing walls, report - r.e commendation;   Steel Sheet Pile Cofferdam Design Across Cameron Run River, Fairfax County, Virginia - direct soil test borings, conduct laboratory soil tests, evaluation of soil boring - test results, earth pressure - stability analyses, design cofferdam; United Brands Pier, Locust Point South, Maryland - direct soil test boring program, conduct lab tests, evaluation of boring - test results, settlement - stability analyses, feasibility recommendations for Singatad, Kehart, November, Hurka;    Deal Island Bridge, 1500 feet long, Chesapeake Bay, Maryland - evaluate soil borings-lab test results, stability-load-settlement-lateral resistance analyses in design of 54 inch concrete cylinder piles, design of concrete-cased taper piles.

U.S. Coast Guard, Curtis Bay Md., Building No. 10, steel H piles; Port of Wilmington, Delaware, steel flutted-concrete piles and steel H piles; Harford County Court House, reinforced concrete caissons; William & Heinz Co., Prince Georges County, cast-in-place concrete auger piles; Cedar Cove Md. Water Tank, 47 ft long, 14 – 9 inch diameter, 55 kips, timber piles; Guilford Ave. Bridge, Baltimore pier reconstruction, cast-in-place concrete auger piles; Harrington Harbor, Maryland, timber piles; Alluvion Street storm drain, Baltimore, cast-in-place auger piles; Anchorage Marina, Boston Street, Baltimore, steel pipe piles; Deal Island Bridge abutments, steel shell concrete filled taper piles; Lakewood Ave. Storm Drain, Baltimore, 75 ton, 16 inch concrete, cast-in-place auger piles – steel H piles – 65 ton, 16 inch concrete, cast-in-place auger piles; Ramada Inn, Mobile Alabama, 14 inch concrete, cast-in-place auger piles; Storage tank facility, Hawkins Point, Maryland, steel H piles; Washington Metropolitan Area Transit Authority Rapid Transit, New Carrollton Route, pre-cast concrete piles and deep, battered, reinforced concrete caissons; Belle View, Virginia Pumping Station steel H piles; Maryland State Prison Hagerstown reinforced concrete caissons; Drum Point Maryland, timber piles; Alcatel Microwave Tower, Naval Air Warfare Center, Patuxent, Maryland, 80 ton, 50 ft. steel H piles; etc.

09/11/2003  05:48   4103296548          KONDNER ENGINEERING                PAGE

**Pavements:** Taught Graduate And Undergraduate Courses In Highway And Airfield Pavement Design; Served On "Strength And Deformation Characteristics of Pavement Sections" U.S. Academy of Sciences Highway Research Board; Directed Research Project On Analyses Of Full Scale Road Test Of Flexible Pavement Performance Under National Cooperative Highway Research Program; Pavement Construction Parsons Paper Co. - Cabin Branch Industrial Park, Prince George's Co; Pavement Construction Charles County Md Industrial Park; Pavement Failure Investigations And Redesign With Underdrains Ramada Inns In Montgomery And Mobile Alabama; West Smallwood Drive Charles County Subgrade - Pavement Failure Investigation And Redesign; Maryland Rte 176 At Amtrak Subgrade - Pavement Failure Investigation - Redesign; Western Prince Georges County Transportation Alternatives Study; Oles Envelope Pavement Failure Investigation Baltimore; Continental Foods Expansion Baltimore - Design and Construction Of Pavement Areas; Ebenezer Road Pavement Construction - Troubleshooting, Baltimore County; Hampton Park Industrial Park Prince Georges County, Underdrains - Pavement Construction; Hollins Ferry Road Baltimore Commercial Site, Pavement Failure Investigation, Underdrain - Pavement Redesign; Canterbury Riding Development Subgrade - Pavement Failure Investigation, Laurel, Howard County; Rocky Lane Housing Development Pavement Failure Investigation, Baltimore County; Etc.

**Pile-Caisson Foundations:** 54 inch diameter - 6 inch wall, 100 ft long, reinforced concrete cylinder piles for 1500 ft long Deal Island Bridge, Md. Rt. 363; North Hospital Building, University Hospital, Baltimore, nominal 50 ft, reinforced concrete caissons; Incinerator Plant No. 5, Anacostia Park, Washington D.C., steel H piles; Pepco-Benning Road Bridge, Anacostia Park, Washington, D.C., steel H pile; Glidden Paint Co., Industrial Complex, Baltimore Maryland, steel H piles; Maryland Rt. 198 Bridge Over Patuxent River 75 ton - 14 inch tapered monotude piles; Maryland Rt. 838, Charlotte Hall Md. Water Tank, 14 inch diameter, 50 kip, 45 ft timber piles; Wye Narrows Bridge 48 inch diameter - 6 inch wall, 70 ft long, reinforced concrete cylinder piles and 12 inch diameter - 70 ft long, corrugated Republic piles for abutments; The Pier Condominiums, Norfolk, Virginia, 18 inch diameter - ½ inch wall, 95 ft long, pipe piles



# KONDNER ENGINEERING AND TECHNICAL SERVICES

19824 DOWNES ROAD
PARKTON, MARYLAND 21120

Telephone 410-329-6548

CIVIL ENGINEERING
SITE EVALUATION
SITE PLANNING
SOIL TEST BORINGS
LABORATORY TESTING
ENGINEERING REPORTS
ENVIRONMENTAL STUDIES

ENGINEERING SERVICES FOR LAWYERS
FORENSIC ENGINEERING
FOUNDATION ENGINEERING
UNDERGROUND STRUCTURES
CONCRETE & STRUCTURAL DESIGN
EARTH DYNAMICS
CONSTRUCTION INSPECTION

## RATE SCHEDULE

## EXPERT ENGINEERING SERVICES

## LEGAL MATTERS, ARBITRATIONS, CLAIMS
## DAMAGE INVESTIGATIONS, CONSTRUCTION PROBLEMS

Expert services:  All time spent by expert (except court appearances and depositions) including but not limited to consultation, case review, study of plans – specifications – contract documents, site research, document – literature research, engineering calculations and analyses, investigative planning, site inspections, site testing, laboratory work, meetings, report preparation, etc. – current rate $150.00 per hour plus costs and expenses.

Court Appearances and Depositions, Expert Services:  All time spent by expert (portal to portal) on court appearances and depositions – current rate $300.00 per hour plus costs and expenses.

Testing – Laboratory Costs:  Site testing and laboratory tests associated with the expert services not contracted for and paid directly by the client will be billed to the client.

Expenses:  Transportation – travel, lodging – meals, photography, special equipment rentals, transportation of specimens – materials, storage, equipment parts, secretarial, reproduction, materials, documents, etc.

Billings will be presented periodically such as monthly or at completion of appropriate work segments.  All bills are payable on presentation, 1.5% per month charge over 30 days.

Fees for certain special circumstances may differ from the above rates and may be payable in advance.

Above rate schedule effective January 1, 2006



EXHIBIT

D

FROM :                        FAX NO. :4103296548              Oct. 13 2006 03:16PM  P2

# KONDNER ENGINEERING AND TECHNICAL SERVICES

19624 DOWNES ROAD

PARKTON, MARYLAND 21120

Telephone 410-329-6548

CIVIL ENGINEERING
SITE EVALUATION
SITE PLANNING
SOIL TEST BORINGS
LABORATORY TESTING
ENGINEERING REPORTS
ENVIRONMENTAL STUDIES

ENGINEERING SERVICES FOR LAWYERS
FORENSIC ENGINEERING
FOUNDATION ENGINEERING
UNDERGROUND STRUCTURES
CONCRETE & STRUCTURAL DESIGN
EARTH DYNAMICS
CONSTRUCTION INSPECTION

## WATER VAPOR CONDENSATION DAMAGE TO MANUFACTURED HOUSING

### IN

### THE HOT, HUMID CLIMATE OF THE SOUTHEASTERN UNITED STATES

For

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Gibson Vance
218 Commerce Street
Montgomery, Alabama 36104

October 13, 2006

By

Dr. Robert L. Kondner, P.E.

FROM :                          FAX NO. :4103296548          Oct. 12 2006 10:21PM  P3

1

## INTRODUCTION

The hot, humid climate of the southeastern part of the United States requires careful consideration of potential moisture problem mitigation during the construction and siting of manufactured housing governed by the Department Of Housing And Urban Development (HUD) under 24CFR3280.

## CLIMATIC LOCATIONS

The geographic areas of the southeastern U.S. deemed to be within these hot, humid and fringe climatic conditions are shown in Figure 1 as expressed by HUD in the Federal Register, Vol. 67, No. 79, April 24, 2002. All or parts of Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas denoted by counties, are deemed by HUD to be within the hot, humid and fringe climatic conditions.

20402     Federal Register / Vol. 67, No. 79 / Wednesday, April 24, 2002 / Rules and Regulations

# Humid and Fringe Climate Map

## FIGURE 1



F. The following areas of local governments (counties or similar areas, unless otherwise specified), listed by State, are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map, and this waiver may be applied to homes built to be sited within these jurisdictions:

### Alabama

Baldwin, Barbour, Bullock, Butler, Choctaw, Clarke, Cofee, Conecuh, Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox

### Florida

All counties and locations within the State of Florida

### Georgia

Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, Glynn, Wayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman,
Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth

### Louisiana

All counties and locations within the State of Louisiana.

### Mississippi

Adams, Amite, Clairborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson

### North Carolina

Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender

### South Carolina

Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown,

### Texas

Anderson, Angelina, Aransas, Atascosa, Austin, Bastrop, Bee, Bexar, Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass, Chambers, Cherokee, Colorado,
Comal, De Witt, Dimmit, Duval, Falls, Fayette, Fort Bend, Franklin, Freestone, Frio, Gavelston, Goliad, Gonzales, Gregg, Grimes, Guadalupe, Hardin, Harris, Harrison, Hays, Henderson, Hidalgo, Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes, Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty, Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen, Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces, Orange, Panola, Polk, Rains, Refugio, Robertson,
Rusk, Sabine, San Augistina, San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler, Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington, Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala

Dated: April 16, 2002.

**John C. Weicher,**

*Assistant Secretary for Housing–Federal Housing Commissioner.*

[FR Doc. 02–9860 Filed 4–23–02; 8:45 am]

BILLING CODE 4210–27–P

3

## MANUFACTURED HOUSING PERFORMANCE IN HOT, HUMID CLIMATES

For years manufactured housing in the hot, humid climate of the southeastern part of the United States has suffered from water vapor condensation moisture problems caused by humid, hot, moisture – laden outside air penetrating the exterior envelope of the home and coming into contact with cooler, less permeable interior surfaces such as vinyl wall or floor coverings, resulting in soft and deteriorating wallboards, extensive mold formation, buckled floors, damaged wood trim and molding, and health concerns that have prevented the manufactured housing from meeting the performance requirements of HUD 24CFR 3280.303(b) that "all construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades".

It is important to consider the relative permeability of various wall, ceiling, and floor products used in manufactured housing in the hot, humid, and fringe climates of the United States. For example, 3/8 inch gypsum wall board laminated with paper having a water based top coat had a measured permeability of 11.44 perms while the same wall board laminated with 4 mil vinyl had a measured permeability of 0.42 perms, a difference of 2724 percent, resulting in a nearly impermeable inside wall surface when vinyl is used as the exterior wall living space side covering. This virtually guarantees the condensation of water vapor on the backside of the vinyl covered surface within the exterior wall structure.

Note that the requirements of 24 CFR 3280.504(b)(1) Exterior walls, with a vapor barrier not greater than 1.0 perm installed on the living space side of the wall is not feasible in hot, humid climates. However, the requirements of 24 CFR 3280.504(b)(2) with an external covering having a permeability of not less than 5.0 perms results in a house that can "breathe" and is suitable for use in the hot, humid climate of the southeastern United States.

4

In response to the extensive history of complaints of the damages caused by these water vapor condensation moisture problems in hot, humid climates, HUD in March 2000 issued a waiver process for CFR 3280.504 "Condensation control and installation of vapor retarders." Prior to March 2000, CFR 3280.504 did not make a distinction among the various climatic conditions of the United States for water vapor condensation control and the construction installation of vapor retarders. The waiver process allows manufacturers of manufactured houses constructed to be sited in hot, humid and fringe climates to install the vapor retarder on the exterior side, rather than the interior or living space side, of the exterior walls provided that the permeability of the exterior wall has a vapor retarder or exterior covering with a permeability not greater than 1.0 perm and the interior or living space side of the wall with a permeability of 5 perms or greater. The waiver also requires manufacturers to add a statement and a map to the data plate of the home stating that the house is only suitable for installation in humid and fringe climates.

Under 24 CFR 3282.14 "Alternative construction of manufactured homes", Section (a), HUD "encourages innovation and the use of new technology in manufactured homes" and "will permit manufacturers to utilize new designs or techniques not in compliance with the Standards" and "(2) Where such construction would provide performance that is equivalent to or superior to that required by the Standards." However, manufacturers using such waivers shall provide notice to prospective purchasers regarding the particulars of the waiver prior to actual purchase. When HUD issues a waiver, it reminds manufacturers that additional measures are likely needed in the design and construction of their homes to sufficiently abate the moisture problems in hot, humid climates and, therefore, comply with other requirements in the Standards, such as the performance requirements of CFR 3280.303(b) "to insure durable, livable, and safe housing".

### MANUFACTURER HOUSING DEFECTS IN HOT, HUMID CLIMATES

The most egregious defect of manufactured housing in the hot, humid, and fringe climates of the southeastern United States is the installation of a vapor barrier or vapor retarder on the interior or living space side of the wall, ceiling, and floor areas of the home which are the colder inside surfaces. Such construction guarantees that humid, hot, moisture – laden outside air water vapor that penetrates the exterior envelope (walls, roof, underside belly board) of the home must condense to form water on the colder back surfaces of the vapor barriers or vapor retarders which are the back – side surfaces within the walls, above the ceilings, and below the floors. This condensation water within the walls, above the ceilings and below the floor cannot escape and builds up (accumulates) resulting in deterioration of the wall boards, deterioration of the ceiling support structures, deterioration of the floor support structures with buckled floors and damaged wood trim and floor moldings, as well as the formation of an environment for the formation and growth of various types of molds within the walls, ceiling, and beneath the floors. Such construction is a clear violation of 24 CFR 3280.303(b) because it is a direct violation of "accepted engineering practices" and is not in conformance with the performance requirements of providing and insuring "durable, livable, and safe housing."

The second most egregious form of deficiency of manufactured housing in the hot, humid, and fringe climates of the southeastern U.S. is the sum package of individual point defects that allow the hot, humid, outside water vapor to penetrate the exterior building envelope. These individual point defects include; leaks and holes in the heating and cooling air ductwork systems with potential positive pressures in the belly and negative pressures within the living space drawing in outside water vapor air, failed return air ducts resulting in pulling of moist air from crawlspace, holes – tears in the belly board coverings below the floor system above the crawlspace with or without ground vapor

6

barriers and crawlspace skirt venting, improper sizing and operation of air conditioning systems, improper location and use of exhaust fans, electrical and plumbing pathways and devices acting as holes thru the building envelope, etc.

The above sum package of individual point defects reflects on the quality of construction of manufactured housing and casts doubt that 24 CFR 3280.303(b) is being met since the above package of defects does not meet the performance requirements to insure "durable", livable, and safe housing and shall demonstrate "acceptable workmanship" reflecting "journeyman quality of work of the various trades."


## EXAMPLE OF MANUFACTURED HOUSING IN HOT, HUMID CLIMATE

The single wide manufactured home located at 3393 Hunter Road, Columbia, Alabama, is one example of manufactured housing located within the hot, humid climate of the southeastern United States.  Inspection reports prepared by Healthy Homes of Louisiana, LLC and R. T. Bonney and Associates, Inc. demonstrate that the home was constructed using vinyl covered wall board for the interior living space sides of the exterior walls resulting in water vapor condensation moisture accumulating inside the perimeter walls which has caused structural deterioration and created fungal (mold) growth within the wall structure.  Such construction in direct violation of accepted engineering practice within the hot, humid climate of the southeastern United States will worsen with time and eventually render the home unfit for it's use as housing.  This is in violation of the performance requirements of 24 CFR 3280.303(b) and, thus the housing is not in compliance with the HUD Standards for manufactured housing.

# EXHIBIT "C"

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                    Northern Division

4    - - - - - - - - - - - - - - -+
                                  |      *ORIGINAL*
5    ROBERT FORD                   |
                                  |
6              Plaintiff,          |
                                  |
7      vs.                         |      Case No.:
                                  |      1:06-CV-423-BH-C
8    CHAMPION HOME BUILDERS CO.    |
                                  |
9                                  |
               Defendants.         |
10   - - - - - - - - - - - - - - -+

11                    Videoconference

12        Deposition of Dr. Robert L. Kondner, P.E.

13                    Washington, D.C.

14              Friday, December 21, 2007

15                    2:48 p.m.

16

17

18

19

20

21    Job No. 22-119787

22    Pages 1 - 140

23    Reported by:  Laurie Bangart-Smith

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

1                      Deposition of

2              Dr. Robert L. Kondner, P.E.

3

4    Held at the offices of:

5            L.A.D. REPORTING
             1100 Connecticut Avenue
6            Suite 850
             Washington, D.C. 20036
7            (800)292-4789

8

9

10

11

12

13

14

15

16

17           Taken pursuant to the Federal Rules of Civil

18      Procedure, by notice, before Laurie

19      Bangart-Smith, Registered Professional Reporter

20      and Notary Public in and for the District of

21      Columbia.

22

23

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

```
 1                    A P P E A R A N C E S

 2      ON BEHALF OF THE PLAINTIFF:

 3               JON D. PELS, ESQUIRE

 4               PELS, ANDERSON & LEE, L.L.C.

 5               4833 Rugby Avenue

 6               Fourth Floor

 7               Bethesda, Maryland 20814

 8               (301)986-5570

 9

10      ON BEHALF OF THE DEFENDANT:

11               R. SCOTT SIMPSON, ESQ. (via videoconference)

12               RITCHEY & SIMPSON

13               3288 Morgan Drive

14               Suite 100

15               Birmingham, Alabama 35216

16               (205)876-1600

17

18

19

20

21

22

23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 4

1                     EXAMINATION INDEX

2                                                     PAGE

3     EXAMINATION BY MR. SIMPSON  . . . . . . . . . . .    6

4     EXAMINATION BY MR. PELS . . . . . . . . . . . . .  127

5     REDIRECT BY MR. SIMPSON . . . . . . . . . . . . .  128

6

7

8

9                          E X H I B I T S

10                 (Attached to the Transcript)

11    DEPOSITION EXHIBIT                                 PAGE

12    No. 1     Notice of deposition duces tecum           8

13    No. 2     Kondner's expert report, 11/30/07          8

14

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

```
 1                    P R O C E E D I N G S

 2            MR. SIMPSON:  The usual stipulations are

 3       fine with me, Jon.

 4            MR. PELS:  Yeah, same objection on the duces

 5       tecum, but again I got it recently.  I know we've

 6       been giving it to the Beasley firm, but I think

 7       we've brought everything responsive, and we're

 8       happy to -- I think we've got a relationship with

 9       you, and we'll follow up if you need us to.

10            MR. SIMPSON:  Okay.

11            MR. PELS:  Kind of like the last case.

12            MR. SIMPSON:  Just for the record, I'm

13       filling in for Greg on this case.  I haven't

14       appeared yet.  I probably will, but if you will

15       just work with Greg on that document production.

16            MR. PELS:  Right.

17            MR. SIMPSON:  I'm sure we can do that.

18            MR. PELS:  Okay.

19

20

21

22

23    / / /
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1              DR. ROBERT L. KONDNER, P.E.,

2     having been first duly sworn, testified upon his oath

3     as follows:

4              EXAMINATION BY COUNSEL FOR DEFENDANT

5     BY MR. SIMPSON:

6         Q    Doctor, I think we've just completed one

7     deposition in the Murphy case, and we're getting ready

8     to start the Ford case.  Are you ready to go forward

9     on that basis?

10        A    Yep.

11        Q    Okay.  I'm going to try to have fewer

12    questions in this one, since I asked you about

13    everything I care about in the last one.  I guess I'll

14    ask you:  Over lunch, has your opinion changed in the

15    Murphy case?

16        A    No, I don't think so.

17        Q    Okay.  Did you and Mr. Pels discuss your

18    testimony or anything in the case over lunch?

19        A    No, we did not.

20        Q    Okay.  Are you familiar with the Ford home?

21        A    I'm familiar with the reports by Parks and

22    Bonney.  I have not seen the Ford home.

23        Q    All right.  I've got a report from

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1     a manufactured home?

2          A    No.

3          Q    I think we've established through the Murphy

4     deposition, which we just completed just 30 minutes

5     ago, you've never built a manufactured home.

6                MR. PELS:  Objection.

7                You can answer.

8                THE WITNESS:  That's correct.

9     BY MR. SIMPSON:

10         Q    Correct?  You've never designed a

11    manufactured home?

12               MR. PELS:  Objection; relevance.

13               You can answer.

14               THE WITNESS:  Correct.

15    BY MR. SIMPSON:

16         Q    You've never seen a manufactured home

17    constructed in a factory setting?

18               MR. PELS:  Objection.

19               You can answer.

20               THE WITNESS:  Correct.

21    BY MR. SIMPSON:

22         Q    Correct?

23         A    Correct, yeah.

Page 11

1         Q    You don't know how long it takes to build a

2    manufactured home from start to finish?

3              MR. PELS:  Objection.

4              You can answer.

5              THE WITNESS:  That's correct.

6    BY MR. SIMPSON:

7         Q    You don't personally know anybody at the

8    Department of HUD which regulates manufactured

9    housing?

10             MR. PELS:  Objection.

11             You can answer.

12             THE WITNESS:  That's correct.

13   BY MR. SIMPSON:

14        Q    You don't know how HUD regulations are made?

15             MR. PELS:  Objection.

16             You can answer.

17             THE WITNESS:  That's basically correct, the

18        gory details of how it's done.

19   BY MR. SIMPSON:

20        Q    You don't know who the HUD Consensus

21   Committee is or how it works?

22        A    That's correct.

23             MR. PELS:  Objection.

Page 12

```
 1    BY MR. SIMPSON:

 2         Q    You're not a HUD code expert?

 3              MR. PELS:  Objection.

 4              You can answer.

 5              THE WITNESS:  That's correct.

 6    BY MR. SIMPSON:

 7         Q    You're not a mold expert?

 8              MR. PELS:  Objection.

 9              You can answer.

10              THE WITNESS:  That's correct.

11    BY MR. SIMPSON:

12         Q    You're not a gypsum expert?

13              MR. PELS:  Objection.

14              THE WITNESS:  That's correct.

15    BY MR. SIMPSON:

16         Q    And you're not a thermographic imaging

17    expert?

18              MR. PELS:  Objection.

19              THE WITNESS:  That's correct.

20    BY MR. SIMPSON:

21         Q    You've never designed a wall system in a HUD

22    code home in your life?

23              MR. PELS:  Objection.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

1            THE WITNESS:   That's correct.

2    BY MR. SIMPSON:

3        Q    You've never seen a (b)(1) wall fail with

4    your own two eyes in the field in Alabama?

5        A    That is correct.

6        Q    You're not familiar with the other HUD code

7    design alternatives for wall construction in an expert

8    sense?

9            MR. PELS:   Objection; no foundation.

10           THE WITNESS:   Would you explain that.

11   BY MR. SIMPSON:

12       Q    Yeah.   You've never designed or built a home

13   under 3280.504(b)(2)?

14       A    That's correct.

15       Q    You've never designed or built a home under

16   HUD code section 3280.503?

17       A    That's correct.

18       Q    You've never designed or built a home under

19   the waiver?

20       A    That's correct.

21       Q    You wrote the report in this case based on

22   materials the lawyers who hired you provided to you,

23   correct?

Page 27

1    does it?

2          A    Not that I see here.

3          Q    Do you have any idea where the waiver

4    actually is?

5          A    Where the waiver of what is?  Oh, in this

6    code?

7          Q    The wall design waiver; have you ever read

8    it?

9          A    It would have to be back in 504.  Let's go

10   back to 504.

11         Q    Doctor, it's not in there.  Have you ever

12   read it?

13         A    I don't know whether I ever have or not.

14         Q    All right.  Let's go on to B3.  Are you

15   familiar with any of the criticisms of B3?

16              MR. PELS:  Objection; form and foundation.

17              THE WITNESS:  B3.

18   BY MR. SIMPSON:

19         Q    Sir, the question I'm asking you can't be

20   answered by looking at the HUD code.

21         A    No, I'm not.

22         Q    You've never designed a (b)(3) home, have

23   you?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1    meter was used here by Mr. Parks?

2              MR. PELS:  Objection.

3              You can answer.

4              THE WITNESS:  Well, you could probably read

5         it right off of his photograph.

6    BY MR. SIMPSON:

7         Q    Are you an expert in moisture meters?

8         A    No, I'm not.

9         Q    Do you know if salt can affect the accuracy

10   of moisture meters?

11        A    It probably can.  I would imagine a lot of

12   other things could, too.

13        Q    Yes, sir, I agree with that.  Do you know if

14   there's any salt in gypsum?

15        A    Sodium chloride?  I do not know.

16        Q    You do not know the chemical composition of

17   gypsum?

18        A    No, I don't.

19        Q    Have you ever seen gypsum made in a factory?

20        A    No, I have not.

21        Q    How is gypsum made; do you know?

22        A    I really don't know.

23        Q    Do you know what the term "hydroscopic

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 42

```
 1              THE WITNESS:   No.

 2    BY MR. SIMPSON:

 3         Q    Are you familiar with the standard and

 4    reference guide for professional mold remediation

 5    which is otherwise designated as the IICRCS520?

 6         A    I have previously testified that I'm not a

 7    mold expert.

 8         Q    So you're not familiar with that book I just

 9    mentioned?

10         A    No, I'm not.

11         Q    Do you know what kind of mold testing

12    Mr. Parks did in the Ford home?

13         A    Well, I think if you go back and look at the

14    results that are reported by the testing laboratory,

15    it will tell you.

16         Q    I'm wondering if you know.

17         A    If I know?  Oh, the only thing I know is

18    what he's reported.

19         Q    Do you know what kinds of mold testing a

20    person can do on a house?  Can you classify the

21    different types of tests?

22         A    No, I cannot.

23         Q    Do you know what kinds of tests he did?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 92

1        here.  He's got it.

2    BY MR. SIMPSON:

3        Q    Do you know whether this house is properly

4    skirted and vented in the skirting?

5        A    It's skirted.  I can see it in the

6    photograph, and I assume it's properly vented.  I

7    think that it is.

8        Q    Do you know for sure?

9        A    I don't know for sure.  I'd have to go

10    through the whole report and look at it.

11        Q    Do you know if the air conditioner is

12    properly sized?

13        A    Well, it's draining to the outside.  That

14    he's got in here.

15        Q    You're not an air conditioning HVAC expert,

16    are you?

17        A    No.

18        Q    You don't know whether this is oversized,

19    correct sized or small for this home, do you?

20        A    Really, as a matter of fact, I don't even

21    know what the capacity is.

22        Q    Okay.  Do you know whether the exhaust fans

23    are properly located in this home?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 93

1       A    I don't see it in the report by Bonney.

2    There's not much in here.  No, I don't see anything in

3    here about it.

4       Q    And I think we established this morning

5    you're not sure what a positive operating system is,

6    correct?

7            MR. PELS:  Objection.

8            You can answer.

9            THE WITNESS:  Positive operating system?

10        That would be speculation on my part.

11    BY MR. SIMPSON:

12        Q    Do you know whether this home has a positive

13    operating system?

14        A    I don't recall their mentioning this.

15        Q    Do you know what part of the wall forms the

16    opaque envelope for purposes of HUD code Section

17    3280.505?

18        A    On this particular home?

19        Q    Yes, sir.

20        A    The only place it probably could be for the,

21    with the conditions, the two different conditions,

22    would be the, probably the sheathing or the --

23        Q    Do you know what kind of sheathing this home

VIDEOCONFERENCE DEPOSITION OF DR. ROBERT L. KONDNER, P.E.
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

140

1

2

3  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

4          I, Laurie Bangart-Smith, Registered
   Professional Reporter, the officer before whom

5  the foregoing deposition was taken, do hereby
   certify that the foregoing transcript is a true

6  and correct record of the testimony given; that
   said testimony was taken by me stenographically

7  and thereafter reduced to typewriting under my
   supervision; and that I am neither counsel for,

8  related to, nor employed by any of the parties to
   this case and have no interest, financial or

9  otherwise, in its outcome.

10         IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my notarial seal this 4th day of

11  January, 2008.

12

13

14  My commission expires:  March 14th, 2011

15

16  _Laurie Bangart-Smith_

17  _____

18  LAURIE BANGART-SMITH
   NOTARY PUBLIC IN AND FOR

19  THE DISTRICT OF COLUMBIA

20

21

22

23

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

NICHOLAS STRICKLAND, *et al.,*      *
                                              *

    Plaintiffs,      *
                                                *

v.      *    **Case Number: 1:06-CV-00682-TFM**
                                                *

CHAMPION ENTERPRISES, INC., *et al.,*      *
                                                *

    Defendants.      *

## DECLARATION OF DAVID TOMPOS, PE

1.    My name is David Tompos. I am over the age of eighteen years and make this declaration based upon my personal knowledge.

2.    I am a practicing professional engineer with approximately 37 years of engineering experience in the manufactured housing industry. I am a registered engineer in 23 states, including Alabama. My *curriculum vitae* is attached as Exhibit 1.

3.    I was retained by Gregory S. Ritchey, counsel for Champion Home Builders Co., to assist in evaluating the reports and opinions of Bobby Parks (hereinafter referred to as "Parks") and Robert Kondner (hereinafter referred to as "Kondner") regarding the manufactured home owned by the Stricklands, which is located at 272 Bluff Springs Road, Cowarts, Alabama. I have prepared a written report of my findings, a copy of which is attached as Exhibit 2.

4.    Based on my personal inspection of the property and a careful review of the investigation and conclusions of Parks, it is my professional opinion, to a reasonable degree of scientific certainty, that Parks and Kondner do not have a firm grasp of the design and engineering principles embodied in the HUD Code or of how the HUD Code operates. It is also my opinion that Parks' and Kondner's conclusions regarding the Strickland home's Code

compliance and structural deterioration of the walls are not justified by the methodology or the data collected in their investigations.

5.      First, Parks does not appear to be qualified to speak to design issues in the Strickland home, and his deposition testimony and conclusions display a fundamental misunderstanding of how the HUD Code operates. Parks is not an engineer, has no college education whatsoever, and has had no training in any architectural or engineering programs that address how to properly design a manufactured home. Parks' experience is that of a HVAC repairman, not of an engineer or design expert. Furthermore, he is not familiar with the basic design principles employed by HUD Code section 3280.504(b) or with the proper interpretation of the HUD Code generally.

6.      Parks concludes that the wall construction standards used for the exterior walls in the Strickland home violate HUD Code Sections 303(b) and 504(b). This conclusion is false, and its reasoning shows that Parks does not understand how the HUD Code operates.

7.      HUD develops its safety standards for the Code through a consensus process that relies on professionals with engineering expertise who provide conclusive technical documentation on issues to establish sound engineering practices. As a result, the Code embodies sound engineering practices, and meeting the specific requirements of this Code that is developed in this manner therefore conforms to sound and accepted engineering practices.

8.      Section 504(b) of the Code allows for 4 alternative designs for exterior walls in manufactured homes: 1) living side vapor barrier of one perm or less, or 2) unventilated wall cavities sealed by a pressure envelope of at least five perms, or 3) ventilated wall cavities, or 4) homes in Zone 1 may place the vapor barrier on the opposite side of the wall from the living space. Each of these alternative construction designs has been deemed by HUD to represent

good engineering practices. Nothing in the Code prohibits the use of a 504(b)(1) wall construction in Zone 1. Furthermore, HUD does not have data, research, or other information that would justify restricting the use of 504(b)(1) homes to Zones 2 and 3.

9. The Strickland exterior walls are constructed with vinyl covered gypsum wallboard with a perm rating of less than 1 on the living side of the walls. This construction method complies explicitly with Section 504(b)(1). The wall designs utilized in the Strickland home are the most widely used condensation control method in the industry for all climactic conditions and have been approved by a third party inspection agency comprised of engineer design professionals as required by the HUD regulations.

10. HUD has explicitly stated that the specific requirements of Section 504(b) trump the general requirements in Section 303(b). Parks' and Kondner's arguments to the contrary fundamentally misrepresent HUD's code interpretation and its enforcement policy.

11. In addition, HUD Code Section 508(c) explicitly allows for thermal shorts that cover up to one percent of the total exterior wall surface area. The areas identified in Parks' infrared pictures that display temperature differentials of an unknown magnitude compose an aggregate area of far less than one percent of the exterior wall surface area. Therefore, the walls conform to that aspect of the HUD standards as well. The fact that Parks does not acknowledge that thermal shorts are allowed under the HUD Code underscores his lack of familiarity with the Code.

12. In addition to Parks' and Kondner's lack of qualifications as design experts or HUD Code experts, their facts and data do not logically support their conclusions. The conclusion that "serious non-compliant code issues" are "causing structural deterioration" is refuted not only by the HUD Code issues previously discussed, but also by a lack of evidence of

structural deterioration in the walls themselves. Parks relies on moisture meter readings to conclude that the walls have excessive moisture accumulation, but he never tests the actual moisture content of the walls.

13.     In short, to a reasonable degree of scientific certainty, it is my opinion that both Parks and Kondner are unqualified to offer any opinions that relate to the code compliance or design aspects of the Strickland home, and that their conclusions are unsupported by the facts.

I declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed on this the _____ 2 1 _____ day of March 2008.

David Tompos

# EXHIBIT "E"

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

January 19, 2007

Mr. Brian D. Cooney
Vice President, Government Affairs
Manufactured Housing Institute
2101 Wilson Blvd., Suite 610
Arlington, VA 22201-3062

Dear Mr. Cooney:

Following up on our December meeting with you and your colleagues, we have had a chance to review the plaintiffs' pleadings you have provided us on various vapor barrier cases. As the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards, I can say that these pleadings consistently misrepresent HUD enforcement policy by arguing that HUD's general standard at 3280.303(b) should be applied to manufacturers' practices regarding the placement of vapor barriers even though these manufacturers have complied with HUD's more specific vapor barrier standard at 3280.504(b).

Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

Thank you again for bringing this situation to our attention. HUD has a distinct interest in maintaining an accurate understanding by arbitrators and the courts of HUD's enforcement policies and practices regarding the Manufactured Home Construction and Safety Standards. We would be especially concerned by a reported judicial decision that misstated HUD policy and practice, so please keep us advised of developments in these cases.

Sincerely,

William W. Matchneer III
Associate Deputy Assistant Secretary for
Regulatory Affairs and Manufactured Housing

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

JUN 2 1 2007

I, *Theodore A. Ford*, Director, employed by United States Department of Housing and Urban Development, certify that I have official duties in the United States Department of Housing and Urban Development, District of Columbia and have authority to make and issue this certificate. I further certify that the signature of William W. Matchneer III, Associate Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, United States Department of Housing and Urban Development, District of Columbia, appearing on the attached copy of the document is a copy of a genuine signature and that the signer has the official capacity indicated thereon.

Theodore Ford
Director



# EXHIBIT "F"

CONSTRUCTION INDUSTRY CONSULTANTS        151

## KONDNER ENGINEERING AND TECHNICAL SERVICES

19624 Downes Road                                    Phone:    410
Parkton, MD 21120                                              (301) 329-6548

**Officers and Key Personnel**

Dr. Robert L. Kondner, P.E., President

**Contact Person**

Dr. Robert L. Kondner
(301) 329-6548
410

**Background and History**

Doctorate, MSE, and B.E. in Engineering. Graduate and undergraduate teacher. Over
125 publications in areas of expertise. Has provided expert testimony in federal, state,
and local courts, and for arbitration. Sponsored by governmental and industrial
organizations in researching the static and dynamic response properties of soils and
soil-foundation systems, highway pavements, concrete footings, dewatering of soils,
cutting and excavation of soils, and stress distributions in soils.

Dr. Kondner's extensive and unique personal hands-on experience over a period of 35
years in construction troubleshooting, construction-damage claims, design, analysis,
teaching, and research in a number of fields combine to bring a broad interdisciplinary
engineering-construction-materials background to bear on design-construction-site
interaction problems, including their cause and solution, as a service to owners,
developers, government agencies, contractors, architects, engineers, surety companies,
and their attorneys. Importance is placed on proper homework to support assertion of
cause-mitigation of problem and formulation in simple, basic, understandable terms.

**Special Expertise and Approach**

Soils                                    Underground utilities and structures
Foundations                              Bulkheads – Cofferdams
Geotechnical engineering                 Sheeting-shoring
Structural Engineering                   Landfill systems
Forensic Engineering                     Highway pavements
Materials – Rheology                     Site-environmental studies
Groundwater                              Vibration-dynamic seismic
Engineering geology                        studies-designs
Subsurface studies                       Damage-failure investigations

Dr. Kondner's expertise in a number of disciplines eliminates the need for multiple
experts and provides for more effective continuity among various areas of a case as
well as more effective communication with both contractor and attorney. Dr. Kondner
has assisted attorneys in selection of subject matter for depositions and cross-
examinations as well as evaluation of depositions and technical strategy.


EXHIBIT
C

152                    CONSULTANTS DIRECTORY

## Technical Projects and Assignments

Damage-Failure investigations and assessments: piers, bridges, buildings, tunnels, pipelines, bulkheads, roadways, slabs, piles, walls, retaining systems, machine foundation vibrations.

Changed subsurface conditions claim, expert testimony: dredging project, Tenn Tombigbee Waterway.

Failure investigation, expert testimony: Lewistown, PA.

Vibration-Seismic investigation, foundation design; Westinghouse Defense & Electronics Systems Center.

Bulkhead-Tieback system failure investigation; Christiana River, Wilmington, DE.

Bridge foundations design, construction guidance; Deal Island, MD.

Patapsco sewage pumping station: subsurface evaluation, Baltimore, MD.

Shooting-Shoring failure claims, expert testimony: building excavations, Washington, D.C.

Investigation of retaining wall failure, expert testimony: Pittsburgh, PA.

## Representative Clients

Akamosa Construction Co.
Armco Steel Corporation
Blake Construction Co.
Marosa Construction Co.
Slagstand, Kehart,
   November & Hurka
Hensel Phelps Construction Co.
The Hartford Insurance Group
Corson & Gruman
   Construction Co.
Westinghouse Electric Corporation
Maryland Casualty Co.
Bechtel Power Corporation
Fidelity and Deposit Companies
Weeks Dredging and
   Contracting Inc.
D.A. & L. Caruso Inc.
Gruen Associates
Williams Construction Co.
Cutler Laboratories

Koppers Company, Inc.
Pepper, Hamilton & Scheetz (attorneys)
Counsel, U.S. Army Corps of Engineers
Blum, Yumkas, Mailman,
   Gutman (attorneys)
Michael S. Simon (attorney)
Walt, Tieder Killian & Hoffar (attorneys)
Mandelbaum, Salsburg, Gold &
   Lazris (attorneys)
Braude, Margulies, Sacks &
   Rephan (attorneys)
Dept. of Justice, Land-Natural
   Resource Div.
Steptoe & Johnson (attorneys)
Venable, Baetjer & Howard (attorneys)
Pipper & Marbury (attorneys)
Cohen, Milstein & Hausfeld (attorneys)
Pelino & Lentz (attorneys)
Semmes, Bowen & Semmes (attorneys)
Melnicove, Kaufman, Weiner (attorneys)

## BIOGRAPHIC NOTE
### Dr. Robert L. Kondner, P.E.
### President, Kondner Engineering And Technical Services

**Education:** Bachelor and Master's Degrees in Civil Engineering and Doctorate from the Department of Mechanics of The Johns Hopkins Univ., with special emphasis in Deformable Mechanics, Geotechnical Engineering, Structures, Foundation Engineering, Rheology, and Geology.

**Teaching-Research:** Professorships at Technological Institute of Northwestern Univ., Univ. of Maryland, The Johns Hopkins Univ., Loyola College - Teaching at both the undergraduate and graduate levels, Director of numerous projects and programs of Ph.D. and Master Degree graduates.

**Publications:** Author of more than 125 publications in areas of expertize in various national and international journals, symposia, proceedings, texts, etc.

**Areas of Expertize:** Geotechnical Engineering, Mechanics and Rheology, Hydrogeotechnical Engineering, Materials, Structural Mechanics, Soil Mechanics and Foundation Engineering, Environmental Studies, Underground Construction, Damage Assessments, Hydrology-Erosion Studies, Dynamics of Soil-Water-Structure Systems, Highway Design, etc. Registered Professional Engineer and Consultant to private, industrial and Governmental organizations with over 35 years experience as a troubleshooter on construction projects.

**Expert Testimony:** City, County, State Courts, U.S. District Courts, U.S. Court of Claims, Legislative Hearings, Arbitration Proceedings, Insurance Investigations.

**National Committee Service:** U.S. Academy of Sciences Committees on "Soil and Rock Properties" and "Mechanics of Earth Masses and Layered Systems" - Seacretary American Society of Civil Engineers Technical Conference on Design of Foundations For Control of Settlements - Director of applied research project under National Cooperative Highway Research Program.

**Awards and Honors:** Alfred A. Raymond International Award for Soil Mechanics and Foundation Engineering, Collingwood Prize of the American Society of Civil Engineers, Chicago One of Ten Outstanding Young Men of 1963 and Nominee for U.S., Numerous Fellowships, etc.

**Utility Construction Projects:** Buchanan Co. Va. Water Distribution System 25 Miles 6-16 inch; Fairfax Co. Va. 42", 48", 72" Sanitary - 30" Force Main projects; Staten Island New York 10" thru 18" Sanitary-Water; Hampton Roads Va. 54", Subaqueous Sanitary; Washington Suburban Sanitary Com. 42", 48", 72", 96", 108" Sanitary-Water; Bergen Co. N.J. Interceptor Sewer; Pumping Stations in Va., Md., Del.; Tunnels in Md., Pa., N.J.; Box Culverts in Md.; Balto. Co., 42", 48", 54", 66", 72" Sanitary Projects; Wash. Co. Sanitary Dist. 8"-12" Sewer, 3"-10" Main, etc.

09.11.2003  05:48   4103295549          KONDNER ENGINEERING                    PAGE

**Hydrogeotechnical Engineering:** Direct planning, location, analyses, and drilling of groundwater wells, develop wells, conduct multi-day well test programs, analyses of test data, develop design parameters and construction recommendations associated with potable and chemically acceptable cooling waters for underground self sustained nuclear defense facilities subject to close-down under nuclear attack in Florida, California, Massachusetts, Wisconsin, Maryland, and Wyoming; Plan, direct, analyses and installation of hundreds of shallow and deep well groundwater pumping-drawdown projects associated with construction-property protection contracts; Groundwater-well pollution investigation at various landfill projects; Industrial groundwater-spills, pollution hydrogeotechnical investigations associated with industrial spills of chemicals, oil, gas, acid, etc.; Teaching groundwater-seepage-well flow-dewatering and other hydrogeotechnological subjects at both graduate and under-graduate levels; Expert hydrogeotechnical testimony in various courts, legislative hearings, arbitration proceedings and insurance claim investigations; Invited lecturer on hydrogeotechnical matters before governmental, professional, environmental, educational, and community groups.

**Bridge Foundations:** Deal Island Bridge, Md. Rt. 363 – 1500 ft 54 inch concrete cylinder piles; Pepco-Benning Road Bridge, Wash. D.C. – 300 ft skew span at Anacostia River channel; Md. Rt. 198 Multi-Span Bridge over B & O Railroad; National Freeway U.S. 48 over U.S. 40 – 1000 ft, pier footings and piles; Md. Rt. 198 Multi-Span Bridge over Patuxent River; Baltimore Region Rapid Transit System, Elevated Structures, Rogers Ave. - Cold Spring and Reisterstown Sections - soils - foundations consultant, design concrete formwork; Wye Narrows Bridge Md. Rt. 838 – 700 ft, pile foundations; Wash. Metro. Area Rapid Transit System, Aerial Structures - embankment sections

**Environmental-Groundwater Projects:** BFI Hazardous Chemical Pro-cessing Center - Landfill Dundalk Maryland; SCA Landfill Hydrogeotechnical Investigation Windsor-Lower Windsor Township York Co. Pa., Groundwater Investigation Leonardtown Sewage Works Leonardtown Maryland, Alpha Ridge Landfill Howard Co. Md., Hernwood Landfill Balto. Co. Md., Parkton Landfill Balto. Co. Md., Kerr McGee Acid Spill Balto. City Md., Industrial Underground Oil Spill, Balto. Md.

Vibration-Dynamic-Seismic Projects:   Underground Defense Struc-
tures Subject To Nuclear Attack - California, Mass., Wiscon-
sin, Florida, Maryland, Wyoming; Seismic Analyses -
Certifications Of Control Structures For Nuclear Power
Plants Various U.S. Locations; Super Sensitive Machine
Systems Foundation Design - Westinghouse Defense; Blasting
Control Interstate I-795 and I-83 Projects; Hydraulic
Dynamic Failures Of Pipelines - Virginia, PA.; Dynamics Of
Air Compressors-Foundations Systems - Kaiser Aluminum,
Koppers Co.; Pile Driving And Construction Equipment Vibra-
tion Monitoring And Control - Virginia, Interstate I-
83, I-170, Lakewood Relief Drain; Extensive Research Studies-
Nuclear Weapons Effects Board, Defense Atomic Support
Agency;External Examiner, School Of Earthquake Engineering
Roorkee India., etc.

Groundwater-Well Projects; Well Development For Underground
Nuclear Defense Facilities in Florida, California, Mass.,
Wisconsin, Maryland, Wyoming; Numerous Construction
Dewatering-Well Drawdown Projects; Groundwater Pollution In-
vestigations at Various Landfill Projects; Industrial
Pollution Hydrogeotechnical Investigations; Expert Hydrogeo-
technical Testimony - Various Courts, Legislative Hearings,
Arbitration Proceedings, Insurance Investigations.

Damage-Failure Investigations And Assessments:  Armco Wall -
Pittsburg PA, Eastern Vo. Tech. High School, Cutter Labs -
Holabird Industrial Park, Koppers Co., Ashland Oil Co. Neal
West Virginia, Pipe Arch Westminster, Buildings Savannah
Georgia, Building Mobile Alabama, Numerous Building In
Staten Island New York, Federal Hill Balto., Water Distribu-
tion System - 25 Miles Virginia, Fairfield Balto., Lakewood
Ave. Balto., Belle View Apartment Complex Fairfax Co.
Virginia, Piers U.S. Coast Guard Yard Curtis Bay Md., 800
Block Lombard Street Balto., Blocks Of Buildings Carrolton
Ave. And Cross Streets West Balto., Historical Sites -
Carroll Mansion - Flag House - War Memorial Building -
Shot Tower - Saint Vincent DePaul Church - Balto., Paradise
Manor Apartment Complex Anacostia Park Washington, Building
Montgomery Alabama, Culvert-Bridge At Polk Creek - Anacostia,
Industrial Buildings - Russell Street West Balto., etc.

Seismic Analyses Control Structures - Nuclear Power Plants:  In-
clude Beaver Valley - Unit 2 Pittsburgh, North Anna Units 3 -
4 Virginia, Watts Bar TVA, Joseph M. Farley Units 1 -
2 Alabama, Bellfonte Units 1 - 2 TVA, Sequoyah Units 1 -
2 TVA, Arkansas Unit 2, etc.

09/11/2003  05:48   4103296548          KONDNER ENGINEERING                    PAGE

Sheeting-Shoring:    Patapsco Pumping Station - Steel Sheet Pile Circular Cofferdam with Reinforced Concrete Ring Wales 50 ft deep 122 ft in diameter, next to river; Medical Clinic Coal Bunker, U.S. Naval Academy; Md. Rt. 176 Bridge Over Amtrak; Steel Sheeting with anchor tie-back system; North Hospital Building, Univ. of Md. Balto., Slurry Wall Retaining System with tie-back system; Numerous Soldier Pile-Wood Lagging and Steel Sheet Pile Retaining Systems for Alluvion Street Storm Drain Outfall, I-170, Balto.; Steel Sheet Pile River Crossing, Hooff's Run, Va.; Oil-Water Separator Facility Sheeting, Naval Comm. Cheltenham Md.; Steel Sheet Pile System, Pumping Station, Belle View, Va.; Steel Sheet Pile River Crossing, Cameron Run, Va.; Harbor Field Bulkhead, Md. Port Authority, Retaining - Dead man anchor system; Soldier Pile-Wood Lagging And Vertical Wood Sheeting-Timber Retaining Systems, Barrett-Decker Avenues, Staten Island, N.Y.; Steel Sheet Pile, Rts. 273 & 4 Bridge, Delaware; Western Md. Railroad Retaining Systems, Balto. Metro. Construction Reisterstown Section, Steel Sheet Pile and Soldier Pile-Wood Lagging; Entrance Pit - 96 Inch Tunnel, Kenilworth Ave., Wash. D.C., Steel Sheet Pile-Vertical Wood Sheeting-Soldier Pile & Wood Lagging Combined Design; Henderson's Wharf Bulkhead, Balto., Md., Steel Sheet Pile-Timber Pile-Pipe Pile System; Dorsey Run Sewerage Pumping Station, Howard Co., Md., Circular Steel Sheet Pile Cofferdam with Reinforced Concrete Circular Interior Rings, 45 ft deep - 70 ft diameter; Cofferdam, Md. Rt. 335 Bridge Over Blackwater River, Steel Sheet Pile System, Dorcester Co., Md.; Steel Plate - Cross Brace Systems, Lombardee Beach and Chalk Point Pumping Stations, Anne Arundel Co., Md.; Steel Sheet Pile Cofferdam, Md. Rt. 450 Bridge Over North River, Annapolis, Md.; etc.

Hydrology-Erosion-Sedimentation:    Tennessee-Tombigbee Waterway Aliceville Lake Navigation Channel Deposition-Dredging, Alabama-Miss.; Western Prince George's Co. Transportation Alternatives Study-Water Quality, Flood Plain, Hydrologic-Sedimentation Processes of Runoff-Erosion-Yield-Transport-Deposition; Hampton Roads VA. Dredging-Foundation Placement 54 Inch Subaqueous Sanitary System; Alluvion Street Storm Drain Outfall, Balto. MD;   U.S. Coast Guard Piers-Bridge, Underwater Study Using U.S. Navy's UDATS-3 System, Curtis Bay MD;   Guilford Ave. Bridge, Jones Falls Flood Plain, Balto. MD;    Lake Hiawatha-Rockaway River Flood Control Walls-Embankments, Lake Hiawatha, N.J.;      Deal Island Bridge-Chesapeake Bay, Deal Island, MD;       Cabin Branch Industrial Center-Storm Water Management Facility Prince George's Co.;  Hydrogeologic Investigations Frankford Arsenal Delaware River Phil. PA;  Big Timber Creek-Bellmawr Interceptor System-Camden, N.J.; Md. Rt. 450 Bridge Over North River, Cofferdam, A.A. Co. MD; Cameron Run River Pipeline Crossing Alexandria, VA;  Ramapo River Interceptor Sewer System, Bergen Co. N.J.; etc.

Construction Dewatering Systems: Compost Building, Waste Water Authority, Camden, New Jersey; North Hospital Building, Univ. of Md. Hospital, Balto. Md.; Ramapo River Interceptor Sewer System, Bergen Co., N.J.; Biomedical Research Center, D-Building Annex, City Hospital, Balto. Md.; Warehouse-Sales-Office Building, Hampton Park, Prince Georges Co. Md.; Pipeline, Town of Pittsville, Md.; Patapsco Pumping Station, Balto. Co., Md.; Bridge Foundation Constructions, Rt. 38, Rt. 636, Mason's Creek, New Jersey; Lakewood Storm Water Drain, Balto. Md.; Carolyn Building, Jessup, Md.; Dorsey Run Sewerage Pumping Station, Howard Co., Md.; Greenbriar Apartment Development, Columbia, Howard Co., Md.; Frankford Arsenal, U.S. Army Corps of Engr., Delaware River, Phil. Pa.; Pumping Station, Bell View, Virginia; Alluvion Street Storm Drain Outfall, Balto., Md.; Cabin Branch Industrial Center - Storm Water Management Facility, Prince Georges Co., Md.; See Hydrogeotechnical Engineering, Environmental - Groundwater Projects, Groundwater - Well Projects.

Concrete Technology Projects: Baltimore Rapid Transit System; Cold Spring Station, investigation-rehabilitation, Honeycomb-voids in deep cross over beam structures; Lindley Packaging, 1401 West Patapsco Ave., Balto. Md., warehouse reinforced concrete slab-on-grade crack, displacement investigation, rehabilitation recommendations; Port of Wilmington, Delaware, investigation of cracking of 375 ft by 75 ft reinforced concrete slab on structural fill at wharf-pier system; J. Edgar Hoover FBI Building, Pennsylvania Ave. - Tenth Street N.W., Washington, D.C., design sequence of concrete pours with raker and bracing removal with waterproofing and backfilling operations - develop and supervise field concrete wall displacement control procedures and criteria; Mid-Atlantic Toyota Distribution Warehouse, Anne Arundel Co., Md., Investigation of slab cracking, deteriorated slab joint systems; Baltimore Beltway-Baltimore Washington Expressway, concrete mix investigation bridge deck rehabilitation; Cutter Laboratories, Holabird Industrial Park, Balto. Md., investigation of structural distress in floor slab; Aberdeen Proving Ground, U.S. Army, Aberdeen, Md., design reinforced concrete footings and column pedestals for six building complex; Baltimore Rapid Transit System, Balto., Md., Concrete formwork design for elevated plaza stations - aerial structures Rogers Ave. and Reisterstown Stations; Baltimore Travel Plaza Hotel, Balto. Md., investigation of building reinforced concrete slab-on-grade distress-cracking-displacement; Midway Industrial Park Warehouse, Anne Arundel Co., investigation of structural distress-cracking-displacement; of reinforced concrete slab-on-grade; Ebenezer Road

09/11/2003  05:43   4103296548          KONDNER ENGINEERING                PAGE

Bridge Over Amtrack, Balto. Co. Md., investigation - correction of honeycomb - voids of reinforced concrete beams-columns;    Kaufman Products, Curtis Ave., Balto. Md., design reinforced concrete slabs-walls-pedestals-containment facilities, etc.;    Lock Raven Dam, Balto. Co., Md., investigation of deteriorated concrete, anchorage of wire mesh-shotcrete repairs, grout evaluations, etc.;    Quality Inn, Ocean City, Md., investigation of cracking in concrete balcony slabs, multi story structure expert testimony;    Patapsco Pumping Station, Balto. Co. Md., investigation of cracking in 72 inch reinforced concrete influent pipe; South Walter Reed Drive, Arlington, Va., investigation-rehabilitation of warehouse building with cracked-settled concrete floor slabs-on-grade;    Westinghouse Sykesville, Md., evaluation of damage to reinforced concrete floor slab and special equipment foundation, Aegis near field anechoic chamber;    Locker Storage Facility, Reisterstown Road, Balto., Md., investigation of masonry wall construction-cracking storm water leakage;    Sandpiper Dunes Hotel, Ocean City, investigation of cracking in concrete balcony slabs, multi story structure;    Walbrook Professional Building, Balto., Md., investigation of reinforced concrete slab-on-grade cracking;    West Patapsco Ave. - 2100 and 2200 Blocks, investigation of building - concrete slab-on-grade crack patterns with correction recommendations;    U.S. Coast Guard Yard Building No. 40B, Curtis Bay, Md., redesign reinforced concrete spread footings with pile foundations using existing footings; Rossville Medical Center, Baltimore Co., Md., investigation of reinforced concrete floor distress and reinforced concrete column piers-pedestals;    Parkway Drive Office Building, Howard Co., investigation of reinforced concrete floor slab cracking-distress-vibration deflection, study of connections of beams-deck pans-shear heads - etc.;    Dorsey Run Sewerage Pumping Station, Howard Co., Md., design 70 ft circular steel sheet pile - reinforced concrete ring wale cofferdam; William & Heinz Co., Prince Georges Co., Md., design auger in-place concrete grout piles;    AEGIS Anechoic Test Chamber, Westinghouse Sykesville, Md., design concrete foundations for special vibration sensitive criteria;    Tindeco Wharf, 2809 Boston Street, Baltimore, investigation of concrete pile caps;    Deal Island Bridge 1500 Feet Long, Chesapeake Bay, design 54 inch reinforced concrete cylinder piles;    Steel Reinforcement configuration-form arrangement, North End-West Gallery, Patapsco Waste Water Treatment Plant;    Center Trunnion Pier, State Street Bridge Perth Amboy, N.J. Deteriorated Concrete, Cement-Coarse Aggregate alkali-silica reaction, weak zones and freeze-thaw reactions;

Guilford Ave. Bridge, Balto., Md., deteriorated concrete north abutment; Lake Hiawatha-Rockaway River Flood Control Walls – Lake Hiawatha, New Jersey, concrete-grout stabilization of precast wall sections; U.S. Coast Guard Concrete Pier-Bridge, Curtis Bay, Md., investigation of damages to substructure concrete bents, concrete beams, concrete piles, etc. and repair recommendations; U.S. Marine Corps Barricks, Washington, D.C., investigation of reinforced concrete footings-foundation walls, compressive strength; reinforcement-concrete bond, etc.; Blackwater River Bridge at Rte. 335, Structural Analyses of reinforced concrete slab-beam system for construction sequence; Guilford Ave. Bridge, Balto., Md., design and direct installation of reinforced concrete grout auger in-place piles for bridge support during pier-deck rehabilitation; Holiday Inn, Ocean City, Md., investigation of cracking in concrete balcony slabs in multi story building, expert testimony; Camden, N.J., redesign of pile-reinforced concrete pile cap installation in roadway for support of pipe line construction; Allied-Signal Aerospace Co., East Joppa Road, Balto., Co., Md., design reinforced concrete equipment slab.

Waterfront Projects: Harbor Field Bulkhead, Maryland Port Authority, Balto. Ship Unloading Facility – subsurface investigation, evaluation and analyses of earth retaining system, dead man anchorage system, tie bars, etc.; U. S. Coast Guard Piers No. 1, 2, and 3, U. S. Coast Guard Yard Curtis Bay, Maryland – investigation of structural integrity and general condition of the substructural systems of above major facilities with detailed study of substructural elements under the general deck systems including piles, pile caps, bent beams, span beams, cap-beam connections, underside of decking, bolts, fender piles, etc., directed-monitored underwater study using UDATS-3 System (Underwater Damage Assessments Television Systems) with two way communications with diver, T.V. monitor and magnetic tape record, analyses of findings, report – recommendations for repair – cost estimates; Anchorage Marina – 2500 block Boston St., Balto. Md., evaluation of subsurface conditions, earth pressure-stability analyses, lateral pile resistence, bulkhead-pier design for 420 slip commercial marina; Tindeco Bulkhead – Balto. Harbor, 2508 Boston Street, soil test borings, laboratory testing, evaluation of boring-test results, earth pressure – stability analyses, recommendations design details; Building No. 40B – U.S. Coast Guard

Yard, Curtis Bay, Md. - soil test borings load-stress analyses, lateral stability, pile foundation design, construction factors - cost evaluations; Bridge - Md. Rt. 304 over Corsica River, Centreville, Md. - evaluate soil test borings, earth-water pressures, design steel sheet pile retaining - cofferdam systems; Concrete Bridge, Arundel Cove, U.S. Coast Guard Yard Curtis Bay, Md. - investigation of structural integrity and damage to bridge including underwater phases, engineering report, recommendations for repairs-cost estimates; Cameron Run Sheet Pile - Tieback Bulkhead System, Fairfax County, Virginia - investigation of stability of river bulkhead-tieback system and design of retaining system for construction thru bulkhead; Steel Sheet Pile Cofferdam Design - Crossing at Hooff's Run Fairfax County, Virginia - evaluation of soil test boring results, earth pressure-stability analyses, design of cofferdam; South Bulkhead, U.S. Coast Guard Yard, Curtis Bay, Maryland - investigation of structural integrity and damage assesment to sheet pile and facing walls, report - r.e commendation; Steel Sheet Pile Cofferdam Design Across Cameron Run River, Fairfax County, Virginia - direct soil test borings, conduct laboratory soil tests, evaluation of soil boring - test results, earth pressure - stability analyses, design cofferdam; United Brands Pier, Locust Point South, Maryland - direct soil test boring program, conduct lab tests, evaluation of boring - test results, settlement - stability analyses, feasibility recommendations for Singstad, Kehart, November, Hurka; Deal Island Bridge, 1500 feet long, Chesapeake Bay, Maryland - evaluate soil borings-lab test results, stability-load-settlement-lateral resistance analyses in design of 54 inch concrete cylinder piles, design of concrete-cased taper piles.

U.S. Coast Guard, Curtis Bay Md., Building No. 10, steel H piles; Port of Wilmington, Delaware, steel flutted-concrete piles and steel H piles; Harford County Court House, reinforced concrete caissons; William & Heinz Co., Prince Georges County, cast-in-place concrete auger piles; Cedar Cove Md. Water Tank, 47 ft long, 14 - 9 inch diameter, 55 kips, timber piles; Guilford Ave. Bridge, Baltimore pier reconstruction, cast-in-place concrete auger piles; Harrington Harbor, Maryland, timber piles; Alluvion Street storm drain, Baltimore, cast-in-place auger piles; Anchorage Marina, Boston Street, Baltimore, steel pipe piles; Deal Island Bridge abutments, steel shell concrete filled taper piles; Lakewood Ave. Storm Drain, Baltimore, 75 ton, 16 inch concrete, cast-in-place auger piles - steel H piles - 65 ton, 16 inch concrete, cast-in-place auger piles; Ramada Inn, Mobile Alabama, 14 inch concrete, cast-in-place auger piles; Storage tank facility, Hawkins Point, Maryland, steel H piles; Washington Metropolitan Area Transit Authority Rapid Transit, New Carrollton Route, pre-cast concrete piles and deep, battered, reinforced concrete caissons; Belle View, Virginia Pumping Station steel H piles; Maryland State Prison Hagerstown reinforced concrete caissons; Drum Point Maryland, timber piles; Alcatel Microwave Tower, Naval Air Warfare Center, Patuxent, Maryland, 80 ton, 50 ft. steel H piles; etc.

09/11/2003  05:48   4103296548            KONDNER ENGINEERING            PAGE

**Pavements:**  Taught Graduate And Undergraduate Courses In Highway And Airfield Pavement Design; Served On "Strength And Deformation Characteristics Of Pavement Sections" U.S. Academy Of Sciences Highway Research Board; Directed Research Project On Analyses Of Full Scale Road Test Of Flexible Pavement Performance Under National Cooperative Highway Research Program; Pavement Construction Parsons Paper Co. - Cabin Branch Industrial Park, Prince George's Co; Pavement Construction Charles County Md Industrial Park; Pavement Failure Investigations And Redesign With Underdrains Ramada Inns In Montgomery And Mobile Alabama; West Smallwood Drive Charles County Subgrade - Pavement Failure Investigation And Redesign; Maryland Rte 176 At Amtrak Subgrade - Pavement Failure Investigation - Redesign; Western Prince Georges County Transportation Alternatives Study; Oles Envelope Pavement Failure Investigation Baltimore; Continental Foods Expansion Baltimore - Design and Construction Of Pavement Areas; Ebenezer Road Pavement Construction - Troubleshooting, Baltimore County; Hampton Park Industrial Park Prince Georges County, Underdrains - Pavement Construction; Rollins Ferry Road Baltimore Commercial Site, Pavement Failure Investigation, Underdrain - Pavement Redesign; Canterbury Riding Development Subgrade - Pavement Failure Investigation, Laurel, Howard County; Rocky Lane Housing Development Pavement Failure Investigation, Baltimore County; Etc.

**Pile-Caisson Foundations:**  54 inch diameter - 6 inch wall, 100 ft long, reinforced concrete cylinder piles for 1500 ft long Deal Island Bridge, Md. Rt. 363; North Hospital Building, University Hospital, Baltimore, nominal 50 ft, reinforced concrete caissons; Incinerator Plant No. 5, Anacostia Park, Washington D.C., steel H piles; Pepco-Benning Road Bridge, Anacostia Park, Washington, D.C., steel H pile; Glidden Paint Co., Industrial Complex, Baltimore Maryland, steel H piles; Maryland Rt. 198 Bridge Over Patuxent River 75 ton - 14 inch tapered monotude piles; Maryland Rt. 838, Charlotte Hall Md. Water Tank, 14 inch diameter, 50 kip, 45 ft timber piles; Wye Narrows Bridge 48 inch diameter - 6 inch wall, 70 ft long, reinforced concrete cylinder piles and 12 inch diameter - 70 ft long, corrugated Republic piles for abutments; The Pier Condominiums, Norfolk, Virginia, 18 inch diameter - 4 inch wall, 95 ft long, pipe piles;



# KONDNER ENGINEERING AND TECHNICAL SERVICES

19824 DOWNES ROAD
PARKTON, MARYLAND 21120

Telephone 410-329-6548

CIVIL ENGINEERING
SITE EVALUATION
SITE PLANNING
SOIL TEST BORINGS
LABORATORY TESTING
ENGINEERING REPORTS
ENVIRONMENTAL STUDIES

ENGINEERING SERVICES FOR LAWYERS
FORENSIC ENGINEERING
FOUNDATION ENGINEERING
UNDERGROUND STRUCTURES
CONCRETE & STRUCTURAL DESIGN
EARTH DYNAMICS
CONSTRUCTION INSPECTION

## RATE SCHEDULE

## EXPERT ENGINEERING SERVICES

## LEGAL MATTERS, ARBITRATIONS, CLAIMS
## DAMAGE INVESTIGATIONS, CONSTRUCTION PROBLEMS

Expert services:  All time spent by expert (except court appearances and depositions) including but not limited to consultation, case review, study of plans – specifications – contract documents, site research, document – literature research, engineering calculations and analyses, investigative planning, site inspections, site testing, laboratory work, meetings, report preparation, etc. – current rate $150.00 per hour plus costs and expenses.

Court Appearances and Depositions, Expert Services:  All time spent by expert (portal to portal) on court appearances and depositions – current rate $300.00 per hour plus costs and expenses.

Testing – Laboratory Costs:  Site testing and laboratory tests associated with the expert services not contracted for and paid directly by the client will be billed to the client.

Expenses:  Transportation – travel, lodging – meals, photography, special equipment rentals, transportation of specimens – materials, storage, equipment parts, secretarial, reproduction, materials, documents, etc.

Billings will be presented periodically such as monthly or at completion of appropriate work segments. All bills are payable on presentation, 1.5% per month charge over 30 days.

Fees for certain special circumstances may differ from the above rates and may be payable in advance.

Above rate schedule effective January 1, 2006



EXHIBIT
D

# KONDNER ENGINEERING AND TECHNICAL SERVICES

19624 DOWNES ROAD

PARKTON, MARYLAND 21120

Telephone 410-329-6548

CIVIL ENGINEERING
SITE EVALUATION
SITE PLANNING
SOIL TEST BORINGS
LABORATORY TESTING
ENGINEERING REPORTS
ENVIRONMENTAL STUDIES

ENGINEERING SERVICES FOR LAWYERS
FORENSIC ENGINEERING
FOUNDATION ENGINEERING
UNDERGROUND STRUCTURES
CONCRETE & STRUCTURAL DESIGN
EARTH DYNAMICS
CONSTRUCTION INSPECTION

## WATER VAPOR CONDENSATION DAMAGE TO MANUFACTURED HOUSING

### IN

### THE HOT, HUMID CLIMATE OF THE SOUTHEASTERN UNITED STATES

For

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Gibson Vance
218 Commerce Street
Montgomery, Alabama 36104

October 13, 2006

By

Dr. Robert L. Kondner, P.E.

1

## INTRODUCTION

The hot, humid climate of the southeastern part of the United States requires careful consideration of potential moisture problem mitigation during the construction and siting of manufactured housing governed by the Department Of Housing And Urban Development (HUD) under 24CFR3280.

## CLIMATIC LOCATIONS

The geographic areas of the southeastern U.S. deemed to be within these hot, humid and fringe climatic conditions are shown in Figure 1 as expressed by HUD in the Federal Register, Vol. 67, No. 79, April 24, 2002. All or parts of Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas denoted by counties, are deemed by HUD to be within the hot, humid and fringe climatic conditions.

2

**20402**    Federal Register / Vol. 67, No. 79 / Wednesday, April 24, 2002 / Rules and Regulations

# Humid and Fringe Climate Map

## FIGURE 1



F. The following areas of local governments (counties or similar areas, unless otherwise specified), listed by State, are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map, and this waiver may be applied to homes built to be sited within these jurisdictions:

*Alabama*

Baldwin, Barbour, Bullock, Butler, Choctaw, Clarke, Coffee, Conecuh, Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox

*Florida*

All counties and locations within the State of Florida

*Georgia*

Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, Glynn, Wayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman, Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth

*Louisiana*

All counties and locations within the State of Louisiana.

*Mississippi*

Adams, Amite, Claiborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson

---

Federal Register / Vol. 67, No. 79 / Wednesday, April 24, 2002 / Rules and Regulations    **20403**

*North Carolina*

Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender

*South Carolina*

Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown, Horry

*Texas*

Anderson, Angelina, Aransas, Atascosa, Austin, Bastrop, Bee, Bexar, Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass, Chambers, Cherokee, Colorado, Comal, De Witt, Dimmit, Duval, Falls, Fayette, Fort Bend, Franklin, Freestone, Frio, Galveston, Goliad, Gonzales, Gregg, Grimes, Guadalupe, Hardin, Hidalgo, Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes, Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty, Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen, Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces, Orange, Panola, Polk, Rains, Refugio, Robertson, Rusk, Sabine, San Augustine, San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler, Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington, Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala

Dated: April 16, 2002.

*John C. Weicher,*

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. 02-9860 Filed 4-23-02; 8:45 am]

BILLING CODE 4210-27-P

### MANUFACTURED HOUSING PERFORMANCE IN HOT, HUMID CLIMATES

For years manufactured housing in the hot, humid climate of the southeastern part of the United States has suffered from water vapor condensation moisture problems caused by humid, hot, moisture – laden outside air penetrating the exterior envelope of the home and coming into contact with cooler, less permeable interior surfaces such as vinyl wall or floor coverings, resulting in soft and deteriorating wallboards, extensive mold formation, buckled floors, damaged wood trim and molding, and health concerns that have prevented the manufactured housing from meeting the performance requirements of HUD 24CFR 3280.303(b) that "all construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades".

It is important to consider the relative permeability of various wall, ceiling, and floor products used in manufactured housing in the hot, humid, and fringe climates of the United States. For example, 3/8 inch gypsum wall board laminated with paper having a water based top coat had a measured permeability of 11.44 perms while the same wall board laminated with 4 mil vinyl had a measured permeability of 0.42 perms, a difference of 2724 percent, resulting in a nearly impermeable inside wall surface when vinyl is used as the exterior wall living space side covering. This virtually guarantees the condensation of water vapor on the backside of the vinyl covered surface within the exterior wall structure.

Note that the requirements of 24 CFR 3280.504(b)(1) Exterior walls, with a vapor barrier not greater than 1.0 perm installed on the living space side of the wall is not feasible in hot, humid climates. However, the requirements of 24 CFR 3280.504(b)(2) with an external covering having a permeability of not less than 5.0 perms results in a house that can "breathe" and is suitable for use in the hot, humid climate of the southeastern United States.

4

In response to the extensive history of complaints of the damages caused by these water vapor condensation moisture problems in hot, humid climates, HUD in March 2000 issued a waiver process for CFR 3280.504 "Condensation control and installation of vapor retarders." Prior to March 2000, CFR 3280.504 did not make a distinction among the various climatic conditions of the United States for water vapor condensation control and the construction installation of vapor retarders. The waiver process allows manufacturers of manufactured houses constructed to be sited in hot, humid and fringe climates to install the vapor retarder on the exterior side, rather than the interior or living space side, of the exterior walls provided that the permeability of the exterior wall has a vapor retarder or exterior covering with a permeability not greater than 1.0 perm and the interior or living space side of the wall with a permeability of 5 perms or greater. The waiver also requires manufacturers to add a statement and a map to the data plate of the home stating that the house is only suitable for installation in humid and fringe climates.

Under 24 CFR 3282.14 "Alternative construction of manufactured homes", Section (a), HUD "encourages innovation and the use of new technology in manufactured homes" and "will permit manufacturers to utilize new designs or techniques not in compliance with the Standards" and "(2) Where such construction would provide performance that is equivalent to or superior to that required by the Standards." However, manufacturers using such waivers shall provide notice to prospective purchasers regarding the particulars of the waiver prior to actual purchase. When HUD issues a waiver, it reminds manufacturers that additional measures are likely needed in the design and construction of their homes to sufficiently abate the moisture problems in hot, humid climates and, therefore, comply with other requirements in the Standards, such as the performance requirements of CFR 3280.303(b) "to insure durable, livable, and safe housing".

5

## MANUFACTURER HOUSING DEFECTS IN HOT, HUMID CLIMATES

The most egregious defect of manufactured housing in the hot, humid, and fringe climates of the southeastern United States is the installation of a vapor barrier or vapor retarder on the interior or living space side of the wall, ceiling, and floor areas of the home which are the colder inside surfaces. Such construction guarantees that humid, hot, moisture - laden outside air water vapor that penetrates the exterior envelope (walls, roof, underside belly board) of the home must condense to form water on the colder back surfaces of the vapor barriers or vapor retarders which are the back – side surfaces within the walls, above the ceilings, and below the floors. This condensation water within the walls, above the ceilings and below the floor cannot escape and builds up (accumulates) resulting in deterioration of the wall boards, deterioration of the ceiling support structures, deterioration of the floor support structures with buckled floors and damaged wood trim and floor moldings, as well as the formation of an environment for the formation and growth of various types of molds within the walls, ceiling, and beneath the floors. Such construction is a clear violation of 24 CFR 3280.303(b) because it is a direct violation of "accepted engineering practices" and is not in conformance with the performance requirements of providing and insuring "durable, livable, and safe housing."

The second most egregious form of deficiency of manufactured housing in the hot, humid, and fringe climates of the southeastern U.S. is the sum package of individual point defects that allow the hot, humid, outside water vapor to penetrate the exterior building envelope. These individual point defects include; leaks and holes in the heating and cooling air ductwork systems with potential positive pressures in the belly and negative pressures within the living space drawing in outside water vapor air, failed return air ducts resulting in pulling of moist air from crawlspace, holes – tears in the belly board coverings below the floor system above the crawlspace with or without ground vapor

6

barriers and crawlspace skirt venting, improper sizing and operation of air conditioning systems, improper location and use of exhaust fans, electrical and plumbing pathways and devices acting as holes thru the building envelope, etc.

The above sum package of individual point defects reflects on the quality of construction of manufactured housing and casts doubt that 24 CFR 3280.303(b) is being met since the above package of defects does not meet the performance requirements to insure "durable", livable, and safe housing and shall demonstrate "acceptable workmanship" reflecting "journeyman quality of work of the various trades."

## EXAMPLE OF MANUFACTURED HOUSING IN HOT, HUMID CLIMATE

The single wide manufactured home located at 3393 Hunter Road, Columbia, Alabama, is one example of manufactured housing located within the hot, humid climate of the southeastern United States. Inspection reports prepared by Healthy Homes of Louisiana, LLC and R. T. Bonney and Associates, Inc. demonstrate that the home was constructed using vinyl covered wall board for the interior living space sides of the exterior walls resulting in water vapor condensation moisture accumulating inside the perimeter walls which has caused structural deterioration and created fungal (mold) growth within the wall structure. Such construction in direct violation of accepted engineering practice within the hot, humid climate of the southeastern United States will worsen with time and eventually render the home unfit for it's use as housing. This is in violation of the performance requirements of 24 CFR 3280.303(b) and, thus the housing is not in compliance with the HUD Standards for manufactured housing.

# KONDNER ENGINEERING AND TECHNICAL SERVICES

19824 DOWNES ROAD

PARKTON, MARYLAND 21120

Telephone 410-329-6548

CIVIL ENGINEERING
SITE EVALUATION
SITE PLANNING
SOIL TEST BORINGS
LABORATORY TESTING
ENGINEERING REPORTS
ENVIRONMENTAL STUDIES

ENGINEERING SERVICES FOR LAWYERS
FORENSIC ENGINEERING
FOUNDATION ENGINEERING
UNDERGROUND STRUCTURES
CONCRETE & STRUCTURAL DESIGN
EARTH DYNAMICS
CONSTRUCTION INSPECTION

## WATER VAPOR CONDENSATION DAMAGE TO MANUFACTURED HOUSING

IN

## THE HOT, HUMID CLIMATE OF THE SOUTHEASTERN UNITED STATES

MANUFACTURED HOME

OF

ROBERT FORD
15101 SECTION LINE ROAD
WILMER, ALABAMA

For

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Gibson Vance
218 Commerce Street
Montgomery, Alabama 36104

November 30, 2007

By

Dr. Robert L. Kondner, P.E.

1

## INTRODUCTION

The hot, humid climate of the southeastern part of the United States requires careful consideration of potential moisture problem mitigation during the construction and siting of manufactured housing governed by the Department Of Housing And Urban Development (HUD) under 24CFR3280. The manufactured home of Robert Ford located at 15101 Section Line Road, Wilmer, Alabama is located within the hot, humid and fringe climatic zone defined by HUD and, as such, subject to the conditions and regulations generated for such climatic locations.

The manufactured home at 15101 Section Line Road has been inspected by R. T. Bonney and Associates, Inc. and the results of that inspection are contained within their report dated June 26, 2006. In addition, the Robert Ford manufactured home also was inspected on June 26, 2006 for elevated moisture within the perimeter walls, mold growth and penetrations of the building envelope by Healthy Homes of Louisiana, L.L.C., the results of which are contained in their report.

## CLIMATIC LOCATIONS

The geographic areas of the southeastern U.S. deemed to be within these hot, humid and fringe climatic conditions are shown in Figure 1 as expressed by HUD in the Federal Register, Vol. 67, No. 79, April 24, 2002. All or parts of Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas denoted by counties, are deemed by HUD to be within the hot, humid and fringe climatic conditions.

2

# Humid and Fringe Climate Map

## FIGURE 1



F. The following areas of local governments (counties or similar areas, unless otherwise specified), listed by State, are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map, and this waiver may be applied to homes built to be sited within these jurisdictions:

### Alabama

Baldwin, Barbour, Bullock, Butler, Choctaw, Clarke, Coffee, Conecuh, Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox

### Florida

All counties and locations within the State of Florida.

### Georgia

Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, Glynn, Wayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman,
Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth

### Louisiana

All counties and locations within the State of Louisiana.

### Mississippi

Adams, Amite, Claiborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson

### North Carolina

Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender

### South Carolina

Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown, Horry

### Texas

Anderson, Angelina, Aransas, Atascosa, Austin, Bastrop, Bee, Bexar, Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass, Chambers, Cherokee, Colorado,
Comal, De Witt, Dimmit, Duval, Falls, Fayette, Fort Bend, Franklin, Freestone, Frio, Galveston, Goliad, Gonzales, Gregg, Grimes, Guadalupe, Hardin, Harris, Harrison, Hays, Henderson, Hidalgo, Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes, Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty, Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen, Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces, Orange, Panola, Polk, Rains, Refugio, Robertson,
Rusk, Sabine, San Augustine, San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler, Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington, Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala

Dated: April 18, 2002.

John C. Weicher,
Assistant Secretary for Housing-Federal Housing Commissioner.
[FR Doc. 02-9660 Filed 4-23-02; 8:45 am]
BILLING CODE 4210-17-P

## MANUFACTURED HOUSING PERFORMANCE IN HOT, HUMID CLIMATES

For years manufactured housing in the hot, humid climate of the southeastern part of the United States has suffered from water vapor condensation moisture problems caused by humid, hot, moisture – laden outside air penetrating the exterior envelope of the home and coming into contact with cooler, less permeable interior surfaces such as vinyl wall or floor coverings, resulting in soft and deteriorating wallboards, extensive mold formation, buckled floors, damaged wood trim and molding, and health concerns that have prevented the manufactured housing from meeting the performance requirements of HUD 24CFR 3280 that "all construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades".

It is important to consider the relative permeability of various wall, ceiling, and floor products used in manufactured housing in the hot, humid, and fringe climates of the United States. For example, 3/8 inch gypsum wall board laminated with paper having a water based top coat had a measured permeability of 11.44 perms while the same wall board laminated with 4 mil vinyl had a measured permeability of 0.42 perms, a difference of 2724 percent, resulting in a nearly impermeable inside wall surface when vinyl is used as the exterior wall living space side covering. This virtually guarantees the condensation of water vapor on the backside of the vinyl covered surface within the exterior wall structure. It is also important to consider whether the impermeable surface is continuous or discontinuous. For discontinuous impermeable surfaces, it is possible for the water vapor to escape through the discontinuities.

In response to the extensive history of complaints of the damages caused by these water vapor condensation moisture problems in hot, humid climates, HUD in March 2000 issued a waiver process for CFR 3280.504 "Condensation control and installation of vapor retarders." Prior to March 2000, CFR 3280.504 did not make a distinction among the various climatic conditions of

4

the United States for water vapor condensation control and the construction installation of vapor retarders. The waiver process allows manufacturers of manufactured houses constructed to be sited in hot, humid and fringe climates to install the vapor retarder on the exterior side, rather than the interior or living space side, of the exterior walls provided that the permeability of the exterior wall has a vapor retarder or exterior covering with a permeability not greater than 1.0 perm and the interior or living space side of the wall with a permeability of 5 perms or greater. The waiver also requires manufacturers to add a statement and a map to the data plate of the home stating that the house is only suitable for installation in humid and fringe climates.

Under 24 CFR 3282.14 "Alternative construction of manufactured homes", Section (a), HUD "encourages innovation and the use of new technology in manufactured homes" and "will permit manufacturers to utilize new designs or techniques not in compliance with the Standards" and "(2) Where such construction would provide performance that is equivalent to or superior to that required by the Standards." However, manufacturers using such waivers shall provide notice to prospective purchasers regarding the particulars of the waiver prior to actual purchase. When HUD issues a waiver, it reminds manufacturers that additional measures are likely needed in the design and construction of their homes to sufficiently abate the moisture problems in hot, humid climates and, therefore, comply with other requirements in the Standards, such as the performance requirements of CFR 3280 "to insure durable, livable, and safe housing".

Regardless of the waiver and alternative construction, the use of vinyl covered wallboard in hot humid climates has never been required for CFR 3280.504(b)(1). In fact, a vapor permeable wallboard has at all relevant times been available under CFR 3280.504(b)(1).

5

## MANUFACTURER HOUSING DEFECTS IN HOT, HUMID CLIMATES

The most egregious defect of manufactured housing in the hot, humid, and fringe climates of the southeastern United States is the installation of vinyl covered wallboard as a vapor barrier or as a vapor retarder on the interior or living space side of the wall, ceiling, and floor areas of the home which are the colder inside surfaces. Such construction guarantees that humid, hot, moisture -- laden outside air water vapor that penetrates the exterior envelope (walls, roof, underside belly board) of the home must condense to form water on the colder back surfaces of vinyl covered wallboard as the vapor barriers or as vapor retarders which are the back -- side surfaces within the walls, above the ceilings, and below the floors. This condensation water within the walls, above the ceilings and below the floor cannot escape and builds up (accumulates) resulting in deterioration of the wall boards, deterioration of the ceiling support structures, deterioration of the floor support structures with buckled floors and damaged wood trim and floor moldings, as well as the formation of an environment for the formation and growth of various types of molds within the walls, ceiling, and beneath the floors. Such construction is a clear violation of 24 CFR 3280 because it is a direct violation of "accepted engineering practices" and is not in conformance with the performance requirements of providing and insuring "durable, livable, and safe housing."

The second most egregious form of deficiency of manufactured housing in the hot, humid, and fringe climates of the southeastern U.S. is the sum package of individual point defects that allow the hot, humid, outside water vapor to penetrate the exterior building envelope. These individual point defects include; leaks and holes in the heating and cooling air ductwork systems with potential positive pressures in the belly and negative pressures within the living space drawing in outside water vapor air, failed return air ducts resulting in pulling of moist air from crawlspace, holes -- tears in the belly board coverings below the floor system above the crawlspace with or without ground vapor

6

barriers and crawlspace skirt venting, improper sizing and operation of air conditioning systems, improper location and use of exhaust fans, electrical and plumbing pathways and devices acting as holes thru the building envelope, etc.

The above sum package of defects reflects on the quality of construction of manufactured housing and casts doubt that 24 CFR 3280 is being met since the above package of defects does not meet the performance requirements to insure "durable", livable, and safe housing and shall demonstrate "acceptable workmanship" reflecting "journeyman quality of work of the various trades."

## EXAMPLE OF MANUFACTURED HOUSING IN HOT, HUMID CLIMATE

The double wide manufactured home located at 15101 Section Line Road, Wilmer, Alabama, is one example of manufactured housing located within the hot, humid climate of the southeastern United States. Inspection reports prepared by Healthy Homes of Louisiana, LLC and R. T. Bonney and Associates, Inc. demonstrate that the home was constructed using vinyl covered wall board for the interior living space sides of the exterior walls resulting in water vapor condensation moisture accumulating inside the perimeter walls which has caused structural deterioration and created fungal (mold) growth within the wall structure. Such construction in direct violation of accepted engineering practice within the hot, humid climate of the southeastern United States will worsen with time and eventually render the home unfit for it's use as housing. This does not meet the performance requirements of 24 CFR 3280 and, thus the housing is not in compliance with the HUD Standards for manufactured housing.

# KONDNER ENGINEERING AND TECHNICAL SERVICES

19624 DOWNES ROAD

PARKTON, MARYLAND 21120

Telephone 410-329-6548

CIVIL ENGINEERING
SITE EVALUATION
SITE PLANNING
SOIL TEST BORINGS
LABORATORY TESTING
ENGINEERING REPORTS
ENVIRONMENTAL STUDIES

ENGINEERING SERVICES FOR LAWYERS
FORENSIC ENGINEERING
FOUNDATION ENGINEERING
UNDERGROUND STRUCTURES
CONCRETE & STRUCTURAL DESIGN
EARTH DYNAMICS
CONSTRUCTION INSPECTION

## WATER VAPOR CONDENSATION DAMAGE TO MANUFACTURED HOUSING

### IN

### THE HOT, HUMID CLIMATE OF THE SOUTHEASTERN UNITED STATES

MANUFACTURED HOME

OF

KELLY MURPHY
5489 WASHINGTON FERRY ROAD
MONTGOMERY, ALABAMA

For

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Lance Gould
218 Commerce Street
Montgomery, Alabama 36104

October 18, 2007

By

Dr. Robert L. Kondner, P.E.

## INTRODUCTION

The hot, humid climate of the southeastern part of the United States requires careful consideration of potential moisture problem mitigation during the construction and siting of manufactured housing governed by the Department Of Housing And Urban Development (HUD) under 24CFR3280. The manufactured home of Kelly Murphy located at 5489 Washington Ferry Road, Montgomery, Alabama is located within the hot, humid and fringe climatic zone defined by HUD and, as such, subject to the conditions and regulations generated for such climatic locations.

The manufactured home at 5489 Washington Ferry Road has been inspected by R. T. Bonney and Associates, Inc. and the results of that inspection are contained within their report dated July 5, 2006. In addition, the Kelly Murphy manufactured home also was inspected on May 22, 2006 for elevated moisture within the perimeter walls, mold growth and penetrations of the building envelope by Healthy Homes of Louisiana, L.L.C., the results of which are contained in their report.

## CLIMATIC LOCATIONS

The geographic areas of the southeastern U.S. deemed to be within these hot, humid and fringe climatic conditions are shown in Figure 1 as expressed by HUD in the Federal Register, Vol. 67, No. 79, April 24, 2002. All or parts of Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas denoted by counties, are deemed by HUD to be within the hot, humid and fringe climatic conditions.

# Humid and Fringe Climate Map

## FIGURE 1



F. The following areas of local governments (counties or similar areas, unless otherwise specified), listed by State, are deemed to be within the humid and fringe climate areas shown on the Humid and Fringe Climate Map, and this waiver may be applied to homes built to be sited within these jurisdictions:

### Alabama

Baldwin, Barbour, Bullock, Butler, Choctaw, Clarke, Cofee, Conecuh, Covington, Crenshaw, Dale, Escambia, Geneva, Henry, Houston, Lowndes, Marengo, Mobile, Monroe, Montgomery, Pike, Washington, Wilcox

### Florida

All counties and locations within the State of Florida.

### Georgia

Appling, Atkinson, Bacon, Baker, Ben Hill, Berrien, Brantley, Brooks, Bryan, Calhoun, Camden, Charlton, Chatham, Clay, Clinch, Coffee, Colquitt, Cook, Crisp, Decatur, Dougherty, Early, Echols, Effingham, Evans, Glynn, Wayne, Grady, Irwin, Jeff Davis, Lanier, Lee, Liberty, Long, Lowndes, McIntosh, Miller, Mitchell, Pierce, Quitman, Randolph, Seminole, Tattnall, Terrell, Thomas, Tift, Turner, Ware, Worth

### Louisiana

All counties and locations within the State of Louisiana.

### Mississippi

Adams, Amite, Claiborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Pearl River, Perry, Pike, Rankin, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson

### North Carolina

Brunswick, Carteret, Columbus, New Hanover, Onslow, Pender

### South Carolina

Jasper, Beaufort, Colleton, Dorchester, Charleston, Berkeley, Georgetown, Horry

### Texas

Anderson, Angelina, Aransas, Atascosa, Austin, Bastrop, Bee, Bexar, Brazoria, Brazos, Brooks, Burleson, Caldwell, Calhoun, Cameron, Camp, Cass, Chambers, Cherokee, Colorado, Comal, De Witt, Dimmit, Duval, Falls, Fayette, Fort Bend, Franklin, Freestone, Frio, Gavelston, Goliad, Gonzales, Gregg, Grimes, Guadalupe, Hardin, Harris, Harrison, Hays, Henderson, Hidalgo, Hopkins, Houston, Jackson, Jasper, Jefferson, Jim Hogg, Jim Wells, Karnes, Kaufman, Kennedy, Kinney, Kleberg, La Salle, Lavaca, Lee, Leon, Liberty, Limestone, Live Oak, Madison, Marion, Matagorda, Maverick, McMullen, Medina, Milam, Montgomery, Morris, Nacogdoches, Navarro, Newton, Nueces, Orange, Panola, Polk, Rains, Refugio, Robertson, Rusk, Sabine, San Augustine, San Jacinto, San Patricio, Shelby, Smith, Starr, Titus, Travis, Trinity, Tyler, Upshur, Uvalde, Val Verde, Van Zandt, Victoria, Walker, Waller, Washington, Webb, Wharton, Willacy, Williamson, Wilson, Wood, Zapata, Zavala

Dated: April 15, 2002.

John C. Weicher,

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. 02–9660 Filed 4–23–02; 6:45 am]

BILLING CODE 4210-27-P

## MANUFACTURED HOUSING PERFORMANCE IN HOT, HUMID CLIMATES

For years manufactured housing in the hot, humid climate of the southeastern part of the United States has suffered from water vapor condensation moisture problems caused by humid, hot, moisture -- laden outside air penetrating the exterior envelope of the home and coming into contact with cooler, less permeable interior surfaces such as vinyl wall or floor coverings, resulting in soft and deteriorating wallboards, extensive mold formation, buckled floors, damaged wood trim and molding, and health concerns that have prevented the manufactured housing from meeting the performance requirements of HUD 24CFR 3280.303(b) that "all construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades".

It is important to consider the relative permeability of various wall, ceiling, and floor products used in manufactured housing in the hot, humid, and fringe climates of the United States. For example, 3/8 inch gypsum wall board laminated with paper having a water based top coat had a measured permeability of 11.44 perms while the same wall board laminated with 4 mil vinyl had a measured permeability of 0.42 perms, a difference of 2724 percent, resulting in a nearly impermeable inside wall surface when vinyl is used as the exterior wall living space side covering. This virtually guarantees the condensation of water vapor on the backside of the vinyl covered surface within the exterior wall structure.

In response to the extensive history of complaints of the damages caused by these water vapor condensation moisture problems in hot, humid climates, HUD in March 2000 issued a waiver process for CFR 3280.504 "Condensation control and installation of vapor retarders." Prior to March 2000, CFR 3280.504 did not make a distinction among the various climatic conditions of the United States for water vapor condensation control and the construction installation of vapor retarders. The waiver process allows manufacturers of manufactured houses constructed to be sited

4

in hot, humid and fringe climates to install the vapor retarder on the exterior side, rather than the interior or living space side, of the exterior walls provided that the permeability of the exterior wall has a vapor retarder or exterior covering with a permeability not greater than 1.0 perm and the interior or living space side of the wall with a permeability of 5 perms or greater. The waiver also requires manufacturers to add a statement and a map to the data plate of the home stating that the house is only suitable for installation in humid and fringe climates.

Under 24 CFR 3282.14 "Alternative construction of manufactured homes", Section (a), HUD "encourages innovation and the use of new technology in manufactured homes" and "will permit manufacturers to utilize new designs or techniques not in compliance with the Standards" and "(2) Where such construction would provide performance that is equivalent to or superior to that required by the Standards." However, manufacturers using such waivers shall provide notice to prospective purchasers regarding the particulars of the waiver prior to actual purchase. When HUD issues a waiver, it reminds manufacturers that additional measures are likely needed in the design and construction of their homes to sufficiently abate the moisture problems in hot, humid climates and, therefore, comply with other requirements in the Standards, such as the performance requirements of CFR 3280.303(b) "to insure durable, livable, and safe housing".

Regardless of the waiver and alternative construction, the use of vinyl covered wallboard in hot humid climates has never been required for CFR 3280.504(b)(1). In fact, a vapor permeable wallboard has at all relevant times been available under CFR 3280.504(b)(1).

## MANUFACTURER HOUSING DEFECTS IN HOT, HUMID CLIMATES

The most egregious defect of manufactured housing in the hot, humid, and fringe climates of the southeastern United States is the installation of vinyl covered wallboard as a vapor barrier or as a vapor retarder on the interior or living space side of the wall, ceiling, and floor areas of the home which are the colder inside surfaces. Such construction guarantees that humid, hot, moisture – laden outside air water vapor that penetrates the exterior envelope (walls, roof, underside belly board) of the home must condense to form water on the colder back surfaces of vinyl covered wallboard as the vapor barriers or as vapor retarders which are the back – side surfaces within the walls, above the ceilings, and below the floors. This condensation water within the walls, above the ceilings and below the floor cannot escape and builds up (accumulates) resulting in deterioration of the wall boards, deterioration of the ceiling support structures, deterioration of the floor support structures with buckled floors and damaged wood trim and floor moldings, as well as the formation of an environment for the formation and growth of various types of molds within the walls, ceiling, and beneath the floors. Such construction is a clear violation of 24 CFR 3280.303(b) because it is a direct violation of "accepted engineering practices" and is not in conformance with the performance requirements of providing and insuring "durable, livable, and safe housing."

The second most egregious form of deficiency of manufactured housing in the hot, humid, and fringe climates of the southeastern U.S. is the sum package of individual point defects that allow the hot, humid, outside water vapor to penetrate the exterior building envelope. These individual point defects include; leaks and holes in the heating and cooling air ductwork systems with potential positive pressures in the belly and negative pressures within the living space drawing in outside water vapor air, failed return air ducts resulting in pulling of moist air from crawlspace, holes – tears in the belly board coverings below the floor system above the crawlspace with or without ground vapor

barriers and crawlspace skirt venting, improper sizing and operation of air conditioning systems, improper location and use of exhaust fans, electrical and plumbing pathways and devices acting as holes thru the building envelope, etc.

The above sum package of defects reflects on the quality of construction of manufactured housing and casts doubt that 24 CFR 3280.303(b) is being met since the above package of defects does not meet the performance requirements to insure "durable", livable, and safe housing and shall demonstrate "acceptable workmanship" reflecting "journeyman quality of work of the various trades."

## EXAMPLE OF MANUFACTURED HOUSING IN HOT, HUMID CLIMATE

The double wide manufactured home located at 5489 Washington Ferry Road, Montgomery, Alabama, is one example of manufactured housing located within the hot, humid climate of the southeastern United States. Inspection reports prepared by Healthy Homes of Louisiana, LLC and R. T. Bonney and Associates, Inc. demonstrate that the home was constructed using vinyl covered wall board for the interior living space sides of the exterior walls resulting in water vapor condensation moisture accumulating inside the perimeter walls which has caused structural deterioration and created fungal (mold) growth within the wall structure. Such construction in direct violation of accepted engineering practice within the hot, humid climate of the southeastern United States will worsen with time and eventually render the home unfit for it's use as housing. This does not meet the performance requirements of 24 CFR 3280.303(b) and, thus the housing is not in compliance with the HUD Standards for manufactured housing.

# EXHIBIT "G"

# Healthy Homes of Louisiana, llc
## PO Drawer 3127
### West Monroe, La. 71294
318-397-1974        Fax 318-397-2123        Bobby@Parksmobileair.com

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Gibson Vance
218 Commerce Street
Montgomery, AL 36104



**Figure 1** The Hunt/Strickland home in Cowarts, al

1

# Healthy Homes of Louisiana, llc
## PO Drawer 3127
## West Monroe, La. 71294

318-397-1974        Fax 318-397-2123        Bobby@Parksmobileair.com

---

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Gibson Vance
218 Commerce Street
Montgomery, AL 36104


re: inspection of the Champion factory built
home belonging to the Hunt/Strickland family.


### Summary

    An inspection was completed at the above mentioned home,
Champion serial number SRP011-03-621-20853, located Cowarts, Al
on 06-06-2006. The purpose of this inspection was to investigate
concerns of possible structural issues within the home. These
issues included;

1) Elevated moisture content within the perimeter walls causing
structural softening and deflections.
2) Possible fungal-like growth within the home.


  The following conclusion is based on information gathered from
this investigation. This home was found to have structural
deterioration and mold growth. The issue of concern is;

  Improper application of the wall construction standards.
 Does not concur with basic engineering practices or meet the
prescriptive standards which requires *"home producers in
assuring that homes built and sited in humid and fringe climates
are durable and free of moisture-related problems."
*24 CFR Part 3280 [Docket No. FR-4578-F-02]   / 3280.504(b)

2

## Conclusion

The above problem has created extremely moist conditions within the perimeter walls. This moisture has caused structural deterioration and created fungal growth within the wall structure. Due to this inappropriate wall design being utilized within the geographical location of this home, the conditions will only worsen with time and eventually render the home unfit for it's intended purpose. Remediation of this home should be performed by licensed professionals in order to preserve structural integrity and prevent any further occupant exposure. (SEE FUNGAL SAMPLE REPORT)

Further details are contained within the entirety of this report

Healthy Homes of Louisiana, llc
Robert Parks, mm

3

## Issue

Improper application of the wall construction standards. Does not concur with basic engineering practices or meet the prescriptive standards which requires *"home producers in assuring that homes built and sited in humid and fringe climates are durable and free of moisture-related problems."
*24 CFR Part 3280 [Docket No. FR-4578-F-02]  / 3280.504(b)





**Figure 3**    3280.504(b)(1) which is the wall structure utilized within the subject home.

**Figure 2** 3280.504(b)(2) is a wall standard which would meet the prescribed requirements of the Manufactured Home Construction and Safety Standards.

Figure 3 depicts the wall standard which was found to be utilized in the construction of the Hunt/Strickland home. This standard requires *"a vapor barrier not greater than 1 perm (dry cup method) installed on the living space side of the wall"*. This wall construction offers little resistance to the moisture laden outdoor air found within the "Hot Humid"/"Fringe" climates, yet requires an almost completely restrictive barrier on the cold indoor side (a.k.a. *"living space side"*) of the wall structure. This serves to trap the moisture within the wall cavity area and cause "cold in summer" side of the wall to condensate much like a "glass of ice tea in the summertime".

This moisture then becomes the source for the fungal growth which occurs. Because of the severe climate conditions of the south, this scenario usually occurs from early May through September. This prolonged exposure to moisture can and has caused premature deterioration of the wall structure. Typical moisture content within the interior partition walls of this home were in the 10% -12% range. Consistent readings within the Hunt/Strickland's perimeter gypsum walls were found to exceed 25%mc.

4

## EXAMPLES OF AIR INFILTRATION
## FOUND WITHIN THE HUNT/STRICKLAND'S HOME



**Figure 4** Perimeter wall within the end bedroom.



**Figure 5** Areas of air/heat infiltration are visible via infrared thermography.



**Figure 6** Perimeter wall near kitchen areas.



**Figure 7** Air/heat infiltration was found consistently around the perimeter wall structure.

5



**Figure 8** Perimeter wall structure.



**Figure 9** Infrared picture on Figure 8.



**Figure 10** Perimeter wall area.



**Figure 11** Infrared picture of Figure 10.

6

# FUNGAL SAMPLE REPORT

**Points of reference;**

**1. Contamination levels of non-specific toxic or allergenic fungal spores.** Mold contamination is considered present in a building when the total mold spore concentration per cubic meter is above **10,000. (***Baxter, ETS***).**

**2.** *The National Allergy Bureau* considers mold counts in air of 0 - 900 as low, 900 to 2500 as moderate, 2500 to 25,000 as high, and **above 25,000 as very high**. At "high" levels most individuals with any sensitivity will experience symptoms. Acceptable levels for individual species vary since species toxicity varies widely as does spore size, weight, and other features which affect risk to building occupants.

    A total of four(4) air samples were retrieved from the Hunt/Strickland residence.

Outdoor air sample
  #10987396

Master bath w/c
  #10987400

Middle BR w/c
  #10987431



End BR w/c
#10987447

7

## Air Sample Comparison

| | | | |
|---|---|---|---|
| Alternaria | 4 | 33 | 0.3 |
| Ascospores | 53 | 1233 | 11.4 |
| Aspergillus/Penicillium-like | 25 | 556 | 4.9 |
| Basidiospores | 330 | 7333 | 64.7 |
| Bipolaris/Drechslera | 3 | 67 | 0.6 |
| Chaetomium | <1 | <22 | NA |
| Cladosporium | 57 | 1267 | 11.2 |
| Curvularia | 2 | 44 | 0.4 |
| Epicoccum | 1 | 22 | 0.2 |

**Figure 13** Exert from outdoor air sample # 10987396

   * Initial air sampling has prescribed a need for additional evidence to be retrieved from the home. After defense inspection has been completed, large samples of gypsum board, from various locations, will be removed and sampled for fungal growth.

An indication of fungal growth observed from the sampling;

   Aspergillus/Penicillium, was found to dominate some of the samples by 76%-99% respectively (see Figure 14-16). This was not found to be the case within the outdoor sampling. The outdoor sample was extremely diversified, as would be expected. (see Figure 13)

| | | | |
|---|---|---|---|
| Aspergillus/Penicillium-like | 34000 | 2266667 | 99.3 |
| Basidiospores | 34 | 2267 | 0.1 |

**Figure 15** Exert from wall cavity sample#10987431

| | | | |
|---|---|---|---|
| Ascospores | 1 | 67 | 0.3 |
| Aspergillus/Penicillium-like | 107 | 7133 | 90.7 |
| Basidiospores | 8 | 533 | 6.9 |

**Figure 14** Exert from wall cavity sample # 10987447

| | | | |
|---|---|---|---|
| Aspergillus/Penicillium-like | 40 | 2667 | 76.9 |
| Basidiospores | 7 | 467 | 13.5 |

**Figure 16** Exert from wall cavity sample # 10987400

Mr. Bobby Parks                                          June 15, 2006
Healthy Homes of LA, LLC
P.O. Drawer 3127
West Monroe, LA 71294

DOH ELAP# 11626            Account# 15609            Login# L134675

Dear Mr. Parks:

Enclosed are the analytical results of the samples received by our laboratory June 13, 2006. All test results meet the quality control requirements of AIHA and NELAC unless otherwise stated in this report. All samples on the chain of custody were received in good condition unless otherwise noted.

Results in this report are based on the sampling data provided by the client and refer only to items tested. Unless otherwise requested, all samples will be discarded 14 days from the date of this report.

Please contact Client Services at (888) 432-5227, if you would like any additional information regarding this report.

Thank you for using Galson Laboratories.

Sincerely,

Galson Laboratories

F. Joseph Unangst

F. Joseph Unangst
Laboratory Director

Enclosure(s)

page 1 of 6                      Report Reference:1 Generated:15-JUN-06 16:44

*Galson*
**Laboratories**
6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client       : Healthy Homes of LA, LLC
Site         : Hunter
Project No.  : B A

Date Sampled   : 06-JUN-06
Date Received  : 13-JUN-06
Date Analyzed  : 14-JUN-06

Account No.: 15609
Login No.  : L134675
Incubation Temp : NA

Client ID : 10987396       Lab ID : L134675-1       Air Volume : 0.045 m3
Analysis  : Standard Spore Trap          Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|---|---|---|---|
| Mycelial Fragments | 16 | 356 | NA |
| Pollen | 2 | 44 | NA |
| Total Fungal Spores | 510 | 11333 | NA |
| ------------------------ | | | |
| Acremonium-like | <1 | <22 | NA |
| Alternaria | 4 | 89 | 0.3 |
| Ascospores | 58 | 1289 | 11.4 |
| Aspergillus/Penicillium-like | 25 | 556 | 4.9 |
| Basidiospores | 330 | 7333 | 64.7 |
| Bipolaris/Drechslera | 3 | 67 | 0.6 |
| Chaetomium | <1 | <22 | NA |
| Cladosporium | 57 | 1267 | 11.2 |
| Curvularia | 2 | 44 | 0.4 |
| Epicoccum | 1 | 22 | 0.2 |
| Fusarium | <1 | <22 | NA |
| Memnoniella | <1 | <22 | NA |
| Nigrospora | <1 | <22 | NA |
| Paecilomyces-like | <1 | <22 | NA |
| Pithomyces | <1 | <22 | NA |
| Rusts/Smuts | 2 | 44 | 0.4 |
| Scopulariopsis | <1 | <22 | NA |
| Stachybotrys | <1 | <22 | NA |
| Torula | <1 | <22 | NA |
| Trichoderma-like | <1 | <22 | NA |
| Ulocladium | <1 | <22 | NA |
| Other/Unidentified | 28 | 622 | 5.5 |

COMMENTS: SOPs: ib-airocell(4)
Sample results were not corrected for the lab blank.

## Outdoor Air sample

Level of quantitation: 1 Spore
Analytical Method   : GALSON IB-AIROCELL
Sampler             : Spore Trap

Submitted by: RF
Approved by : AFS
Date: 15-JUN-06
QC by: Tom Burgess

< -Less Than        > -Greater Than      m3 -Cubic Meters   NA -Not Applicable
cm2 -Square Centimeters  CFU -Colony forming units  g -Grams   NS -Not Specified
ND -Not Detected

# Galson Laboratories

6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client    : Healthy Homes of LA, LLC
Site      : Hunter
Project No. : B A

Date Sampled   : 06-JUN-06
Date Received  : 13-JUN-06
Date Analyzed  : 14-JUN-06

Account No.: 15609
Login No.  : L134675
Incubation Temp : NA

Client ID : 10987400         Lab ID : L134675-2      Air Volume : 0.015 m3
Analysis  : Standard Spore Trap          Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|---|---|---|---|
| Mycelial Fragments | 4 | 267 | NA |
| Pollen | <1 | <67 | NA |
| Total Fungal Spores | 52 | 3467 | NA |
| -------------------------- | | | |
| Acremonium-like | <1 | <67 | NA |
| Alternaria | <1 | <67 | NA |
| Ascospores | <1 | <67 | NA |
| Aspergillus/Penicillium-like | 40 | 2667 | 76.9 |
| Basidiospores | 7 | 467 | 13.5 |
| Bipolaris/Drechslera | <1 | <67 | NA |
| Chaetomium | <1 | <67 | NA |
| Cladosporium | 4 | 267 | 7.7 |
| Curvularia | <1 | <67 | NA |
| Epicoccum | 1 | 67 | 1.9 |
| Fusarium | <1 | <67 | NA |
| Memnoniella | <1 | <67 | NA |
| Myxospore | <1 | <67 | NA |
| Paecilomyces-like | <1 | <67 | NA |
| Pithomyces | <1 | <67 | NA |
| Rusts/Smuts | <1 | <67 | NA |
| Scopulariopsis | <1 | <67 | NA |
| Stachybotrys | <1 | <67 | NA |
| Torula | <1 | <67 | NA |
| Trichoderma-like | <1 | <67 | NA |
| Ulocladium | <1 | <67 | NA |
| Other/Unidentified | <1 | <67 | NA |

COMMENTS: SOPs:  ib-airocell(4)
          Sample results were not corrected for the lab blank.

## Master bath wall cavity

Level of quantitation: 1 Spore              Submitted by: RF
Analytical Method   : GALSON IB-AIROCELL    Approved by : APS
Sampler             : Spore Trap            Date: 15-JUN-06
                                            QC by: Tom Burgess

< -Less Than       > -Greater Than      m3 -Cubic Meters  NA -Not Applicable
cm1 -Square Centimeters  CFU -Colony forming units  g -Grams      NS -Not Specified
ND -Not Detected

# Galson
# Laboratories
6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

```
Client       : Healthy Homes of LA, LLC
Site         : Hunter
Project No.  : B A

Date Sampled   : 06-JUN-06          Account No.: 15609
Date Received  : 13-JUN-06          Login No.  : L134675
Date Analyzed  : 14-JUN-06          Incubation Temp : NA
```

---

Client ID : 10987431          Lab ID : L134675-3          Air Volume : 0.015 m3
Analysis  : Standard Spore Trap          Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|-----------|-------------|---------------|-----------|
| Mycelial Fragments | 45 | 3000 | NA |
| Pollen | <1 | <67 | NA |
| Total Fungal Spores | 34066 | 2271067 | NA |
| ------------------------- | | | |
| Acremonium-like | <1 | <67 | NA |
| Alternaria | <1 | <67 | NA |
| Ascospores | <1 | <67 | NA |
| Aspergillus/Penicillium-like | 34000 | 2266667 | 99.9 |
| Basidiospores | 34 | 2267 | 0.1 |
| Bipolaris/Drechslera | <1 | <67 | NA |
| Chaetomium | <1 | <67 | NA |
| Cladosporium | 21 | 1400 | 0.1 |
| Curvularia | 1 | 67 | <0.1 |
| Epicoccum | 1 | 67 | <0.1 |
| Fusarium | <1 | <67 | NA |
| Memnoniella | <1 | <67 | NA |
| Nigrospora | <1 | <67 | NA |
| Paecilomyces-like | <1 | <67 | NA |
| Pithomyces | <1 | <67 | NA |
| Rusts/Smuts | 1 | 67 | <0.1 |
| Scopulariopsis | <1 | <67 | NA |
| Stachybotrys | <1 | <67 | NA |
| Torula | <1 | <67 | NA |
| Trichoderma-like | <1 | <67 | NA |
| Ulocladium | <1 | <67 | NA |
| Other/Unidentified | 8 | 533 | <0.1 |

COMMENTS: SOPs: ib-aircell(4)
        Sample results were not corrected for the lab blank.

## Middle BR wall cvity

---

```
Level of quantitation: 1 Spore          Submitted by: RF
Analytical Method   : GALSON IB-AIROCELL   Approved by : APS
Sampler             : Spore Trap            Date: 15-JUN-06
                                            QC by: Tom Burgess
```

---

```
<   -Less Than          >   -Greater Than      m3  -Cubic Meters   NA -Not Applicable
cm2 -Square Centimeters  CFU -Colony forming units g   -Grams       NS -Not Specified
ND  -Not Detected
```

# Galson
# Laboratories
6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client      : Healthy Homes of LA, LLC
Site        : Hunter
Project No. : B A

Date Sampled  : 06-JUN-06          Account No.: 15609
Date Received : 13-JUN-06          Login No.  : L134675
Date Analyzed : 15-JUN-06          Incubation Temp : NA

---

Client ID : 10987447        Lab ID : L134675-4      Air Volume : 0.015 m3
Analysis  : Standard Spore Trap            Crowding Factor : 1

| Parameter | Total Count | Conc Count/m3 | Percent % |
|---|---|---|---|
| Mycelial Fragments | 6 | 400 | NA |
| Pollen | 4 | 267 | NA |
| Total Fungal Spores | 118 | 7867 | NA |
| ------------------------ | | | |
| Acremonium-like | <1 | <67 | NA |
| Alternaria | <1 | <67 | NA |
| Ascospores | 1 | 67 | 0.8 |
| Aspergillus/Penicillium-like | 107 | 7133 | 90.7 |
| Basidiospores | 8 | 533 | 6.8 |
| Bipolaris/Drechslera | <1 | <67 | NA |
| Chaetomium | <1 | <67 | NA |
| Cladosporium | <1 | <67 | NA |
| Curvularia | <1 | <67 | NA |
| Epicoccum | 1 | 67 | 0.8 |
| Fusarium | <1 | <67 | NA |
| Memnoniella | <1 | <67 | NA |
| Nigrospora | <1 | <67 | NA |
| Paecilomyces-like | <1 | <67 | NA |
| Pithomyces | <1 | <67 | NA |
| Rusts/Smuts | <1 | <67 | NA |
| Scopulariopsis | <1 | <67 | NA |
| Stachybotrys | <1 | <67 | NA |
| Torula | <1 | <67 | NA |
| Trichoderma-like | <1 | <67 | NA |
| Ulocladium | <1 | <67 | NA |
| Other/Unidentified | 1 | 67 | 0.8 |

COMMENTS: SOPs: ib-airocell(4)
          Sample results were not corrected for the lab blank.

## End BR wall cavity

---

Level of quantitation: 1 Spore             Submitted by: RF
Analytical Method    : GALSON IB-AIROCELL   Approved by : APS
Sampler              : Spore Trap           Date: 15-JUN-06
                                            QC by: Tom Burgess

---

<   -Less Than         >   -Greater Than      m3  -Cubic Meters    NA -Not Applicable
cm2 -Square Centimeters  CFU -Colony forming units  g   -Grams        NS -Not Specified
ND  -Not Detected

Galson Laboratories
6601 Kirkville Rd. E. Syracuse, NY 13057

LABORATORY ANALYSIS REPORT

Client : Healthy Homes of LA, LLC
Site : Hunter
Project No. : B A

Date Sampled : 06-JUN-06
Date Received : 13-JUN-06
Date Analyzed : 14-JUN-06

Account No.: 15609
Login No. : L134675
Incubation Temp : NA

Client ID : BLANK
Analysis : Standard Spore Trap

Lab ID : L134675-5

Air Volume : NA
Crowding Factor : 0

| Parameter | Total Count | Percent % |
|---|---|---|
| Mycelial Fragments | <1 | NA |
| Pollen | <1 | NA |
| Total Fungal Spores | <1 | NA |
| ------------------------ | | |
| *Acremonium-like* | <1 | NA |
| *Alternaria* | <1 | NA |
| Ascospores | <1 | NA |
| *Aspergillus/Penicillium-like* | <1 | NA |
| Basidiospores | <1 | NA |
| *Bipolaris/Drechslera* | <1 | NA |
| *Chaetomium* | <1 | NA |
| *Cladosporium* | <1 | NA |
| *Curvularia* | <1 | NA |
| *Epicoccum* | <1 | NA |
| *Fusarium* | <1 | NA |
| *Memnoniella* | <1 | NA |
| *Nigrospora* | <1 | NA |
| *Paecilomyces-like* | <1 | NA |
| *Pithomyces* | <1 | NA |
| Rusts/Smuts | <1 | NA |
| *Scopulariopsis* | <1 | NA |
| *Stachybotrys* | <1 | NA |
| *Torula* | <1 | NA |
| *Trichoderma-like* | <1 | NA |
| *Ulocladium* | <1 | NA |
| Other/Unidentified | <1 | NA |

COMMENTS: SOPs: ib-airocell(4)
Sample results were not corrected for the lab blank.

**BLANK**

Level of quantitation: 1 Spore
Analytical Method : GALSON IB-AIROCELL
Sampler : Spore Trap

Submitted by: RF
Approved by : APS
Date: 15-JUN-06
QC by: Tom Burgess

< -Less Than
> -Greater Than
m3 -Cubic Meters
NA -Not Applicable
cm2 -Square Centimeters
CFU -Colony forming units
g -Grams
NS -Not Specified
ND -Not Detected

INDUSTRIAL HYGIENE ANALYTICAL LABORATORY
SAMPLING AND ANALYSIS GUIDE

**GALSON LABORATORIES**

6601 Kirkville Rd
East Syracuse, NY 13057-9672
Tel: 315-432-2227
Toll: 888-432-LABS(5227)
Fax: 315-437-0571
www.galsonlabs.com

Check if change of address

New Client? ☐ yes ☐ no

Client Account #: **15509**

**Need Results By:** (Surcharge)

| | |
|---|---|
| 5 Business Days | 0% |
| 4 Business Days | 35% |
| 3 Business Days | 50% |
| 2 Business Days | 75% |
| Next Day by 5pm | 100% |
| Next Day by Noon | 150% |
| Same day | 200% |

Report To : Healthy Homes of Louisiana, llc
PO Box 3127
West Monroe, La 71294

Phone No. : 318-397-1974

Invoice To : Same

Phone No. :
Fax No. :

Site Name : Hunter   Project : B/A   Sampled By : Robert Parks

Verbal Authorization :
Purchase Order No. :
Credit Card No. : 372527450814001   Card Holder Name : Robert Parks   Exp. : 07/08

American Express

Fax Results To :
Email Results To : bobby@parksmobileair.com   Fax No. :

| Sample Identification | Date Sampled | Collection Medium | *Air Volume (liters) Passive Monitors (Min) | Analysis Requested | Method Reference | Specific DL Needed |
|---|---|---|---|---|---|---|
| 1098 7296 | 06-06-06 | Air Cell | 45 Lts | Airs | | |
| 1098 7400 | 06-06-06 | Air Cell | 15 Lts | Airs | | |
| 1098 7431 | 06-06-06 | " | 15 Lts | Airs | | |
| 1098 7447 | 06-06-06 | Air Cell | 15 Lts | Airs | | |

✗ IF YOU DO NOT WANT A LABORATORY BLANK ADDED PLEASE CHECK BOX. If blanks are not submitted or box is not checked, our policy states that a laboratory blank will be added for each analyte and it will be charged at normal rate.

List description of industry or process / interferences present in sampling area :

| Chain of Custody | Print Name | Signature | Date/Time |
|---|---|---|---|
| Relinquished by : | Robert Parks | | 6/12/06 5:10pm |
| Received by LAB : | M. Kramer | | 6/13/06 @ 9:45 |
| Login # : 134675 | | | |

Samples received after 3pm will be considered as next day's business

* sample collection time X LPM = Air Vol. (L)

47

GALSON LABORATORIES

# Healthy Homes of Louisiana, llc

PO Box 3127
West Monroe, La. 71294
*A Building Science Company*

*Ph. 318-397-1974      Fax 318-397-2123      Bobby@Parksmobileair.com*

### Mold Remediation Estimate
### Summary

The purpose of this document is to provide an estimate for mold remediation in Mr. Deese's manufactured homes which was built with interior vinyl covered wallboard. While following New York City guidelines, a conservative and common sense approach was utilized.

The following steps and cost were applied;

1) Storage container (personal contents removed from the home)....    300.00 per mo

2) Initial "Base Line" air testing.....    500.00

3) Mold Remediation.....    9,785.00

4) Final air testing for re-entry clearance.....    500.00

       Total*    11,085.00

* This total is for mold remediation and re-entry clearance only. It does NOT include any allowances for the re-construction of the home nor the return of personal contents to the home.

Healthy Homes of Louisiana, llc
Robert Parks, mm

009001

This page
intentionally left
blank

# Healthy Homes of Louisiana, llc
## PO Drawer 3127.
## West Monroe, La. 71294

Ph. 318-397-1974        Fax 318-397-2123        Bobby@ParksMobileAir.com

Alan Wozniak, CIAQP, CIEC
President/CEO
Pure Air Control Services

www.pureaircontrols.com
1-800-422-7873 ext 802

re: Single section manufactured housing remediation project estimate.

Dear Sir,

As we discussed, I am enclosing a mold remediation protocol for a manufactured housing project. I would appreciate an estimate for this project which will get us to the outlined stage of completion. I understand that there may be slight variances depending upon a specific job location and exact size of home. Another consideration which may vary the estimate would be the amount of personal belongs within the home which will need to be removed for storage and actual storage availability in a specific area.

For the intended purpose of this estimate, I would appreciate a conservative estimate approach. Any actual jobs which may result from this project will be bid individually for a more exact cost estimate.

Thank you,
Healthy Homes of Louisiana, llc
Robert Parks, mm

009003

## General guidelines to be followed for mold remediation in all manufactured housing projects.

1) Turn off the air handler (furnace or air conditioner) supplying the work area.

2) It is assumed that the air ducts **have not** been contaminated so they should be sealed to protect them during the remediation

3) Evacuate the entire home of all personal belongings. This includes, but is not limited to, furniture, clothing and appliance. These items my be stored in an onsite containment or in an off site storage facility.

4) **ALL** carpeting throughout the home should be removed.

5) Maintain proper ambient air pressure balances from room-to-room as required depending upon protocol used.

6) Personal protective equipment: gloves, eye protection without vents, disposable protective clothing that also covers the head and feet and at a minimum a N95 respirator. Consider use of full-face mask respirators with HEPA filtration canisters. The final decision form proper PPE will be left up to the professional judgement of the remediation professional and/or their company protocol.

7) Remove all vinyl covered gypsum board from the perimeter wall structure from within the home interior wall structure.

8) Vacuum while cutting the gypsum board using a HEPA vacuum or a vacuum with a high efficiency collection bag and vent the vacuum to the outside.

9) All contaminated material should be placed in plastic bags at least 6 mil in thickness, double bagged and disposed of as regular trash.

10) Vacuum all moldy surfaces thoroughly. Vacuum surfaces before damp wiping or scrubbing.

11)Damp wipe all surfaces with disposable wipes.

12)Scrub any wood that has mold growth using soapy water and thoroughly rinse.

13) Drying can be accelerated by using heat lamps and a dehumidifier. Do not use fans blowing against the wall surfaces.

14) Allow the wood to thoroughly dry before installing new gypsum board. This will usually mean returning at least a day later, or longer. Measure the moisture content with a moisture meter. Wooden materials should be less than 15 per cent moisture content by weight.

15) You are done when all visible mold is removed and no dust is present.


Thank you,
Healthy Homes of Louisiana, llc
Robert Parks, mm



Figure 1 Example of single wide manufactured home.

000006

This page
intentionally left
blank

003007

# INDOOR AIR QUALITY REMEDIATION QUOTE

## Type of Indoor Environmental Service:

☐ Building Diagnostics     ☐ Environmental Laboratory
☐ Environmental Project Management   ☑ Building/HVAC Remediation
☑ Environmental HVAC Maintenance   ☐ Mold-Contaminated Drywall Removal
☐ Topical Treatment



**Prepared For:**

 Contract Holder
FSS Contract 10F-0486R

Healthy Homes of Louisiana, llc
c/o Mr. Robert Parks
PO Drawer 3127
West Monroe, LA 71294
PH: 318-397-1974
FX: 318-397-2123
EMAIL: bobby@parksmobileair.com

**Project Quote:**
BRS No. 06R-4949

Mobile Home Remediation, Various Locations

**Prepared by:**

    **Building Remediation Sciences, Inc.**    

    *A Division of Pure Air Control Services*
**Kevin W. McKee**
**Director of Building Remediation Sciences**    
EMLAP #102705

*Indoor Environmental Diagnostic, Environmental Laboratory and Remediation Specialists*

1(727) 572-4550
1(800) 422-7873

E-mail: iaq@pureaircontrols.com
Web Site: www.pureaircontrols.com

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CAC067992





ESMLAP # 102795



Contract Holder



8 (a) Certified



**IAQ Advisory Board**

- *Alan L. Wozniak, CIAQP*
  *President/CEO*

- Mark D. Wozniak, M.B.A.,
  CIAQP
  *Vice President*

- *Rajiv Sahay, Ph.D.*
  *Laboratory Manager*

- *Ambuj Kumar, M.D., M.P.H.*
  *Environmental Health Consultant*

- *Francisco T. Aguirre*
  *Senior IAQ Diagnostician*
  *Certified St. Lic. Class A*

- *Cynthia M. Bailey*
  *Business Manager*

- *Dr. Monroe J. King, P.A.*
  *Allergist / Immunologist*
  *Medical Consultant*

*Mechanical Division:*
U.S. ENERGY SERVICES
*St. Lic #CACO57992*

*Publisher of:*
*THE IEQ REVIEW*



*Home of the:*
*evalu-aire*
*Screen Test Kit*



Building Health Check

# Building Remediation
## Sciences, Inc.

November 21, 2006

Healthy Homes of Louisiana, llc
Mr. Robert Parks
PO Drawer 3127
West Monroe, LA 71294

**RE:    IAQ Improvement Program: Removal of Mold Contaminated Materials + Environmental Cleaning - Quality Assurance/Quality Control (QA/QC) for Mobile Home Remediation, Various Locations, , ,**

Dear Mr. Parks:

We appreciate the opportunity to provide you and Healthy Homes of Louisiana, llc with professional mechanical HVAC remediation. As requested, the attached contract proposal (PACS 06R-4949) has been submitted.

**Background:** Pure Air Control Services has been requested to provide a quote to perform professional environmental remediation in various singlewide and doublewide mobile homes. The condition and origin of these conditions have been described as follows by Bobby Parks of Healthy Homes of Louisiana.

These homes were built utilizing a vinyl-covered gypsum board on the interior portion of all the outer perimeter walls and the mating walls of the doublewide mobile homes. Moisture has somehow penetrated the exterior walls and become trapped in the wall cavity and mold has grown on the interstitial side of the gypsum board. The proposal will cover costs to remove the furnishings and other personal belongings from the homes to a portable storage unit to be positioned at each jobsite. The portable storage units will not be the responsibility of the remediation contractor, they will be provided by someone other than the remediation contractor. We have been instructed to assume that the furnishings and personal belonging are free of contaminants. The remediation contractor (Pure Air Control Services) will be responsible for removing the furnishings from the mobile homes to the storage containers, Positioned on the job site.

The air conditioning system will be turned off prior to any work and the supply and return vents will be sealed off with visqueen. If any of these mobile homes utilize split systems the air handlers will be protected by covering with 6 mil visqueen. Any other appliances in the home will be protected with 6 mil visqueen in the same manner. Any appliance that emits heat or needs circulation of air to operate will be turned of at the breaker panel. Any cabinetry that is affixed to or obstructs the removal of any outer perimeter gypsum board will be removed. The remediation contractor will not assume any responsibility for damage occurring during the removal of cabinetry or furnishings. All prudent precautionary measures will be taken to protect the appliances and furnishings.

---

*"Indoor Air Diagnostic, Environmental Laboratory and Remediation Experts"*

**Corporate Office**
4911 Creekside Drive · Suite C · Clearwater, FL 33760 · (727) 572-4550 · Toll Free: 1-800-422-7873 · Fax: (727) 572-5859
E-mail: iaq@pureaircontrols.com · Web Site: www.pureaircontrols.com

**Scope of Work:**  Provide a professional environmental remediation crew trained in remediation protocol for the removal of mold-contaminated materials while utilizing containment protocol.

- All furnishings will be removed from the mobile homes and placed in the on site portable storage units.
- The air conditioner will be turned off and all A/C vents will be sealed off with tape and 6 mil visqueen such as the refrigerator, stove, hot water tank etc.
- Air scrubbers will be positioned through out the mobile home prior to the removal of any building materials.  Since all areas of the Mobile home will be affected by the remediation work the entire mobile home will be treated as one large containment area.
- All carpet will be removed from the home; the carpet will be cut and bagged prior to removal from home.
- All vinyl-covered gypsum board will be removed from outer perimeter walls any cabinetry obstructing the removal of the gypsum board will be removed cleaned, bagged in 6 mil visqueen and brought to storage container.
- On the doublewide mobile homes the mating wall where the two halves of the trailer are adjoined, the gypsum board will be removed from both sides of the wall.
- All inner wall cavities will be cleaned utilizing HEPA vacuums, wet wiping techniques, wire brushing and possibly encapsulating with a antimibrobial coating if visibly stained.
- Once all contaminated materials have been removed from the home, a complete environmental cleaning of the home will be performed utilizing HEPA fitted vacuums, and wet wiping techniques.
- The flooring will then be treated with an antimicrobial bound solution such as multicide.
- Air scrubbers will remain in the home for a period of 48 hours.  At this phase it is recommended that the post remediation clearance test be performed.

All remediation work will be performed in accordance with remediation protocol included in this proposal.

009012

Healthy Homes of Louisiana, llc
Mr. Robert Parks
November 21, 2006
Page 2

All of these remedial recommendations must be completed under strict containment specifications which
includes applications to address OSHA (Labor) 29 C.F.R. regulations:

| ☑ | Respiratory Protection Program: | 1910.134 |
| ☑ | Confined Space Program: | 1910.146 |
| ☑ | Hazard Communication Program: | 1910.1200 |
| ☑ | Lock Out-Tag Out Program: | 1910.147 |

A final recommendation with respect to the remediation work includes a post remediation Quality
Assurance/Quality Control (QA/QC) effort to ensure all IAQ concerns have been successfully resolved.

We look forward to working with you and Healthy Homes of Louisiana, llc on this important task.  If you
have any questions, please call me at (800) 422-7873 ext. 803.

Sincerely,

PURE AIR CONTROL SERVICES

_____
Kevin W. McKee
Director of Building Remediation Sciences

Enclosures

cc:    Alan L. Wozniak, CIAQP, President/CEO
       Edgar D. Ziegler, Business Development Manager

11/21/06   F:\Sales\Word\ACT Documents\BX Proposals\2006\paar 4949 DOC

*"Indoor Air Diagnostic, Environmental Laboratory and Remediation Experts"*

**Corporate Office**
*4911 Creekside Drive  ·  Suite C  ·  Clearwater, FL  33760  ·  (727) 572-4550  ·  Toll Free: 1-800-422-7873  ·  Fax: (727) 572-5859*
*E-mail: iaq@pureaircontrols.com  ·  Web Site: www.pureaircontrols.com*

Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992



EMLAP No. 102795

QUOTE:    PACS No. 06R-4949

CLIENT:    Healthy Homes of Louisiana, llc - Mr. Robert Parks

DATE:    November 21, 2006

SUBJ:    Mold Contaminant Drywall Removal, and Topical Treatment for Mobile Home Remediation, Various Locations, , ,

**Standard Mold Contaminant Drywall Removal, Air Handler, Ductwork Remediation and Topical Treatment Protocols:**

**Standard Remediation of Mold-Contaminated Drywall In Indoor Environments Protocols:**

A.   Different levels of containment are necessary depending on the extent of the contamination problem. In all situations, the underlying cause of water accumulation must be rectified or the problem will recur. There must be a mechanism in place for ensuring an immediate response to these problems. Clean up should be conducted when the affected area is unoccupied. In all remediation, a routine follow-up inspection at 6-12 months or sooner if visible mold contamination or water damage recurs should be conducted. Emphasis should be on ensuring proper repair of the building infrastructure, so that water damage and moisture buildup does not recur.

Four different levels of abatement, as described below, are identified, based on the extent of mold contamination.

**Level I: Small Isolated Areas (10 SF or less)**

- Remediation can be conducted by regular building maintenance staff, if they have received training on the proper clean-up methods, personal protection and potential health hazards of indoor mold. This training can be performed as part of a program to comply with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200).

- Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA Respiratory Protection Standard (29 CFR 1910.134), is suggested.  Gloves and eye protection should be worn in accordance with OSHA Personal Protection Equipment Standards (29 CFR 1910.133 and 1910.138).

- The remediation area should be unoccupied.  Vacating people from spaces adjacent to the work area is not necessary but, is recommended in the presence of infants, persons recovering from recent surgery, immune suppressed individuals or individuals with chronic inflammatory lung diseases such as, asthma, hypersensitivity pneumonitis and severe allergies.  Containment of the remediation area is not necessary.  Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are suggested.  Contaminated materials that cannot be cleaned should be removed from the building in a sealed plastic bag. There are no special requirements for the disposal of moldy materials.

- The remediation area and adjacent areas used by remedial workers for egress should be cleaned with a damp cloth and/or mop and a detergent solution.

- Areas should be left dry and visibly free from contamination and debris.

Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992





EMLAP No. 102795

### Level II: Mid-Sized Isolated Areas (10 - 30 SF)

- Remediation can be conducted by regular building maintenance staff, if they have received training on the proper clean-up methods, personal protection and potential health hazards of indoor mold. This training can be performed as part of a program to comply with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200).

- Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA Respiratory Protection Standard (29 CFR 1910.134), is suggested. Gloves and eye protection should be worn in accordance with OSHA Personal Protection Equipment Standard (29 CFR 1910.133 and 1910.138).

- The remediation area should be unoccupied. Vacating people from spaces adjacent to the work area is not necessary but is recommended in the presence of infants, persons having undergone recent surgery, immune suppressed individuals, or people with chronic inflammatory lung diseases such as, asthma, hypersensitivity pneumonitis and severe allergies.

- The remediation area should be covered with a plastic sheet and sealed with tape before remediation, to contain dust/debris.

- Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are suggested.

- Contaminated materials that cannot be cleaned should be removed from the building in sealed plastic bags. There are no special requirements for the disposal of moldy materials.

- The remediation area and areas used by remedial workers for egress should be HEPA vacuumed (a vacuum equipped with a High-Efficiency Particulate Air filter) and cleaned with a damp cloth and/or mop and a detergent solution.

  - Areas should be left dry and visibly free from contamination and debris.

### Level III: Large Isolated Areas (30 - 100 SF)

A health and safety professional with experience performing microbial investigations should be consulted prior to remediation activities to provide oversight for the project.

The following procedures at a minimum are suggested:

- Personnel trained in the handling of hazardous materials and equipped with respiratory protection, (e.g., N95 disposable respirator), in accordance with the OSHA Respiratory Protection Standard (29 CFR 1910.134), is suggested.

- Gloves and eye protection should be worn in accordance with OSHA Personal Protection Equipment Standards (29 CFR 1910.133 and 1910.138).

- The remediation area and areas directly adjacent should be covered with plastic sheets and sealed with tape before remediation, to contain dust/debris.

- Seal ventilation ducts/grills in the work area and areas directly adjacent with plastic sheeting.

Building Remediation
Sciences, Inc.

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992



EMLAP No. 102795

- The remediation area and areas directly adjacent should be unoccupied. Further vacating of people from spaces near the work area is suggested in the presence of infants, persons having undergone recent surgery, immune suppressed individuals, or people with chronic inflammatory lung diseases (e.g., asthma, hypersensitivity pneumonitis and severe allergies.)

- Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are suggested.

- Contaminated materials that cannot be cleaned should be removed from the building in sealed plastic bags. There are no special requirements for the disposal of moldy materials.

- The remediation area and surrounding areas should be HEPA vacuumed and cleaned with a damp cloth and/or mop and a detergent solution.

- Areas should be left dry and visibly free from contamination and debris.

    If abatement procedures are expected to generate dust (e.g., abrasive cleaning of contaminated surfaces, demolition of plaster walls) or the visible concentration of the mold is heavy (blanket coverage as opposed to patchy), then it is suggested that the remediation procedures for Level IV be followed.

### Level IV: Extensive Contamination (> 100 SF)

A health and safety professional with experience performing microbial investigations should be consulted prior to remediation activities to provide oversight for the project. The following procedures are recommended:

- Personnel trained in the handling of hazardous materials equipped with:

    1. Full-face respirators with high efficiency particulate air (HEPA) cartridges,

    2. Disposable protective clothing covering both head and shoes, and

    3. Gloves.

- Containment of the affected area:

    1. Complete isolation of work area from occupied spaces using plastic sheeting sealed with duct tape (including ventilation ducts/grills, fixtures, and any other openings);

    2. The use of an exhaust fan with a HEPA filter to generate negative pressurization; and

    3. Airlocks and decontamination chamber.

Vacating people from spaces adjacent to the work area is not necessary but is suggested in the presence of infants, persons having undergone recent surgery, immune suppressed individuals, or people with chronic inflammatory lung diseases such as, asthma, hypersensitivity pneumonitis and severe allergies.

000014

**Building Remediation
Sciences, Inc.**

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992





EMLAP No. 102795

Contaminated materials that cannot be cleaned should be removed from the building in sealed plastic bags. The outside of the bags should be cleaned with a damp cloth and a detergent solution or HEPA vacuumed in the decontamination chamber prior to their transport to uncontaminated areas of the building. There are no special requirements for the disposal of moldy materials.

The contained area and decontamination chamber should be HEPA vacuumed and cleaned with a damp cloth and/or mop with a detergent solution and be visibly clean prior to the removal of isolation barriers.

Air monitoring should be conducted prior to occupancy to determine if the area is safe to reoccupy.

## Topical Treatment:

A. Set up Negative Air Machine (NAM) HEPA fitted of 99.97% of 0.3 microns rated at 2,000 CFM.
B. Visqueen mold affected walls and duct tape.
C. Visqueen floors and duct tape at edge of carpeted area.
D. *Remove mold-effected drywall.  Double bag, goose neck and dispose.
E. Hand HEPA vacuum mold affected wall spaces.
F. Treat wall areas with Microbshield, a bound antimicrobial solution.
G. Treat carpeted areas with Microbshield, a bound antimicrobial solution.

**Building Remediation Sciences, Inc.**

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992





EMLAP No. 102795

### Project Quote: PACS No. 06R-4949

| CLIENT: | Healthy Homes of Louisiana, llc |
|---|---|
| IAQ REMEDIATION PROJECT: | Mobile Home Remediation, Various Locations |

| | Location | Size | Type of IAQ Remediation | Total Unit Rate |
|---|---|---|---|---|
| A) | Various Locations within Louisiana | Singlewide Mobile | • Removal of furnishing and personal belongings from mobile home to on-site storage container <br> • Removal of mold contaminated gypsum board and carpets. <br> • Complete environmental cleaning of interior surfaces. <br> • Provide air scrubbers | $9,785 |
| B) | Various Locations within Louisiana | Doublewide Mobile | • Removal of furnishing and personal belongings from mobile home to on-site storage container <br> • Removal of mold contaminated gypsum board and carpets. <br> • Complete environmental cleaning of interior surfaces. <br> • Provide air scrubbers | $12,375 |
| | Total Cost | | | TBD |

Healthy Homes of Louisiana, llc, Client Acceptance

Date

Kevin W. McKee
Director of Building Remediation Sciences
U.S. Energy Services,; Pure Air Control Services

Date

11/21/06  F:\Sales\Word\ACT Documents\RX Proposals\2006\pacr-4949.DOC

**Building Remediation Sciences, Inc.**

Mechanical Hygiene Division:
U.S. Energy Services, Inc.
Mechanical License No. CACO57992




EMLAP No. 102795

## GENERAL TERMS, CONDITIONS AND LIMITATIONS:

1. **Field Samples:**
This contract proposal is limited to the number of field samples and types of tests described above. Should additional field samples or tests be required, due observations in the field, or within the discretion of PACS, you will be notified of such additional work, and if acceptable, will be charged at a per unit rate. If you declir additional recommended testing, you understand that the accuracy of the final analysis will be limited accordingly.

2. **Testing Schedule:**
To promote the greatest level of confidence in the report that will be provided hereunder, PACS shall determine the schedule for collection of Field Samples, attemptir to reflect typical ambient conditions found at the premises. **Healthy Homes of Louisiana, llc** shall provide access to all areas of the premises, and make suitab arrangements for access into areas designated by **Healthy Homes of Louisiana, llc** as restricted access. Whenever possible, collection of field samples will b undertaken at mutually convenient times.

3. **Site Conditions:**
PACS does not specifically assume the responsibility for evaluating the HVAC system for deficiencies unless specifically described within the Scope of Work portion c this proposed contract.

4. **Governing Specifications:**
The collection of field samples, analysis of the same, and reports of findings undertaken for will be performed in accordance with PACS specifications as outlined herei ("PACS Specifications"). PACS Specifications shall govern and control the scope and the standard of the work to be performed, unless otherwise specifically stated l this proposed contract.

5. **Property:**
PACS shall not be held responsible for any damages incurred or sustained by client which are not directly caused by the negligence of PACS, including, but not limite to, actions for damages brought against client by an employee, agent contractor or subcontractor of Client. PACS shall not be held responsible for the condition of, c damage to, the premises or property of Client caused by violations of any applicable building, housing, electrical or mechanical codes, either existing or created by client its employees, agents, contractors or subcontractors. Client shall indemnify and hold PACS harmless for any damages or liability to PACS related to said conditions o events, and shall reimburse PACS for all costs and attorney fees expended by PACS in defending or settling such claims or enforcing the provisions of this paragraph.

6. **Time For Performance:**
PACS time for completion of performance under this proposed contract shall be subject to reasonable adjustments in the event of delay caused by any of the following third parties, including client; delays occasioned by the owner and/or tenant of the premises; governmental entities; weather; acts of God; and war or insurrection.

7. **Site Preparation:**
Client shall take all necessary precautions and measures to ensure that PACS is provided safe and secure job conditions as established and required by governmenta regulations. Compliance with all regulatory safety conditions by Healthy Homes of Louisiana, llc is a condition precedent to performance by PACS of the worl described in this proposed contract. In the absence of specific laws or regulations, client shall provide work conditions free from latent or concealed hazards, which may cause injury to persons or property performing with, or at the direction of, PACS, and client shall secure the work area to prevent theft of materials and supplies.

8. **Early Termination:**
In the event Healthy Homes of Louisiana, llc terminates this agreement, for any reason, after PACS takes action to commence performance hereunder, but prior tc completion of the Diagnostic Report, Healthy Homes of Louisiana, llc shall be responsible to PACS for all expenses incurred, and labor performed, under this agreement including the costs of enforcement of this agreement, and payment hereunder, as provided for in paragraph 11.

9. **Travel Time and Expenses:**
Travel expenses are normally billed as out-of-pocket expenses. The only exceptions involve per diem rates agreed upon for meals and lodging, or when government regulations necessitate such an agreement. Lodging, meals and incidental expenses will be kept reasonable and will relate to regional rates. The client will be billed the hourly rates previously described (See Professional IAQ Consulting Fee Schedule). Travel fees may reflect first class air ticket expenses. *Note: Governmenta, Accounts-All automobile mileage expenses, per diem and lodging shall be reimbursed in accordance with Florida Statute Chapter 112.061.*

10. **Payment:**
Payment for services rendered are payable Net 15 from invoice date unless otherwise stipulated per authorized Contract terms and conditions. A finance charge of 1.5% per month is assessed on all amounts if payment is not received within Contract terms. Pure Air Control Services reserves the right to invoice for 1.) Field Work - Sample Collection upon completion of field work; and 2.) Lab Support Services, Report Writing - Consultation Services upon completion of services.

11. **Attorney Fees/Enforcement:**
Should PACS, its successors or assigns, have to retain the services of an attorney for the enforcement of any term, condition or stipulation of this agreement, the prevailing party shall be entitled to award of attorney fees and taxable costs incurred, including costs incurred in any bankruptcy or appellate proceedings.

In the event of a dispute under the terms of this agreement, or the services provided, the parties hereto agree that venue for legal action instituted shall be Pinellas County, Florida, (where payment is to be made). All parties agree to subject themselves to the jurisdiction of the courts in Pinellas County, Florida and waive any objection to venue or jurisdiction

In executing this contract proposal, Healthy Homes of Louisiana, llc acknowledges that PACS interpretations are based upon the results of sample analyses, taken from specific locations and at specific points in time. Other conditions elsewhere in the subject premises may differ from the areas tested, and such conditions are unknown, which conditions may change over time. PACS will not be responsible for the interpretation or use of this data by others developed from this diagnostic report.

---

Healthy Homes of Louisiana, llc, Client Acceptance

Date

---

Kevin W. McKee
Director of Building Remediation Sciences
U.S. Energy Services/Pure Air Control Services

Date

000017

## Healthy Homes of Louisiana, llc. / Parks Mobile Air, llc.
### PO Drawer 3127
### West Monroe, La 71294

Ph. 318-397-1974        Fax 318-397-2123

Bobby@ParksMobileAir.com

www.ParksMobileAir.com

**Robert Parks**
**President**

Graduate: Calhoun High School, 1981 Class Valedictorian
       Calhoun, Louisiana

Employment:
       Parks Air, Heat, And Electrical -Installer/Service Tech. 1981-1984
       Holiday Manufactured Housing - Operations Manager    1984-1987
       Parks Air and Heat, Inc. / Parks Mobile Air, LLC     1987- 2005
             Owner and President
       Healthy Homes of Louisiana, llc - Managing Member 2003 - Present

Short Biography:

       Robert Parks has over 25 years experience in Manufactured Housing, Modular Homes, Residential Site Built Homes and Light Commercial. Specialties include Air Conditioning, Heating, Ventilation, Condensation Control and Building Failure Analysis with an excess of 500 buildings analyzed and documented since 1998. Cases have ranged from product liability to wrongful death with experience in litigation support, deposition, discovery / production, and testimony.

Consultant for:

   The Louisiana Governor Office :

       Louisiana State Administrative Agency (SAA) - Administrative Consultant 2003- Present
       Louisiana Manufactured Housing Commission  - Technical Consultant 2003-2005
   National Consultant for Cavalier Homes Inc and subsidiaries, Addison, Alabama.2003- Present
   National Consultant for Liberty Homes and subsidiaries, Goshen, Indiana. 2003-Present
       Also (non-contracted) consultant for Southern Energy Homes and subsidiaries
2000-2004, Lexington Homes 2005 - Present, Skyline Homes 2004 -Present, Karsten Homes 2005, Horton Homes 2004 - Present.

       Technical Advisor, Manufactured Housing Institute an The Mfg. Housing Research Alliance- (Project) **Alternatives for Minimizing Moisture Problems in Homes Located in Hot, Humid Climates 2001-2004**

1

Committee Volunteer, Mfg. Housing Research Alliance- (Project) Energy Star Cooling
Equipment Sizing Guidelines 2004-2005

**Seminars and Presentations Presented:**

1999 Council of State Administrative Agencies, (Regional Conference) Myrtle Beach, SC
(Mfg. Housing Ventilation Systems - Field Study)

1999 Mfg. Housing Air Distribution Systems - Field Study

2000 Council of State Administrative Agencies, Featured Speaker(Regional Conference)
Perdido Beach, AL (Indoor Air vs Outdoor Air -Field Study)

2000 La State Fire Marshall -Baton Rouge, La
(Building Inspection in Hot Humid Climates, Training Class)

2001 La. Mfg. Housing Association, Annual Conference - Baton Rouge, La.
Featured Speaker, (Indoor Air vs Outdoor Air -Field Study)

2001 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)

2001 National Manufactured Housing Congress - Las Vegas NV
(Building Failure in Hot Humid Climate, Workshop Speaker)

2002 La. Mfg. Housing Commission - Inspector Training, Baton Rouge, La.

2002 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Alexandria, La.

2003 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Baton Rouge, La.

2003 Southern Energy Homes, Addison AL (Building Practices for Hot Humid Climates)

2003 Cavalier Homes, Addison AL (Building Practices for Hot Humid Climates)

2003 Buccaneer/Home Repair Service, Hamilton Al. (Building Practices for Hot Humid Climates)

2003 Waverlee Homes, Hamilton, Al. (Building Practices for Hot Humid Climates)

2003 La. Mfg. Housing Commission - Inspector Training, Baton Rouge, La.

2003 Cavalier Homes, Millen, Ga. (Building Practices for Hot Humid Climates)

2004 Cavalier Homes, Nashville, N.C. (Building Practices for Hot Humid Climates)

2004 Cavalier Homes, Ft. Worth, Texas (Building Practices for Hot Humid Climates)

2004 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Baton Rouge, La. (Building Practices for Hot Humid
Climates)

2004 La. Mfg. Housing Association - Continuing Education Class for Home Installers
Alexandria, La. (Simplifying Home Installation Manuals )

2004 La. Mfg. Housing Association - Continuing Education Class for Retail Dealers
Baton Rouge, La. and Alexandria, La. (Building Practices for Hot Humid Climates)

**Industry Service, Completed Courses and License Held**

**Manufactured Housing:**

Louisiana Manufactured Housing Association - State Board of Directors 1999-2004
Northeast Chapter -La Mfg. Housing -Chapter President 1999-2004

2

Appointment, National Fire Protection Association (NFPA)
        Mechanical for Manufactured Housing Committee  2000-2002


HVAC:

        Louisiana State Mechanical License 1994-Present
        Louisiana State Electrical License 1994-Present
        Refrigeration Service Engineers Society  Type 1, Type 2, Type 3, Universal
        Evcon Mfg. Housing Furnace Certification Course 1994
        Manufactured Housing Installation Course 1995
        Evcon Mfg. Housing Special Training Course/Application, Installation ,and Service 1996
        Mechanical Application of Refrigeration  1997
        American Standard  -A.S.S.E.T. Program   1998
        American Standard  - 16 SEER H/P & A/C Certification   1998
        Evcon Furnaces and Heat Pump Application Certification    1998
        Nordyne Mfg. Housing Furnace Seminar 1998
        Mfg. Housing Installer Certification Course 1998
        Nordyne  -Mfg. Housing Seminar 1999
        Air Conditioning Contractors of America (ACCA) -Fundamental of Load Calculation and
                        System Design.  Certified in Manual J and Manual D
        Aces/Coleman/Evcon Dealer Council            1996-98


Building Science:

        Home Energy Rating - *Kansas Building Science Institute, Manhattan KS*
        Infrared Thermography (Level 1) - *Snell Infrared , Phoenix Ar.*
        Member Energy & Environmental Building Association (EEBA)
        Co-operative project work - *Florida Solar Energy Center, Orlando, Florida*
        Co-operative project work - *Mfg. Housing Research Alliance,*
        Building Science: Understanding and Controlling Moisture in Buildings;
                *American Industrial Hygiene Association (AIHA) ,San Francisco, Ca. 02-2005*
        Member of American Society of Heating, Refrigeration, A/C and Electrical (ASHRAE)
        Listed, Building Science Consultant for the American Industrial Hygiene Association
        Associate Member - Northeast La., Louisiana, and National Home Builders Association

Indoor Air Quality:

        Environmental Inspector Certification - Certified by The Environmental Assessment
                                Association Certification number # 74080
        Member Environmental Assessment Association 2002-Present
        Member American Industrial Hygiene Association (AIHA) 2003-Present

3

Member Indoor Environmental Standards Organization(IESO) - 2003 - Present


continued;


Indoor Air Quality: continued

Louisiana's Unfair Trade Practices and Consumer Protection Law -
(Mold Remediation/Consultant Ethics and Standards) - 2004
**Medical University of South Carolina - College Of Health Professions Program in Environmental Health Sciences**
Certified At The Medical University of South Carolina;
A) Indoor Air Quality Investigations - Certification number # IAQI27120-21801
B) Microbial Remediation: Design and Abatement - Certification number # MR27120-
22273
Louisiana State Mold Remediation Contractor - Licences Number #250061



Civic Involvement:
Christ Church - Executive Board of Directors   1995-2001
Graduate  - Leadership Ouachita   1997
Leadership Council  - Leadership Ouachita 1998
West Monroe Chamber of Commerce - 2000- 2004
Adopt-A-School Task Force
Economic Development Committee
Chairman - Work Force Development Task Force
Boys and Girls Club of West Monroe  - Board of Directors 1999-Present
Nominated for "New Board Member of Year" at National Convention 1999
"Board Member of Year" - 2000
Achievement award for "Meritorious Service"  - 2001
Board President-Elect  - 2001-03

4

Robert Parks
111 Green Rd.
West Monroe, La 71291

5

# Healthy Homes of Louisiana, llc
## PO Drawer 3127
### West Monroe, La. 71294

Ph. 318-355-1918          Fax 318-397-2123          Bobby@ParksMobileAir.com

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Mr. Lance Gould
218 Commerce Street
Montgomery, AL 36104

Re: Previous testimony and depositions

The following represents a listing of cases in which testimony or depositions were given within the last four years:

DEPOSITIONS;

1) Joseph and Shelly Miller Vs. Belmont Homes, et al

2) Courtney Tassin Vs Cappaert Homes, Inc

3) Benjamin Gotte and Any Gotta Vs Bellcrest Homes, Inc., et al

4) Kelly G. Aucoin, et ux Vs. Southern Quality homes, LLC and Dynasty Homes, Inc.

5) Herbert Zenon III Vs Nationwide Housing Systems and
                        American Homestar of Lancaster, et al

6) Cathy Chauvin Vs Fleetwood Homes, et al

1

# EXHIBIT "H"

**Murphy**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3              NORTHERN DIVISION
 4
         HAROLD KELLY MURPHY,
 5
             Plaintiff,
 6                              CASE NUMBER
             vs.               2:06-cv-618-MEF
 7
         SOUTHERN ENERGY HOMES,
 8       INC., et al.,
 9           Defendants.
10     *    *    *    *    *    *    *    *
11
12
13        DEPOSITION OF BOBBY PARKS, taken
14     pursuant to stipulation and agreement
15     before Barbara A. Howell, Certified
16     Court Reporter and Commissioner for the
17     State of Alabama at Large, ACCR No. 123,
18     in the Law Offices of Beasley, Allen,
19     Crow, Methvin, Portis & Miles, P.C., 272
20     Commerce Street, Montgomery, Alabama, on
21     Tuesday, November 27, 2007, commencing
22     at approximately 11:00 a.m.
23
```

2

**Murphy**

Page 2

```
 1              A P P E A R A N C E S
 2
        FOR THE PLAINTIFF:
 3
        Mr. C. Lance Gould
 4      Beasley, Allen, Crow, Methvin,
        Portis & Miles, P.C.
 5      Attorneys at Law
        272 Commerce Street
 6      Montgomery, Alabama   36104
 7
        FOR THE DEFENDANTS:
 8
        Mr. W. Scott Simpson
 9      Mr. Gregory S. Ritchey
        RITCHEY & SIMPSON, P.C.
10      Attorneys at Law
        3288 Morgan Drive
11      Suite 100
        Birmingham, Alabama   35216
12
13
14
15
16
17
18
19
20
21
22
23
```

3

**Murphy**

Page 3

```
 1                    I N D E X

 2

     EXAMINATION BY:                    PAGE

 3

     MR. SIMPSON.....................     5

 4

 5   EXHIBITS                           PAGE

 6   DEFENDANTS' EXHIBIT #1...........     5

 7   DEFENDANTS' EXHIBIT #2...........     6

 8   DEFENDANTS' EXHIBIT #3...........     6

 9   DEFENDANTS' EXHIBIT #4...........     7

10   DEFENDANTS' EXHIBIT #5...........     8

11   DEFENDANTS' EXHIBIT #6...........   149

12

13

14

15

16

17

18

19

20

21

22

23
```

**Murphy**

```
 1              S T I P U L A T I O N S
 2          It is hereby stipulated and agreed
 3      by and between counsel representing the
 4      parties that the deposition of BOBBY
 5      PARKS is taken pursuant to the Federal
 6      Rules of Civil Procedure and that said
 7      deposition may be taken before
 8      Barbara A. Howell, Court Reporter and
 9      Commissioner for the State of Alabama at
10      Large, without the formality of a
11      commission; that objections to questions
12      other than objections as to the form of
13      the questions need not be made at this
14      time but may be reserved for a ruling at
15      such time as the deposition may be
16      offered in evidence or used for any
17      other purpose as provided for by the
18      Federal Rules of Civil Procedure.
19          It is further stipulated and agreed
20      by and between counsel representing the
21      parties in this case that said
22      deposition may be introduced at the
23      trial of this case or used in any manner
```

**Murphy**

```
 1        by either party hereto provided for by
 2        the Federal Rules of Civil Procedure.
 3
 4        *    *    *    *    *    *    *    *
 5
 6                        BOBBY PARKS
 7          The witness, having first been duly
 8          sworn or affirmed to speak the truth,
 9          the whole truth, and nothing but the
10             truth, testified as follows:
11                   THE REPORTER:   Usual
12                      stipulations?
13                   MR. SIMPSON:   Sure.
14                     EXAMINATION
15        BY MR. SIMPSON:
16   Q.   Almost good afternoon.  Good morning.
17   A.   Yes, sir.
18   Q.   We've met before.  Let me start by
19        marking some exhibits and we'll just
20        jump right into this.  Let me mark
21        Exhibit #1.
22                   (Defendants' Exhibit #1 was
23                      marked for identification.)
```

**Murphy**

```
 1        compare the (b)(1) to the (b)(2) wall;
 2        correct?
 3   A.   Correct.
 4   Q.   Is there anywhere in either of your two
 5        reports or in your field notes where
 6        you actually make an opinion that
 7        another design -- (b)(2), (b)(3),
 8        waiver, AC, whatever -- is a better
 9        alternative feasible design than
10        (b)(1)?  Do you say that anywhere in
11        your reports?
12   A.   I think I depict that the (b)(2), in --
13        in theory and intent, is a much more
14        appropriate wall structure than the
15        (b)(1).
16   Q.   And we've already established you don't
17        know that you've ever seen one of
18        these.
19   A.   I can't say that I have or haven't.
20   Q.   Now, you would agree with me if you
21        found moisture readings of 25 to 40
22        percent, you can't say what the
23        absolute percentage of moisture in
```

**Murphy**

Page 132

```
 1        those walls is because you didn't cut
 2        and bake the sample.
 3   A.   That is correct.
 4   Q.   And cutting and baking is the only
 5        authoritative way to know for sure.
 6   A.   That's correct.
 7   Q.   Now, you did thermographic imaging in
 8        this home.
 9   A.   Correct.
10   Q.   And do you agree with me that -- have
11        you looked at the standard that we
12        talked about from the last trial?
13   A.   No, I have not.
14   Q.   So you don't know sitting here today
15        whether your thermographic protocols
16        comport with or violate the standard
17        for imaging in homes such as this?
18   A.   Well, that particular standard you're
19        referencing is -- is describing test
20        methods for insulation values in -- in
21        (unintelligible).  And that's not what
22        my intent was in this home.  So I never
23        in any way intended to test or identify
```

**Murphy**

Page 206

```
 1              REPORTER'S CERTIFICATE
 2
 3       STATE OF ALABAMA )
                          )
 4       ELMORE COUNTY    )
 5
 6            I do hereby certify that the above
 7       and foregoing transcript was taken down
 8       by me in stenotype, and the questions
 9       and answers thereto were transcribed by
10       means of computer-aided transcription,
11       and that the foregoing represents a true
12       and correct transcript of the testimony
13       given by said witness.
14            I further certify that I am neither
15       of counsel, nor of any relation to the
16       parties to the action, nor am I anywise
17       interested in the result of said cause.
18
19
20            Barbara A. Howell, Certified
              Court Reporter and Commissioner
21            for the State of Alabama at Large
              ACCR NO. 123 - Expires 9/30/08
22            MY COMMISSION EXPIRES:  12/27/08
23
```